1                **IN THE UNITED STATES DISTRICT COURT**
                 **FOR THE WESTERN DISTRICT OF TEXAS**
2                          **AUSTIN DIVISION**

3   UNITED STATES OF AMERICA,     )  AU:10-CR-00297(1)-LY
                                  )
4       Plaintiff,                )
                                  )
5   VS.                           )  AUSTIN, TEXAS
                                  )
6   DAVID ANDREW DIEHL,           )
                                  )
7       Defendant.                )  FEBRUARY 7, 2011

8           ***********************************************
                     TRANSCRIPT OF BENCH TRIAL
9
              BEFORE THE HONORABLE LEE YEAKEL
10
                       VOLUME 1 OF 2
11          ***********************************************

12  APPEARANCES:

13  FOR THE PLAINTIFF:          MATTHEW B. DEVLIN
                                ASSISTANT UNITED STATES ATTORNEY
14                              816 CONGRESS AVENUE, SUITE 1000
                                AUSTIN, TEXAS 78701
15
    FOR THE DEFENDANT:          STEPHEN M. ORR
16                              ORR & OLAVSON
                                804 RIO GRANDE
17                              AUSTIN, TEXAS 78701

18  COURT REPORTER:             ARLINDA RODRIGUEZ, CSR
                                200 WEST 8TH STREET
19                              AUSTIN, TEXAS 78701
                                (512) 916-5143
20

21

22

23

24  Proceedings recorded by computerized stenography, transcript

25  produced by computer.

1                           **EXAMINATION INDEX**

2

SEAN MULLEN
3         DIRECT BY MR. DEVLIN                        12
          CROSS BY MR. ORR                            43
4         REDIRECT BY MR. DEVLIN                      48
          RECROSS BY MR. ORR                          49

5

KERRY JENKINS
6         DIRECT BY MR. DEVLIN                        58
          CROSS BY MR. ORR                            72

7

KENNETH COURTNEY
8         DIRECT BY MR. DEVLIN                        87
          CROSS BY MR. ORR                           115
9         REDIRECT BY MR. DEVLIN                     145

10   N.A.D.
          DIRECT BY MR. ORR                          158
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT INDEX**

|  |  |  | OFFD / ADM |  |
|---|---|---|---|---|
| Government |  |  |  |  |
| 1 | Agreed Stipulation |  | 20 | 79 |
| 1-1 | Video 3:49 |  | 20 | 22 |
| 1-1B | Still image |  | 22 | 22 |
| 1-1C | Still image |  | 22 | 22 |
| 1-1D | Still image |  | 22 | 22 |
| 1-1E | Still image |  | 22 | 22 |
| 1-1F | Still image |  | 22 | 22 |
| 1-1G | Still image |  | 22 | 22 |
| 1-1H | Still image |  | 22 | 24 |
| 1-1I | $1 million novelty bill |  | 24 | 20 |
| 1-2 | Video 3:08 |  | 20 | 23 |
| 1-2B | Still image |  | 23 | 23 |
| 1-2C | Still image |  | 23 | 23 |
| 1-2D | Still image |  | 23 | 23 |
| 1-2E | Still image |  | 23 | 23 |
| 1-2F | Still image |  | 23 | 20 |
| 2 | Video 1:20 |  | 20 | 25 |
| 2A | Still image |  | 25 | 20 |
| 3 | Video 3:04 |  | 20 | 20 |
| 4-1 | Video clip 3:44 (1:54) |  | 20 | 20 |
| 5-1 | Video segment 6:20 |  | 20 | 20 |
| 5-2 | Video segment 9:38 |  | 20 | 20 |
| 6 | Video 0:34 |  | 20 | 20 |

```
 1                    EXHIBIT INDEX (CONTINUED)

 2                                                   OFFD  /  ADM
       Government
 3     7         Video 5:02                          20        27

 4     7A      Still image                           27        27

 5     7B      Still image                           27        27

 6     7C      Still image                           27        27

 7     7E      Still image                           27        27

 8     7G      Still image                           27        20

 9     8         Video 4:21                          20        20

10     9-1     Video 0:26                            20        28

11     9-1A    Still image                           28        28

12     9-1B    Still image                           28        20

13     9-2     Video 0:16                            20        20

14     10      Video 0:41                            20        30

15     11      Video 40:30                           30        33

16     12A     Deed records Feb 1999 purchase        33        34

17     12B     Deed records Nov 2000 sale            34        35

18     12C     Star Ranch records                    35        35

19     12C-1   Star Ranch record                     35        36

20     12D     Seton medical records - June 2000     36        37

21     12E     TCSO accident report                  37        26

22     12F     Sealed document (protected victims)   26        20

23     13      Compilation of all videos under seal  20         7

24     Defendant
       1       E-mail from David Andrew Diehl        140       140
25
```

| | | |
|---|---|---|
| 09:03:03 | 1 | (Open Court, Defendant present) |
| 09:03:03 | 2 | THE COURT:  Case calls for trial *United States v.* |
| 09:03:07 | 3 | *David Andrew Diehl*, Number A-10-CR-297-LY.  I'll hear |
| 09:03:15 | 4 | announcements first from the Government. |
| 09:03:16 | 5 | MR. DEVLIN:  Matthew Devlin for the United States, |
| 09:03:19 | 6 | Your Honor. |
| 09:03:19 | 7 | THE COURT:  Is the Government ready? |
| 09:03:20 | 8 | MR. DEVLIN:  Government is ready to proceed. |
| 09:03:22 | 9 | THE COURT:  And then for the defense? |
| 09:03:23 | 10 | MR. ORR:  Steve Orr for Mr. Diehl, Your Honor.  We're |
| 09:03:25 | 11 | ready. |
| 09:03:26 | 12 | THE COURT:  All right.  Is the defense ready. |
| 09:03:28 | 13 | MR. ORR:  Yes, sir. |
| 09:03:28 | 14 | THE COURT:  All right.  The defendant has been |
| 09:03:30 | 15 | charged in a second superseding indictment returned October the |
| 09:03:34 | 16 | 19th, 2010 by a grand jury impaneled in the Austin Division in |
| 09:03:39 | 17 | the Western District of Texas with ten counts of sexual |
| 09:03:45 | 18 | exploitation of a child and production of child pornography. |
| 09:03:53 | 19 | Does the defendant waive the reading of the |
| 09:03:55 | 20 | indictment, or does the defendant wish the indictment read? |
| 09:04:00 | 21 | THE DEFENDANT:  Waive reading of the indictment, |
| 09:04:00 | 22 | yes.  Yes, sir. |
| 09:04:01 | 23 | THE COURT:  Mr. Diehl, you're familiar with the |
| 09:04:03 | 24 | charges in the indictment? |
| 09:04:04 | 25 | THE DEFENDANT:  Yes, sir. |

| | | |
|---|---|---|
| 09:04:05 | 1 | THE COURT:  And to such charges, how do you plead? |
| 09:04:08 | 2 | THE DEFENDANT:  Not guilty. |
| 09:04:09 | 3 | THE COURT:  All right.  Very good. |
| 09:04:10 | 4 | Now, Mr. Orr, you may be seated or you may remain |
| 09:04:14 | 5 | standing.  Mr. Diehl, I have got a couple of questions I want |
| 09:04:17 | 6 | to ask you.  This case by agreement of the parties, by you and |
| 09:04:22 | 7 | the Government, is scheduled to be a bench trial which means |
| 09:04:26 | 8 | it's a trial to the Court, to me, and I will take up all |
| 09:04:32 | 9 | matters, both legal and factual, in this case and determine the |
| 09:04:36 | 10 | disputed facts in this case and apply the law to them. |
| 09:04:41 | 11 | You have previously signed a waiver of a jury trial. |
| 09:04:44 | 12 | Do you remember doing that? |
| 09:04:46 | 13 | THE DEFENDANT:  Yes, sir. |
| 09:04:46 | 14 | THE COURT:  And I previously accepted that waiver |
| 09:04:51 | 15 | after my review of it.  But at this time I want to ask you: |
| 09:04:54 | 16 | You voluntarily signed that waiver of jury trial? |
| 09:04:57 | 17 | THE DEFENDANT:  Yes, sir. |
| 09:04:58 | 18 | THE COURT:  And you do understand that you have a |
| 09:05:00 | 19 | right to have a jury hear the charges against you and |
| 09:05:03 | 20 | deliberate and determine your guilt or innocence; is that |
| 09:05:08 | 21 | correct? |
| 09:05:08 | 22 | THE DEFENDANT:  Yes, sir. |
| 09:05:09 | 23 | THE COURT:  And your lawyer has explained that to |
| 09:05:10 | 24 | you? |
| 09:05:11 | 25 | THE DEFENDANT:  Yes, sir. |

| | | |
|---|---|---|
| 09:05:11 | 1 | THE COURT:  Do you continue to desire to waive your |
| 09:05:13 | 2 | right to trial by jury? |
| 09:05:15 | 3 | THE DEFENDANT:  Yes, sir. |
| 09:05:15 | 4 | THE COURT:  And you do that freely and voluntarily? |
| 09:05:18 | 5 | THE DEFENDANT:  Yes, sir. |
| 09:05:18 | 6 | THE COURT:  And nobody has promised you anything or |
| 09:05:20 | 7 | promised you what the outcome of this case may be if you try |
| 09:05:26 | 8 | the case to the Bench instead of to the jury; is that correct? |
| 09:05:29 | 9 | THE DEFENDANT:  That's correct. |
| 09:05:30 | 10 | THE COURT:  And you do understand, then, by waiving a |
| 09:05:32 | 11 | jury, that I will make all of the decisions in this case; is |
| 09:05:36 | 12 | that correct? |
| 09:05:36 | 13 | THE DEFENDANT:  Yes, sir. |
| 09:05:37 | 14 | THE COURT:  All right.  Then the Court reaffirms the |
| 09:05:40 | 15 | acceptance of your waiver of trial by jury. |
| 09:05:43 | 16 | There further has been an agreed stipulation of facts |
| 09:05:48 | 17 | and evidence filed in this case which is signed by the attorney |
| 09:05:54 | 18 | for the Government, Mr. Devlin, and by your attorney, Mr. Orr, |
| 09:06:00 | 19 | and by you.  Are you familiar with that stipulation of facts |
| 09:06:03 | 20 | and evidence? |
| 09:06:04 | 21 | THE DEFENDANT:  Yes, sir. |
| 09:06:04 | 22 | MR. DEVLIN:  And, Judge, if I may, may I go ahead at |
| 09:06:08 | 23 | this time move to admit Government Exhibit 1, which is the |
| 09:06:10 | 24 | agreed stipulation of facts of evidence and have you cover what |
| 09:06:13 | 25 | you need to about that? |

| | | |
|---|---|---|
| 09:06:14 | 1 | THE COURT: Mr. Orr, any objection to Government's |
| 09:06:15 | 2 | Exhibit Number 1. |
| 09:06:17 | 3 | MR. ORR: No, Your Honor. But I think we need to |
| 09:06:19 | 4 | make it clear on the record that that exhibit applies only for |
| 09:06:23 | 5 | this proceeding today; that we have specifically not agreed |
| 09:06:28 | 6 | that it may be used in any other proceeding in state or federal |
| 09:06:33 | 7 | court. |
| 09:06:33 | 8 | THE COURT: The Court admits Government Exhibit |
| 09:06:35 | 9 | Number 1, which is the Agreed Stipulation of Facts and |
| 09:06:39 | 10 | Evidence, which was signed by the Government and by the |
| 09:06:44 | 11 | defendant and by the attorney for the defendant on January |
| 09:06:49 | 12 | 27th, 2011 and filed January 31st, 2011. |
| 09:06:53 | 13 | The Court has previously reviewed that agreed |
| 09:06:58 | 14 | stipulation when it was filed, and I'm familiar with the |
| 09:07:01 | 15 | statements made in there. And I do note that the parties agree |
| 09:07:05 | 16 | and stipulate that the stipulation and the facts contained in |
| 09:07:10 | 17 | the stipulation are to be used solely for purposes of this |
| 09:07:14 | 18 | trial that we have commenced this morning and for no other |
| 09:07:18 | 19 | purpose. And the Court accepts it in that vein. |
| 09:07:22 | 20 | However, Mr. Diehl, I wish to advise you that |
| 09:07:27 | 21 | although I accept it and confirm and affirm that that is my |
| 09:07:31 | 22 | understanding of the stipulation, there is always a possibility |
| 09:07:37 | 23 | that some other judge, if there are any other cases that are |
| 09:07:42 | 24 | brought, might look at that. And at that point, you and your |
| 09:07:48 | 25 | attorney may need to argue as to what you stipulated to. |

| | | |
|---|---|---|
| 09:07:54 | 1 | So although I accept this stipulation solely for the |
| 09:07:58 | 2 | purposes of this trial today, it is not a guarantee that it |
| 09:08:05 | 3 | could not be used somewhere else.  It would just be against my |
| 09:08:09 | 4 | wishes.  Do you understand that? |
| 09:08:10 | 5 | THE DEFENDANT:  Yes. |
| 09:08:11 | 6 | THE COURT:  And you would have an opportunity to |
| 09:08:14 | 7 | object to it in any later trial or any later proceeding.  Do |
| 09:08:19 | 8 | you understand that? |
| 09:08:19 | 9 | THE DEFENDANT:  Yes, sir. |
| 09:08:20 | 10 | THE COURT:  All right.  You have read the agreed |
| 09:08:22 | 11 | stipulation that you signed; is that correct? |
| 09:08:26 | 12 | THE DEFENDANT:  I'm hoping it's the latest version |
| 09:08:28 | 13 | that I read. |
| 09:08:29 | 14 | THE COURT:  Well, let's be certain.  Mr. Orr, would |
| 09:08:31 | 15 | you please take the original that I just admitted into |
| 09:08:35 | 16 | evidence, and we'll take a couple of minutes and you can read |
| 09:08:41 | 17 | it. |
| 09:08:41 | 18 | MR. ORR:  I'm pretty sure it hasn't been altered |
| 09:08:45 | 19 | anywhere in the process, but I don't suppose it hurts for him |
| 09:08:47 | 20 | to take a look at it. |
| 09:08:51 | 21 | And while he's doing that, Your Honor, we do invoke |
| 09:08:53 | 22 | the Rule. |
| 09:08:54 | 23 | THE COURT:  All right.  The Rule has been invoked. |
| 09:08:57 | 24 | Mr. Devlin, is there any -- and Mr. Orr, is there anyone |
| 09:09:01 | 25 | present here in the courtroom that you intend to use as a |

| | | |
|---|---|---|
| 09:09:04 | 1 | witness in this case? |
| 09:09:10 | 2 | MR. DEVLIN:  I do have two -- two individuals, two |
| 09:09:13 | 3 | FBI Special Agents, Sean -- I mean, excuse me -- Jake Baillie |
| 09:09:17 | 4 | and Scott Jensen, who are here and I would ask that they be |
| 09:09:20 | 5 | excused from the Rule. |
| 09:09:22 | 6 | MR. ORR:  We have no problem with that, Your Honor. |
| 09:09:24 | 7 | They're case agents. |
| 09:09:25 | 8 | THE COURT:  All right.  Then I excuse the case agent |
| 09:09:28 | 9 | from the Rule.  Is there anyone else, Mr. Devlin or Mr. Orr, |
| 09:09:31 | 10 | present in the courtroom that is not a case agent or, in your |
| 09:09:34 | 11 | case, a party who might be called upon to testify in this case? |
| 09:09:40 | 12 | MR. DEVLIN:  No, Your Honor. |
| 09:09:40 | 13 | THE COURT:  All right.  Then I instruct both of you |
| 09:09:43 | 14 | to tell anyone that you may call as a witness who is not |
| 09:09:46 | 15 | present in the courtroom at this time that the Rule has been |
| 09:09:49 | 16 | invoked; that no witnesses are to talk about this case among |
| 09:09:53 | 17 | themselves or with any other person except when they're on the |
| 09:09:57 | 18 | witness stand and testifying in this courtroom; except the |
| 09:10:00 | 19 | witnesses may discuss the case with the lawyers for either |
| 09:10:04 | 20 | side.  So do you both understand that?  Mr. Devlin? |
| 09:10:06 | 21 | MR. DEVLIN:  Yes, Your Honor. |
| 09:10:09 | 22 | THE COURT:  Mr. Orr? |
| 09:10:10 | 23 | MR. ORR:  Yes, Your Honor. |
| 09:10:10 | 24 | THE COURT:  All right. |
| 09:10:43 | 25 | MR. ORR:  Your Honor, Mr. Diehl agrees that it's the |

| | | |
|---|---|---|
| 09:10:45 | 1 | same. |
| 09:10:45 | 2 | THE COURT:  All right.  Mr. Diehl, that is the agreed |
| 09:10:47 | 3 | stip -- Government's Exhibit Number 1 is in fact the Agreed |
| 09:10:51 | 4 | Stipulation of Facts and Evidence which you signed; is that |
| 09:10:53 | 5 | correct? |
| 09:10:53 | 6 | THE DEFENDANT:  Yes, sir. |
| 09:10:54 | 7 | THE COURT:  And you're familiar with that? |
| 09:10:55 | 8 | THE DEFENDANT:  Yes, sir. |
| 09:10:56 | 9 | THE COURT:  And you reaffirm that the statements made |
| 09:11:00 | 10 | and the Agreed Stipulation of Facts and Evidence is true, and |
| 09:11:03 | 11 | the Court may proceed on the basis of the evidence that is |
| 09:11:06 | 12 | contained in that stipulation; is that correct? |
| 09:11:08 | 13 | THE DEFENDANT:  Yes, sir. |
| 09:11:10 | 14 | THE COURT:  And with regard to any witnesses who are |
| 09:11:12 | 15 | mentioned in that stipulation who might be called, you agree to |
| 09:11:17 | 16 | waive your right to confront and cross-examine those witnesses |
| 09:11:22 | 17 | and you understand what that means; is that correct? |
| 09:11:25 | 18 | MR. ORR:  Yes, Your Honor. |
| 09:11:26 | 19 | THE COURT:  All right.  Is there anything else the |
| 09:11:28 | 20 | Court -- I mean, either side desires me to go over or to do |
| 09:11:34 | 21 | before we proceed with the evidence in this case? |
| 09:11:36 | 22 | MR. DEVLIN:  No, Your Honor. |
| 09:11:37 | 23 | THE COURT:  Mr. Orr? |
| 09:11:38 | 24 | MR. ORR:  No, Your Honor. |
| 09:11:39 | 25 | THE COURT:  All right.  Government's Exhibit |

| | | |
|---|---|---|
| 09:11:40 | 1 | Number 1, having been accepted into evidence, the Court has |
| 09:11:45 | 2 | that exhibit before it as evidence.  Mr. Devlin, if you have |
| 09:11:50 | 3 | additional witnesses to call, you may call your first witness |
| 09:11:53 | 4 | at this time. |
| 09:11:53 | 5 | MR. DEVLIN:  Thank you, Your Honor.  And just for |
| 09:11:56 | 6 | formality's sake, we do waive an opening statement. |
| 09:11:58 | 7 | MR. ORR:  Yes, Your Honor. |
| 09:11:59 | 8 | MR. DEVLIN:  And we're ready to proceed. |
| 09:12:01 | 9 | THE COURT:  All right.  Both sides waive opening |
| 09:12:03 | 10 | statements. |
| 09:12:03 | 11 | MR. ORR:  Yes, Your Honor. |
| 09:12:04 | 12 | MR. DEVLIN:  Your Honor, the first witness we call is |
| 09:12:06 | 13 | Special Agent Sean Mullen. |
| 09:12:36 | 14 | **SEAN MULLEN,** |
| 09:12:36 | 15 | having been first duly sworn, testified as follows: |
| 09:12:36 | 16 | **DIRECT EXAMINATION** |
| 09:12:36 | 17 | **BY MR. DEVLIN:** |
| 09:12:36 | 18 | Q.   Agent Mullen, would you please state your name and spell |
| 09:12:39 | 19 | your last name for the record, please? |
| 09:12:41 | 20 | A.   Sean Mullen, M-u-l-l-e-n. |
| 09:12:43 | 21 | Q.   A how are you employed? |
| 09:12:44 | 22 | A.   Special agent of the FBI. |
| 09:12:46 | 23 | Q.   And how long have you been an FBI agent? |
| 09:12:49 | 24 | A.   Since November of 2003. |
| 09:12:51 | 25 | Q.   And what areas are you assigned to investigate currently? |

MULLEN - DIRECT                                              13

| | | |
|---|---|---|
| 09:12:54 | 1 | A.   Cyber crimes, which involved high-tech crimes, including |
| 09:12:58 | 2 | computer intrusion, intellectual property rights, and sexual |
| 09:13:02 | 3 | exploitation of children, to include child pornography. |
| 09:13:04 | 4 | Q.   All right.  Are you the case agent in this investigation? |
| 09:13:07 | 5 | A.   Yes, I am. |
| 09:13:08 | 6 | Q.   Okay.  Can you describe for the Court briefly how this |
| 09:13:14 | 7 | investigation began and how it went in the direction that it |
| 09:13:18 | 8 | did. |
| 09:13:18 | 9 | A.   Sure.  We received -- the FBI received some information |
| 09:13:21 | 10 | from the Maine State Police in August of 2009.  They had been |
| 09:13:25 | 11 | looking into the video series known as the "tent series," which |
| 09:13:29 | 12 | is a child pornography series. |
| 09:13:30 | 13 | Q.   And that's tent, t-e-n-t? |
| 09:13:31 | 14 | A.   T-e-n-t, tent, yes.  At the time they were able to narrow |
| 09:13:36 | 15 | the location where they believed that the videos had been shot |
| 09:13:39 | 16 | and contacted the location, which is the Star Ranch in McDade, |
| 09:13:43 | 17 | Texas in Bastrop County.  At that point they provided |
| 09:13:49 | 18 | information to us, and the agents interviewed folks out at |
| 09:13:52 | 19 | Star Ranch. |
| 09:13:54 | 20 | The victim was identified.  At that point she was |
| 09:13:56 | 21 | interviewed, and she identified the defendant and other |
| 09:14:03 | 22 | witnesses for us to interview. |
| 09:14:04 | 23 | Q.   And that was the victim who has been identified in the |
| 09:14:06 | 24 | stipulation and indictment as Jane Doe Number 1? |
| 09:14:09 | 25 | A.   That is correct. |

MULLEN – DIRECT                                              14

09:14:11  1              MR. DEVLIN:  All right.  Your Honor, may I -- I'm

09:14:16  2   sorry.

09:14:16  3   Q.   (BY MR. DEVLIN) And then from there additional videos were

09:14:18  4   discovered as well?

09:14:19  5   A.   Correct.  During the case of -- during ongoing unrelated

09:14:23  6   investigations, we identified other videos that we believe were

09:14:27  7   produced and made by the defendant.  At that point we were able

09:14:33  8   to identify the victims there -- the second victim, Jane Doe

09:14:36  9   Number 2.  And from there interviewed her, and she confirmed it

09:14:40  10  was her in the videos and that it was the defendant.

09:14:42  11             And then after that we found subsequent videos

09:14:46  12  working with the National Center of Missing & Exploited

09:14:49  13  Children that they believed also were involved in the series

09:14:51  14  known as c-baby which would include Jane Doe Number 2 and Jane

09:14:54  15  Doe Number 3.

09:14:56  16  Q.   And c-baby is spelled c-b-a-b-y?

09:14:59  17  A.   That is correct.

09:15:00  18  Q.   Okay.  The -- can you describe for the Court briefly what

09:15:04  19  a series is in terms of child pornography?

09:15:09  20  A.   Sure.  One or more visual depictions of child pornography

09:15:13  21  that contain one or more victims that either have not been

09:15:17  22  identified or have been identified.  And in law enforcement and

09:15:21  23  within conjunction with the National Center for Missing &

09:15:23  24  Exploited Children collectively put all those videos and images

09:15:29  25  together in order to help identify the location, the victim,

09:15:31  1  and/or the offender.

09:15:33  2  Q.   Okay.  And they're often commonly name as a result of

09:15:36  3  maybe a common object in the picture or maybe a common name

09:15:39  4  that's being used.  There's just some commonality to the series

09:15:43  5  that gives it its name?

09:15:45  6  A.   That is correct.

09:15:46  7         MR. DEVLIN:  Okay.  May I approach the witness,

09:15:50  8  Your Honor?

09:15:50  9         THE COURT:  You may.  And I'll let you both know you

09:15:52  10  don't need to ask to approach the witness.  If you have

09:15:54  11  business with the witness, just approach the witness.  And when

09:15:57  12  you complete your business, return to the podium.

09:16:00  13         MR. DEVLIN:  Thank you, Your Honor.

09:16:50  14  Q.   (BY MR. DEVLIN) Agent Mullen, I'm going to show you a

09:16:53  15  number of DVDs, the Digital Versatile Discs that have been

09:16:59  16  marked as follows:  Government Exhibit 1-1, do you recognize

09:17:03  17  that disc?

09:17:03  18  A.   Yes, I do.

09:17:04  19  Q.   Is that the same -- is there a video contained on that

09:17:08  20  disc that conforms to the video cited as Government Exhibit 1-1

09:17:15  21  in the stipulation?

09:17:16  22  A.   Yes.

09:17:17  23  Q.   And you have viewed this?

09:17:18  24  A.   Yes, I have.

09:17:19  25  Q.   And you viewed this exact one?

| 09:17:20 | 1 | A.    Yes, I have. |
| 09:17:21 | 2 | Q.    And it does contain the video that is described in the |
| 09:17:24 | 3 | stipulation under Government Exhibit 1-1? |
| 09:17:25 | 4 | A.    Yes, it does. |
| 09:17:26 | 5 | Q.    Okay.  Government Exhibit 1-2 is also a DVD with a video |
| 09:17:30 | 6 | on it that conforms to the video described under Government |
| 09:17:33 | 7 | Exhibit 1-2 in the stipulation? |
| 09:17:35 | 8 | A.    Yes, it does. |
| 09:17:36 | 9 | Q.    Okay.  And Government Exhibit 2 conforms to the video |
| 09:17:42 | 10 | described as Government Exhibit 2 in the stipulation? |
| 09:17:45 | 11 | A.    Yes, it does. |
| 09:17:53 | 12 | Q.    Government Exhibit 3, that also contains a video that |
| 09:17:56 | 13 | conforms to the video described as Government Exhibit 3 in the |
| 09:17:59 | 14 | stipulation? |
| 09:17:59 | 15 | A.    Yes, it does. |
| 09:18:00 | 16 | Q.    Okay.  Government Exhibit 4-1, does that conform -- does |
| 09:18:06 | 17 | that contain a video that conforms to the video described as |
| 09:18:10 | 18 | Government Exhibit 4-1 in the stipulation? |
| 09:18:14 | 19 | A.    Yes, it does. |
| 09:18:15 | 20 | Q.    And Government Exhibit 5-1 does that conform to the video |
| 09:18:18 | 21 | described as Government Exhibit 5-1? |
| 09:18:21 | 22 | A.    Yes. |
| 09:18:21 | 23 | Q.    Okay.  Let me just go back to 4-1 for a moment.  There |
| 09:18:52 | 24 | is -- when you were reviewing 4-1, it's stated that that was -- |
| 09:18:55 | 25 | in the stipulation that was approximately 3 minutes and 44 |

09:18:58  1   seconds.  And it turned out when it was converted to DVD that

09:19:02  2   it was about 1 minute and 54 seconds; is that correct?

09:19:06  3   A.   That is correct.

09:19:06  4   Q.   Okay.  It is still the same video that is described there;

09:19:10  5   is that right?

09:19:11  6   A.   Yes, it is.

09:19:11  7   Q.   Was there some sort of I guess problem with the video

09:19:14  8   formatting on that particular one that made it shorter than it

09:19:17  9   was originally described?

09:19:19  10  A.   Yes.  The original player showed it as being 3 minutes --

09:19:24  11  approximately 3 minutes and 44 seconds in length.  And when

09:19:27  12  converted, it shrunk it down to actual video time of a minute

09:19:31  13  and 54 seconds.

09:19:32  14  Q.   Okay.  This was a video that you'd obtained from

09:19:35  15  elsewhere.  It was just simply in kind of a -- I guess a

09:19:39  16  problematic format, if you will.  It would skip occasionally

09:19:42  17  and what have you; is that right?

09:19:43  18  A.   That's correct.

09:19:44  19  Q.   So it would show one time on Windows Media Player.  And

09:19:48  20  then when converted to DVD, it showed another time; is that

09:19:50  21  correct?

09:19:50  22  A.   That's correct.

09:19:50  23  Q.   But you have watched it in full, and it is the same video

09:19:52  24  described as Government's Exhibit 4-1 in the stipulation?

09:19:55  25  A.   Yes, it is.

09:19:56  1   Q.   Okay.  I think we've gone over Government Exhibit 5-1.

09:20:04  2   That's the same one as described as Government Exhibit 5-1 in

09:20:05  3   the stipulation?

09:20:05  4   A.   Yes.

09:20:06  5   Q.   Government Exhibit 5-2, is that a video that conforms to

09:20:12  6   the description as Government Exhibit 5-2 in the stipulation?

09:20:17  7   A.   Yes.

09:20:17  8   Q.   Government Exhibit 6, is that a video that conforms --

09:20:24  9           THE COURT:  Just a minute, Mr. Devlin.  I'm looking

09:20:27  10  at -- never mind.  I've got it now.

09:20:29  11          MR. DEVLIN:  Okay.

09:20:29  12  Q.   (BY MR. DEVLIN) Government Exhibit 6, does that contain a

09:20:33  13  video that conforms to the description under Government --

09:20:36  14  Government Exhibit 6 in the stipulation?

09:20:39  15  A.   Yes.

09:20:39  16  Q.   Government Exhibit 7, is that a -- does that contain a

09:20:46  17  video that conforms to the description under Government

09:20:48  18  Exhibit 7 in the stipulation?

09:20:50  19  A.   Yes.

09:20:50  20  Q.   Government Exhibit 8, is that a DVD containing a video

09:20:57  21  that conforms to the description under Government Exhibit 8 in

09:21:00  22  the stipulation?

09:21:01  23  A.   Yes.

09:21:01  24  Q.   Government Exhibit 9-1 and 9-2, I'll give you those

09:21:08  25  together.  Do those contain videos that conform to the

09:21:11   1   descriptions of Government's Exhibits 9-1 and 9-2 respectively

09:21:16   2   in the stipulation?

09:21:17   3   A.   Yes, they do.

09:21:18   4   Q.   And Government Exhibit 10, does that contain a video that

09:21:23   5   conforms to the video described under Government Exhibit 10 in

09:21:26   6   the stipulation?

09:21:27   7   A.   Yes, it does.

09:21:28   8   Q.   Okay.  And these are all the same videos that are charged

09:21:34   9   under the respective counts:  Counts 1, 2, 3 through 10 in the

09:21:39   10  indictment; is that correct?

09:21:40   11  A.   That's correct.

09:21:41   12  Q.   There's one -- Count 4 of the indictment contains a

09:21:44   13  description of two videos.  Only one of those videos are

09:21:48   14  contained here; is that correct?

09:21:49   15  A.   That is correct.

09:21:50   16  Q.   All right.  And, finally, I'm going to show you Government

09:21:59   17  Exhibit 13.  Is this a compilation basically for the Court's

09:22:03   18  convenience of all the videos, with the exception of Government

09:22:06   19  Exhibit 7?

09:22:07   20  A.   Yes, it is.

09:22:08   21  Q.   Okay.  And Government Exhibit 7 just simply would not copy

09:22:11   22  onto this disc and needs to be viewed separately; is that

09:22:14   23  correct?

09:22:14   24  A.   That is correct.

09:22:16   25          MR. DEVLIN:  Okay.  Your Honor, at this time I would

| | | |
|---|---|---|
| 09:22:17 | 1 | move admit Government's Exhibits 1-1, 1-2, 2, 3, 4-1, 5-1, 5-2, |
| 09:22:35 | 2 | 6, 7, 8, 9-1, 9-2, and 10.  And, as well, Government Exhibit |
| 09:22:45 | 3 | 13, which is just simply a compilation copy for the Court's |
| 09:22:50 | 4 | viewing convenience of the aforementioned exhibits, minus |
| 09:22:55 | 5 | Government Exhibit 7. |
| 09:22:56 | 6 | THE COURT:  Mr. Orr? |
| 09:22:57 | 7 | MR. ORR:  Your Honor, as long as the compilation is |
| 09:22:59 | 8 | nothing other than just an identical reproduction and |
| 09:23:05 | 9 | Mr. Devlin informed that it is of the other exhibits, we have |
| 09:23:09 | 10 | no objection. |
| 09:23:09 | 11 | THE COURT:  All right.  Government's Exhibits, 1-1, |
| 09:23:14 | 12 | 1-2, 2, 3, 4-1, 5-1, 5-2, 6, 7, 8, 9-1, 9-2, 10, and 13 are |
| 09:23:28 | 13 | admitted. |
| 09:23:38 | 14 | MR. DEVLIN:  And, judge, as I mentioned, 13 contains |
| 09:23:41 | 15 | everything but Government's Exhibit 7.  Government's Exhibit 7 |
| 09:23:44 | 16 | will have to be viewed separately, but it is not very long. |
| 09:23:47 | 17 | And if we may, Judge, I know you wanted to view the exhibits. |
| 09:23:50 | 18 | I do have some more questions for Agent Mullen.  Would you like |
| 09:23:53 | 19 | to reserve that to the end of his testimony or do you want to |
| 09:23:55 | 20 | view them now? |
| 09:23:56 | 21 | THE COURT:  Well, go ahead and ask your questions |
| 09:23:58 | 22 | now.  And if it becomes necessary during the course of your |
| 09:24:01 | 23 | questions for me to view the exhibits before you finish |
| 09:24:05 | 24 | questioning, I'll interrupt.  Otherwise, I'll hear the |
| 09:24:08 | 25 | questions and then view the exhibits. |

MULLEN – DIRECT

| | | |
|---|---|---|
| 09:24:09 | 1 | MR. DEVLIN:  Very well.  Judge, while Mr. Orr is |
| 09:24:46 | 2 | looking at some other exhibits I'd given him, I would also ask |
| 09:24:49 | 3 | that the exhibits that you just admitted -- and I'll name them |
| 09:24:53 | 4 | again -- 1-1, 1-2, 2, 3, 4-1, 5-1, 5-2, 6, 7, 8, 9-1, 9-2, 10, |
| 09:25:04 | 5 | and 13 all be admitted under seal because they all contain |
| 09:25:08 | 6 | child pornography. |
| 09:25:09 | 7 | THE COURT:  Mr. Orr? |
| 09:25:10 | 8 | MR. ORR:  We don't object admitting them under seal. |
| 09:25:13 | 9 | We don't agree that they necessarily contain child |
| 09:25:17 | 10 | pornography.  But it's fine. |
| 09:25:18 | 11 | THE COURT:  All right.  The Court rules that |
| 09:25:20 | 12 | Government's Exhibits 1-1, 1-2, 2, 3, 4-1, 5-1, 5-2, 6, 7, 8, |
| 09:25:28 | 13 | 9-1, 9-2, 10, and 13 are admitted under seal and not to be |
| 09:25:36 | 14 | viewed by anyone without order of this Court. |
| 09:25:39 | 15 | After the Court reviews the exhibits and reaches its |
| 09:25:45 | 16 | decision in this case, if the Court finds that the exhibits do |
| 09:25:49 | 17 | not in fact contain child pornography, the Court will |
| 09:25:53 | 18 | reconsider its previous order. |
| 09:25:55 | 19 | MR. DEVLIN:  Thank you, Your Honor. |
| 09:26:28 | 20 | (Soto voce discussion between Counsel) |
| 09:26:31 | 21 | Q.   (BY MR. DEVLIN) Agent Mullen, I'm going to show you a |
| 09:26:36 | 22 | series of photographs marked Government's Exhibits 1-1B, 1-1C, |
| 09:26:47 | 23 | 1-1D, 1-1E, 1-1F, 1-1G and 1-1H.  I want you to tell me if -- |
| 09:26:58 | 24 | take a look at those and tell me if you recognize those? |
| 09:27:18 | 25 | A.   Yes.  I recognize all of them. |

09:27:20  1   Q.   And do they depict -- do they depict the victim known as

09:27:25  2   Jane Doe Number 1, which is seen in Government Exhibit 1-1 and

09:27:29  3   1-2?

09:27:30  4   A.   Yes, they do.

09:27:31  5   Q.   And those are true and accurate still images taken from

09:27:34  6   those videos?

09:27:35  7   A.   Yes, they are.

09:27:36  8   Q.   Now, some of them have been redacted; is that correct, so

09:27:39  9   that they are not pornographic?

09:27:41  10  A.   That is correct.

09:27:42  11  Q.   Nevertheless, they do show Jane Doe Number 1 as she

09:27:46  12  appeared in those videos at that time; is that correct?

09:27:49  13  A.   That is correct.

09:27:50  14          MR. DEVLIN:  Your Honor, I would move admit

09:27:52  15  Government's Exhibits 1-B, 1-C, 1-D, 1-E, 1-F, 1-G, and 1-H.

09:28:02  16  And I would further move to admit them under seal because they

09:28:07  17  depict a protected victim in this case.

09:28:10  18          MR. ORR:  We have no objection, Your Honor.

09:28:12  19          THE COURT:  All right, Government's Exhibit 1-1B,

09:28:16  20  1-1C, 1-1D, 1-1E, 1-1F, 1-1G, 1-1H are admitted, and those

09:28:25  21  exhibits are admitted under seal on the basis that they depict

09:28:30  22  images of a protected victim.

09:28:34  23  Q.   (BY MR. DEVLIN) I'm going to go ahead and show you what's

09:28:37  24  been marked as Government Exhibits 1-2B, 1-2C, 1-2D, 1-2E, and

09:28:46  25  1-2F, and tell me if you recognize those?

| 09:28:57 | 1 | THE COURT:  It was 1-2B through what? |
| 09:28:59 | 2 | MR. DEVLIN:  1-2B through F. |
| 09:29:07 | 3 | A.   Yes.  I do recognize those. |
| 09:29:09 | 4 | Q.   And those -- are those still images depicting the victim |
| 09:29:13 | 5 | known as Jane Doe Number 1? |
| 09:29:14 | 6 | A.   Yes, they do. |
| 09:29:15 | 7 | Q.   And these are still images taken from -- the video |
| 09:29:18 | 8 | Government Exhibit 1-2; is that correct? |
| 09:29:19 | 9 | A.   That is correct. |
| 09:29:20 | 10 | Q.   And do these accurately portray her as she appeared in |
| 09:29:23 | 11 | that video? |
| 09:29:24 | 12 | A.   Yes, they do. |
| 09:29:25 | 13 | MR. DEVLIN:  Okay.  Your Honor, I'd move to admit |
| 09:29:26 | 14 | Government's Exhibits 1-2B through F into evidence and would |
| 09:29:29 | 15 | further move to admit them under seal because they depict a |
| 09:29:32 | 16 | protected victim in this case. |
| 09:29:34 | 17 | MR. ORR:  We have no objection to the admission or to |
| 09:29:36 | 18 | their being sealed, Your Honor. |
| 09:29:37 | 19 | THE COURT:  Government's Exhibit 1-2B, 1-2C, 1-2D, |
| 09:29:44 | 20 | 1-2E, and 1-2F are admitted, and they are admitted under seal |
| 09:29:50 | 21 | because they contain images of a protected victim. |
| 09:29:55 | 22 | Q.   (BY MR. DEVLIN) And I'm going to show you what's been |
| 09:29:56 | 23 | marked as 1-1I.  Can you -- can you identify that for us. |
| 09:30:01 | 24 | A.   Yes.  It is a -- it looks to be a copy of a bill that is |
| 09:30:06 | 25 | seen in one of the videos in count 1 of the indictment. |

09:30:09   1   Q.   And this is basically a $1 million novelty bill that is

09:30:13   2   seen in Government Exhibit 1-1; is that correct?

09:30:15   3   A.   That is correct.

09:30:16   4   Q.   And this is a much clearer and larger version of that

09:30:20   5   $1 million bill; is that correct?

09:30:21   6   A.   Yes, it is.

09:30:23   7              MR. DEVLIN:   All right.   I'll go ahead and move to

09:30:24   8   admit Government Exhibit 1-1I, Your Honor.

09:30:28   9              MR. ORR:   No objection to admission or to sealing,

09:30:30   10   Your Honor.

09:30:31   11              MR. DEVLIN:   It doesn't need to be sealed,

09:30:33   12   Your Honor.

09:30:33   13              THE COURT:   Mr. Orr?

09:30:35   14              MR. ORR:   No.   That's fine.   I misunderstood.

09:30:37   15              THE COURT:   Government's Exhibit 1-1I is admitted.

09:31:51   16   Q.   (BY MR. DEVLIN) Agent Mullen, I'm showing you what has

09:31:54   17   been marked as Government's Exhibit 2A.   Do you recognize that

09:31:57   18   document?

09:31:57   19   A.   Yes, I do.

09:31:58   20   Q.   Or photograph, I should say.   Is that a still image that

09:32:02   21   is taken from the video marked as Government Exhibit 2?

09:32:04   22   A.   Yes, it is.

09:32:05   23   Q.   And is that a still photo -- a still image, I should say,

09:32:08   24   of the victim known as Jane Doe Number 2?

09:32:10   25   A.   Yes, it is?

MULLEN – DIRECT

```
09:32:11   1   Q.   And is that an accurate still image from the video?
09:32:14   2   A.   Yes, it is.
09:32:15   3            MR. DEVLIN:  Judge, I would move to admit Government
09:32:16   4   Exhibit 2A into evidence and would move to admit it under seal
09:32:20   5   because it depicts a protected victim.
09:32:22   6            MR. ORR:  No objection, Your Honor.
09:32:23   7            THE COURT:  Government's Exhibit 2A is admitted.  It
09:32:26   8   is admitted under seal because it contains the image of a
09:32:29   9   protected victim.
09:32:49  10   Q.   (BY MR. DEVLIN) Agent Mullen, since we've been talking
09:32:51  11   about protected victims, I want to show you a document that's
09:32:54  12   marked as Government's Exhibit 12F.  Can you tell me what that
09:32:57  13   document is?
09:32:57  14   A.   Yes.  It's a list of the true identities of the protected
09:33:01  15   victims and the associated Jane Doe that are referenced to
09:33:05  16   that.
09:33:05  17   Q.   So it list Jane Doe Number 1, Jane Doe Number 2 and
09:33:08  18   Jane Doe Number 3, who are cited in the indictment as well as
09:33:11  19   in the agreed stipulation?
09:33:12  20   A.   Yes, it does.
09:33:12  21   Q.   And it shows their true name?
09:33:14  22   A.   Yes, it does.
09:33:15  23   Q.   As well as the relationship in this case to the defendant;
09:33:19  24   is that correct?
09:33:20  25   A.   That is correct.
```

09:33:20   1   Q.   Is the information in that document true and accurate?

09:33:24   2   A.   Yes, it is.

09:33:26   3            MR. DEVLIN:  Okay.  Your Honor, at this time I move

09:33:27   4   to admit Government Exhibit 12F into evidence and would move to

09:33:32   5   admit it under seal since it does refer to protected victims.

09:33:38   6            MR. ORR:  No objection, Your Honor.

09:33:39   7            THE COURT:  Government's Exhibit 12F is admitted.  It

09:33:41   8   is admitted under seal, as it contains the identity and other

09:33:45   9   information concerning protected victims.

09:35:50  10   Q.   (BY MR. DEVLIN) Agent Mullen, I am handing you a series of

09:35:56  11   photographs.  The first ones are marked Government's Exhibits

09:36:02  12   7A, 7B, 7C, 7E, 7G, and 9-1A and 9-1B.

09:36:18  13            First on the Government's exhibits marked with the --

09:36:21  14   in the series seven, can you take a look at those and tell me

09:36:24  15   if you recognize those.

09:36:33  16            THE COURT:  Did that go through 7G, did you say?

09:36:35  17            MR. DEVLIN:  Yes, Your Honor.  There was a couple of

09:36:38  18   letters that aren't there.

09:36:39  19            THE COURT:  That's all right.  I just wanted to make

09:36:42  20   sure.

09:36:42  21            MR. DEVLIN:  Yes.  The last one is 7G.

09:36:45  22            THE COURT:  And what were the two after that?

09:36:47  23            MR. DEVLIN:  9-1A and 9-1B.

09:36:50  24            THE COURT:  Thank you.

09:36:56  25   Q.   (BY MR. DEVLIN) Agent Mullen, do you recognize these

09:36:59  1  photographs?

09:36:59  2  A.    Yes, I do.

09:37:00  3  Q.    And that one with the number 7 in them refer -- are they

09:37:03  4  still images of the videos depicted in Government Exhibit 7?

09:37:06  5  A.    Yes, they are.

09:37:08  6  Q.    And are they still images of the victim known as

09:37:11  7  Jane Doe Number 3?

09:37:12  8  A.    Yes, they are.

09:37:14  9  Q.    And these are true and accurate still images taken from

09:37:17  10 those videos?

09:37:18  11 A.    Yes, they are.

09:37:20  12         MR. DEVLIN:  I would move to admit, Judge, 7A, B, C,

09:37:22  13 E, and G into evidence, and would move to admit them under seal

09:37:26  14 since they depict protected victim.

09:37:29  15         MR. ORR:  No objection.

09:37:30  16         THE COURT:  All right.  7A -- run through the

09:37:33  17 exhibits.

09:37:33  18         MR. DEVLIN:  Yes, sir.  7A, B, C, E as in echo, and G

09:37:39  19 as in golf.

09:37:42  20         THE COURT:  All right.  Government's Exhibit 7A, B,

09:37:45  21 C, E, and G are admitted, and they're admitted under seal

09:37:50  22 because they contain images of a protected victim.

09:37:54  23 Q.    (BY MR. DEVLIN) And do you recognize the photos marked as

09:37:59  24 Government's Exhibits 9-1A and B.

09:38:02  25 A.    Yes, I do.

MULLEN - DIRECT                                                   28

09:38:03   1   Q.   And are those still images taken from the video marked as

09:38:07   2   Government Exhibit 9-1?

09:38:08   3   A.   Yes, they are.

09:38:09   4   Q.   And are they -- do they both depict still images of the

09:38:12   5   victim known as Jane Doe Number 3?

09:38:15   6   A.   Yes.

09:38:15   7   Q.   And these are true and accurate still images taken from

09:38:19   8   those videos?

09:38:20   9   A.   Yes, they are.

09:38:21  10        MR. DEVLIN:  Your Honor, I move to admit Government's

09:38:22  11   Exhibits 9-1A and B, and further move to admit them under seal

09:38:30  12   since they depict a protected victim.

09:38:42  13        MR. ORR:  No objection.

09:38:43  14        THE COURT:  Government's Exhibits 9-1A and 9-1B are

09:38:47  15   admitted, and they are admitted under seal because they contain

09:38:52  16   information and images regarding a protected victim.

09:39:02  17   Q.   (BY MR. DEVLIN) Agent Mullen, I'm showing you what has

09:39:32  18   been marked as Government Exhibit 11.  Is there a video on that

09:39:36  19   DVD that you're familiar with?

09:39:40  20   A.   Yes.

09:39:40  21   Q.   And is it basically described as a home video that was

09:39:44  22   provided to you by Kerry Jenkins, the defendant's ex-wife?

09:39:48  23   A.   Yes, it is.

09:39:49  24   Q.   And there was a -- the portion of that video is about

09:39:52  25   40 minutes.  It was part of a longer video that was about --

09:39:56  1  well, just a little over an hour long that essentially depicted

09:39:59  2  some home movies; is that correct?

09:40:01  3  A.   That's correct.

09:40:01  4  Q.   The first 22 minutes or so which are not on there depicted

09:40:04  5  a wedding that was subsequent to the divorce of Mr. Diehl and

09:40:11  6  Ms. Jenkins; is that right?

09:40:13  7  A.   Yes, it is.

09:40:14  8  Q.   And that is not on this video; is that correct?

09:40:17  9  A.   That's correct.

09:40:17  10  Q.   The last 40 minutes or so of that home video are on here;

09:40:21  11  is that right?

09:40:22  12  A.   That is right.

09:40:23  13  Q.   And that depicts Jane Doe Number 2; is that correct?

09:40:26  14  A.   That's correct.

09:40:26  15  Q.   And there's just various -- I guess it cuts in and out as

09:40:28  16  the video was recorded; is that correct?

09:40:31  17  A.   That's correct.

09:40:32  18  Q.   And that was taken by the defendant, Mr. Diehl?

09:40:35  19  A.   Yes, it was.

09:40:36  20  Q.   At or near the time of the other videos involving

09:40:39  21  Jane Doe Number 2?

09:40:40  22  A.   Yes, it was.

09:40:41  23  Q.   This does not contain child pornography, however, per se;

09:40:45  24  is that correct?

09:40:46  25  A.   That's correct.

MULLEN – DIRECT                                                    30

09:40:46   1   Q.   It does show -- it does show Jane Doe Number 2, perhaps in
09:40:50   2   a state of undress but not nude; is that correct?
09:40:53   3   A.   That's correct.
09:40:54   4          MR. DEVLIN:  Your Honor, at this time I move to admit
09:40:56   5   Government Exhibit 11 into evidence.
09:40:59   6          MR. ORR:  No objection, Your Honor.
09:41:00   7          THE COURT:  Government Exhibit Number 11 is admitted.
09:41:03   8          MR. DEVLIN:  And, Judge, I would further move to
09:41:05   9   admit it under seal since it does depict one of the protected
09:41:09  10   victims; namely, Jane Doe Number 2.
09:41:13  11          THE COURT:  Mr. Orr?
09:41:13  12          MR. ORR:  Oh.  No objection.
09:41:15  13          THE COURT:  The exhibit, Government's Exhibit
09:41:18  14   Number 11, is admitted under seal, as it contains images of a
09:41:23  15   protected victim.
09:41:43  16   Q.   (BY MR. DEVLIN) Agent Mullen, you have obviously seen the
09:41:46  17   video contained in Government's Exhibit 11, the home video; is
09:41:50  18   that correct?
09:41:50  19   A.   That's correct.
09:41:51  20   Q.   Can you briefly give -- the Court will see it, but can you
09:41:54  21   briefly give the Court an overview of what is on that video
09:41:57  22   that is of significance today?
09:41:59  23   A.   Yes.  Towards the end of the video, I guess about halfway
09:42:03  24   through it, there is a portion that appears to be a
09:42:06  25   video recording of a camera -- where the camera is hidden in

| | | |
|---|---|---|
| 09:42:10 | 1 | the bedroom and focused on a closet area in that bedroom. |
| 09:42:15 | 2 | Q.   And what happens later? |
| 09:42:16 | 3 | A.   During that portion of the video, at one point the face of |
| 09:42:20 | 4 | the defendant is seen leaning over and looking into the |
| 09:42:23 | 5 | camera.  And then later after that, Jane Doe Number 2 and |
| 09:42:28 | 6 | another female enter the room and eventually undress partially |
| 09:42:32 | 7 | and play around.  And then they play and kick the bed and |
| 09:42:36 | 8 | something falls over the camera and you just hear audio. |
| 09:42:39 | 9 | Q.   Okay.  They're playing in the room, just the two of them |
| 09:42:42 | 10 | alone; is that correct? |
| 09:42:43 | 11 | A.   That's correct. |
| 09:42:43 | 12 | Q.   At least as far as you can tell? |
| 09:42:45 | 13 | A.   That's what it appears to be, yes. |
| 09:42:48 | 14 | Q.   And the video is hidden apparently under some sort of |
| 09:42:50 | 15 | sheet or other covering? |
| 09:42:51 | 16 | A.   Yes. |
| 09:42:52 | 17 | Q.   And you said at some point that the covering is knocked |
| 09:42:55 | 18 | loose and -- and it covers the -- the lens portion of the |
| 09:43:00 | 19 | camera? |
| 09:43:00 | 20 | A.   That's correct. |
| 09:43:01 | 21 | Q.   But there's still some audio after that? |
| 09:43:03 | 22 | A.   Yes, there is. |
| 09:43:04 | 23 | Q.   And it basically shows girls playing; is that correct? |
| 09:43:07 | 24 | A.   That's correct. |
| 09:43:08 | 25 | Q.   So they were just kind of dressing and undressing, just |

MULLEN – DIRECT

| | | |
|---|---|---|
| 09:43:11 | 1 | kind of normal play, almost, if you will; it that right? |
| 09:43:15 | 2 | A.   Yes. |
| 09:43:15 | 3 | Q.   But at the beginning of that portion of the video, there |
| 09:43:18 | 4 | was nobody in that room other than the defendant; is that |
| 09:43:21 | 5 | right? |
| 09:43:21 | 6 | A.   That's correct. |
| 09:43:22 | 7 | Q.   Okay.  And the beginning part of that video, is it fair to |
| 09:43:26 | 8 | say that it has a lot of images of Jane Doe Number 2 just |
| 09:43:30 | 9 | around the defendant's former residence in Austin? |
| 09:43:32 | 10 | A.   Yes. |
| 09:43:33 | 11 | Q.   Okay.  She's dressed, and it's just basically home movies? |
| 09:43:38 | 12 | A.   That's correct. |
| 09:43:39 | 13 | Q.   Okay. |
| 09:44:14 | 14 |         MR. DEVLIN:  Judge, I am going to move -- |
| 09:44:17 | 15 |         Excuse me.  Strike that. |
| 09:44:18 | 16 | Q.   (BY MR. DEVLIN) Agent Mullen, I'm showing you what's been |
| 09:44:21 | 17 | marked as Government's Exhibit 12A and 12B.  Do you recognize |
| 09:44:24 | 18 | Government's Exhibit 12A. |
| 09:44:26 | 19 | A.   Yes, I do. |
| 09:44:26 | 20 | Q.   What is that? |
| 09:44:27 | 21 | A.   It is a deed of trust for the defendant's previous |
| 09:44:35 | 22 | residence in Austin. |
| 09:44:37 | 23 | Q.   Okay.  And that is a residence on Hazelhurst Drive here in |
| 09:44:41 | 24 | Austin? |
| 09:44:41 | 25 | A.   That is correct. |

```
09:44:42   1   Q.   And this is a certified copy from the Williamson County
09:44:48   2   Clerk's Office; is that correct?
09:44:49   3   A.   That's correct.
09:44:50   4   Q.   All right.  And it purports to show the purchase of that
09:44:53   5   residence by Defendant Diehl and his then wife Kerry Diehl; is
09:44:58   6   that correct?
09:44:59   7   A.   That's correct.
09:45:00   8   Q.   Also known as Kerry Jenkins?
09:45:02   9   A.   Yes.
09:45:02  10   Q.   All right.
09:45:03  11           MR. DEVLIN:  And, judge, I move to admit Government's
09:45:05  12   Exhibit 12A.
09:45:06  13           MR. ORR:  No objection, Your Honor.  And that does
09:45:08  14   not need to be sealed, Judge.
09:45:10  15           THE COURT:  Government's Exhibit 12A is admitted.
09:45:13  16   Q.   (BY MR. DEVLIN) And Government's Exhibit 12B, do you
09:45:14  17   recognize that?
09:45:15  18   A.   Yes, I do.
09:45:16  19   Q.   And what is that?
09:45:16  20   A.   It's a certified copy from the Williamson County Clerk's
09:45:19  21   Office of a General Warranty Deed for the residence --
09:45:22  22   Defendant's residence on Hazelhurst in Austin, Texas, where
09:45:27  23   they -- the sale of their property in November of 2000.
09:45:30  24   Q.   Okay.
09:45:31  25           MR. DEVLIN:  Your Honor, I move to admit Government's
```

MULLEN – DIRECT

| | | |
|---|---|---|
| 09:45:33 | 1 | Exhibit 12B. |
| 09:45:34 | 2 | MR. ORR:  No objection, Your Honor. |
| 09:45:35 | 3 | THE COURT:  Government's Exhibit 12B is admitted. |
| 09:46:24 | 4 | Q.  (BY MR. DEVLIN) I'm showing you what's been -- Agent |
| 09:46:27 | 5 | Mullen, I'm showing you what's been marked as Government's |
| 09:46:30 | 6 | Exhibit 12C.  Do you recognize that packet of documents? |
| 09:46:35 | 7 | A.   Yes, I do. |
| 09:46:39 | 8 | Q.   And what does that exhibit purport to show? |
| 09:46:43 | 9 | A.   It is a registration form for an event called the |
| 09:46:48 | 10 | SS Star Ranch dated June 18th through June 24th, 2000, where |
| 09:46:53 | 11 | David and Kerry Diehl have signed and attended it for |
| 09:46:57 | 12 | approximately two days. |
| 09:46:59 | 13 | Q.   Okay. |
| 09:47:00 | 14 | A.   And then the receipts -- various receipts and canceled |
| 09:47:04 | 15 | checks from Mr. Diehl while at the Star Ranch. |
| 09:47:09 | 16 | Q.   During the period June 18th through June 24th, 2000? |
| 09:47:18 | 17 | A.   Yes.  Except for one check that is dated June 25th, 2000. |
| 09:47:22 | 18 | Q.   Okay.  Just one day after that? |
| 09:47:24 | 19 | A.   Yes. |
| 09:47:24 | 20 | Q.   These are copies of originals that you have? |
| 09:47:26 | 21 | A.   That's correct. |
| 09:47:27 | 22 | Q.   And the copy is a fair and accurate depiction of the |
| 09:47:30 | 23 | originals of those; is that correct? |
| 09:47:32 | 24 | A.   That's correct. |
| 09:47:33 | 25 | MR. DEVLIN:  Your Honor, I move to admit Government's |

09:47:34   1   Exhibit 12C.

09:47:35   2            MR. ORR:  No objection, Your Honor.

09:47:36   3            THE COURT:  Government's Exhibit 12C is admitted.

09:47:39   4   Q.   (BY MR. DEVLIN) I'm also going to show you Government's

09:47:41   5   Exhibit 12C-1.  Do you recognize that?

09:47:44   6   A.   Yes, I do.

09:47:45   7   Q.   And what is that?

09:47:46   8   A.   Two receipts for food items, a receipt from Star Ranch,

09:47:52   9   both dated June 24th, 2000.  One with Kerry Diehl's name on it;

09:47:59  10   the other with David Diehl and Jane Doe Number 1, first name.

09:48:02  11   Q.   Okay.  The first name of Jane Doe Number 1 is on one of

09:48:05  12   the receipts pertaining to David Diehl?

09:48:08  13   A.   That's correct.

09:48:09  14   Q.   And were those also part of the Star Ranch records that

09:48:11  15   you obtained from the Star Ranch?

09:48:13  16   A.   Yes, they are.

09:48:14  17   Q.   These are copies of the originals?

09:48:15  18   A.   Yes, they are.

09:48:16  19   Q.   Are these true and accurate copies?

09:48:16  20   A.   Yes, they are.

09:48:16  21            MR. DEVLIN:  Your Honor, I move to admit Government's

09:48:17  22   Exhibit 12C-1 and would move to admit it under seal because of

09:48:22  23   the reference to the protected victim Jane Doe Number 1.

09:48:26  24            MR. ORR:  No objection, Your Honor.

09:48:26  25            THE COURT:  Government's Exhibit 12C-1 is admitted.

09:48:29   1   It is admitted under seal because of the reference to the

09:48:32   2   protected victim.

09:48:34   3   Q.   (BY MR. DEVLIN) I'm showing you what's been marked as

09:48:36   4   Government Exhibit 12D.  Do you recognize that document?

09:48:58   5   A.   Yes, I do.

09:48:58   6   Q.   And what is that?

09:48:59   7   A.   It is a certified copy from the Seton Northwest Hospital

09:49:04   8   of medical records pertaining to Mr. Diehl's visit to the

09:49:08   9   emergency room at Seton Northwest Hospital on June 13th, 2000.

09:49:12  10   Q.   Okay.  And you said these are certified by Seton; is that

09:49:17  11   correct?

09:49:17  12   A.   That's correct.

09:49:18  13   Q.   Certified business records?

09:49:20  14   A.   That's correct.

09:49:21  15   Q.   And they completed an affidavit to that effect on these

09:49:23  16   records?

09:49:23  17   A.   Yes, they did.

09:49:25  18   Q.   And these are true and accurate copies -- the affidavit is

09:49:27  19   the original affidavit, and the medical records themselves are

09:49:30  20   copies that were provided by Seton; is that correct?

09:49:33  21   A.   That's correct.

09:49:34  22           MR. DEVLIN:  Your Honor, I move to admit

09:49:35  23   Government's Exhibit 12D.

09:49:37  24           MR. ORR:  No objection, Your Honor.

09:49:38  25           THE COURT:  Government's Exhibit 12D is admitted.

09:49:41  1  Q.   (BY MR. DEVLIN) And, finally, Government's Exhibit 12E, do

09:49:43  2  you recognize that?

09:49:44  3  A.   Yes, I do.

09:49:45  4  Q.   And what is that?

09:49:46  5  A.   That is a copy of a Travis County incident report

09:49:50  6  detailing a motorcycle accident dated June 13th, 2000 that

09:49:56  7  Mr. Diehl had -- was involved in.

09:49:58  8  Q.   All right.  And that essentially relates the motorcycle

09:50:03  9  accident referenced in the Government Exhibit 12D medical

09:50:05  10  record?

09:50:06  11  A.   Yes, it does.

09:50:07  12       MR. DEVLIN:  I move to admit Government's Exhibit

09:50:09  13  12E, Judge?

09:50:10  14       MR. ORR:  No objection, Your Honor.

09:50:11  15       THE COURT:  Government's Exhibit 12E is admitted.

09:50:15  16  Q.   (BY MR. DEVLIN) Agent Mullen, the medical records and the

09:50:18  17  motorcycle accident that occurred on June 13th, 2000 involving

09:50:21  18  Mr. Diehl, what is the relevance of that to this case?

09:50:25  19  A.   The relevance of that is injuries sustained by Mr. Diehl

09:50:29  20  from that accident that were depicted in the videos in count 1

09:50:33  21  of the indictment where it shows abrasions to his left hand.

09:50:38  22  Q.   Okay.  So Government's Exhibits 1-1 and 1-2 show his hand,

09:50:44  23  and it shows some injury to that hand, some abrasions, that

09:50:48  24  were caused as a result of that motorcycle accident; is that

09:50:52  25  correct?

| | | |
|---|---|---|
| 09:50:52 | 1 | A.    That's correct. |
| 09:50:53 | 2 | Q.    Okay.  And, in fact, Government Exhibits 1-1 and 1-2 were |
| 09:50:59 | 3 | produced shortly after that accident during the -- that |
| 09:51:03 | 4 | conference or that event at the Star Ranch from June 18th |
| 09:51:06 | 5 | through June 24th, 2000; is that correct? |
| 09:51:09 | 6 | A.    That's correct. |
| 09:51:10 | 7 | Q.    All right.  Agent Mullen, have -- going back to the tent |
| 09:51:28 | 8 | and c-baby videos, in this particular case, are the video |
| 09:51:34 | 9 | exhibits in counts 1-1 -- excuse me -- Government's |
| 09:51:38 | 10 | Exhibits 1-1 through 10, the videos, are those videos that have |
| 09:51:45 | 11 | been known to be part of the tent series and the c-baby |
| 09:51:50 | 12 | series?  And, if so, which ones conform to which series? |
| 09:51:54 | 13 | A.    Yes, they are.  The videos in count 1 pertain to tent |
| 09:51:57 | 14 | series. |
| 09:51:58 | 15 | Q.    That's Government's Exhibits 1-1 and 1-2? |
| 09:52:00 | 16 | A.    That's correct. |
| 09:52:01 | 17 | Q.    Okay. |
| 09:52:01 | 18 | A.    And then all other Government exhibits pertain to the |
| 09:52:04 | 19 | c-baby series. |
| 09:52:05 | 20 | Q.    And that's basically Government's Exhibit 2 through 10; is |
| 09:52:08 | 21 | that right? |
| 09:52:09 | 22 | A.    That's correct. |
| 09:52:10 | 23 | Q.    All right.  Now that the producer of those videos has been |
| 09:52:20 | 24 | identified, have you been kind of designated as a point of |
| 09:52:27 | 25 | contact for other agents where those videos have turned up |

MULLEN – DIRECT                                    39

| | | |
|---|---|---|
| 09:52:30 | 1 | around the country? |
| 09:52:31 | 2 | A.   Yes, I am. |
| 09:52:32 | 3 | Q.   Okay.  And is that common for -- when a series of child |
| 09:52:38 | 4 | pornography with an identified victim is found, that the agents |
| 09:52:43 | 5 | will contact whoever the agent was who determined that victim |
| 09:52:49 | 6 | in that video and, you know, kind of -- sometimes you have to |
| 09:52:53 | 7 | come out and testify about the circumstances relating to those |
| 09:52:56 | 8 | videos; is that correct? |
| 09:52:57 | 9 | A.   Yes, it is. |
| 09:52:58 | 10 | Q.   Okay.  Have you been contacted about the tent and c-baby |
| 09:53:02 | 11 | series? |
| 09:53:03 | 12 | A.   Yes, I have. |
| 09:53:04 | 13 | Q.   Have you been contacted recently about that? |
| 09:53:06 | 14 | A.   Yes, I have. |
| 09:53:07 | 15 | Q.   And, basically, these have been other FBI agents? |
| 09:53:10 | 16 | A.   Other FBI agents and other federal agents, as well as |
| 09:53:14 | 17 | state and local law enforcement officers. |
| 09:53:16 | 18 | Q.   Okay.  And why have they contacted you? |
| 09:53:19 | 19 | A.   They contacted me after the -- the National Center for |
| 09:53:21 | 20 | Missing & Exploited Children have indicated to them that videos |
| 09:53:25 | 21 | or depictions they have found during their criminal |
| 09:53:26 | 22 | investigations were part of the c-baby and/or tent series.  And |
| 09:53:30 | 23 | they contacted me to provide a victim identification and |
| 09:53:32 | 24 | confirmation that that indeed was him and also provide |
| 09:53:36 | 25 | investigative summaries. |

09:53:38  1   Q.   Oak.  And where were those agents conducting those

09:53:41  2   investigation who contacted you about the tent series and the

09:53:45  3   c-baby series?

09:53:46  4   A.   They have contacted me from California, Florida, Texas,

09:53:48  5   New Jersey, and Ohio are some of -- a few of the ones that have

09:53:53  6   contacted me.

09:53:53  7   Q.   Okay.  And as it states in the stipulation, all of these

09:53:56  8   videos -- the video exhibits, as they're collectively referred

09:54:00  9   to in the stipulation, have been all found outside of the State

09:54:05  10  of Texas; is that correct?

09:54:06  11  A.   That is correct.

09:54:06  12  Q.   Is there one video that has in it -- I believe it might be

09:54:11  13  Government Exhibit 5-1 -- that shows a magazine -- a partial

09:54:18  14  magazine?  Can you talk about that for a moment?

09:54:20  15  A.   Sure.  During that video, a portion of it is shot, it

09:54:23  16  looks like, underneath a coffee table.  And at the very bottom

09:54:27  17  it depicts a magazine that was identified by law enforcement in

09:54:31  18  the United Kingdom as being a *Dirt Rider Magazine* from October

09:54:36  19  of 1999.

09:54:37  20  Q.   Okay.  And had that -- had that video been found outside

09:54:40  21  of Texas?

09:54:42  22  A.   Yes.  It was found by the United Kingdom in 1999 --

09:54:46  23  October of 1999.

09:54:48  24  Q.   Okay.  And, indeed, is it also true that one or more of

09:54:53  25  the video exhibits has been found in Australia?

| | | |
|---|---|---|
| 09:54:56 | 1 | A.    That is correct. |
| 09:54:57 | 2 | Q.    Okay.  And do you know which video that is? |
| 09:55:00 | 3 | A.    I do not know exactly which one. |
| 09:55:02 | 4 | Q.    Was it one of the c-baby videos? |
| 09:55:04 | 5 | A.    It's one of the c-baby videos. |
| 09:55:06 | 6 | Q.    Okay.  And that was found -- how early was that video |
| 09:55:09 | 7 | found? |
| 09:55:09 | 8 | A.    I do not recall. |
| 09:55:10 | 9 | Q.    Okay.  But the one with the magazine in it which -- which |
| 09:55:19 | 10 | I believe is Government Exhibit 5-1, that was found in the |
| 09:55:23 | 11 | United Kingdom as early as 1999? |
| 09:55:26 | 12 | A.    That is correct. |
| 09:55:27 | 13 |        MR. ORR:  Your Honor, I object and move to strike the |
| 09:55:29 | 14 | testimony.  Apparently it's based on hearsay -- I don't know |
| 09:55:34 | 15 | how many-hand hearsay that this was found in 1999. |
| 09:55:36 | 16 |        THE COURT:  Mr. Devlin? |
| 09:55:37 | 17 |        MR. DEVLIN:  Your Honor, it's just simply providing |
| 09:55:39 | 18 | some background information about an admitted exhibit. |
| 09:55:41 | 19 |        THE COURT:  Well, I'll sustain the objection as to |
| 09:55:43 | 20 | the date it was found as being hearsay. |
| 09:55:46 | 21 |        MR. DEVLIN:  Okay. |
| 09:55:46 | 22 | Q.    (BY MR. DEVLIN) And, in fact, you -- are you aware whether |
| 09:55:51 | 23 | or not any of these videos that have been admitted have been |
| 09:55:54 | 24 | found in other child pornography cases here in Austin? |
| 09:55:57 | 25 | A.    Yes, they have. |

MULLEN - DIRECT

| | | |
|---|---|---|
| 09:55:58 | 1 | Q.   And one or more of them have been found in cases here? |
| 09:56:03 | 2 | A.   That is correct. |
| 09:56:03 | 3 | Q.   And as recently as within the last couple of months? |
| 09:56:07 | 4 | A.   That is correct. |
| 09:56:07 | 5 | Q.   And perhaps as far back as months or years; is that |
| 09:56:11 | 6 | correct? |
| 09:56:11 | 7 | A.   That is correct. |
| 09:56:12 | 8 | Q.   Okay.  Now, did you have an opportunity to obtain a |
| 09:56:17 | 9 | computer that was believed to be associated with |
| 09:56:24 | 10 | Defendant Diehl? |
| 09:56:24 | 11 | A.   Yes, I did. |
| 09:56:25 | 12 | Q.   Can you describe the circumstances of that. |
| 09:56:27 | 13 | A.   Yes.  The computer that was -- that had belonged to the |
| 09:56:30 | 14 | defendant was shipped by the defendant and/or his attorney from |
| 09:56:34 | 15 | Florida to his ex-wife in Austin.  And at that point we |
| 09:56:38 | 16 | obtained it. |
| 09:56:39 | 17 | Q.   What kind of computer was it? |
| 09:56:41 | 18 | A.   It was a desktop computer that contained two hard drives. |
| 09:56:45 | 19 | Q.   Okay.  And a desktop in contrast to a laptop.  It did not |
| 09:56:49 | 20 | have a flip top.  It was a large -- |
| 09:56:50 | 21 | A.   Tower, correct. |
| 09:56:51 | 22 | Q.   -- tower.  Okay. |
| 09:56:56 | 23 | Has that computer been -- been looked at? |
| 09:56:59 | 24 | A.   We submitted it, and our -- our examiners have tried to |
| 09:57:04 | 25 | forensically examine the computer but have been unable to |

| | | |
|---|---|---|
| 09:57:07 | 1 | because the drives -- one of the drives is encrypted. |
| 09:57:10 | 2 | Q.   Okay.  And they're still working on breaking that |
| 09:57:14 | 3 | encryption? |
| 09:57:14 | 4 | A.   To my knowledge they are still trying, yes. |
| 09:57:32 | 5 | MR. DEVLIN:  Pass the witness Your Honor. |
| 09:57:45 | 6 | **CROSS-EXAMINATION** |
| 09:57:45 | 7 | **BY MR. ORR:** |
| 09:57:48 | 8 | Q.   How are you this morning, sir? |
| 09:57:50 | 9 | A.   I'm doing fine.  How are you? |
| 09:57:51 | 10 | Q.   I'm fine.  So far as the videos that have been admitted, |
| 09:58:03 | 11 | you didn't -- you didn't personally locate any of them; is that |
| 09:58:06 | 12 | correct, sir? |
| 09:58:07 | 13 | A.   That's correct. |
| 09:58:08 | 14 | Q.   Oak.  So far as the laptop is concerned, were there any |
| 09:58:14 | 15 | efforts to get a search warrant while that laptop was in |
| 09:58:17 | 16 | Florida? |
| 09:58:18 | 17 | A.   There was no laptop that I was aware of. |
| 09:58:22 | 18 | Q.   Okay.  You didn't know anything about it in Florida? |
| 09:58:24 | 19 | A.   You mean a desktop? |
| 09:58:26 | 20 | Q.   Desktop.  Excuse me. |
| 09:58:27 | 21 | A.   Correct, yes. |
| 09:58:28 | 22 | Q.   Were efforts made to get a search warrant for it? |
| 09:58:30 | 23 | A.   Yes, there were. |
| 09:58:31 | 24 | Q.   And was that search warrant -- were you successful in |
| 09:58:35 | 25 | getting a search warrant?  By "you," I mean the Federal Bureau |

| 09:58:38 | 1 | of Investigation? |
| 09:58:40 | 2 | A.   No, we were not. |
| 09:58:41 | 3 | Q.   Okay.  And why not? |
| 09:58:42 | 4 | A.   The judge did not sign the warrant. |
| 09:58:44 | 5 | Q.   Okay.  And did you get a search warrant to search it here? |
| 09:58:47 | 6 | A.   Yes, we did. |
| 09:58:48 | 7 | Q.   Okay.  But you -- and based on what?  Did you have more |
| 09:58:53 | 8 | information, or why did you get one here that you couldn't get |
| 09:58:55 | 9 | in Florida? |
| 09:58:56 | 10 | A.   I don't know the answer to that. |
| 09:58:58 | 11 | Q.   Okay.  All right.  If you don't know, you don't know. |
| 09:59:03 | 12 | A.   I submitted an affidavit to the magistrate judge here. |
| 09:59:06 | 13 | Q.   So as far as any -- you have worked on this case for quite |
| 09:59:10 | 14 | some time, have you not, sir? |
| 09:59:12 | 15 | A.   I have. |
| 09:59:13 | 16 | Q.   A lot of what you know is based on hearsay, correct, sir? |
| 09:59:16 | 17 | What other agents have told you? |
| 09:59:18 | 18 | A.   Not a lot of it.  But some of it, yes. |
| 09:59:20 | 19 | Q.   Some of it.  All right, sir. |
| 09:59:23 | 20 |       And you have talked to various witnesses, have you |
| 09:59:25 | 21 | not, sir? |
| 09:59:25 | 22 | A.   I have. |
| 09:59:26 | 23 | Q.   And have you talked to, apparently, Mr. Diehl's ex-wife? |
| 09:59:30 | 24 | A.   Yes, I have. |
| 09:59:31 | 25 | Q.   Okay.  And how many times have you talked to her? |

09:59:33  1  A.   I don't recall the exact number, but probably around ten.

09:59:38  2  Q.   Okay.  And she has been cooperating with the FBI, correct,

09:59:45  3  sir?

09:59:45  4  A.   She's been answering our questions, yes.

09:59:47  5          MR. ORR:  May I have just a moment, Your Honor.

09:59:50  6          THE COURT:  You may.

10:00:30  7  Q.   (BY MR. ORR) All right, sir.  And would it be fair to say

10:00:34  8  that the videos that you have -- that you have admitted in this

10:00:40  9  case, you have established that, based on your investigation,

10:00:42 10  occurred -- were made apparently during a period somewhere in

10:00:46 11  1999 and 2000?

10:00:47 12  A.   That's correct.

10:00:48 13  Q.   Okay.  And it would also be fair to say the original

10:00:54 14  complaint in this case dealt with a video that was at least

10:00:58 15  discovered somewhere around 2005?  Or do I have that wrong?

10:01:02 16  A.   That's approximately correct.

10:01:03 17  Q.   All right.  And so, based on the investigation, what you

10:01:07 18  found is that you believe through hearsay that some of these

10:01:12 19  maybe -- were put on the Internet earlier than 2005?

10:01:16 20  A.   Yes.

10:01:17 21  Q.   But you have no direct knowledge of that?

10:01:19 22  A.   That's correct.

10:01:20 23  Q.   Okay.  But you have no evidence based on your thorough

10:01:24 24  investigation that any videos were produced in this particular

10:01:30 25  case after December or -- of 2000?

MULLEN – CROSS

| | | |
|---|---|---|
| 10:01:36 | 1 | A.   That's correct. |
| 10:01:37 | 2 | Q.   Oak.  Or could we even restrict that to the summer of |
| 10:01:40 | 3 | 2000? |
| 10:01:41 | 4 | A.   I don't know the exact time.  Just through the time he |
| 10:01:45 | 5 | lived at the house.  Roughly -- |
| 10:01:47 | 6 | Q.   Sometime in 2000? |
| 10:01:49 | 7 | A.   -- sometime in 2000 |
| 10:01:49 | 8 | Q.   Okay.  And for a period of time this case was investigated |
| 10:01:53 | 9 | and Mr. Diehl was on the streets, was still at home in Florida, |
| 10:01:56 | 10 | correct? |
| 10:01:57 | 11 | A.   That's correct. |
| 10:01:57 | 12 | Q.   And were efforts made to surveil him in Florida? |
| 10:02:01 | 13 | A.   Yes, they were. |
| 10:02:02 | 14 | Q.   Okay.  Were efforts made to contact and subpoena his |
| 10:02:07 | 15 | various Internet service providers? |
| 10:02:10 | 16 | A.   Yes, they were. |
| 10:02:13 | 17 | Q.   Okay.  And by way of the Internet service, can you |
| 10:02:16 | 18 | determine who has made downloads of what over a period of time? |
| 10:02:20 | 19 | A.   Not through a subpoena, no. |
| 10:02:21 | 20 | Q.   Well, okay.  Did you get a chance to look at the records |
| 10:02:24 | 21 | that were returned from his various Internet service providers |
| 10:02:27 | 22 | and his mail providers? |
| 10:02:29 | 23 | A.   Yes. |
| 10:02:30 | 24 | Q.   Okay.  Did you find any evidence there of any downloads or |
| 10:02:35 | 25 | uploads of anything that was illegal? |

MULLEN - CROSS

| | | |
|---|---|---|
| 10:02:37 | 1 | A.   No, I did not. |
| 10:02:38 | 2 | Q.   Okay.  And that covered a period of how long? |
| 10:02:42 | 3 | A.   Up to whatever the Internet service provider maintained |
| 10:02:48 | 4 | and then what was ever in the E-mail at the time. |
| 10:02:51 | 5 | Q.   Do you have any idea how many years that would be? |
| 10:02:54 | 6 | A.   I do not recall the exact time frame.  But ... |
| 10:02:58 | 7 | Q.   Some number of years? |
| 10:03:00 | 8 | A.   Yes.  At least a year. |
| 10:03:02 | 9 | Q.   At least a year? |
| 10:03:03 | 10 | A.   Yeah.  Probably. |
| 10:03:04 | 11 | Q.   Well, would it surprise you to learn that, at least in the |
| 10:03:07 | 12 | discovery, there's E-mails going back to at least '08? |
| 10:03:11 | 13 | A.   No. |
| 10:03:11 | 14 | Q.   Okay.  And possibly as far back as '06 and '07.  That, |
| 10:03:16 | 15 | again, would not surprise you? |
| 10:03:18 | 16 | A.   No, it would not. |
| 10:03:19 | 17 | Q.   Okay.  Now, so far as any surveillance, did you -- did the |
| 10:03:23 | 18 | FBI surveil Mr. Diehl in any way in terms of his personal daily |
| 10:03:28 | 19 | activities? |
| 10:03:29 | 20 | A.   I believe they did, yes. |
| 10:03:30 | 21 | Q.   Okay.  And did they see him, you know, taking his child to |
| 10:03:34 | 22 | tennis lessons and that sort of thing? |
| 10:03:37 | 23 | A.   No, they did not. |
| 10:03:37 | 24 | Q.   Okay.  You're aware that he did have custody of his son? |
| 10:03:41 | 25 | A.   Yes, I am. |

10:03:41  1   Q.   Okay.  Anyway, during this -- do you have any idea how

10:03:44  2   long the surveillance lasted?

10:03:45  3   A.   It was a very brief surveillance.  Maybe a day at the

10:03:50  4   most.

10:03:50  5   Q.   Oh, okay.  So the one day didn't reveal anything untoward

10:03:54  6   in Mr. Diehl's behavior?

10:03:56  7   A.   That's correct.

10:03:57  8   Q.   Neither did the subpoenaing of his E-mail service

10:04:01  9   providers as well as his Internet service providers?

10:04:03  10  A.   That's correct.

10:04:04  11          MR. ORR:  Okay.  I pass the witness.

10:04:06  12                  **REDIRECT EXAMINATION**

10:04:07  13  BY MR. DEVLIN:

10:04:07  14  Q.   Agent Mullen, would the information that you requested

10:04:11  15  from the Internet service providers pertaining to Mr. Diehl

10:04:14  16  necessarily inform you whether he had uploaded anything

10:04:19  17  illegally?

10:04:19  18  A.   No, they would not.

10:04:20  19  Q.   And in terms of the word "uploaded," how -- how is it, I

10:04:25  20  guess in general, that people can upload things to the

10:04:28  21  Internet?

10:04:28  22  A.   They can do it various ways.  They can send it through

10:04:35  23  E-mail.  They can do it through social networking sites.  They

10:04:40  24  can use peer-to-peer software and other means.

10:04:42  25  Q.   Okay.  Are there also networks, something called Usenet?

| | | |
|---|---|---|
| 10:04:46 | 1 | Have you heard of that? |
| 10:04:47 | 2 | A.   Yes I have. |
| 10:04:48 | 3 | Q.   What is Usenet? |
| 10:04:49 | 4 | A.   Usenet is kind of a bulletin board service where you can |
| 10:04:54 | 5 | post pictures and comments and different binary files. |
| 10:04:58 | 6 | Q.   In your experience do Internet service providers routinely |
| 10:05:02 | 7 | record every action taken by a user in term of browsing or |
| 10:05:06 | 8 | uploading or downloading? |
| 10:05:07 | 9 | A.   No, they do not. |
| 10:05:08 | 10 | Q.   Okay.  That would require the -- would that require the |
| 10:05:12 | 11 | ISPs to actually take affirmative steps to record that |
| 10:05:15 | 12 | information and store it? |
| 10:05:16 | 13 | A.   Yes, it would. |
| 10:05:17 | 14 | Q.   Do most ISPs do that? |
| 10:05:19 | 15 | A.   No, they do not. |
| 10:05:21 | 16 | Q.   Do any ISPs do that? |
| 10:05:24 | 17 | A.   Not that I'm aware of. |
| 10:05:26 | 18 | MR. DEVLIN:  Pass the witness, Your Honor. |
| 10:05:27 | 19 | MR. ORR:  Just a second, Your Honor. |
| 10:05:36 | 20 | **RECROSS-EXAMINATION** |
| 10:05:36 | 21 | **BY MR. ORR:** |
| 10:05:36 | 22 | Q.   Well, Special Agent Mullen, isn't it true that Internet |
| 10:05:39 | 23 | service providers do record upload and download logs, and they |
| 10:05:42 | 24 | can provide information if they see someone's doing something |
| 10:05:45 | 25 | on their servers that they shouldn't be doing? |

10:05:49  1   A.    I don't know if they record upload and download.  They

10:05:52  2   record IP information.

10:05:53  3   Q.    Well, and if there's some IP information -- say,

10:05:57  4   certain -- say if a child pornography site has a certain IP

10:06:01  5   address, the FBI would likely know about that, would they not?

10:06:05  6   A.    It's possible they would know about it, yes.

10:06:07  7   Q.    And in Mr. Diehl's history that you got any subpoenas, you

10:06:11  8   could get the Internet service provider addresses, could you

10:06:14  9   not?

10:06:15  10  A.    I could get the IP address which Mr. Diehl's address had

10:06:20  11  at the time, not the ones he's talking to.  That would require

10:06:24  12  a court order.

10:06:24  13  Q.    Well, you didn't find any -- any unusual or illegal

10:06:29  14  Internet protocol addresses in your records, did you, or

10:06:32  15  anything that lead you to believe that he had any connection to

10:06:36  16  a child pornography site?

10:06:37  17  A.    No.

10:06:38  18          MR. ORR:  Pass the witness.

10:06:38  19          MR. DEVLIN:  No further questions, Your Honor.

10:06:40  20          THE COURT:  All right.  You may step down.  At this

10:06:43  21  time, in order that I can get this in context, I want to view

10:06:49  22  the exhibits that were introduced during this witness's

10:06:53  23  testimony.  How do you want to proceed?

10:06:58  24          MR. ORR:  Your Honor, we -- with Mr. Diehl's

10:07:00  25  permission, we suggest that the videos need not be shown in

| | | |
|---|---|---|
| 10:07:04 | 1 | Open Court.  That Your Honor could view them, if necessary, in |
| 10:07:08 | 2 | your -- in Your Honor's chambers.  There's no use to I think go |
| 10:07:12 | 3 | through all of that out here. |
| 10:07:13 | 4 | THE COURT:  Well, it is necessary that I view them if |
| 10:07:18 | 5 | I'm going to make a decision. |
| 10:07:19 | 6 | MR. ORR:  I think it's necessary, yes, sir. |
| 10:07:23 | 7 | THE COURT:  And I'm hesitant to view them at a time |
| 10:07:25 | 8 | after this witness may have left because it's possible that the |
| 10:07:28 | 9 | Court will have questions.  So -- |
| 10:07:34 | 10 | MR. ORR:  I'm -- well, sorry. |
| 10:07:35 | 11 | THE COURT:  -- I feel like I need to -- I think you |
| 10:07:38 | 12 | have provided or the Government has provided a hookup where I |
| 10:07:40 | 13 | can view them here at my bench.  And I realize this may take a |
| 10:07:45 | 14 | little bit of time while I view them, but I think it is |
| 10:07:48 | 15 | important that the Court review all of the evidence in this |
| 10:07:51 | 16 | case in a timely and contemporaneous fashion to the testimony |
| 10:07:56 | 17 | that I receive regarding that. |
| 10:07:58 | 18 | MR. ORR:  I do agree to that, Your Honor.  I didn't |
| 10:08:00 | 19 | mean that we would -- that Your Honor would view them later.  I |
| 10:08:03 | 20 | just meant, Your Honor, that we might take a recess and let |
| 10:08:05 | 21 | Your Honor view them in chambers, either with or without |
| 10:08:08 | 22 | Mr. Devlin and myself. |
| 10:08:10 | 23 | THE COURT:  Well, I believe that I would prefer not |
| 10:08:17 | 24 | to do that even though it is cumbersome.  I think this is an |
| 10:08:23 | 25 | open proceeding, even though the child pornography will not be |

| | | |
|---|---|---|
| 10:08:27 | 1 | exhibited to the public.  And you-all may be in recess if you |
| 10:08:31 | 2 | want, but I'm going to review them here on the equipment that's |
| 10:08:34 | 3 | provided here in the Courtroom in Open Court as part of this |
| 10:08:39 | 4 | trial as opposed to recessing to chambers to view it. |
| 10:08:42 | 5 | MR. ORR:  Yes, sir.  May I have just one more second? |
| 10:08:45 | 6 | THE COURT:  You may. |
| 10:08:49 | 7 | MR. ORR:  Your Honor, we don't need to see it.  We've |
| 10:08:52 | 8 | all seen all this stuff.  We don't need to see it again on the |
| 10:08:55 | 9 | big monitors. |
| 10:08:57 | 10 | THE COURT:  That will be fine.  Do what you need to |
| 10:08:59 | 11 | do to get it set up for me to observe the evidence.  And those |
| 10:09:05 | 12 | will be -- I think all of the videos have been introduced in |
| 10:09:09 | 13 | evidence during Agent Mullen's testimony.  Is that correct, |
| 10:09:14 | 14 | Mr. Devlin? |
| 10:09:15 | 15 | MR. DEVLIN:  I'm sorry, Your Honor? |
| 10:09:16 | 16 | THE COURT:  All of the videos the Government intends |
| 10:09:19 | 17 | to introduce were introduced during Agent Mullen's testimony; |
| 10:09:23 | 18 | is that correct? |
| 10:09:23 | 19 | MR. DEVLIN:  Yes, sir. |
| 10:09:24 | 20 | THE COURT:  All right.  So when I observe these |
| 10:09:26 | 21 | videos, then there will be -- there will not be a need to take |
| 10:09:30 | 22 | an additional break to observe other videos that will be |
| 10:09:33 | 23 | introduced in evidence; is that correct? |
| 10:09:35 | 24 | MR. DEVLIN:  That's correct, Your Honor. |
| 10:09:36 | 25 | THE COURT:  And is it your intention to do this based |

| | | |
|---|---|---|
| 10:09:39 | 1 | on the way the exhibits have come in, by my viewing Exhibit |
| 10:09:42 | 2 | Number 13, which is a compilation of the other videos; is that |
| 10:09:47 | 3 | correct? |
| 10:09:47 | 4 | MR. DEVLIN:  Thirteen -- let me ... |
| 10:09:49 | 5 | THE COURT:  And 7. |
| 10:09:50 | 6 | MR. DEVLIN:  Thirteen and 7 and -- 13 and 7 have the |
| 10:09:53 | 7 | videos that contain child pornography.  Since 11 does not |
| 10:09:57 | 8 | contain child pornography, we did not include it, but it is |
| 10:10:00 | 9 | separate and it's about 40 minutes long.  So there's |
| 10:10:03 | 10 | essentially three discs. |
| 10:10:05 | 11 | THE COURT:  All right.  Well, those will be what I |
| 10:10:06 | 12 | need to -- if they're in evidence, I want to observe all of |
| 10:10:10 | 13 | them. |
| 10:10:58 | 14 | The one you put in at this point is which number? |
| 10:11:02 | 15 | MR. DEVLIN:  I put it in as Government Exhibit 13, |
| 10:11:04 | 16 | Judge.  It will come up with a user-friendly screen that will |
| 10:11:06 | 17 | allow you to click on each exhibit.  What will happen is the |
| 10:11:09 | 18 | exhibit -- when you click on the name of the exhibit, it will |
| 10:11:12 | 19 | play that exhibit.  At the end of it, it will go back to the -- |
| 10:11:15 | 20 | to the menu, and then you can play the next exhibit. |
| 10:11:22 | 21 | THE COURT:  Well, what I will do is, after the first |
| 10:11:24 | 22 | one ends, I'll have you do this for fear that I will do |
| 10:11:28 | 23 | something. |
| 10:11:43 | 24 | MR. DEVLIN:  That's fine.  Do you mind sticking up |
| 10:11:44 | 25 | here and doing that? |

| | | |
|---|---|---|
| 10:11:44 | 1 | LEGAL ASSISTANT:  No.  I'll be here. |
| 10:11:44 | 2 | MR. DEVLIN:  Go ahead. |
| 10:11:44 | 3 | (Court views exhibits) |
| 10:11:44 | 4 | MR. DEVLIN:  Your Honor, we're free to step in and |
| 10:11:46 | 5 | out while you watch that? |
| 10:28:00 | 6 | THE COURT:  You may. |
| 10:28:00 | 7 | (At the bench, on the record) |
| 10:28:00 | 8 | MR. ORR:  May I approach the bench and see that, |
| 10:28:04 | 9 | Your Honor? |
| 10:28:28 | 10 | THE COURT:  This is 5-2, maybe 5-1. |
| 10:28:36 | 11 | MR. ORR:  You did take out the compilation?  The |
| 10:28:39 | 12 | extraneous stuff that's not in there? |
| 10:28:40 | 13 | MR. DEVLIN:  Remember, one of them is about six |
| 10:28:42 | 14 | minutes, and the other is about nine, the video segments that |
| 10:28:45 | 15 | we did have. |
| 10:28:46 | 16 | THE COURT:  5-1 is 620.  And 5-9 -- and 5-2 is 938. |
| 10:28:52 | 17 | MR. DEVLIN:  Some of them are four or five minutes |
| 10:28:54 | 18 | long. |
| 10:28:54 | 19 | MR. ORR:  What I mean is that there's one in what |
| 10:28:55 | 20 | count that had that huge amount of stuff in it?  That's out of |
| 10:29:00 | 21 | here? |
| 10:29:00 | 22 | MR. DEVLIN:  Yeah.  That was this one that was |
| 10:29:01 | 23 | actually I think five had the 48 minute one.  So we only took |
| 10:29:06 | 24 | the two segments. |
| 10:29:07 | 25 | MR. ORR:  Okay. |

| | | |
|---|---|---|
| 10:29:08 | 1 | MR. DEVLIN:  So ... |
| 10:49:13 | 2 | (Viewing exhibits) |
| 10:49:13 | 3 | (Open Court, Defendant present) |
| 10:49:13 | 4 | MR. ORR:  Your Honor, could we let Mr. Diehl take a |
| 10:49:16 | 5 | break? |
| 10:49:17 | 6 | THE COURT:  Yes.  How long a break do you need, |
| 10:49:26 | 7 | Counsel? |
| 10:49:26 | 8 | MR. ORR:  He just needs to go, Your Honor.  He just |
| 10:49:30 | 9 | needs a quick trip, I think. |
| 10:49:34 | 10 | THE COURT:  Before he leaves, let me ask you both: |
| 10:49:37 | 11 | What parts of Exhibit 11 do you think are important to this |
| 10:49:43 | 12 | case for me to see?  The whole 40 minutes or should I -- are |
| 10:49:48 | 13 | there particular parts of it? |
| 10:49:50 | 14 | MR. DEVLIN:  Probably the second half, approximately. |
| 10:49:58 | 15 | THE COURT:  I'm not there yet. |
| 10:49:59 | 16 | MR. DEVLIN:  Okay. |
| 10:50:00 | 17 | THE COURT:  But I just wanted to know if I should |
| 10:50:01 | 18 | watch the whole 40 minutes or what is the part that is of ... |
| 10:50:09 | 19 | MR. DEVLIN:  You can -- no.  I have no need for the |
| 10:50:11 | 20 | Court to see the first 20 minutes or so.  I'd have to go to the |
| 10:50:15 | 21 | exact portion that I would like you to see.  And, actually, it |
| 10:50:18 | 22 | would end up being a very small segment because even with the |
| 10:50:22 | 23 | testimony, there was a point where the camera was being hidden |
| 10:50:25 | 24 | and then it videotaped some activity and then it was covered. |
| 10:50:27 | 25 | So there's really nothing at that point. |

| | | |
|---|---|---|
| 10:50:29 | 1 | THE COURT:  Well, go ahead and let's let Mr. Diehl |
| 10:50:31 | 2 | take a break, and I will continue to observe Exhibit 7.  And |
| 10:50:35 | 3 | then I'll have you -- the two of you set Exhibit 11 up for me |
| 10:50:39 | 4 | to see what I need to see.  And then we'll be through with |
| 10:50:43 | 5 | that. |
| 10:50:44 | 6 | MR. DEVLIN:  Very good, Your Honor. |
| 10:50:44 | 7 | (Recess, Court continues viewing exhibits) |
| 10:56:01 | 8 | (Open Court, Defendant present) |
| 10:56:01 | 9 | THE COURT:  You want to put 11 in and fast-forward to |
| 10:56:04 | 10 | whatever part you want the Court to observe. |
| 10:56:06 | 11 | (Court views exhibits) |
| 11:02:47 | 12 | THE COURT:  Mr. Orr? |
| 11:02:53 | 13 | (At the bench, on the record) |
| 11:02:53 | 14 | MR. DEVLIN:  This is the portion right here where |
| 11:02:58 | 15 | he's getting in front of it. |
| 11:03:00 | 16 | MR. ORR:  I thought we just saw that a second ago. |
| 11:03:03 | 17 | MR. DEVLIN:  We were fast-forwarding through it, so |
| 11:03:06 | 18 | now we're going at regular speed. |
| 11:03:08 | 19 | MR. ORR:  Okay. |
| 11:06:12 | 20 | MR. DEVLIN:  After this it's just all audio, Judge. |
| 11:06:15 | 21 | There's nothing.  Just all -- unless you have a desire to keep |
| 11:06:20 | 22 | playing this, Steve. |
| 11:06:21 | 23 | MR. ORR:  No. |
| 11:06:22 | 24 | MR. DEVLIN:  There's nothing significant. |
| 11:06:24 | 25 | MR. ORR:  No. |

| | | |
|---|---|---|
| 11:06:25 | 1 | MR. DEVLIN:  So may I stop it? |
| 11:06:27 | 2 | THE COURT:  You may. |
| 11:06:28 | 3 | MR. ORR:  Are we done with videos? |
| 11:06:30 | 4 | MR. DEVLIN:  Yes. |
| 11:06:31 | 5 | MR. ORR:  Good.  Great. |
| 11:06:49 | 6 | (Open Court, Defendant present) |
| 11:06:49 | 7 | THE COURT:  The Court has reviewed Defendant's |
| 11:06:52 | 8 | Exhibits 13 and 7 in their entirety, and the portions -- I |
| 11:06:59 | 9 | mean -- pardon me -- Government's Exhibits 13 and 7 in their |
| 11:07:02 | 10 | entirety and the portion of Government's Exhibit Number 11 that |
| 11:07:08 | 11 | the attorneys advised me was the most relevant to the decisions |
| 11:07:15 | 12 | the Court has to make in this case. |
| 11:07:18 | 13 | So at this time, having reviewed those exhibits, the |
| 11:07:20 | 14 | Court has no additional questions for Agent Sean Mullen, who |
| 11:07:28 | 15 | was the witness.  He was passed before the Court observed the |
| 11:07:35 | 16 | exhibits and stepped down.  Does either party have any |
| 11:07:37 | 17 | additional questions of Agent Mullen at this time? |
| 11:07:41 | 18 | MR. DEVLIN:  No, Your Honor. |
| 11:07:43 | 19 | THE COURT:  Mr. Orr? |
| 11:07:44 | 20 | MR. ORR:  No, Your Honor. |
| 11:07:46 | 21 | THE COURT:  All right.  Mr. Devlin, you may call your |
| 11:07:50 | 22 | next witness. |
| 11:07:51 | 23 | MR. DEVLIN:  Your Honor, the Government would call |
| 11:07:52 | 24 | Kerry Jenkins. |
| 11:08:52 | 25 | ********************* |

<table>
<tr><td>11:08:52</td><td>1</td><td><b>KERRY JENKINS,</b></td></tr>
<tr><td>11:08:52</td><td>2</td><td>having been first duly sworn, testified as follows:</td></tr>
<tr><td>11:08:52</td><td>3</td><td><b>DIRECT EXAMINATION</b></td></tr>
<tr><td>11:08:52</td><td>4</td><td><b>BY MR. DEVLIN:</b></td></tr>
<tr><td>11:08:52</td><td>5</td><td>Q.   Good morning.</td></tr>
<tr><td>11:08:53</td><td>6</td><td>A.   Good morning.</td></tr>
<tr><td>11:08:54</td><td>7</td><td>Q.   A little nervous this morning?</td></tr>
<tr><td>11:08:56</td><td>8</td><td>A.   Yes.</td></tr>
<tr><td>11:08:57</td><td>9</td><td>Q.   Okay.  Just be calm, and I'm going to ask you a couple of</td></tr>
<tr><td>11:09:01</td><td>10</td><td>easy questions.</td></tr>
<tr><td>11:09:02</td><td>11</td><td>Is your name Kerry Jenkins?</td></tr>
<tr><td>11:09:04</td><td>12</td><td>A.   Yes.</td></tr>
<tr><td>11:09:05</td><td>13</td><td>Q.   Okay.  You -- how old are you?</td></tr>
<tr><td>11:09:09</td><td>14</td><td>A.   I'm 31.</td></tr>
<tr><td>11:09:11</td><td>15</td><td>Q.   Okay.  And do you live in the Austin area?</td></tr>
<tr><td>11:09:14</td><td>16</td><td>A.   Yes.</td></tr>
<tr><td>11:09:14</td><td>17</td><td>Q.   Okay.  Do you know the defendant in this case,</td></tr>
<tr><td>11:09:18</td><td>18</td><td>David Diehl?</td></tr>
<tr><td>11:09:19</td><td>19</td><td>A.   Yes.</td></tr>
<tr><td>11:09:20</td><td>20</td><td>Q.   How do you know him?</td></tr>
<tr><td>11:09:22</td><td>21</td><td>A.   He's my ex-husband.</td></tr>
<tr><td>11:09:24</td><td>22</td><td>Q.   When were you married to the defendant?</td></tr>
<tr><td>11:09:27</td><td>23</td><td>A.   January 1st, 1996.</td></tr>
<tr><td>11:09:29</td><td>24</td><td>Q.   And are you no longer married to him; is that correct?</td></tr>
<tr><td>11:09:34</td><td>25</td><td>A.   That's correct.</td></tr>
</table>

JENKINS – DIRECT                                          59

| | | |
|---|---|---|
| 11:09:34 | 1 | Q.   Do you remember when you divorced? |
| 11:09:36 | 2 | A.   Our divorce was final on May 21st, 2003 -- I'm sorry -- |
| 11:09:42 | 3 | 2002. |
| 11:09:42 | 4 | Q.   2002?  All right.  How old were you when you married the |
| 11:09:47 | 5 | defendant? |
| 11:09:47 | 6 | A.   Sixteen. |
| 11:09:48 | 7 | Q.   Do you remember how old he was? |
| 11:09:51 | 8 | A.   Thirty-one. |
| 11:09:52 | 9 | Q.   Okay.  And when did you meet him? |
| 11:09:57 | 10 | A.   I was 15.  It was the summer of '95. |
| 11:10:02 | 11 | Q.   All right.  Did you meet him here in Texas or somewhere |
| 11:10:06 | 12 | else? |
| 11:10:06 | 13 | A.   I met him in Ohio. |
| 11:10:07 | 14 | Q.   In Ohio.  Okay.  Is he originally from Ohio? |
| 11:10:12 | 15 | A.   Yes. |
| 11:10:13 | 16 | Q.   All right.  Have you had any contact with him since your |
| 11:10:22 | 17 | divorce? |
| 11:10:22 | 18 | A.   Yes. |
| 11:10:23 | 19 | Q.   And why is that? |
| 11:10:24 | 20 | A.   We have a child together. |
| 11:10:26 | 21 | Q.   Okay.  You have a son; is that correct? |
| 11:10:29 | 22 | A.   That's correct. |
| 11:10:30 | 23 | MR. ORR:  Your Honor, could we ask that she speak |
| 11:10:32 | 24 | up?  I'm sorry.  I'm just having a little trouble. |
| 11:10:34 | 25 | THE COURT:  If you'll pull the microphone a little |

| 11:10:37 | 1 | closer to you kind of below your mouth. |

11:10:37  1  closer to you kind of below your mouth.

11:10:45  2  Q.   (BY MR. DEVLIN) When you were married to the defendant,

11:10:53  3  how was he employed?

11:10:54  4  A.   He was a software engineer.

11:10:56  5  Q.   Okay.  Was he a software engineer when you met him?

11:11:01  6  A.   Yes.

11:11:01  7  Q.   And did he hold software engineering jobs?

11:11:05  8  A.   Yes.

11:11:06  9  Q.   Okay.  Do you know how long he had worked as a software

11:11:10  10  engineer when you got married?

11:11:13  11  A.   As far as I know, since he graduated from college.

11:11:17  12  Q.   All right.  Do you remember when that was?

11:11:19  13  A.   No.

11:11:19  14  Q.   Okay.  What kind of -- what kinds of jobs did he hold when

11:11:26  15  you were married to him?

11:11:28  16  A.   Programming.  He was a software engineer, so he

11:11:31  17  programmed.  He mostly took contracts, some short-term jobs.

11:11:35  18  Q.   All right.  And after you were Married to him, do you know

11:11:38  19  what kind of jobs he had?

11:11:40  20  A.   As far as I know, the same.

11:11:42  21  Q.   Okay.  So you've had reason to be in touch with him, as

11:11:45  22  you mentioned, because you had a son together; is that right?

11:11:48  23  A.   That's correct.

11:11:49  24  Q.   And he's about, what, 14 years old now?

11:11:52  25  A.   Yes.

11:11:52   1   Q.   Okay.  And after you were divorced, he was living

11:11:56   2   primarily with the defendant; is that right?

11:11:58   3   A.   That's correct.

11:11:59   4   Q.   Okay.  While you were married, where did you and the

11:12:06   5   defendant live?  You had mentioned you met him in Ohio; is that

11:12:09   6   right?

11:12:10   7   A.   That's correct.

11:12:11   8   Q.   Okay.  After that where did the two of you live?

11:12:13   9   A.   We lived a lot of places.  When we first got married we

11:12:18  10   lived in Montgomery, Alabama for a very short time.  And then

11:12:21  11   we moved to Chicago, Illinois.  We lived in Atlanta, Georgia,

11:12:27  12   and we lived in the suburbs of Chicago.  We lived in Ohio.  We

11:12:32  13   lived in Austin, Texas.

11:12:33  14   Q.   All right.  So you went -- you were in Chicago, you left,

11:12:37  15   and then came back again?

11:12:38  16   A.   Correct.

11:12:38  17   Q.   Is that basically what you're saying?  Okay.

11:12:42  18        Did you live in Austin from roughly February 1999 to

11:12:46  19   November of 2000?

11:12:48  20   A.   That sounds about right.

11:12:49  21   Q.   Okay.  Was that at a residence Hazelhurst Drive here in

11:12:52  22   Austin?

11:12:53  23   A.   Part of that time, yes.

11:12:54  24   Q.   Part of that time.  And part of that time you lived where

11:12:57  25   else?

| | | |
|---|---|---|
| 11:12:58 | 1 | A.   In an apartment on McNeil Road. |
| 11:12:59 | 2 | Q.   Was that before or after you lived in that house? |
| 11:13:02 | 3 | A.   Before. |
| 11:13:02 | 4 | Q.   Okay.  So you were in Austin a little over 18 months.  Was |
| 11:13:06 | 5 | that -- would it be fair to say that that was the longest |
| 11:13:09 | 6 | amount of time you stayed in one place during your marriage? |
| 11:13:13 | 7 | A.   Probably, yes. |
| 11:13:14 | 8 | Q.   Okay.  In November of 2000, you left Austin; is that |
| 11:13:21 | 9 | right? |
| 11:13:21 | 10 | A.   That sounds correct. |
| 11:13:24 | 11 | Q.   I should say the two of you left Austin; is that -- |
| 11:13:27 | 12 | A.   No.  Actually, he stayed. |
| 11:13:28 | 13 | Q.   Okay. |
| 11:13:30 | 14 | A.   I went up to Ohio and got a job.  He actually stayed.  We |
| 11:13:34 | 15 | had an RV, and he was working a contract here in Austin, and so |
| 11:13:38 | 16 | he stayed for a while. |
| 11:13:39 | 17 | Q.   All right.  Was there a time that he moved from Austin? |
| 11:13:42 | 18 | A.   Yes.  I mean, I don't understand the question. |
| 11:13:47 | 19 | Q.   I'm sorry.  After -- after you -- after you sold the house |
| 11:13:50 | 20 | here in Austin, okay, are you saying that you went to Ohio? |
| 11:13:55 | 21 | A.   Yes. |
| 11:13:55 | 22 | Q.   And he stayed around Austin for a while? |
| 11:13:58 | 23 | A.   Yes.  He stayed in the RV. |
| 11:14:00 | 24 | Q.   Okay. |
| 11:14:00 | 25 | A.   At an RV park. |

| | | |
|---|---|---|
| 11:14:02 | 1 | Q.   Okay.  Was there a time that he moved elsewhere from |
| 11:14:05 | 2 | Austin?  Did he leave Austin at some point to move elsewhere? |
| 11:14:09 | 3 | A.   No. |
| 11:14:10 | 4 | Q.   No?  He stayed in Austin for how long? |
| 11:14:13 | 5 | A.   It was a short time. |
| 11:14:15 | 6 | Q.   Okay.  Do you know where else he moved after that? |
| 11:14:19 | 7 | A.   Well, he -- after that -- we were still married -- he |
| 11:14:22 | 8 | moved up to Ohio. |
| 11:14:23 | 9 | Q.   Right.  Okay.  So he moved to Ohio. |
| 11:14:25 | 10 | A.   Yes. |
| 11:14:25 | 11 | Q.   All right.  How long did y'all live in Ohio at that point? |
| 11:14:29 | 12 | A.   I don't remember. |
| 11:14:37 | 13 | Q.   All right.  Was it a long time or a short amount of time? |
| 11:14:40 | 14 | A.   It was probably close to two years -- a year and a half to |
| 11:14:48 | 15 | two years. |
| 11:14:48 | 16 | Q.   All right.  Did you live anywhere else other than Ohio |
| 11:14:52 | 17 | while you were still married after that? |
| 11:14:53 | 18 | A.   No. |
| 11:14:54 | 19 | Q.   All right.  Were you divorced while you were living in |
| 11:14:57 | 20 | Ohio? |
| 11:14:57 | 21 | A.   Yes. |
| 11:14:58 | 22 | Q.   Okay.  After the divorce, okay, where did you live? |
| 11:15:03 | 23 | A.   I stayed in Ohio for a short time, and then I moved to |
| 11:15:07 | 24 | Texas. |
| 11:15:07 | 25 | Q.   All right.  Where did the defendant live after the |

11:15:10  1  divorce, to your knowledge?

11:15:11  2  A.   He lived in many places.  He lived -- has lived in

11:15:15  3  Florida, California, Texas.  He's lived in Corpus Christi and

11:15:22  4  Austin and Dallas and Houston.  He's lived in northern

11:15:30  5  California, and he's lived a couple of different places in

11:15:32  6  Florida.

11:15:32  7  Q.   All right.  And you, again, kept in touch with him because

11:15:42  8  he had custody of your son; is that right?

11:15:44  9  A.   That's correct.

11:15:45  10  Q.   Did he have custody of your son during all of those moves?

11:15:48  11  A.   Most of them.

11:15:49  12  Q.   All right.  And you were obviously still in touch with

11:15:53  13  your son, and he would visit regularly?

11:15:55  14  A.   Yes.

11:15:55  15  Q.   Okay.  And you've lived in Texas all of that time since

11:15:59  16  then?  Since you've moved back to Texas, you've lived only in

11:16:01  17  Texas?

11:16:02  18  A.   Yes.

11:16:02  19  Q.   All right.  Why did -- why did the two of you -- and then

11:16:08  20  after his -- after your divorce, why did he move so often?

11:16:12  21  A.   He would take contracts -- software engineering contracts

11:16:22  22  for work.  And then when the contract was up, he would move on

11:16:25  23  to a different contract.  So he would go where he could get the

11:16:28  24  most money.

11:16:28  25  Q.   Okay.  So it's all job related, basically?

JENKINS - DIRECT

| | | |
|---|---|---|
| 11:16:33 | 1 | A.   Yes. |
| 11:16:33 | 2 | Q.   All right.  When, did -- while you were married, did you |
| 11:16:38 | 3 | and he have computers and computer equipment in the house? |
| 11:16:44 | 4 | A.   Yes. |
| 11:16:44 | 5 | Q.   All right.  Did you -- when was the earliest that you can |
| 11:16:49 | 6 | remember you had computers and computer equipment in your |
| 11:16:52 | 7 | residence, wherever you were? |
| 11:16:54 | 8 | A.   He had a computer when we got married. |
| 11:16:57 | 9 | Q.   All right.  Did -- do you remember what kind of computer |
| 11:17:02 | 10 | it was? |
| 11:17:03 | 11 | A.   No. |
| 11:17:03 | 12 | Q.   All right.  Did he have more than one computer? |
| 11:17:05 | 13 | A.   At times, yes. |
| 11:17:07 | 14 | Q.   Okay.  Did you have a computer? |
| 11:17:09 | 15 | A.   Yes.  And I used his sometimes before I got my own. |
| 11:17:15 | 16 | Q.   All right.  How would you describe his computer in terms |
| 11:17:19 | 17 | of what kind was it?  Was it a desktop? laptop? perhaps both? |
| 11:17:24 | 18 | A.   Desktop -- well, he had both.  When -- at first he had a |
| 11:17:28 | 19 | desktop. |
| 11:17:29 | 20 | Q.   Okay.  And then at some point there was a laptop? |
| 11:17:33 | 21 | A.   Yes. |
| 11:17:33 | 22 | Q.   Okay.  Maybe more -- was there more than one at any point? |
| 11:17:36 | 23 | A.   More than one computer? |
| 11:17:38 | 24 | Q.   Uh-huh. |
| 11:17:39 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:17:39 | 1 | Q.   Okay.  Did he -- did he configure or build his own |
| 11:17:48 | 2 | computer? |
| 11:17:49 | 3 | A.   Yes. |
| 11:17:50 | 4 | Q.   So he would add parts to it over time? |
| 11:17:52 | 5 | A.   I guess. |
| 11:17:53 | 6 | Q.   Okay. |
| 11:17:54 | 7 | A.   He built -- the one computer he built.  He ordered all the |
| 11:17:58 | 8 | parts, and then he built it. |
| 11:18:00 | 9 | Q.   Okay.  When you moved to the various places, did you |
| 11:18:11 | 10 | always bring your computer equipment? |
| 11:18:13 | 11 | A.   Yes. |
| 11:18:13 | 12 | Q.   And I'm saying the two of you when you were married. |
| 11:18:16 | 13 | A.   Yes. |
| 11:18:17 | 14 | Q.   All right.  Did you have any video-recording equipment, |
| 11:18:25 | 15 | like video cameras, with you? |
| 11:18:28 | 16 | A.   Yes. |
| 11:18:28 | 17 | Q.   All right.  Who used the video equipment? |
| 11:18:32 | 18 | A.   Mostly David. |
| 11:18:33 | 19 | Q.   All right.  Did he use it a lot? |
| 11:18:36 | 20 | A.   Yes. |
| 11:18:36 | 21 | Q.   Can you describe that in a little bit more detail. |
| 11:18:40 | 22 | A.   Anytime we went anywhere, he would video record.  He would |
| 11:18:44 | 23 | video record the kids around the house.  Just -- he would video |
| 11:18:50 | 24 | record on his motorcycle.  So he would have me video record him |
| 11:18:54 | 25 | on his motorcycle. |

| | | |
|---|---|---|
| 11:18:56 | 1 | Q.   Okay.   Okay.   Would it be fair to say he was an avid |
| 11:19:02 | 2 | videographer? |
| 11:19:03 | 3 | A.   I would say that's fair. |
| 11:19:05 | 4 | Q.   All right.   What kinds of cameras did he own? |
| 11:19:10 | 5 | A.   He owned a JVC camcorder.   He owned another camcorder.   I |
| 11:19:18 | 6 | believe it was a Sony.   And he also had some other camera |
| 11:19:21 | 7 | equipment -- lipstick camera, and then another camera that was |
| 11:19:27 | 8 | like a just a small camera on a circuit board that hooked to |
| 11:19:33 | 9 | the camcorders so that he could video without actually using |
| 11:19:41 | 10 | the camcorder. |
| 11:19:41 | 11 | Q.   What do you mean by a lipstick camera? |
| 11:19:44 | 12 | A.   It's a small, maybe, three inches -- two and a half to |
| 11:19:49 | 13 | three inches long cylinder with a camera in the end.   And then |
| 11:19:53 | 14 | it hooked into the camcorder.   He taped it to the top of his |
| 11:19:59 | 15 | helmet when he rode his motorcycle. |
| 11:20:01 | 16 | Q.   All right.   Kind of a helmet cam, if you will? |
| 11:20:04 | 17 | A.   He made it that way, yes. |
| 11:20:06 | 18 | Q.   Okay.   Are you -- did you previously describe a button |
| 11:20:12 | 19 | camera? |
| 11:20:12 | 20 | A.   I think that's probably what it's called. |
| 11:20:15 | 21 | Q.   And what is that. |
| 11:20:16 | 22 | A.   It's a camera on a circuit board, about one inch-by-one |
| 11:20:22 | 23 | inch square.   Very thin and with a round, very small camera |
| 11:20:27 | 24 | lens on top of it.   So I believe that they are -- they're kind |
| 11:20:33 | 25 | of used in, like, the nanny cams.   You know, like a teddy |

| | | |
|---|---|---|
| 11:20:37 | 1 | bear's eye.  I think that's it. |
| 11:20:40 | 2 | Q.    Okay.  Do you know what he was using that camera for? |
| 11:20:43 | 3 | A.    I don't.  He -- I didn't know he ever used it, if he did. |
| 11:20:48 | 4 | Q.    But you had seen this lipstick cam and this button camera, |
| 11:20:52 | 5 | as you describe it? |
| 11:20:54 | 6 | A.    Yes. |
| 11:20:54 | 7 | Q.    All right.  Did he -- the JVC and the Sony cameras that |
| 11:21:00 | 8 | you described, do you know how they recorded video?  Did they |
| 11:21:03 | 9 | do it on a tape? on a disc? internally?  Do you recall? |
| 11:21:08 | 10 | A.    I know that JVC camera used tapes.  I don't recall the |
| 11:21:13 | 11 | Sony. |
| 11:21:14 | 12 | Q.    All right.  Was there -- are you aware whether he ever |
| 11:21:19 | 13 | uploaded and stored videos on his computer? |
| 11:21:23 | 14 | A.    I know that he did upload and store videos of him riding |
| 11:21:28 | 15 | his motorcycle on the computer. |
| 11:21:31 | 16 | Q.    All right.  Did he ever edit or maybe do anything -- I'm |
| 11:21:41 | 17 | going to say do anything fancy with any of his videos on his |
| 11:21:44 | 18 | computer. |
| 11:21:45 | 19 | A.    He was trying to learn how.  He had some video editing |
| 11:21:48 | 20 | software that he was using, and he was learning how to use that |
| 11:21:52 | 21 | to, like, set music to the videos and edit segments and stuff. |
| 11:21:56 | 22 | Q.    Okay.  Were you ever involved in any of that?  In any |
| 11:22:00 | 23 | video editing or anything like that? |
| 11:22:03 | 24 | A.    No.  I knew that he did it, but I didn't really take an |
| 11:22:07 | 25 | interest. |

11:22:07   1   Q.   Okay.  When you moved, what happened to the video cameras

11:22:14   2   and the video equipment that you owned?

11:22:17   3   A.   They moved with us.

11:22:18   4   Q.   All right.  When you divorced -- when you and he divorced,

11:22:23   5   what happened to the video equipment?

11:22:25   6   A.   He kept it.  And then at some point later after -- we had

11:22:29   7   been divorced for a while -- he gave me the JVC camcorder so

11:22:34   8   that I would have one.  It was actually in the divorce that I

11:22:38   9   would get one, but I didn't take it initially.  I waited until

11:22:42  10   later.

11:22:42  11   Q.   Okay.  Do you know how much later that you got that

11:22:45  12   camera, roughly?

11:22:46  13   A.   Maybe a year.

11:22:48  14   Q.   All right.  And was it from that camera that you -- was

11:22:52  15   that the camera that you gave later to Special Agent Mullen?

11:22:56  16   A.   Yes.

11:22:57  17   Q.   Okay.  And inside it was -- it contained a -- a video

11:23:00  18   recording?

11:23:01  19   A.   Yes.

11:23:02  20   Q.   Okay.  And he -- Special Agent Mullen retained that video

11:23:10  21   recording; is that right?

11:23:11  22   A.   That's correct.

11:23:12  23   Q.   Just some home movies, I guess; is that right?

11:23:16  24   A.   Yes.

11:23:16  25   Q.   Have you ever heard of any software called retriever

JENKINS - DIRECT

11:23:28  1  software?

11:23:29  2  A.    Yes.

11:23:29  3  Q.    Can you tell me -- tell us about that?

11:23:31  4  A.    It's a software program that David wrote to go onto the

11:23:35  5  Internet and download files.  I don't know much more about it

11:23:42  6  than that.  I probably did years ago, but I don't really

11:23:46  7  remember.

11:23:46  8  Q.    How do you know about that?

11:23:48  9  A.    Well, he wrote it.  He told me about it.  And I actually

11:23:52  10  designed and animated GIF for him to use for the program.

11:23:56  11  Q.    Okay.  Was this while you were married?

11:23:59  12  A.    Yes.

11:23:59  13  Q.    All right.  Do you know why he developed that?

11:24:03  14  A.    To go Online and download files.  But I don't know

11:24:10  15  exactly -- I don't know much about it, really.

11:24:15  16  Q.    Okay.  Now, you're aware of what the defendant is charged

11:24:23  17  with here in court today; is that correct?

11:24:25  18  A.    That's correct.

11:24:26  19  Q.    Production of child pornography.  While you were married

11:24:31  20  to him, were you aware of any activities that he had involving

11:24:37  21  child pornography?

11:24:38  22  A.    No, I was not.

11:24:39  23  Q.    Were you involved in any way with child pornography?

11:24:42  24  A.    No, I was not.

11:24:43  25  Q.    When did you first learn about this investigation?

```
11:24:47  1  A.   I learned about this investigation between Christmas and
11:24:53  2  New Year's of 2009.
11:24:56  3  Q.   Okay.  And was that -- what did you learn at that point?
11:25:02  4  A.   I learned that --
11:25:05  5            MR. ORR:  Objection to hearsay, Your Honor.  What she
11:25:08  6  learned.
11:25:08  7            THE COURT:  Well, it's not hearsay yet.  I'm going to
11:25:11  8  let her answer the question, and then I'll let you re-urge your
11:25:14  9  objection.
11:25:14 10            MR. ORR:  Yes, sir.
11:25:15 11  Q.   (BY MR. DEVLIN) Just in general what did you learn about
11:25:17 12  the investigation?
11:25:18 13  A.   I learned that David was under investigation for -- for --
11:25:26 14  at the time, what I knew of it was child molestation of someone
11:25:32 15  that I knew.
11:25:32 16  Q.   Okay.
11:25:33 17            THE COURT:  Now, when you say between Christmas and
11:25:37 18  New Year's 2009, was that Christmas 2008 to New Year's 2009 or
11:25:42 19  Christmas 2009 to New Year's 2010?
11:25:47 20            THE WITNESS:  Christmas 2009 to New Year's 2010.
11:25:51 21            THE COURT:  Okay.  Thank you.
11:25:52 22  Q.   (BY MR. DEVLIN) Did you have anything to do with starting
11:25:55 23  that investigation?
11:25:57 24  A.   No.  I did not start the investigation.
11:25:59 25  Q.   Okay.  It was already ongoing when you learned about it?
```

| | | |
|---|---|---|
| 11:26:02 | 1 | A.    Correct. |
| 11:26:03 | 2 | MR. DEVLIN:  May I have a moment, Your Honor. |
| 11:26:05 | 3 | THE COURT:  You may. |
| 11:26:15 | 4 | MR. DEVLIN:  Your Honor, I pass the witness. |
| 11:26:17 | 5 | THE COURT:  Mr. Orr? |
| 11:26:34 | 6 | **CROSS–EXAMINATION** |
| 11:26:34 | 7 | **BY MR. ORR:** |
| 11:26:34 | 8 | Q.    Hi.  How are you doing? |
| 11:26:35 | 9 | A.    Hi. |
| 11:26:36 | 10 | Q.    So when you lived with Mr. Diehl here in Austin and you |
| 11:26:49 | 11 | had -- you had a son, correct? |
| 11:26:51 | 12 | A.    Correct. |
| 11:26:52 | 13 | Q.    Little A.? |
| 11:26:53 | 14 | A.    Yes. |
| 11:26:54 | 15 | Q.    That's what he goes by, right? |
| 11:26:56 | 16 | A.    Yes. |
| 11:26:56 | 17 | Q.    So he was a little boy at the time? |
| 11:26:58 | 18 | A.    Uh-huh. |
| 11:26:58 | 19 | Q.    He's getting bigger now, right? |
| 11:27:00 | 20 | A.    Yes. |
| 11:27:01 | 21 | Q.    Okay.  Good.  And so far as the sorts of things -- one of |
| 11:27:08 | 22 | the things that you did with Mr. Diehl is y'all went to the |
| 11:27:11 | 23 | Star Ranch Nudist Colony here in the Austin area, did you not? |
| 11:27:16 | 24 | A.    We did. |
| 11:27:17 | 25 | Q.    Okay.  And so at the ranch there are children who were |

| | | |
|---|---|---|
| 11:27:22 | 1 | nude, correct? |
| 11:27:23 | 2 | A.   That is correct. |
| 11:27:24 | 3 | Q.   Adults, children, everybody runs around without their |
| 11:27:27 | 4 | clothes on? |
| 11:27:28 | 5 | A.   That's correct. |
| 11:27:29 | 6 | Q.   And so far as how many visits do you think he made to the |
| 11:27:34 | 7 | Star Ranch with David? |
| 11:27:36 | 8 | A.   Many.  We -- we were members. |
| 11:27:41 | 9 | Q.   Okay. |
| 11:27:41 | 10 | A.   We went regularly. |
| 11:27:43 | 11 | Q.   Okay.  Did he have a -- did y'all have a cabin there ever? |
| 11:27:47 | 12 | A.   Yes. |
| 11:27:48 | 13 | Q.   Okay.  And you still continue to go to the Star Ranch, do |
| 11:27:53 | 14 | you not? |
| 11:27:54 | 15 | A.   I haven't been lately because he won't let me. |
| 11:27:57 | 16 | Q.   Okay.  Well, your parents stay out there, do they not? |
| 11:28:02 | 17 | A.   Yes, they do. |
| 11:28:03 | 18 | Q.   Okay.  And you and Mr. Diehl are now at the -- you're |
| 11:28:08 | 19 | feuding about A., correct? |
| 11:28:10 | 20 | A.   Yes. |
| 11:28:11 | 21 | Q.   That's maybe a -- that's a fair way to put it, is it not? |
| 11:28:15 | 22 | There are some sort of civil proceedings pending about your |
| 11:28:18 | 23 | son? |
| 11:28:19 | 24 | A.   Yes. |
| 11:28:19 | 25 | Q.   Okay.  And one of the things his civil lawyer asked to |

11:28:23  1  have done in that case was that you be enjoined from taking A.

11:28:26  2  to the Star Ranch?

11:28:28  3  A.   Yes.

11:28:28  4  Q.   Okay.  And you -- have you violated that order, not to do

11:28:32  5  that?

11:28:33  6  A.   No, I have not.

11:28:34  7  Q.   Okay.  So -- and do you have any idea why Mr. Diehl did

11:28:38  8  not want A. going to the Star Ranch?

11:28:41  9           MR. DEVLIN:  Objection, Your Honor.  Relevance.

11:28:49 10           THE COURT:  Mr. Orr, do you have a response to the

11:28:51 11  objection?

11:28:51 12           MR. ORR:  I think it's relevant in that they try to

11:28:56 13  portray Mr. Diehl in a poor light, and I'm trying to put him

11:28:59 14  back in a slighter better light.

11:29:01 15           THE COURT:  I'll allow the question.  The objection

11:29:02 16  is overruled.

11:29:04 17           THE WITNESS:  Can you repeat the question?

11:29:05 18  Q.   (BY MR. ORR) Do you have any idea why Mr. Diehl would not

11:29:08 19  want his son going to the Star Ranch?

11:29:10 20  A.   No.  I'm not sure why.

11:29:12 21  Q.   Okay.  All right.  Are you aware of the -- other than just

11:29:19 22  a general outline of what the charges are against Mr. Diehl in

11:29:23 23  this case, are you aware of any of -- any of the videos or what

11:29:27 24  the details are?

11:29:28 25  A.   I have identified victims.

| | | |
|---|---|---|
| 11:29:30 | 1 | Q.   Okay.  That's because Mr. -- Mr. Devlin and Agent Mullen |
| 11:29:36 | 2 | have shown you still photographs? |
| 11:29:38 | 3 | A.   Yes. |
| 11:29:39 | 4 | Q.   And you were able to say, Well, that's so and so and this |
| 11:29:42 | 5 | is so and so.  That sort of thing, correct? |
| 11:29:44 | 6 | A.   Correct. |
| 11:29:45 | 7 | Q.   All right.  Well, when you visit the Star Ranch, is there |
| 11:29:52 | 8 | ways to video -- can you take photographs out there and |
| 11:29:55 | 9 | videos?  Can you do that? |
| 11:29:56 | 10 | A.   In general it's not allowed. |
| 11:29:58 | 11 | Q.   But in -- are there specific instances where it can be |
| 11:30:02 | 12 | allowed? |
| 11:30:02 | 13 | A.   There are. |
| 11:30:03 | 14 | Q.   Okay.  And what -- tell the Court what -- what those |
| 11:30:06 | 15 | instances are? |
| 11:30:07 | 16 | A.   Special events.  They take photographs of the children |
| 11:30:13 | 17 | with Santa Clause at Christmas.  Most of the children are |
| 11:30:18 | 18 | clothed -- |
| 11:30:19 | 19 | Q.   Okay. |
| 11:30:19 | 20 | A.   -- when that happens. |
| 11:30:20 | 21 | Q.   Okay.  And do the children -- in order for the parents to |
| 11:30:24 | 22 | get permission for them to be photographed, do they have to |
| 11:30:28 | 23 | wear an arm band? |
| 11:30:29 | 24 | A.   I believe that was the case during the 2000 convention. |
| 11:30:32 | 25 | Q.   Okay.  And so there was a convention in 2000, correct? |

| | | |
|---|---|---|
| 11:30:35 | 1 | A.    Yes. |
| 11:30:36 | 2 | Q.    And you attended that with Mr. Diehl and A.? |
| 11:30:38 | 3 | A.    No, I did not. |
| 11:30:39 | 4 | Q.    Oh, you did not go? |
| 11:30:41 | 5 | A.    No.  And neither did A.. |
| 11:30:43 | 6 | Q.    Okay.  Well, were you out there at all in 2000? |
| 11:30:46 | 7 | A.    Yes. |
| 11:30:47 | 8 | Q.    Okay.  With Mr. Diehl and A.? |
| 11:30:49 | 9 | A.    Yes. |
| 11:30:49 | 10 | Q.    Okay.  But you have no recollection of attending the |
| 11:30:54 | 11 | convention? |
| 11:30:55 | 12 | A.    No. |
| 11:30:55 | 13 | Q.    Okay.  You think that Mr. Diehl went there by himself? |
| 11:30:58 | 14 | A.    Yes. |
| 11:30:59 | 15 | Q.    Okay.  All right.  Now, was there a time when -- that a |
| 11:31:12 | 16 | young relative of Mr. Diehl's came to live with you in Austin? |
| 11:31:16 | 17 | A.    Yes. |
| 11:31:16 | 18 | Q.    And about when was that? |
| 11:31:18 | 19 | A.    That was in '99, I believe. |
| 11:31:27 | 20 | Q.    Okay.  And how long did she live with you? |
| 11:31:29 | 21 | A.    I don't recall.  She lived with us for a while.  She was |
| 11:31:34 | 22 | enrolled in school. |
| 11:31:35 | 23 | Q.    About six months to a year at the most? |
| 11:31:38 | 24 | A.    Yes. |
| 11:31:38 | 25 | Q.    Something like that? |

JENKINS - CROSS

| | | |
|---|---|---|
| 11:31:39 | 1 | And without mentioning her name, she would be |
| 11:31:42 | 2 | Mr. Diehl's niece. Would that be fair to say? |
| 11:31:44 | 3 | A. Yes. |
| 11:31:45 | 4 | Q. Okay. And about how old was she at that time? |
| 11:31:48 | 5 | A. I believe she was seven. |
| 11:31:50 | 6 | Q. Okay. Could she have been a little older? |
| 11:31:55 | 7 | A. She might have been eight. |
| 11:31:56 | 8 | Q. Okay. Were there any problems with her in terms of |
| 11:32:01 | 9 | discipline or anything like that? |
| 11:32:03 | 10 | A. Occasionally. She's a child. There occasionally are. |
| 11:32:08 | 11 | Q. Well, that's part of growing up. Sometimes you're hard to |
| 11:32:12 | 12 | handle? |
| 11:32:12 | 13 | A. Yes. |
| 11:32:12 | 14 | Q. Not everyone can be the perfect child like I was, I |
| 11:32:18 | 15 | suppose. |
| 11:32:18 | 16 | So did you -- did you know -- there was another young |
| 11:32:32 | 17 | lady. I think you've been shown her photograph probably from a |
| 11:32:35 | 18 | video from the Star Ranch. |
| 11:32:40 | 19 | A. Can you be more specific? |
| 11:32:41 | 20 | Q. Well, I'd rather not mention her name. |
| 11:32:44 | 21 | A. Well, yes. |
| 11:32:45 | 22 | Q. The young lady from the Star Ranch. She would have been |
| 11:32:49 | 23 | about ten at the time? |
| 11:32:50 | 24 | A. Yes. |
| 11:32:50 | 25 | Q. Okay. And did there ever come a time, for instance, when |

| | | |
|---|---|---|
| 11:33:03 | 1 | either -- when some young girl would climb into your bed with |
| 11:33:08 | 2 | you and David? |
| 11:33:09 | 3 | A.   Very rarely.  I didn't like to have the children in my |
| 11:33:13 | 4 | bed.  A. didn't sleep in my bed. |
| 11:33:15 | 5 | Q.   Well, you'd kick them out, right? |
| 11:33:17 | 6 | A.   Yes. |
| 11:33:17 | 7 | Q.   You and David would kick them out? |
| 11:33:19 | 8 | A.   Yes. |
| 11:33:20 | 9 | Q.   It was something -- it was unwanted attention that you |
| 11:33:23 | 10 | were receiving from the little girls, correct? |
| 11:33:26 | 11 | A.   Well, either A. or her.  We didn't allow either of them to |
| 11:33:29 | 12 | sleep in the bed. |
| 11:33:30 | 13 | Q.   Okay.  It just gets too crowded, right? |
| 11:33:35 | 14 | A.   Yeah.  I just didn't think it was appropriate. |
| 11:33:37 | 15 | Q.   Okay.  All right.  And did -- was there a time when Mr. -- |
| 11:33:42 | 16 | Mr. Diehl had a motorcycle accident, around -- somewhere around |
| 11:33:46 | 17 | this time frame that we're talking about? |
| 11:33:48 | 18 | A.   Yes. |
| 11:33:48 | 19 | Q.   Okay.  Was it a fairly bad accident? |
| 11:33:50 | 20 | A.   Yes. |
| 11:33:51 | 21 | Q.   Okay.  Could you tell the Court what happened to him in |
| 11:33:54 | 22 | that accident? |
| 11:33:54 | 23 | A.   He injured his hand, his forearm, his ribs. |
| 11:34:00 | 24 | Q.   Okay.  And did you -- did you go to the hospital with him? |
| 11:34:05 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:34:06 | 1 | Q.   And what hospital did he go to? |
| 11:34:08 | 2 | A.   Seton Northwest. |
| 11:34:09 | 3 | Q.   Okay.  How long was he in the hospital? |
| 11:34:11 | 4 | A.   It was just an ER visit. |
| 11:34:13 | 5 | Q.   Just an emergency visit? |
| 11:34:16 | 6 | A.   Yes. |
| 11:34:16 | 7 | Q.   Okay.  And was he given some drugs there at the hospital? |
| 11:34:20 | 8 | A.   Yes. |
| 11:34:20 | 9 | Q.   Okay.  Do you know what he was given? |
| 11:34:22 | 10 | A.   Morphine, and then he was prescribed Silvadene for his |
| 11:34:27 | 11 | road rash. |
| 11:34:28 | 12 | Q.   For what? |
| 11:34:28 | 13 | A.   Road rash. |
| 11:34:30 | 14 | Q.   Okay.  Was he given some Oxycontin there? |
| 11:34:33 | 15 | A.   I do not recall any. |
| 11:34:35 | 16 | Q.   Okay.  Well, did -- did you and Mr. Diehl share a doctor? |
| 11:34:41 | 17 | That is, did you have -- did he go to the same doctor you went |
| 11:34:46 | 18 | to? |
| 11:34:46 | 19 | A.   Yes. |
| 11:34:46 | 20 | Q.   Okay.  And was the doctor prescribing medications for you? |
| 11:34:51 | 21 | A.   Yes. |
| 11:34:51 | 22 | Q.   And what had he prescribed for you? |
| 11:34:54 | 23 | A.   Well, I don't believe that was at the same time -- |
| 11:34:57 | 24 | MR. ORR:  Objection.  Relevance. |
| 11:34:58 | 25 | THE COURT:  Mr. Orr.  Relevance? |

11:35:00  1          MR. ORR:  Well, it goes to the relevance of what

11:35:02  2  Mr. Diehl was allowed to take and what he got from the same

11:35:05  3  doctor.

11:35:06  4          THE COURT:  All right.  And what relevance does all

11:35:08  5  of that have to the charges in the indictment?

11:35:10  6          MR. ORR:  I think it goes to what -- to the

11:35:15  7  apparent -- to this time frame, Your Honor, he was on these

11:35:19  8  medications.  And this is the only time frame which I think

11:35:22  9  that any of this ever occurred.  The Government's allegations

11:35:25 10  go to the time frame of 1999 to 2000.  And I'm trying to show

11:35:29 11  during this time frame that he had been receiving medications

11:35:32 12  from his doctor and from the hospital as a result from his

11:35:36 13  wreck.  It might be more appropriate at sentencing but -- if we

11:35:39 14  get that far.

11:35:39 15          THE COURT:  I'll allow you a little leeway, but don't

11:35:42 16  belabor the point.

11:35:43 17          MR. ORR:  No, sir.  I won't.

11:35:45 18          THE COURT:  The objection's overruled.

11:35:46 19  Q.   (BY MR. ORR) So do you remember the doctor's name?

11:35:49 20  A.   No.

11:35:49 21  Q.   Okay.  Well, did you get some medications from the doctor?

11:35:53 22  A.   I did, yes.

11:35:55 23  Q.   And did Mr. Diehl get some medications from the doctor?

11:35:58 24  A.   I do not recall.

11:35:59 25  Q.   Okay.  Well, at one point the doctor gave you too much --

| 11:36:04 | 1 | too many medications, and you actually overdosed, correct? |
| 11:36:07 | 2 | A.   That is correct. |
| 11:36:08 | 3 | Q.   By accident, I assume, correct? |
| 11:36:10 | 4 | A.   Yes. |
| 11:36:10 | 5 | Q.   All right.  But whatever the doctor gave you, it was |
| 11:36:13 | 6 | something that apparently was either too much in quantity or |
| 11:36:16 | 7 | not an appropriate substance, correct? |
| 11:36:18 | 8 | A.   Correct. |
| 11:36:20 | 9 | Q.   And you do know that Mr. Diehl visited this doctor? |
| 11:36:24 | 10 | A.   Yes. |
| 11:36:24 | 11 | Q.   Okay.  Now, so far as you mentioned these video cameras, |
| 11:36:41 | 12 | Mr. Diehl never video-ed you in any way during the course of |
| 11:36:45 | 13 | your marriage or your time together.  Would that be a fair |
| 11:36:48 | 14 | statement? |
| 11:36:48 | 15 | A.   He video recorded me. |
| 11:36:50 | 16 | Q.   Did he video you in any kind of sexual activities? |
| 11:36:54 | 17 | A.   Not to my knowledge. |
| 11:36:55 | 18 | Q.   Okay.  Other than just home videos, that's all you know |
| 11:36:58 | 19 | about with him, correct? |
| 11:36:59 | 20 | A.   Correct. |
| 11:37:00 | 21 | Q.   Okay.  Did you have access to his computer there at the |
| 11:37:04 | 22 | house that you lived in together in Austin? |
| 11:37:07 | 23 | A.   Yes. |
| 11:37:08 | 24 | Q.   Okay.  And you never saw any -- any -- you testified you |
| 11:37:11 | 25 | didn't know anything about any of this sort of thing.  You |

JENKINS - CROSS

| | | |
|---|---|---|
| 11:37:14 | 1 | didn't see any kind of child pornography or any kind of |
| 11:37:19 | 2 | pornography on the computer.  Would that be a fair statement? |
| 11:37:22 | 3 | A.   That is fair. |
| 11:37:23 | 4 | Q.   Okay.  Now, you -- Mr. Diehl during the time of the |
| 11:37:31 | 5 | marriage was gone a lot, was he not?  Traveling? |
| 11:37:34 | 6 | A.   That is true. |
| 11:37:35 | 7 | Q.   And that was difficult, was it not?  Or was it? |
| 11:37:39 | 8 | A.   Some -- most of the time, it was. |
| 11:37:41 | 9 | Q.   Okay.  In any event, you've been remarried to another man, |
| 11:37:45 | 10 | correct? |
| 11:37:45 | 11 | A.   That's correct. |
| 11:37:46 | 12 | Q.   And what is his name? |
| 11:37:48 | 13 | A.   Charles. |
| 11:37:48 | 14 | Q.   Okay.  And you -- what's his last name? |
| 11:37:51 | 15 | A.   Claybo (phonetic). |
| 11:37:52 | 16 | Q.   Okay.  And you have -- you have three children with him, |
| 11:37:57 | 17 | do you not? |
| 11:37:58 | 18 | A.   Yes, I do. |
| 11:37:58 | 19 | Q.   Okay.  And now you are seeking custody of A., right? |
| 11:38:02 | 20 | A.   I have custody of A. |
| 11:38:04 | 21 | Q.   Okay.  Well, you have custody.  Do you have temporary |
| 11:38:07 | 22 | custody or permanent custody? |
| 11:38:08 | 23 | A.   Temporary. |
| 11:38:09 | 24 | Q.   Okay.  So you're seeking permanent custody? |
| 11:38:12 | 25 | A.   Yes. |

11:38:12   1   Q.   Okay.  Now, when -- when Mr. -- at the time of the

11:38:21   2   divorce, Mr. Diehl, what, got custody of his son by agreement

11:38:24   3   with you?  Is that the way it worked?

11:38:28   4   A.   No.  At the time of the divorce, we had shared parenting.

11:38:31   5   Q.   Okay.  And then did that become parenting that Mr. Diehl

11:38:37   6   undertook more than you did in terms of time, at least?

11:38:41   7   A.   Mr. Diehl moved.

11:38:43   8   Q.   Uh-huh.

11:38:44   9   A.   And then we were still sharing A.  And then he took him in

11:38:52   10  the middle of the night and took him to Ohio and filed for

11:38:55   11  custody while I was pregnant on bed rest and couldn't travel.

11:38:59   12  And he lied to the Court, and he told the Court that I had no

11:39:03   13  part of A.'s life.

11:39:06   14  Q.   And how long ago was that?

11:39:08   15  A.   That was in two thousand -- 2003 -- 2002.

11:39:15   16  Q.   Okay.  And -- but until    1iehl was arrested by the

11:39:19   17  United States of America, you didn't undertake to get custody

11:39:23   18  of A. back?

11:39:24   19  A.   No, I did not.

11:39:36   20       MR. ORR:  May I have just a moment, Your Honor?

11:40:17   21  Q.   (BY MR. ORR) Okay.  So -- and you're aware of the

11:40:20   22  activities that Mr. Diehl has undertaken with his son A.?

11:40:24   23  A.   Could you be more specific?

11:40:26   24  Q.   Well, he takes him to tennis lessons and takes him to

11:40:30   25  school and that sort of thing?

JENKINS - CROSS

| 11:40:32 | 1 | A. He did. Now I do that. |

11:40:32  1  A.   He did.  Now I do that.

11:40:33  2  Q.   Huh?

11:40:34  3  A.   He did, and now I do that.

11:40:35  4  Q.   Okay.  And he's quite an accomplished tennis player, is he

11:40:40  5  not?

11:40:40  6  A.   He is.

11:40:41  7  Q.   Now, you claim he was taken in the middle of the night?

11:40:43  8  A.   Yes, he was.

11:40:44  9  Q.   You mean from your house?  You mean stolen or kidnapped?

11:40:48  10  A.   No.  When it was his visitation.

11:40:50  11  Q.   Okay.  Well, if the -- the divorce was in Ohio, correct?

11:40:56  12  A.   Correct.

11:40:56  13  Q.   And so that until I guess changed, that Court would have

11:41:01  14  jurisdiction over the child?

11:41:03  15  A.   Yes.

11:41:04  16  Q.   And so was there a change of orders there after -- at some

11:41:09  17  time after the divorce?

11:41:10  18  A.   There was.

11:41:11  19  Q.   Okay.  And you undertook no way -- nothing to change that

11:41:16  20  order?

11:41:17  21  A.   No.

11:41:18  22  Q.   Okay.

11:41:20  23          THE COURT:  Now, I'm giving you some leeway here, but

11:41:23  24  I think --

11:41:23  25          MR. ORR:  I was about to move on.  You're absolutely

| | | |
|---|---|---|
| 11:41:26 | 1 | right, Your Honor.  Your Honor has once again given me some |
| 11:41:30 | 2 | latitude. |
| 11:41:31 | 3 | THE COURT:  Don't abuse it. |
| 11:41:33 | 4 | Q.  (BY MR. ORR) Just one more question. |
| 11:42:08 | 5 | Did there ever come a time -- well, do you know who a |
| 11:42:11 | 6 | person named Kenneth Courtney is? |
| 11:42:13 | 7 | A.  I don't know Kenneth Courtney personally.  I have heard of |
| 11:42:18 | 8 | him. |
| 11:42:18 | 9 | Q.  And did you ever mention him to the FBI? |
| 11:42:21 | 10 | A.  I did. |
| 11:42:21 | 11 | Q.  And in what context did you do that? |
| 11:42:28 | 12 | A.  I -- David told me that -- that Kenneth Courtney had been |
| 11:42:33 | 13 | arrested for possession of child pornography, and I relayed |
| 11:42:38 | 14 | that information to the FBI, that Kenneth Courtney was someone |
| 11:42:41 | 15 | that David knew. |
| 11:42:42 | 16 | Q.  That he what? |
| 11:42:43 | 17 | A.  That Kenneth Courtney was someone that David knew after |
| 11:42:46 | 18 | David told me that he had been arrested. |
| 11:42:49 | 19 | Q.  Okay.  And when you -- when you lived with Mr. Diehl, did |
| 11:43:18 | 20 | he seem to love his son? |
| 11:43:19 | 21 | A.  Yes. |
| 11:43:20 | 22 | Q.  And you never saw him -- you know the allegations against |
| 11:43:24 | 23 | him, correct? |
| 11:43:25 | 24 | A.  Yes. |
| 11:43:25 | 25 | Q.  And you never saw him undertake anything like that that |

JENKINS - CROSS

| | | |
|---|---|---|
| 11:43:30 | 1 | involved -- you'd had no idea that, if any of this was going |
| 11:43:35 | 2 | on, it was going on -- let me put it like that -- correct? |
| 11:43:38 | 3 | A.   I'm sorry can you ask the question? |
| 11:43:40 | 4 | Q.   You never knew anything -- in other words, you never knew |
| 11:43:43 | 5 | about any videos of any children? |
| 11:43:45 | 6 | A.   No, I did not.  I mean, not any pornographic videos. |
| 11:43:49 | 7 | Q.   Well, the normal family home videos? |
| 11:43:52 | 8 | A.   Yes.  There were family home videos. |
| 11:43:55 | 9 | Q.   Okay.  And that's all that you knew about? |
| 11:43:58 | 10 | A.   Yes. |
| 11:43:58 | 11 | Q.   Okay. |
| 11:44:00 | 12 | MR. ORR:  Pass the witness. |
| 11:44:02 | 13 | THE COURT:  Mr. Devlin, redirect? |
| 11:44:03 | 14 | MR. DEVLIN:  Nothing further, Your Honor. |
| 11:44:05 | 15 | THE COURT:  All right.  You may step down.  At this |
| 11:44:07 | 16 | time the Court will be in recess until 1:30. |
| 11:44:10 | 17 | MR. DEVLIN:  Your Honor, before that may the witness |
| 11:44:12 | 18 | be excused?  I know that Mr. Orr has subpoenaed her. |
| 11:44:16 | 19 | MR. ORR:  Can we have rebuttal, Your Honor, if |
| 11:44:20 | 20 | necessary?  I don't think it will be necessary. |
| 11:44:22 | 21 | THE COURT:  All right.  Well, we'll have to keep her |
| 11:44:25 | 22 | here. |
| 11:44:28 | 23 | MR. DEVLIN:  Okay. |
| 11:44:28 | 24 | THE COURT:  All right.  The Court's in recess until |
| 11:44:30 | 25 | 1:30. |

| 11:44:30 | 1 | (Recess) |

13:34:42   2      (Open Court, Defendant present)

13:34:42   3           THE COURT:  Are we ready to proceed?  Do we have

13:34:44   4  anything we need to take up?

13:34:46   5           MR. DEVLIN:  Nothing we need to take up from the

13:34:47   6  Government, Your Honor.

13:34:48   7           THE COURT:  Mr. Orr, anything?

13:34:49   8           MR. ORR:  No, Your Honor.

13:34:49   9           THE COURT:  All right.  Mr. Devlin, you may call your

13:34:52  10  next witness.

13:34:53  11           MR. DEVLIN:  Call Kenneth Courtney.

13:35:42  12      (Witness sworn)

13:36:03  13           MR. DEVLIN:  May I proceed, Your Honor?

13:36:04  14           THE COURT:  You may.

13:36:05  15                        **KENNETH COURTNEY,**

13:36:05  16  having been first duly sworn, testified as follows:

13:36:05  17                        **DIRECT EXAMINATION**

13:36:05  18  **BY MR. DEVLIN:**

13:36:06  19  Q.   Your name is Kenneth Courtney, and that's spelled

13:36:10  20  C-o-u-r-t-n-e-y; is that correct?

13:36:11  21  A.   Yes, sir.

13:36:11  22  Q.   Okay.  And you are -- do you know the defendant in this

13:36:17  23  case, David Diehl?

13:36:18  24  A.   Yes, sir.

13:36:18  25  Q.   And, Judge, may I -- I'm just going to adjust his

COURTNEY – DIRECT

| | | |
|---|---|---|
| 13:36:22 | 1 | microphone a little bit.  Or if you can do that. |
| 13:36:29 | 2 | A.   Yes, sir. |
| 13:36:30 | 3 | Q.   How do you know Mr. Diehl? |
| 13:36:33 | 4 | A.   We were friends. |
| 13:36:35 | 5 | Q.   How long have you known him? |
| 13:36:38 | 6 | A.   Since 2006 -- 2005.  Roughly six, seven years. |
| 13:36:50 | 7 | Q.   Okay.  Around mid 2000s or so.  Okay.  You describe |
| 13:36:58 | 8 | yourselves as friends.  Can you be a little bit more detailed |
| 13:37:02 | 9 | about that?  How good a friends were you? |
| 13:37:04 | 10 | A.   We were -- we shared a common profession, programming.  We |
| 13:37:12 | 11 | both had -- we were single parents.  We both had similar |
| 13:37:18 | 12 | political views.  Similar pastimes -- motorcycles.  Good |
| 13:37:28 | 13 | friends. |
| 13:37:28 | 14 | Q.   Okay.  Where did you first meet him? |
| 13:37:32 | 15 | A.   Busch Gardens. |
| 13:37:33 | 16 | Q.   Was that in Tampa, Florida? |
| 13:37:36 | 17 | A.   Yes, sir. |
| 13:37:36 | 18 | Q.   Okay.  And just basically fair to say that you were in the |
| 13:37:40 | 19 | same vicinity and struck up a conversation -- |
| 13:37:43 | 20 | A.   Yes, sir. |
| 13:37:43 | 21 | Q.   -- and went from there? |
| 13:37:44 | 22 |      Okay.  How frequently did you socialize with him, |
| 13:37:53 | 23 | would you say, on average? |
| 13:37:54 | 24 | A.   Professionally, probably virtually every day during our |
| 13:37:59 | 25 | professional careers.  Sometimes it was on and off, but |

| | | |
|---|---|---|
| 13:38:02 | 1 | virtually every day on Instant Messenger or other forms of |
| 13:38:10 | 2 | Internet communication.  But primarily instant messenger. |
| 13:38:14 | 3 | Q.    Okay.  How about personally? |
| 13:38:16 | 4 | A.    Telephone, maybe every other day or maybe once a week or |
| 13:38:21 | 5 | something like that.  It just depended. |
| 13:38:23 | 6 | Q.    Okay.  Did you know his family? |
| 13:38:27 | 7 | A.    I knew his son A. |
| 13:38:28 | 8 | Q.    All right.  Did you have a child of your own who was about |
| 13:38:33 | 9 | A.'s age? |
| 13:38:33 | 10 | A.    Yes, sir.  Lauren.  She's almost 12. |
| 13:38:35 | 11 | Q.    Okay.  She's almost 12 now? |
| 13:38:39 | 12 | A.    Yes, sir. |
| 13:38:39 | 13 | Q.    Okay.  So five or six years ago, I guess she would have |
| 13:38:42 | 14 | been five, six, seven years old? |
| 13:38:44 | 15 | A.    Correct.  I also had another daughter at that time who has |
| 13:38:48 | 16 | since passed away. |
| 13:38:49 | 17 | Q.    Okay.  Did the defendant know your family? |
| 13:38:51 | 18 | A.    Yes, sir. |
| 13:38:52 | 19 | Q.    Okay.  Did you visit his house? |
| 13:38:56 | 20 | A.    Yes, I did. |
| 13:38:57 | 21 | Q.    And where was he living at the time that you knew him? |
| 13:39:00 | 22 | A.    In Oldsmar, Florida. |
| 13:39:01 | 23 | Q.    Okay. |
| 13:39:02 | 24 | A.    Just outside of Tampa. |
| 13:39:03 | 25 | Q.    All right.  And where were you living at that time? |

13:39:05  1   A.   I was living in Brandon -- well, Riverview, Florida.

13:39:09  2   Q.   I take it they're fairly close in distance?

13:39:12  3   A.   Roughly 35 miles.

13:39:13  4   Q.   All right.  Was there a time -- when you met him, he was

13:39:17  5   living at this location in Florida?

13:39:18  6   A.   I believe so.

13:39:19  7   Q.   Okay.  Did -- was there a point in time that -- after that

13:39:24  8   that he moved away from Florida?

13:39:27  9   A.   More recently he had spent a year in San Jose, California.

13:39:32  10  Q.   Do you remember roughly when that was?

13:39:35  11  A.   About a year and a half before May -- before I fell.  So

13:39:40  12  that was I guess 2008.  I can't remember precisely.

13:39:44  13  Q.   Okay.  And I'm asking you a lot about times.  I think

13:39:47  14  you've related to me previously that times are not necessarily

13:39:49  15  the most precise thing for you.  Is that fair to say?

13:39:52  16  A.   I go by basic milestones in my home life, and that would

13:39:56  17  be the loss of my daughter in 2006.  So plus or minus.  It's

13:40:01  18  kind of vague now.  And also because I've been down for two

13:40:06  19  years.

13:40:06  20  Q.   Let's talk about that for a minute, Mr. Courtney.  You're

13:40:10  21  currently serving a sentence yourself; is that correct?

13:40:14  22  A.   Yes, sir.

13:40:15  23  Q.   And it's a 15-year sentence with the State of Florida?

13:40:18  24  A.   Yes, sir.

13:40:19  25  Q.   And what is that for?

COURTNEY - DIRECT                                    91

13:40:20  1   A.   Possession of child pornography.

13:40:21  2   Q.   Okay.  You were -- you were sentenced in -- do you

13:40:27  3   remember when you were sentenced?

13:40:29  4   A.   Roughly May 15th of last year -- of this past year.

13:40:36  5   Q.   Of 2010?

13:40:37  6   A.   Yes, sir.

13:40:38  7   Q.   Okay.  When -- when were you arrested?

13:40:40  8   A.   May 14th of 2009.

13:40:43  9   Q.   All right.  And where were you living at the time?

13:40:46  10  A.   Riverview, Florida.

13:40:48  11  Q.   And where is that -- what big city is that near?  Tampa?

13:40:51  12  A.   Tampa.  It's eight miles east of Tampa.

13:40:54  13  Q.   Okay.  And your sentence of 15 years is pretty much solid

13:41:02  14  time.  There's no parole in Florida; is that correct?

13:41:05  15  A.   85 percent.

13:41:06  16  Q.   So you will serve 85 --

13:41:08  17  A.   Twelve years, nine months.

13:41:09  18  Q.   Twelve years and nine months.  So you're looking at

13:41:13  19  probably around, 2021 to get out?

13:41:16  20  A.   February 5th, 2022.

13:41:18  21  Q.   2022.  Okay.  In terms of your being here today, you're

13:41:23  22  not voluntarily here today, are you?  I mean, in terms of you

13:41:29  23  didn't -- you didn't raise your hand and say, Hey, I'll come to

13:41:32  24  this trial.  You were subpoenaed or you were writted out; is

13:41:35  25  that correct?

13:41:35  1  A.   That's correct.

13:41:36  2  Q.   All right.  Regarding your testimony here today, have

13:41:41  3  there been any promises or deals or any other benefits that

13:41:50  4  have been represented to you in exchange to your testimony?

13:41:53  5  A.   Nothing's been promised.  However, I've been told that you

13:41:56  6  will call my prosecuting attorney or prosecutor and say that I

13:42:00  7  was here and that I testified truthfully.

13:42:05  8  Q.   Okay.  Well, in terms of your -- again, as far as a

13:42:09  9  promise, I represented to you that I would contact the

13:42:12  10 prosecutor in your state case.

13:42:13  11 A.   Yes, sir.

13:42:14  12 Q.   And give the prosecutor an overview of the nature of your

13:42:18  13 testimony and what have you; is that correct?

13:42:20  14 A.   Yes, sir.

13:42:21  15 Q.   And that could be good, bad, or ugly if you come in here

13:42:26  16 and lie; is that correct?

13:42:27  17 A.   Absolutely.

13:42:28  18 Q.   Okay.  So it's not necessarily that he's going to be

13:42:31  19 told -- or he or she is going to be told that you testified

13:42:35  20 truthfully.  It's that you testified --

13:42:37  21 A.   Yes, sir.

13:42:37  22 Q.   -- and what it was that you testified to; is that correct?

13:42:39  23 A.   Yes, sir.

13:42:39  24 Q.   And is it fair to say that it's your hope that you do get a

13:42:45  25 benefit of this in terms of a reduction of your sentence?

COURTNEY – DIRECT                                        93

13:42:48   1   A.   Yes, sir.

13:42:48   2   Q.   Okay.  But no promises have been made by me or even the

13:42:51   3   Florida prosecutor regarding that; is that correct?

13:42:55   4   A.   No promises have been made.

13:42:56   5   Q.   And no promises have been made by any court official or

13:43:00   6   any other law enforcement official; is that correct?

13:43:03   7   A.   Yes, sir.

13:43:03   8   Q.   That's just your own personal hope, what you would like to

13:43:07   9   see happen.  But there's been no promise to that effect made;

13:43:10  10   is that correct?

13:43:10  11   A.   Yes, sir.

13:43:11  12   Q.   And you're not testifying here today under any grant of

13:43:14  13   immunity.  Is that true?

13:43:15  14   A.   That's true.

13:43:16  15   Q.   All right.  In terms of your testimony, was there anything

13:43:19  16   that -- that I or maybe Agent Mullen or any other law

13:43:24  17   enforcement agent told you to say in terms of your testimony?

13:43:27  18   A.   Just to be truthful.

13:43:28  19   Q.   Okay.  Anything else?

13:43:30  20   A.   No.

13:43:31  21   Q.   All right.  And is that your intent today, is to be

13:43:35  22   truthful?

13:43:35  23   A.   Yes, sir.

13:43:36  24   Q.   Okay.  Your possession of child pornography conviction,

13:43:49  25   was that in any way -- was there anybody else involved in the

COURTNEY – DIRECT                                94

| 13:43:54 | 1 | activities that gave rise to that? |

13:43:54  1  activities that gave rise to that?

13:43:56  2  A.    No, sir.

13:43:57  3  Q.    All right.  Briefly, did that arise as a result of a

13:44:02  4  search being conducted at your house?

13:44:04  5  A.    Well, the -- the short form would be no.

13:44:10  6  Q.    Okay.  How did it arise?

13:44:14  7  A.    I had a friend who -- who had -- I inadvertently showed my

13:44:20  8  collection to who was later arrested.  And as part of his deal,

13:44:25  9  he said that I had that possession of child pornography.  The

13:44:33  10  detectives came to my house and said they were investigating a

13:44:36  11  burglary, and then I allowed them into my house.  At which

13:44:41  12  point they told me that they were with the Cyber Crimes unit

13:44:44  13  and that they were searching only for producers of child

13:44:48  14  pornography, at which point a long discussion ensued.  After

13:44:52  15  which I gave them complete access to my computer and -- to

13:44:56  16  prove that I wasn't making anything.  I had a ten-year-old

13:45:00  17  daughter that I had custody of, and I wanted to prove that I

13:45:06  18  wasn't making it or anything else.  And the only way I could do

13:45:10  19  that was to give them everything I had.

13:45:12  20  Q.    Okay.  Did you ultimately plead guilty?

13:45:14  21  A.    Yes, sir.

13:45:14  22  Q.    All right.  Were there -- was the Florida State charges

13:45:19  23  the only charges?

13:45:20  24  A.    Yes, sir.

13:45:21  25  Q.    There were no federal charges that came out of it?

| | | |
|---|---|---|
| 13:45:24 | 1 | A.   No, sir. |
| 13:45:24 | 2 | Q.   Let me go back for a moment to something you mentioned. |
| 13:45:33 | 3 | You said that you and Mr. -- let me go back one second. |
| 13:45:37 | 4 | Was the defendant -- was Defendant Diehl in any way |
| 13:45:40 | 5 | the person or part of the people who had reported you about the |
| 13:45:43 | 6 | possession of child pornography? |
| 13:45:45 | 7 | A.   No. |
| 13:45:45 | 8 | Q.   Okay.  In terms of your professional background and the |
| 13:45:48 | 9 | defendant's, you said you were both programmers.  Can you |
| 13:45:52 | 10 | elaborate a little bit on that? |
| 13:45:54 | 11 | A.   We both wrote -- I was a senior partner and was writing |
| 13:45:58 | 12 | Microsoft.net software.  Specifically Web services, Enterprise |
| 13:46:05 | 13 | integration, advanced BIOS parsing engines.  You name it, we |
| 13:46:11 | 14 | wrote it.  So ... |
| 13:46:12 | 15 | Q.   All right.  Was he doing similar things? |
| 13:46:16 | 16 | A.   Yes.  He's a senior technologist. |
| 13:46:18 | 17 | Q.   All right.  And you-all did collaborate on professional |
| 13:46:24 | 18 | projects? |
| 13:46:25 | 19 | A.   Many times.  Yes, sir. |
| 13:46:25 | 20 | Q.   And what kinds of things did you collaborate on? |
| 13:46:28 | 21 | A.   On Enterprise file parsing engine to parse Adobe .pdf |
| 13:46:37 | 22 | files into a database from a flat format.  Collaborated on |
| 13:46:42 | 23 | that.  That was for a florist.  And I referred him for a job I |
| 13:46:51 | 24 | got fired from, and he took the job after I got fired from it |
| 13:46:54 | 25 | for 90 days.  A somewhat small project. |

| | | |
|---|---|---|
| 13:47:01 | 1 | Q.   Okay.  What did you think of him as a software programmer? |
| 13:47:04 | 2 | A.   Top of the line. |
| 13:47:06 | 3 | Q.   You were pretty good yourself? |
| 13:47:08 | 4 | A.   I thought so. |
| 13:47:09 | 5 | Q.   Okay.  What kinds of things did -- were you familiar with |
| 13:47:15 | 6 | any of his specific projects that he worked on as a programmer? |
| 13:47:19 | 7 | A.   Well, he worked on a lot, I'd say, more advanced stuff |
| 13:47:24 | 8 | than I did.  While he was in San Jose, he worked for Price |
| 13:47:30 | 9 | Waterhouse Cooper Research.  And that was all very high-end, |
| 13:47:34 | 10 | state-of-the-art software.  Can you be more specific? |
| 13:47:39 | 11 | Q.   No.  I didn't know if you were familiar with some of the |
| 13:47:42 | 12 | types of things he did specifically.  Did you ever work |
| 13:47:45 | 13 | together with him in the same physical location? |
| 13:47:47 | 14 | A.   Other than the time that we both worked at Marriott Retail |
| 13:47:53 | 15 | Sales.  But that was -- he took the job the week after I left |
| 13:47:56 | 16 | so we never worked in the same location. |
| 13:47:58 | 17 | Q.   And that was an I -- information technology programming |
| 13:48:02 | 18 | type of job? |
| 13:48:03 | 19 | A.   Yes, sir. |
| 13:48:03 | 20 | Q.   All right.  Have you known him to work at anything other |
| 13:48:06 | 21 | than programming or software? |
| 13:48:08 | 22 | A.   No. |
| 13:48:08 | 23 | Q.   All right.  Would it be fair to say he was a software |
| 13:48:13 | 24 | engineer? |
| 13:48:13 | 25 | A.   Yes. |

13:48:13  1  Q.    And you were as well?

13:48:15  2  A.    I -- yes.

13:48:17  3  Q.    Okay.  At some point in your friendship with him, did you

13:48:33  4  learn of his interest in child pornography?

13:48:35  5  A.    Only very late.

13:48:39  6  Q.    Only very what?

13:48:41  7  A.    Late in our -- when I knew him.  It was probably within

13:48:44  8  the last year.  Not probably.  Definitely.  And it came

13:48:47  9  about -- you know, again we talked about just mores -- general

13:48:57 10  societal mores and kind of the difference between what's

13:49:00 11  preached and what's practiced.  And, again, sharing similar

13:49:04 12  political beliefs, you know we kind of eventually discussed

13:49:10 13  that.

13:49:10 14  Q.    All right.  And then who said what first in terms of an

13:49:15 15  interest in child pornography, if you can recall?

13:49:19 16  A.    I honestly can't recall.

13:49:22 17  Q.    All right.  This was before -- this was before or after

13:49:26 18  you were arrested on your own charges?

13:49:28 19  A.    Oh, well before.

13:49:30 20  Q.    Before?

13:49:30 21  A.    I'd say roughly a year, two a year and a half prior.

13:49:37 22  Q.    Prior to your arrest?

13:49:38 23  A.    Yes, sir.

13:49:38 24  Q.    Okay.  So it wasn't a year ago from now.  It was a year

13:49:42 25  ago from the time you were arrested?

13:49:44  1  A.   Yes, sir.

13:49:45  2  Q.   Okay.  Did you share with him your interest in child

13:49:56  3  pornography at this point?

13:49:57  4  A.   Not so much that as much as -- I don't think there was

13:50:01  5  ever child pornography as much as, you know, just

13:50:04  6  "Britney Spears is fine," you know, or "What's up with Miley

13:50:10  7  Cyrus strutting around the stage" or whatever.  So it wasn't so

13:50:13  8  much that discussion of the -- you know, what's out there on

13:50:19  9  the Internet as much as just a discussion that, you know,

13:50:24  10  again, society says age and majority is one thing, yet we have

13:50:30  11  a disparity between the -- again, what's practiced and what's

13:50:36  12  preached.  And that was the discussion.

13:50:38  13  Q.   Okay.  But did there come a point where you learned that

13:50:42  14  he either -- you know, I'm going to say was interested in child

13:50:44  15  pornography?

13:50:44  16  A.   Yes.  Exactly.  We -- it was -- there was a point --

13:50:51  17  again, a specific point where that happened.  And that was

13:50:57  18  roughly one year before I fell.

13:50:59  19  Q.   Okay.  And when you say you fell, that means you were

13:51:02  20  arrested?

13:51:03  21  A.   Yes, sir.

13:51:03  22  Q.   All right.  Did he share his interest in child pornography

13:51:11  23  with you?  Did you share yours with him?

13:51:13  24  A.   Right.  Essentially we would come down to -- you know, I

13:51:17  25  would say I found this particular set of files on eMule or

| | | |
|---|---|---|
| 13:51:23 | 1 | something.  And he would say, Oh, that's chicken shit or |
| 13:51:26 | 2 | child's play or whatever.  That's old hag.  If you ever saw |
| 13:51:30 | 3 | that downloading commercial where the guy's laughing, it's kind |
| 13:51:35 | 4 | of, like, that's so yesterday.  And so, again, a lot of times I |
| 13:51:38 | 5 | would say I have this file name and he would say, Oh.  I've got |
| 13:51:43 | 6 | this or whatever. |
| 13:51:44 | 7 | Q.   Okay.  And you mentioned something called eMule is that |
| 13:51:48 | 8 | spelled e-M-u-l-e? |
| 13:51:50 | 9 | A.   Correct. |
| 13:51:50 | 10 | Q.   Is that -- what is that? |
| 13:51:52 | 11 | A.   It's a file-sharing network. |
| 13:51:54 | 12 | Q.   Okay.  Is that -- did you -- what is the relevance of |
| 13:51:58 | 13 | that? |
| 13:51:59 | 14 | A.   That's one of the primary conduits that I personally |
| 13:52:05 | 15 | downloaded pornography.  There was two conduits that I used |
| 13:52:09 | 16 | that I was familiar with, which was Usenet and the other was |
| 13:52:15 | 17 | eMule. |
| 13:52:15 | 18 | Q.   Usenet would be U-s-e-n-e-t? |
| 13:52:18 | 19 | A.   Correct. |
| 13:52:20 | 20 | Q.   Okay. |
| 13:52:20 | 21 | A.   It's a very esoteric, arcane Internet protocol that's |
| 13:52:24 | 22 | really only known or utilized by about maybe 1/10th of |
| 13:52:29 | 23 | 1 percent of the population, and eMule is much more popular. |
| 13:52:35 | 24 | The -- what I found on it was rampant, so, I mean, I can only |
| 13:52:40 | 25 | imagine that if you were -- I'm not going to go there.  eMule |

13:52:43   1   was my primary.

13:52:46   2   Q.   Okay.  What exactly was Defendant Diehl's involvement with

13:52:51   3   child pornography, as you understood it?

13:52:53   4   A.   Well, as he explained it to me his primary conduit was

13:52:58   5   called IRC, Internet Relay Chat.  And using Internet Relay

13:53:04   6   Chat, he was able to meet people on various channels.  And I

13:53:11   7   don't know the name of those channels off the top of my head,

13:53:15   8   although I have in the past seen pictures that had posters with

13:53:19   9   channel names on them.

13:53:21   10          And using that channel would provide a beginning of

13:53:29   11   the series to that individual in exchange for being -- becoming

13:53:34   12   what he called a maker.  So, again, this was all -- IRC is a

13:53:44   13   very decentralized communication medium that enabled direct

13:53:50   14   communication between each computer.  But, again, that's what I

13:53:56   15   understood.

13:53:57   16   Q.   Okay.  And how -- did he describe himself as -- what did

13:54:02   17   he describe himself as in this world, I guess?

13:54:05   18   A.   He said specifically -- honestly, I don't remember the

13:54:09   19   exact name.  I want to say producer.  But I remember that the

13:54:12   20   people who were making it he called makers, and that was very

13:54:16   21   clear.  I don't remember what he described himself as.

13:54:20   22   Q.   Okay.  And what was his -- what did he do in relation to

13:54:25   23   these makers?

13:54:29   24   A.   It would entice them with the possibility of having this

13:54:33   25   complete series to make new material.  "Make" meaning make new

COURTNEY - DIRECT

13:54:41  1  material in exchange for the rest of the series.

13:54:44  2  Q.    So who would have the series?

13:54:46  3  A.    He would.

13:54:47  4  Q.    He would have, and he would let them have it or have

13:54:50  5  access to it?

13:54:51  6  A.    That's what I understood.  Again, I don't know for sure.

13:54:54  7  Q.    And what do you mean by a series?

13:54:56  8  A.    Well, you know, there would be -- say there could have

13:55:01  9  been a movie that was broken down into individual files.  It

13:55:05  10  could have been a series of a photographic pictorial or

13:55:10  11  something of that nature.  But a series meaning continuity

13:55:16  12  between each set.

13:55:18  13  Q.    Okay.  And so what, then, did you understand would

13:55:22  14  happen?  Would people make videos?

13:55:24  15  A.    That's my understanding.  Or in this case images.  But,

13:55:29  16  again, I -- I only saw a minor portion of that.  So ...

13:55:36  17  Q.    All right.  Did he have a collection of child pornography?

13:55:40  18  A.    Yes.

13:55:40  19  Q.    And how do you know that?

13:55:42  20  A.    Because I saw it.

13:55:43  21  Q.    All right.

13:55:43  22  A.    Part of it.

13:55:44  23  Q.    What was this collection -- what did this collection

13:55:48  24  consist of?

13:55:49  25  A.    Very much like my own.  It was very -- it was contained in

| | | |
|---|---|---|
| 13:55:54 | 1 | an encrypted container.  It was had similar file names and |
| 13:56:04 | 2 | structure to the way I managed my own collection.  And, again, |
| 13:56:12 | 3 | I did see portions of that, and I believe it was either July |
| 13:56:17 | 4 | or -- July or August of 2008, I believe. |
| 13:56:27 | 5 | Q.   All right. |
| 13:56:28 | 6 | A.   The year before I fell. |
| 13:56:29 | 7 | Q.   When you say it was in an encrypted container, what do you |
| 13:56:33 | 8 | mean by that? |
| 13:56:34 | 9 | A.   Well, using various file encryption tools available.  And |
| 13:56:40 | 10 | when you have a container, a container looks and appears to |
| 13:56:44 | 11 | your computer as a normal hard drive or like a USB thumb drive. |
| 13:56:48 | 12 | It just appears as another file name or another drive letter. |
| 13:56:53 | 13 | But it's only accessible after entering the encryption program |
| 13:56:57 | 14 | and the long encryption key. |
| 13:57:00 | 15 | Q.   So the container in this case is some sort of computer or |
| 13:57:03 | 16 | electronic digital device? |
| 13:57:05 | 17 | A.   Well, it's a file that contains more files. |
| 13:57:08 | 18 | Q.   Okay.  On a hard drive or some sort of other computer |
| 13:57:11 | 19 | media? |
| 13:57:11 | 20 | A.   Correct. |
| 13:57:12 | 21 | Q.   Not just a regular box is what I'm trying to get at. |
| 13:57:15 | 22 |      Okay.  So how did he -- how did it come to be that |
| 13:57:25 | 23 | you got to see some of his collection? |
| 13:57:27 | 24 | A.   I was at -- we had started this particular afternoon at |
| 13:57:32 | 25 | his girlfriend's house.  And just -- we were hanging out there, |

COURTNEY – DIRECT

| | | |
|---|---|---|
| 13:57:40 | 1 | and his sister was there and his son was there and my daughter |
| 13:57:47 | 2 | was in Ohio at the time.  We were just hanging out, partying. |
| 13:57:52 | 3 | And then kind of got into a little tussle, so to speak.  Blood |
| 13:58:01 | 4 | was spilled, and we decided to go back to his house. |
| 13:58:07 | 5 | And so we went to Dave's house, and he had something |
| 13:58:11 | 6 | to drink.  And while we were there, we went into his office. |
| 13:58:15 | 7 | And at that point closed the door, and he's, like, Check this |
| 13:58:19 | 8 | out.  And at which point I viewed several different images and |
| 13:58:24 | 9 | videos. |
| 13:58:25 | 10 | Q.   All right.  This was at his house where? |
| 13:58:27 | 11 | A.   In Oldsmar. |
| 13:58:29 | 12 | Q.   Florida? |
| 13:58:30 | 13 | A.   Yes, sir. |
| 13:58:30 | 14 | Q.   And whose -- was it on a computer? |
| 13:58:34 | 15 | A.   Yes, sir. |
| 13:58:34 | 16 | Q.   What kind of computer was it?  Do you know, generally? |
| 13:58:37 | 17 | A.   It was a server class machine.  I believe it was |
| 13:58:42 | 18 | Windows 2000.  I honestly cannot remember, but it was a -- it |
| 13:58:47 | 19 | was a working class machine. |
| 13:58:48 | 20 | Q.   Okay.  I guess I was even going for something simpler than |
| 13:58:53 | 21 | that.  Was it a laptop or a desktop? |
| 13:58:55 | 22 | A.   Desktop. |
| 13:58:56 | 23 | Q.   Okay.  Can you recall the videos that you saw at that |
| 13:58:59 | 24 | time? |
| 13:58:59 | 25 | A.   I can recall two in particular.  The first was -- and I |

13:59:07  1   can't even recall the -- I just remember more by discussing it

13:59:12  2   more than I do by seeing it, but I did see it.  This girl that

13:59:18  3   was singing, and she was nude.  And I saw a little tiny part of

13:59:25  4   that.  And then another video which I since identified of a

13:59:33  5   girl in a tent and who he said was "Star Baby."  He said the

13:59:40  6   actual name, but I did not remember.  So I don't know.

13:59:43  7   Q.   Okay.  Mr. Courtney, I'm going to show you some

14:00:11  8   photographs here.  And if you recognize them, say so; if you

14:00:13  9   don't, say so.  I'm going to show you what's been admitted as

14:00:18  10  Government Exhibit 1-1B.  This is a still image.  Do you

14:00:21  11  recognize that?

14:00:21  12  A.   Yes, sir.

14:00:21  13  Q.   How do you recognize that.

14:00:23  14  A.   That is a frame from the video.

14:00:25  15  Q.   Okay.  How about Government Exhibit 1-1C?

14:00:28  16  A.   Frame from the video.

14:00:29  17  Q.   And do you remember the girl in the video?

14:00:32  18  A.   I don't remember the girl.  I remember the sounds.  I

14:00:35  19  remember the hand.  I remember the ring on the hand.  I

14:00:37  20  remember the -- everything.

14:00:38  21  Q.   Okay.  What kind of sounds do you remember?

14:00:41  22  A.   It was just general banter, going back and forth.  Kind of

14:00:48  23  sounded like there was an established rapport, like he was kind

14:00:52  24  of teasing her.  She was, like, "Come on," or something like

14:00:55  25  that.  But there was rapport that had been developed and some,

COURTNEY – DIRECT

14:01:02    1   "Don't be shy" I think was something that I heard.

14:01:06    2   Q.   Okay.  I'm showing you 1-1D.  So you recognize that?

14:01:12    3   A.   Like the others.

14:01:13    4   Q.   Same girl.  Okay.  How about 1-1F?

14:01:19    5   A.   Same.  I remember that.  That's the tent that I described.

14:01:25    6   Q.   Okay.  I'm going to show you 1-1H.  Does that look

14:01:32    7   familiar?

14:01:33    8   A.   I believe so, yes.

14:01:34    9   Q.   Okay.  All right.  So these are still images from the

14:01:40   10   video that you saw at his house in Florida in two thousand --

14:01:43   11   A.   Right.

14:01:44   12              THE COURT:  Mr. Devlin, let me see the exhibits.

14:01:46   13              MR. DEVLIN:  I'm sorry, Your Honor.

14:01:48   14              THE COURT:  Just need to make sure that I know what

14:01:50   15   you're looking at.

14:02:30   16              MR. DEVLIN:  Okay.

14:02:30   17   Q.   (BY MR. DEVLIN) Mr. Courtney, in regard to this particular

14:02:33   18   video, the Star Baby video, did Defendant Diehl say anything to

14:02:39   19   you regarding that video?

14:02:40   20   A.   Yes, sir.  He said that he had actually made that video.

14:02:44   21   I -- which kind of made me wonder.  I obtained that video on

14:02:50   22   eMule network -- on the eMule file-sharing network.  And so,

14:02:55   23   again, he did say he made it.  And also said -- when he said

14:03:01   24   her name, he said, Don't ever say that name again because you

14:03:05   25   can't say that name.  So I forgot it promptly, and I really do

14:03:08    1   not remember.  So ...

14:03:09    2   Q.    So you had seen that video before that day?

14:03:11    3   A.    Yes, I did.

14:03:12    4   Q.    On your own?

14:03:13    5   A.    Yes.

14:03:14    6   Q.    All right.  Is eMule a network that you can obtain things

14:03:18    7   from basically around the world?

14:03:19    8   A.    It's -- it's -- it's complicated.  The answer is yes.

14:03:24    9   Q.    Okay.  What's the complicated answer?

14:03:28   10   A.    Well, eMule is two separate networks.  There's an

14:03:31   11   eDonkey network and the Gnutella network.  And both -- Gnutella

14:03:35   12   is a distributed network of millions of computers that are all

14:03:42   13   sharing files and that are discovered via the eDonkey network

14:03:46   14   and other networks.  And eDonkey is a server-based network, and

14:03:52   15   the servers are not connected to each other.

14:03:54   16         So each server is its own little island, and you

14:03:57   17   connect into that server.  There may be a million users for

14:04:00   18   server and several hundred servers that are listed.  But the

14:04:04   19   net result is it's a worldwide distributed network of mostly

14:04:08   20   anonymous machines.

14:04:09   21   Q.    Okay.  When he told you that he made that video, what was

14:04:16   22   your reaction to that?

14:04:17   23   A.    Surprise.  I -- I just -- I didn't think that -- I

14:04:27   24   honestly didn't think he did it.  But, you know, again, that's

14:04:32   25   what he said.  I went back, and I must have looked at that

14:04:35  1  video probably 50 times.  So it was ingrained in my head when,

14:04:39  2  you know, it came up.

14:04:41  3  Q.   What else of his collection did you see?

14:04:49  4  A.   Well, I was aware that he had a series called "Tori," who

14:04:53  5  was similar.  But I never saw it.  He said that he had it.  He

14:04:59  6  gave me names.  We talked about the Baby J series, an

14:05:04  7  eight-year-old, nine-year-old girl that was described as the

14:05:10  8  Traci Lords of kitty porn, if you will.  And -- but other than

14:05:17  9  that, I did not see that much of what he had other than those

14:05:22 10  select videos.  Again, he showed me some footage from a nudist

14:05:29 11  camp that he had gone to.  Kids jumping on a bed.  Not

14:05:33 12  explicitly sexual in any way.  Just kids jumping on a bed.

14:05:39 13  Q.   Okay.  Mr. Courtney, I'm going to again show you several

14:05:57 14  photographs, still images.  And if you recognize them say, so;

14:06:01 15  if you don't, please say so.

14:06:02 16       I'm showing you what's been marked as

14:06:04 17  Government's Exhibit 2A.  Do you recognize that at all?

14:06:07 18  A.   Its vaguely familiar, but I wouldn't be able to tell you

14:06:11 19  with certainty.

14:06:12 20  Q.   Okay.

14:06:12 21  A.   I'd say vaguely familiar.

14:06:14 22  Q.   All right.  Government Exhibit 7A?

14:06:16 23  A.   Never.

14:06:20 24  Q.   Government Exhibit 7B?

14:06:25 25  A.   Vaguely familiar.

| | | |
|---|---|---|
| 14:06:26 | 1 | Q.   Okay.  And when you say "vaguely familiar," is it vaguely |
| 14:06:30 | 2 | familiar from stuff you saw from Defendant Diehl or stuff you |
| 14:06:33 | 3 | saw on your own? |
| 14:06:34 | 4 | A.   Independently. |
| 14:06:36 | 5 | Q.   Independently? |
| 14:06:37 | 6 | A.   eMule. |
| 14:06:38 | 7 | Q.   Off of the eMule network.  Okay. |
| 14:06:41 | 8 |      Government Exhibit 7C? |
| 14:06:43 | 9 | A.   Honestly, even though it's the same, no. |
| 14:06:47 | 10 | Q.   Okay. |
| 14:06:48 | 11 | A.   I've never seen that. |
| 14:06:50 | 12 | Q.   Have you seen the person in the picture? |
| 14:06:54 | 13 | A.   I've never seen this person. |
| 14:06:56 | 14 | Q.   Okay.  Government Exhibit 9-1A? |
| 14:07:05 | 15 | A.   Again, that's -- that's not -- the first one is vaguely |
| 14:07:10 | 16 | familiar.  This -- no. |
| 14:07:11 | 17 | Q.   No? |
| 14:07:12 | 18 | A.   No. |
| 14:07:12 | 19 | Q.   Okay.  In terms of making or producing videos, did |
| 14:07:55 | 20 | Defendant Diehl say anything else to you along those lines -- |
| 14:07:58 | 21 | you know, about that to you outside of this one video that you |
| 14:08:01 | 22 | just described? |
| 14:08:03 | 23 | A.   He also -- he described a system of wireless cameras |
| 14:08:08 | 24 | imbedded in cleaning supplies -- an Ajax bottle and a spray |
| 14:08:15 | 25 | bottle -- that were wireless cameras.  Additionally, he had |

14:08:21  1  many times requested that I use these devices for voyeuristic

14:08:28  2  purposes of my own daughter and my girlfriend's daughters in

14:08:32  3  particular.  I never did this, but this is something that he

14:08:40  4  had repeated.  He was like, you know, If you want this, then

14:08:46  5  this is how to accomplish that.  And, again, I -- that was

14:08:50  6  explained to me.

14:08:51  7          He showed me these -- I physically saw these

14:08:54  8  devices.  And, again, I don't know if he used them for that,

14:08:59  9  but I imagine that -- you know, that was the purpose.

14:09:05  10 Q.   What do the devices look like?

14:09:07  11 A.   Cleaning supplies.  I believe it was an Ajax bottle.  I'm

14:09:12  12 not positive.  There was a cleaning bottle that looked like it

14:09:21  13 contained Ajax and another spray bottle.  That, again, at a

14:09:26  14 casual glance, it just looked like plain old cleaning supplies.

14:09:32  15 Q.   Did you see the camera component of those items?

14:09:34  16 A.   I believe I did.

14:09:36  17 Q.   Okay.  And where did you see them?

14:09:37  18 A.   In his closet.

14:09:39  19 Q.   At his house?

14:09:40  20 A.   Yes, sir.

14:09:40  21 Q.   In Florida?

14:09:41  22 A.   Yes, sir.

14:09:41  23 Q.   All right.  Did he show you anything that he had filmed

14:09:45  24 using those?

14:09:46  25 A.   Well, the one scene that I -- I'm not positive if it was

14:09:49  1  indeed.  I saw a scene that was filmed in a nudist colony.

14:09:55  2  And, again, I don't -- I don't think I ever saw anything that

14:09:59  3  was filmed with those.  That was my understanding.

14:10:02  4  Q.   Okay.  Did he say to what extent he had caused others to

14:10:07  5  make videos that he had received?

14:10:10  6  A.   He described himself as a -- as a -- as a player on that

14:10:22  7  scene.  As somebody who had known many people who had been

14:10:27  8  involved in that scene.  And he described one case in

14:10:32  9  particular that he said he knew of a girl named Vicky who had

14:10:36  10 since been interviewed on like *Oprah* or something like that and

14:10:41  11 pointed me to that particular *Oprah* interview.  I actually

14:10:43  12 never saw it, but he said he knew this guy.  And, like I said,

14:10:49  13 that's all conjecture.

14:10:52  14 Q.   So Vicky was a victim of a child pornography video or

14:10:57  15 series of videos?

14:10:58  16 A.   Yes, sir.

14:10:59  17 Q.   And when he said he knew this guy, what did he mean?

14:11:02  18 A.   That he knew -- it was my understanding that he actually

14:11:05  19 had communication with this individual.  But, again, I can't

14:11:10  20 remember precisely on that one.  But something like that.

14:11:14  21 Q.   Did he describe anything else about how involved he was in

14:11:18  22 having other people make child pornography or making it

14:11:22  23 himself?

14:11:23  24 A.   Again, I've personally seen a lot of it.  And only going

14:11:27  25 on -- and, again, on Usenet -- or on Usenet also, but Usenet is

COURTNEY – DIRECT

| 14:11:33 | 1 | much older.  But on eMule, when you click on a file, you might |
| 14:11:37 | 2 | get 5,000 images in a file. |
| 14:11:40 | 3 | And if you go through them, you don't pick and |
| 14:11:43 | 4 | choose.  But there are names of IRC channels in those.  And, |
| 14:11:50 | 5 | you know, again, it was my understanding that he was a very |
| 14:11:53 | 6 | sophisticated IRC user and that he compelled many people to do |
| 14:12:01 | 7 | that, to make video material. |
| 14:12:05 | 8 | Q.   Did he ever brag about it to you? |
| 14:12:08 | 9 | A.   I'd have to say sometimes it came across that way.  It was |
| 14:12:18 | 10 | a -- it was almost -- there was a bit of what I like to -- |
| 14:12:28 | 11 | well, not what I like to call, but what I believe would be |
| 14:12:35 | 12 | cognitive dissonance or, like, trying to make peace with it or |
| 14:12:37 | 13 | something like that, that I felt, you know, that he was coming |
| 14:12:40 | 14 | across with. |
| 14:12:41 | 15 | Q.   Okay.  Did he talk to you about how much child pornography |
| 14:12:53 | 16 | he was -- he had gotten others to make? |
| 14:12:56 | 17 | A.   I don't think he ever quantified it.  He just said that -- |
| 14:13:01 | 18 | again, that as -- that it was -- that it was something that he |
| 14:13:11 | 19 | was doing.  And there was not -- there was -- like -- like he |
| 14:13:18 | 20 | said or -- let me backtrack here. |
| 14:13:21 | 21 | He said that he was -- he was essentially the |
| 14:13:25 | 22 | "mac daddy" of whatever.  I don't think he used that term, but |
| 14:13:29 | 23 | just a player.  Again, a player on a scene for compelling |
| 14:13:34 | 24 | people to make the material -- makers. |
| 14:13:37 | 25 | Q.   Was there a time frame that he explained he was doing it. |

COURTNEY – DIRECT

14:13:40   1  Did it seem like that was occurring in the past or was it

14:13:43   2  occurring in the then present?

14:13:45   3  A.   It seemed like it was an ongoing thing.  And, again, after

14:13:52   4  a dialogue opened up about, occasionally I would say I just got

14:13:55   5  this new series or whatever.  I just found this.  And he was,

14:13:59   6  like, It's old hag.  Or something like that.

14:14:00   7  Q.   Did he say how long he had been involved in child

14:14:04   8  pornography?

14:14:04   9  A.   I don't think we ever discussed it, but we both -- I

14:14:10  10  personally had been downloading it since 1993, okay, on

14:14:12  11  Usenet.  And we were both familiar with Usenet, and we both

14:14:16  12  understood the protocol.  So I guess there was an inference

14:14:19  13  that was at least that long.

14:14:21  14  Q.   How tightly or loosely did he manage this child

14:14:25  15  pornography collection, to your knowledge?

14:14:28  16  A.   Incredibly tightly.

14:14:30  17  Q.   Can you be elaborate a little bit?

14:14:32  18  A.   Very elaborate security protocols, discussion protocols,

14:14:36  19  or anything.  Again, you know, don't talk about it.  Don't --

14:14:39  20  you know, don't -- you know, don't transfer files.  We never

14:14:45  21  once ever transferred a single file ever.

14:14:48  22  Q.   Between you?

14:14:49  23  A.   Between us, the Internet, or anything, you know.  So he

14:14:54  24  was -- he's very aware -- more so than I was -- of the

14:14:59  25  consequences involved with -- with what was going on.

COURTNEY – DIRECT

14:15:06  1  Q.   Okay.  Did he ever share any of his collection, to your

14:15:09  2  knowledge, with anyone else?

14:15:10  3  A.   Only in as much as that he described the process by which

14:15:17  4  he would get new material, which would be several files from

14:15:21  5  the beginning of a series and expectations of a new material at

14:15:25  6  which point he would share the rest of that series.  But it was

14:15:28  7  very -- it was *quid pro quo*.

14:15:31  8  Q.   So he would share a small amount of his material with

14:15:34  9  someone else in the expectation of getting something in return?

14:15:36  10  A.   Yes, sir.

14:15:37  11  Q.   Okay.  And then at that point he would share a greater

14:15:40  12  quantify of it?  Is that basically a summary?

14:15:43  13  A.   Only in that series.  He was very -- he very, like I said,

14:15:49  14  very *quid pro quo*.  Many times I was, like, Give me that.  And

14:15:56  15  he would -- it would -- there was never between us a transfer

14:16:00  16  of any form.  And, again, when you've got eMule, there's -- I

14:16:06  17  mean, it just wasn't necessary.

14:16:10  18  Q.   Did he -- he say anything else to you about making other

14:16:23  19  child porn videos in the way that he said he made that Star

14:16:27  20  Baby one that you referenced?

14:16:28  21  A.   Just, again, what he described was at a nudist colony, he

14:16:34  22  had a girlfriend that I had never met who had several kids.

14:16:38  23  And he would, make, like singing videos or just kind of artsy

14:16:46  24  nudist type videos.  He never described anything sexually

14:16:51  25  explicit or anything like that.  It was an artsy, nudist

COURTNEY - DIRECT

14:16:57  1  happy-go-lucky, dancing, singing naked videos.

14:17:03  2  Q.   Did he ever destroy any of his collection, to your

14:17:06  3  knowledge?

14:17:07  4  A.   There was a scare where he was investigated by some law

14:17:15  5  enforcement body, and he said that he had destroyed his entire

14:17:19  6  collection.  I took that as probably true.  You know, it's very

14:17:28  7  easy to destroy a collection.  You just press delete -- press

14:17:32  8  delete from a secured deletion program, and it's gone.  Or put

14:17:39  9  the CDs in a microwave, and they're gone.

14:17:42 10  Q.   Was there any other occasion perhaps prior to that that

14:17:45 11  he's -- that you know if he destroyed it?

14:17:48 12  A.   We discussed information security, but I do not know of

14:17:52 13  any other time that he said he destroyed it or not.  And,

14:17:56 14  again, it was my inference.  I don't believe for certain that

14:17:59 15  he actually came out and said, I went and destroyed my

14:18:02 16  collection.

14:18:04 17  Q.   Is having a collection important to people who are

14:18:07 18  interested in child pornography?

14:18:08 19  A.   Well, I would say having a collection is important to

14:18:11 20  other people as well.  But the answer is yes.  It's an

14:18:16 21  obsessive compulsive tendency, if you will.  Well, it was for

14:18:21 22  me.  I collected everything.  So I would say yes.

14:18:25 23  Q.   And kept everything?

14:18:27 24  A.   It's the ultimate virus.  It's -- you don't want to delete

14:18:32 25  it.  So right.  Generally speaking, once you have something,

14:18:36    1  you don't want to delete it.

14:18:38    2  Q.   Okay.

14:18:46    3           MR. DEVLIN:  One moment, Your Honor.

14:19:00    4           Pass the witness, Your Honor.

14:19:02    5           THE COURT:  Mr. Orr, cross-examination?

14:19:04    6           MR. ORR:  Thank you, Your Honor.

14:19:06    7                    **CROSS-EXAMINATION**

14:19:06    8  **BY MR. ORR:**

14:19:07    9  Q.   Mr. Courtney, if I understand it, you were first arrested

14:19:11   10  in May -- approximately May the 14th of '09, correct, sir?

14:19:18   11  A.   Precisely May the 14th of 2009.

14:19:21   12  Q.   Okay.  And you were approached by Cyber Crime law

14:19:24   13  enforcement officials in Florida?

14:19:25   14  A.   Yes, sir.

14:19:26   15  Q.   Who apparently used a subterfuge in talking to you to gain

14:19:31   16  admission to your home and to your computers?

14:19:34   17  A.   That's correct, sir.

14:19:35   18  Q.   And at what point did they spring the trap on you?

14:19:42   19  A.   After I'd invited them into my house and --

14:19:46   20  Q.   Okay.  Go ahead.

14:19:47   21  A.   And we were in my kitchen.  They -- you know, I had asked

14:19:51   22  them about the burglary to my house three weeks prior to my

14:19:55   23  arrest.  And they said, Oh, we're really concerned about that.

14:19:59   24  However, we're with the Cyber Crimes unit.  And at that point

14:20:02   25  they -- they kind of started the process of baiting me into

COURTNEY – CROSS

14:20:07   1   doing -- fault.

14:20:11   2   Q.   Well, did they ask you about your activities?

14:20:14   3   A.   Yes, sir.

14:20:14   4   Q.   And did you respond to them about your activities?

14:20:17   5   A.   Not immediately.

14:20:18   6   Q.   Okay.  And when you say "not immediately," well, when did

14:20:21   7   you respond to them?

14:20:23   8   A.   After they assured me that they were looking for people

14:20:27   9   who were producing child pornography and that the laws had

14:20:30   10   changed.  And that if I would cooperate with them and work with

14:20:34   11   them, then -- and help them find people who were producing

14:20:40   12   child pornography at that point, that that -- that's when, you

14:20:44   13   know, I gave in and opened up my computer to allow them to view

14:20:51   14   what I had.

14:20:52   15   Q.   Okay.  And did they view it there on your premises?

14:20:57   16   A.   Yes, sir.

14:20:57   17   Q.   And how long did that take?

14:20:59   18   A.   Approximately an hour and a half.

14:21:01   19   Q.   Okay.  Now, what did they find on your computer?  What

14:21:07   20   type of pornography did they find?

14:21:09   21   A.   Well, I had an extensive collection.  I had roughly

14:21:13   22   3,000-3,500 adult videos from every genre of pornography.  And

14:21:21   23   I would say roughly -- I would say probably 1 percent of my

14:21:26   24   collection was child pornography --

14:21:28   25   Q.   Okay.

COURTNEY – CROSS                                    117

14:21:28  1  A.   -- overall.

14:21:29  2  Q.   All right, sir.  So you're one of those people who has --

14:21:33  3  you had everything on there.  All -- any type of pornography

14:21:36  4  that one might imagine, you would have had a sample of it?

14:21:40  5  A.   I had every thing -- not every pornography.  I had every

14:21:43  6  file.  I had every movie.  I had every virus.  I had every

14:21:49  7  book.  I had everything that was digital.  I had over

14:21:52  8  5 terabytes when I fell.  And of that 5 terabytes, a

14:21:56  9  40-gigabyte container was child pornography, of which there was

14:22:01  10  about 30 gigabytes total?

14:22:04  11  Q.   All right, sir.  And when with the police or the Cyber

14:22:07  12  Crimes people were through going through the computer, did you

14:22:13  13  talk to them some more?

14:22:14  14  A.   Yes, sir.

14:22:15  15  Q.   Okay.  And did you -- at your home there, you kept talking

14:22:22  16  to them?

14:22:23  17  A.   Well, once I was taken into custody, I didn't talk any

14:22:26  18  more.  And also during that entire time, I was never read my

14:22:29  19  rights either.  So, again -- but, again, yes.  I talked to

14:22:36  20  them.

14:22:36  21  Q.   Okay.  About how long did you talk to them at your house?

14:22:39  22  A.   Again, all told, an hour and 30 minutes.

14:22:43  23  Q.   Okay.  And then you were taken to jail, correct?

14:22:46  24  A.   Taken to a holding cell at Hillsborough County.

14:22:51  25  Q.   And you hired an attorney, did you not, sir, at some

| | | |
|---|---|---|
| 14:22:54 | 1 | point? |
| 14:22:54 | 2 | A.   Yes, sir. |
| 14:22:54 | 3 | Q.   I would presume? |
| 14:22:55 | 4 | A.   Yes, sir. |
| 14:22:55 | 5 | Q.   Did you make bond and get out on the streets? |
| 14:22:58 | 6 | A.   My bond was a million dollars. |
| 14:23:00 | 7 | Q.   Okay.  So ... |
| 14:23:04 | 8 | A.   The answer is no. |
| 14:23:06 | 9 | Q.   Well, some people can make a million-dollar bond, but you |
| 14:23:09 | 10 | couldn't? |
| 14:23:09 | 11 | A.   No, sir. |
| 14:23:10 | 12 | Q.   So you hired -- you hired an attorney, correct? |
| 14:23:13 | 13 | A.   Yes, sir. |
| 14:23:14 | 14 | Q.   And he -- when did you first hire that attorney? |
| 14:23:17 | 15 | A.   Well, I heard -- hired my first attorney, John Foster, the |
| 14:23:21 | 16 | day I was arrested.  I was later connived into hiring another |
| 14:23:26 | 17 | attorney who is a very good attorney, for the record.  And -- |
| 14:23:34 | 18 | and so I had two separate attorneys during this process. |
| 14:23:38 | 19 | Q.   You had two separate lawyer during the entire process? |
| 14:23:41 | 20 | A.   Yes, sir. |
| 14:23:41 | 21 | Q.   Okay.  And so you remained in jail under a million-dollar |
| 14:23:47 | 22 | bond until or about you were sentenced May the 15th of last |
| 14:23:53 | 23 | year, 2010? |
| 14:23:54 | 24 | A.   I believe that's correct. |
| 14:23:55 | 25 | Q.   Okay.  And then -- then you since more -- I guess sometime |

COURTNEY - CROSS

| | | |
|---|---|---|
| 14:24:00 | 1 | after that, you were sent to the Florida penitentiary system? |
| 14:24:04 | 2 | A.   Yes, sir. |
| 14:24:04 | 3 | Q.   Okay.  And did you -- you talked to your lawyers while you |
| 14:24:08 | 4 | were in jail, did you not, sir? |
| 14:24:09 | 5 | A.   Frequently. |
| 14:24:10 | 6 | Q.   Okay. |
| 14:24:12 | 7 | A.   There was a serial -- I never had two -- two -- two |
| 14:24:17 | 8 | attorneys at the same time.  So ... |
| 14:24:18 | 9 | Q.   But you had the luxury of having two lawyers? |
| 14:24:22 | 10 | A.   Well, yes. |
| 14:24:22 | 11 | Q.   Or maybe that's a curse, to have two lawyers? |
| 14:24:26 | 12 | A.   That's conjecture. |
| 14:24:28 | 13 | Q.   Anyway -- okay.  And they told you -- I'm going to make a |
| 14:24:32 | 14 | guess -- that you were in a lot of trouble? |
| 14:24:34 | 15 | A.   Absolutely. |
| 14:24:35 | 16 | Q.   And what the Cyber Crimes people told you about mere |
| 14:24:38 | 17 | possession of child pornography being not much of a problem |
| 14:24:42 | 18 | anymore and the law had changed was not correct? |
| 14:24:44 | 19 | A.   Absolutely. |
| 14:24:46 | 20 | Q.   And so did you plea bargain for your, what, 15 years? |
| 14:24:49 | 21 | A.   Yes, sir. |
| 14:24:50 | 22 | Q.   And did your lawyers advise you that that was a whole lot |
| 14:25:00 | 23 | less than you would get going to trial? |
| 14:25:00 | 24 | A.   I believe I was looking at 3,997 years.  So yes. |
| 14:25:00 | 25 | Q.   So 15 is less than that? |

14:25:02  1   A.   Yes.

14:25:02  2   Q.   All right.  So now -- and your lawyers told you, I guess,

14:25:10  3   like Cyber Crimes, that the one way that you could lessen your

14:25:15  4   penalties was to give in information about producers of

14:25:18  5   pornography?

14:25:19  6   A.   Actually, at that point that was never an option.  I was

14:25:24  7   not ever once given the option of communicating or any form of,

14:25:34  8   I -- during my entire plea process, I was never given the

14:25:38  9   option of doing anything of the sort.  I was given the option

14:25:42  10  of take 15 years or go up and plea.  That was my option up

14:25:48  11  until I pled.

14:25:49  12  Q.   Well, despite -- so what you're saying is the Cyber Crimes

14:25:53  13  people told you they wanted information about producers?

14:25:56  14  A.   Yes.

14:25:56  15  Q.   But from the time of your arrest to the time of your

14:26:00  16  sentence, you never gave up any information about producers?

14:26:04  17  A.   That is correct.

14:26:05  18  Q.   And -- but then on May the 27th, thereabouts, of last

14:26:09  19  year, was it with your permission that your attorney

14:26:14  20  Bryant Camareno contacted the FBI and the person of

14:26:18  21  Sean Mullen?

14:26:19  22  A.   Yes, sir.

14:26:19  23  Q.   And could you tell the Court how it came about that

14:26:22  24  your -- your lawyer, Mr. Camareno, contacted Sean Mullen.  Was

14:26:27  25  that at your behest?

COURTNEY – CROSS                                              121

14:26:29   1   A.   He -- well, the answer to that is my attorney was

14:26:34   2   contacted by, I believe, the prosecutor, who had been contacted

14:26:39   3   by the FBI, who apparently had found my name in Mr. Diehl's

14:26:45   4   E-mail archives; at which point they -- they had made the

14:26:49   5   connection that I had been incarcerated for possession of child

14:26:53   6   pornography; at which point they contacted my attorney; at

14:26:56   7   which point I said that I would cooperate.

14:27:01   8   Q.   Well, okay.  So, now, you were mentioned in the E-mail

14:27:08   9   archives with Mr. Diehl, and those E-mail archives would

14:27:11   10  indicate that you had been doing the software business with

14:27:16   11  Mr. Diehl that you described to the Court?

14:27:18   12  A.   Yes, sir.

14:27:18   13  Q.   Okay.  And how far back do you think your E-mail archives

14:27:23   14  would have gone?

14:27:24   15  A.   Well, I believe they certainly go back, I'd say, to maybe

14:27:36   16  2001.  I don't know.  I lost a lot of E-mail --

14:27:40   17  Q.   Okay.

14:27:41   18  A.   -- in 2001.

14:27:42   19  Q.   And a Mr. -- and it's not uncommon for people to keep

14:27:47   20  E-mail going back for years?

14:27:49   21  A.   Decades.  Right.

14:27:51   22  Q.   Decades.  And would that be more common, you think,

14:27:55   23  amongst computer savvy people than, say, amongst lawyers?

14:27:59   24  A.   I wouldn't know.

14:28:00   25  Q.   Okay.  In any event you -- your lawyer --

COURTNEY – CROSS

| | | |
|---|---|---|
| 14:28:06 | 1 | Well, so your story is that the FBI contacted your |
| 14:28:17 | 2 | lawyer? |
| 14:28:18 | 3 | A.   That or the prosecutor.  I don't -- I don't know the |
| 14:28:23 | 4 | actual chain of events that led to my learning of this. |
| 14:28:27 | 5 | Q.   So you wouldn't have any explanation for Special |
| 14:28:31 | 6 | Agent Mullen writing a report in which he indicates that |
| 14:28:35 | 7 | Brian Camareno contacted him? |
| 14:28:40 | 8 | A.   Other than the fact that I discussed this with my attorney |
| 14:28:44 | 9 | and that I said that I would be willing to cooperate.  I don't, |
| 14:28:47 | 10 | again, understand the exact -- I don't know the exact chain of |
| 14:28:51 | 11 | events that occurred. |
| 14:28:52 | 12 | Q.   Okay. |
| 14:28:53 | 13 | A.   I can't say that the day I learned about this was the day |
| 14:28:56 | 14 | I pled out.  And the day I pled out, I was not given an option |
| 14:29:00 | 15 | or in any, way, shape, or form anything related to this.  I was |
| 14:29:05 | 16 | told merely that -- that this would be a possibility in the |
| 14:29:09 | 17 | future. |
| 14:29:10 | 18 | Q.   Well -- okay.  You -- now, you've testified that you hope |
| 14:29:19 | 19 | to get -- or, clearly, you hope to get a time reduction? |
| 14:29:24 | 20 | A.   Yes, sir.  I do hope that. |
| 14:29:25 | 21 | Q.   In exchange for this? |
| 14:29:27 | 22 | A.   Yes, sir. |
| 14:29:27 | 23 | Q.   And you understand that, in order to get a time reduction, |
| 14:29:30 | 24 | you have to do something of value for the prosecution? |
| 14:29:33 | 25 | A.   I have to tell the truth. |

14:29:36  1  Q.   Okay.  When was the first time you talked to anybody from

14:29:39  2  the FBI?

14:29:40  3  A.   The first time would be roughly just prior to

14:29:50  4  Thanksgiving, I believe.

14:29:51  5  Q.   Okay.

14:29:52  6  A.   In November.

14:29:53  7  Q.   And if you tell the truth and if it's of no value to the

14:29:57  8  prosecution, that's not going to get you a reduction in your

14:30:00  9  sentence, is it?

14:30:01  10  A.   Again, as far as I've been told, I've been made no

14:30:06  11  promises or otherwise.  And I don't believe that the value

14:30:11  12  would have merit as far as getting me in front of the judge or

14:30:15  13  not.  It's just simply that I cooperated is enough to get me in

14:30:19  14  front of my judge, from what I understand.

14:30:21  15  Q.   Well, but the more beneficial the cooperation is, the less

14:30:27  16  sentence you'll get?  You hope?

14:30:28  17  A.   I can't answer that question.

14:30:30  18  Q.   Well, if you came over here and you said to this Judge,

14:30:34  19  you know, David Diehl is a great guy.  I've been to his house

14:30:37  20  many times, and I never saw any pornography at his house,

14:30:41  21  that's of no value to anyone, is it, as far as getting you a

14:30:44  22  time sentence -- a time reduction, is it?

14:30:47  23  A.   I guess not.

14:30:48  24  Q.   You have to come over here and say something --

14:30:52  25  A.   The simple fact that I've been extradited and I will have

COURTNEY – CROSS

| | | |
|---|---|---|
| 14:30:54 | 1 | lost that gain time and other things I would imagine would |
| 14:30:58 | 2 | constitute at least a consideration. |
| 14:30:59 | 3 | Q.   Okay.  Now, during this -- the time period of '08 and '09, |
| 14:31:05 | 4 | you were using drugs, were you not, sir? |
| 14:31:06 | 5 | A.   Yes, I was. |
| 14:31:08 | 6 | Q.   And you were using methamphetamine and steroids? |
| 14:31:09 | 7 | A.   Yes, I was. |
| 14:31:09 | 8 | Q.   Okay.  And either one of those drugs singly, and certainly |
| 14:31:16 | 9 | in combination, will dethrone a man's reason, correct? |
| 14:31:20 | 10 | A.   Absolutely. |
| 14:31:21 | 11 | Q.   Okay.  And so what you've testified to is that -- if I |
| 14:31:25 | 12 | understand it, your story is that you're at a party somewhere. |
| 14:31:33 | 13 | At -- where was the party at? |
| 14:31:34 | 14 | A.   It started at his girlfriend's house, and it wasn't a |
| 14:31:38 | 15 | party.  If you call gathering of more than one person a party, |
| 14:31:44 | 16 | then, yes, it was.  It started at his girlfriend's house. |
| 14:31:47 | 17 | Q.   And were you using drugs that day? |
| 14:31:49 | 18 | A.   Actually, I was not. |
| 14:31:50 | 19 | Q.   Okay. |
| 14:31:51 | 20 | A.   I mean, in all fairness, to rephrase the answer to that, I |
| 14:31:55 | 21 | was at that point using intermuscular injection steroids. |
| 14:32:02 | 22 | However, I did not particularly use that day.  I did use that |
| 14:32:05 | 23 | week.  I did not start using methamphetamine until September of |
| 14:32:08 | 24 | the year following.  So until that point, I had not used any |
| 14:32:12 | 25 | methamphetamine.  Just steroids. |

COURTNEY - CROSS

14:32:16  1    Q.   And you mentioned that there was some sort of tussle at

14:32:18  2    the party, and there was some blood?

14:32:20  3    A.   Yes.   There was -- David and I had gotten into physical --

14:32:24  4    he had thrown some punches, and one connected with my -- my

14:32:29  5    tooth and my lip and sent my tooth through my lip, at which

14:32:34  6    point a whole lot of blood started pumping out.   And we got

14:32:38  7    into a little fight, and it was quickly stopped.   It wasn't

14:32:43  8    really a full-blown fight.   It was just -- he probably threw

14:32:47  9    like that one punch at my face, at which point I hit him about

14:32:51  10   three times.   And his girlfriend started screaming and saying,

14:32:54  11   "Stop this."   So we stopped, and that was the extent of it.

14:33:00  12   Q.   Well --

14:33:02  13   A.   And he was drinking, and I was not drinking at that time.

14:33:05  14   I did have some beers that night, but it wasn't -- it wasn't

14:33:15  15   over two or three.

14:33:16  16   Q.   Okay.   And I believe your testimony continues to the

14:33:20  17   effect that you then left this place, correct?

14:33:22  18   A.   Yes, sir.

14:33:23  19   Q.   In what city was this in?

14:33:29  20   A.   I believe it's Odessa on the map.   It's northeast of

14:33:36  21   Oldsmar, about 20 minutes of where he was.   So I don't know the

14:33:40  22   exact name, but I think it was Odessa, Florida or thereabouts?

14:33:44  23   Q.   Okay.   And so then -- and you went over to his house?

14:33:47  24   A.   Yes, sir.

14:33:48  25   Q.   Twenty minutes away?

COURTNEY – CROSS

| | | |
|---|---|---|
| 14:33:49 | 1 | A.   Twenty, 25 minutes. |
| 14:33:51 | 2 | Q.   In what city was that in? |
| 14:33:53 | 3 | A.   Oldsmar. |
| 14:33:55 | 4 | Q.   Okay.  And you're sure he lived -- actually lived in |
| 14:33:59 | 5 | Oakmont *[sic]*? |
| 14:33:59 | 6 | A.   I'm absolutely 100 percent without a doubt sure, correct. |
| 14:34:02 | 7 | Q.   You're certain he didn't live in Safety Harbor? |
| 14:34:04 | 8 | A.   I guess -- I guess he -- I don't know the actual |
| 14:34:10 | 9 | physical -- I never actually mailed him, so I do not know that. |
| 14:34:14 | 10 | But I do know that it's referred to as Oldsmar.  So if that is |
| 14:34:19 | 11 | different, then I did not have his postal address. |
| 14:34:22 | 12 | Q.   Oh, okay.  Well, so far as you testified earlier, y'all |
| 14:34:26 | 13 | lived about 30, 35 miles apart? |
| 14:34:28 | 14 | A.   Correct. |
| 14:34:28 | 15 | Q.   So y'all didn't meet in person a whole lot? |
| 14:34:31 | 16 | A.   Absolutely right. |
| 14:34:32 | 17 | Q.   How many times did you meet in person? |
| 14:34:34 | 18 | A.   I'd say 12 to 15. |
| 14:34:37 | 19 | Q.   Over what?  Five years?  Six years? |
| 14:34:40 | 20 | A.   Yes.  Maybe it was more; maybe it was less.  About 12 to |
| 14:34:45 | 21 | 15. |
| 14:34:45 | 22 | Q.   It might be two or three times a year? |
| 14:34:48 | 23 | A.   I'd say that could be correct. |
| 14:34:51 | 24 | Q.   So did you go out drinking beer together? |
| 14:34:54 | 25 | A.   We'd go to GameStop -- I mean GameWorks.  We'd go to |

| | | |
|---|---|---|
| 14:34:59 | 1 | Buffalo Wild Wings.  We'd go to the Centro Ybor.  We'd go to |
| 14:35:06 | 2 | Channelside in Tampa.  Busch Gardens. |
| 14:35:09 | 3 | Q.   Okay.  Well, let me -- let me ask you -- let me jump back |
| 14:35:14 | 4 | a little bit.  You got sentenced in May of last year, correct? |
| 14:35:18 | 5 | A.   Yes. |
| 14:35:19 | 6 | Q.   And by that time you knew -- it had been in the papers -- |
| 14:35:25 | 7 | you knew that Mr. Diehl had been arrested, did you not? |
| 14:35:30 | 8 | A.   I was aware probably three months prior to my plea |
| 14:35:36 | 9 | bargaining that I -- I don't know the exact time, again, but I |
| 14:35:47 | 10 | do know that it was after I was.  And it certainly -- it in no |
| 14:35:52 | 11 | way, shape, or form affected my plea. |
| 14:35:55 | 12 | Q.   Okay.  But up until the time that you saw Mr. Diehl -- you |
| 14:35:59 | 13 | saw in the media that he had been arrested, it's fair to say |
| 14:36:03 | 14 | you had never mentioned -- |
| 14:36:04 | 15 | A.   I never saw him in the media, sir. |
| 14:36:06 | 16 | Q.   Well, you heard about it? |
| 14:36:08 | 17 | A.   Again, my hearing about it was from my attorney. |
| 14:36:11 | 18 | Q.   Okay.  However you heard about it, from your attorney, you |
| 14:36:15 | 19 | hadn't mentioned to Cyber Crimes or, if I understand it, anyone |
| 14:36:18 | 20 | else about Mr. Diehl allegedly being a producer? |
| 14:36:22 | 21 | A.   Absolutely not. |
| 14:36:23 | 22 | Q.   Only until it's a matter of public media, correct, or you |
| 14:36:28 | 23 | heard about it from your lawyer? |
| 14:36:29 | 24 | A.   After I heard about it from my lawyer. |
| 14:36:31 | 25 | Q.   Okay.  Didn't tell Cyber Crime, didn't tell your lawyer, |

14:36:35  1  didn't tell anybody else.  Didn't write any letters saying,

14:36:39  2  Hey, I know about this big producer.  Cut me some slack?

14:36:43  3  A.   That was never an option for me.

14:36:46  4  Q.   All right, sir.  Now, let's get back to the fight and the

14:36:48  5  trip over to his house -- to Mr. Diehl's house that you say

14:36:51  6  happened.  And so if I understand this, you've got your --

14:36:53  7  what?  Your tooth is broken?

14:36:54  8  A.   No, sir.  It just --

14:36:55  9  Q.   Or jammed into your lip?

14:36:58 10  A.   It was just a swollen lip at this point.

14:36:59 11  Q.   Well, did it hurt?

14:37:01 12  A.   Not particularly.

14:37:02 13  Q.   But there's blood everywhere?

14:37:04 14  A.   It was cleaned up pretty quickly.

14:37:07 15  Q.   All right.  So, anyway, this guy had just bloodied your

14:37:11 16  lip, correct?

14:37:11 17  A.   Yes, sir.

14:37:12 18  Q.   And he says, Well, hey, let's go on over to my house?

14:37:15 19  A.   Yeah.

14:37:16 20  Q.   And so did you go with him in his car?

14:37:18 21  A.   No.  I drove his sister in my car, and he drove in his

14:37:23 22  car.

14:37:23 23  Q.   Okay.  Now, you got over to his house, and about how big a

14:37:27 24  house is it?

14:37:33 25  A.   I'd say roughly -- I don't know for sure -- between 16-

COURTNEY - CROSS

| | | |
|---|---|---|
| 14:37:36 | 1 | and 18-hundred square feet, two-car garage, corner lot. |
| 14:37:46 | 2 | Q.   It's not a real big house? |
| 14:37:48 | 3 | A.   It's a comfortable house, right.  I would say -- I |
| 14:37:53 | 4 | wouldn't call it small.  But, you know ... |
| 14:37:56 | 5 | Q.   Well, it's 15- to 18-hundred square feet? |
| 14:37:59 | 6 | A.   Right.  It's a nice-size house. |
| 14:38:01 | 7 | Q.   Well, it's not a little cracker box, but it's not a |
| 14:38:05 | 8 | two-story mansion? |
| 14:38:06 | 9 | A.   It's entirely subjective to your income level. |
| 14:38:09 | 10 | Q.   Okay.  And so you get there, and you're saying that then |
| 14:38:18 | 11 | after this fight -- well, who else was there? |
| 14:38:20 | 12 | A.   Again, I think it was more of an altercation.  But not -- |
| 14:38:23 | 13 | I don't know how you'd describe it, but it wasn't -- it was a |
| 14:38:28 | 14 | drunk tussle is what it was, for all intents and purposes.  But |
| 14:38:32 | 15 | it was quickly put under the rug. |
| 14:38:36 | 16 | Q.   Would you say you were drunk? |
| 14:38:38 | 17 | A.   Absolutely not. |
| 14:38:39 | 18 | Q.   Had you been drinking earlier? |
| 14:38:41 | 19 | A.   I honestly don't recall drinking. |
| 14:38:44 | 20 | Q.   Okay.  You got to the -- |
| 14:38:45 | 21 | A.   I'm not a big drinker.  I do steroids and meth.  That was |
| 14:38:49 | 22 | my thing.  But at this point, I hadn't even done that. |
| 14:38:52 | 23 | Q.   Well, I feel so much better about your health if you stick |
| 14:38:55 | 24 | to meth and steroids. |
| 14:38:56 | 25 | So you get to the -- get to the house, and who else |

14:38:59  1  was there?

14:39:00  2  A.   I believe it was, again, his sister, his girlfriend.  I

14:39:10  3  don't recall what happened.  I know when we were at his

14:39:14  4  girlfriend's house, she had two infant kids and they had

14:39:18  5  already gone to bed.  I don't know -- I can't recall the

14:39:21  6  disposition of those.  But it was -- I just remember his

14:39:24  7  girlfriend, myself, Dave, and his sister there.  And A. I think

14:39:29  8  had already gone to bed, so I don't know what happened.  I

14:39:33  9  can't remember.

14:39:33  10  Q.   So you don't remember who else was there?

14:39:37  11  A.   I remember, like I said, his girlfriend and his sister

14:39:43  12  passed out in the back room.  And, like I said, that was the

14:39:47  13  night.

14:39:48  14  Q.   Okay.  Well, then your story goes on.  I think you get

14:39:51  15  these people there at the house.  And you're saying that after

14:39:57  16  breaking your lip with his fist, he takes you into the back and

14:40:01  17  says, Hey, look at this?

14:40:02  18  A.   No.  It was -- that's certainly an abbreviated -- but

14:40:07  19  yes.  That's essentially what happened.

14:40:10  20  Q.   Okay.  And your testimony is -- and I believe you told in

14:40:16  21  YOUR previous statement in November of last year -- you

14:40:18  22  mentioned downloading a video?

14:40:20  23  A.   Yes, sir.

14:40:21  24  Q.   And you found a video by yourself on the Internet?

14:40:24  25  A.   Yes, sir.

COURTNEY - CROSS

14:40:25  1  Q.   So, now, according to your testimony, low and behold, if I

14:40:34  2  understand it, if I -- that Mr. Diehl showed you that very same

14:40:41  3  video at his house?

14:40:42  4  A.   Yes, sir.

14:40:42  5  Q.   Just pure coincidence.

14:40:44  6  A.   The video that I'm describing is the one with the girl in

14:40:47  7  a tent, approximately 90 seconds duration.  And it shows -- you

14:40:57  8  can hear the voice of a male and see a hand with a ring on it.

14:41:01  9  And that particular video is the one that he did show me, sir.

14:41:13 10  And that's the one I also described when I spoke to the FBI.

14:41:23 11  Q.   All right, sir.  Now, when was the first time you actually

14:41:36 12  told the FBI that you had seen the video of the young lady in

14:41:40 13  the tent?

14:41:41 14  A.   In November of this past year.

14:41:43 15  Q.   And when did you first tell them that you had actually

14:41:47 16  seen it at Mr. Diehl's house?

14:41:48 17  A.   At the same time.

14:41:50 18  Q.   Okay.

14:41:54 19  A.   And I believe it was November.  I don't have -- I don't

14:41:58 20  have the same information that I'm totally used to.

14:42:03 21  Q.   Okay.  Now, is the video we're talking about -- the Star

14:42:37 22  Baby video, is that what you're calling the tent video?

14:42:41 23  A.   Correct.  And I don't -- I don't precisely recall if

14:42:44 24  that's what he called it.

14:42:46 25  Q.   Okay.  Now, you testified to this Judge here that

14:42:48  1  Mr. Diehl, somewhere back in '08, was it?  '08 or '09?

14:42:55  2  A.   It would be June or July of '08.

14:43:05  3  Q.   Okay.  So you're saying he told you he produced it?

14:43:08  4  A.   When he showed it to me, correct.

14:43:10  5  Q.   Okay.  And so then when you're meeting with the FBI in

14:43:17  6  November of 2010, they asked you about this Star Baby video

14:43:26  7  apparently in a tent, correct?

14:43:27  8  A.   Actually, they did not ask me about it.  I described it

14:43:31  9  without ...

14:43:32  10  Q.   Well, you said you were aware of only one video, right?

14:43:37  11  A.   I said specifically that one that he said that he had

14:43:40  12  made.  But also -- I had also seen another video of -- of

14:43:45  13  specifically A. and two girls jumping on a bed naked at a

14:43:50  14  nudist colony.

14:43:52  15  Q.   Okay.

14:43:52  16  A.   And I believe I also saw the video of a girl singing,

14:43:56  17  although I can't recall it directly because I remember talking

14:43:59  18  about it.

14:43:59  19  Q.   Well, you told the FBI in the November meeting that you

14:44:03  20  had doubts that Diehl had even made --

14:44:05  21  A.   Yes.  I did say that, sir.

14:44:08  22  Q.   Okay.  And if I give you -- well, have you seen the notes

14:44:37  23  of your interview?

14:44:38  24  A.   Yes, sir, I have.

14:44:39  25  Q.   And could you show me in here where there's the incident

COURTNEY – CROSS

14:44:50  1  about getting your lip broken and you went to the house and he

14:44:53  2  took you in the back and showed you?

14:44:56  3  A.   I don't know if that's there or not.  I --

14:44:58  4  Q.   Well --

14:45:01  5  A.   Go ahead.

14:45:01  6  Q.   Well, I thought maybe I was missing it because my eyes

14:45:05  7  aren't as good as they once were.  But I don't find it in there

14:45:09  8  either.

14:45:11  9  A.   Okay.  Noted.

14:45:16  10  Q.   But you did talk to the FBI again in January of this year,

14:45:25  11  correct?

14:45:25  12  A.   I spoke to them again when I arrived here.

14:45:28  13  Q.   Uh-huh.  And then on January the 19th of this year, you --

14:45:53  14  well, you -- you did an interview with the FBI on January the

14:45:57  15  12th of 2011, correct?

14:46:00  16  A.   It appears so.

14:46:02  17  Q.   And that's when you said, it's been reported to me, that

14:46:10  18  you were shown a video by Mr. Diehl?

14:46:11  19  A.   Yes, sir.

14:46:12  20  Q.   And that there's a male voice on the video?

14:46:19  21  A.   Yes, sir.

14:46:19  22  Q.   And that you're unable to identity the voice?

14:46:25  23  A.   That's correct.  I'm not a forensic -- I don't have voice

14:46:29  24  print technology, so I certainly am not able to do that.

14:46:34  25  Q.   Then you state in there, "The video was stored on a

| | | |
|---|---|---|
| 14:46:39 | 1 | removable hard drive belonging to Mr. Diehl." |
| 14:46:42 | 2 | A.    As best as I could observe. |
| 14:46:45 | 3 | Q.    Okay.  Could you tell us what brand -- or, if you know, |
| 14:46:48 | 4 | what brand of removable hard drive this was? |
| 14:46:51 | 5 | A.    I have no idea. |
| 14:46:52 | 6 | Q.    Okay.  Now, you have more expertise than most people do in |
| 14:47:04 | 7 | the area of computers and the Internet, do you not, sir? |
| 14:47:08 | 8 | A.    Some would say. |
| 14:47:09 | 9 | Q.    Yeah.  Okay.  Well, and you know how downloading and |
| 14:47:16 | 10 | uploading works, do you not, sir? |
| 14:47:18 | 11 | A.    For the most part. |
| 14:47:20 | 12 | Q.    Okay.  And as a matter of fact, I'd hazard to guess at the |
| 14:47:25 | 13 | way the Cyber Crimes officials got to you in Florida was they |
| 14:47:28 | 14 | tracked you by some downloading or uploading you had done? |
| 14:47:32 | 15 | A.    That's incorrect. |
| 14:47:33 | 16 | Q.    Okay.  You're saying it was an informant? |
| 14:47:36 | 17 | A.    Yes, sir. |
| 14:47:37 | 18 | Q.    Okay.  But when you were downloading and uploading these |
| 14:47:41 | 19 | pornographic files, you went to particular sites to get them, |
| 14:47:44 | 20 | did you not, sir? |
| 14:47:45 | 21 | A.    I wouldn't call them sites, per se.  Again, on a |
| 14:47:49 | 22 | file-sharing network, it's a distributed network.  There's no |
| 14:47:51 | 23 | site involved.  There's no single site.  There are thousands of |
| 14:47:54 | 24 | them. |
| 14:47:54 | 25 | Q.    Well, would you hazard to guess that you have left -- that |

COURTNEY – CROSS

| | | |
|---|---|---|
| 14:47:58 | 1 | you left through your Internet service provider details of |
| 14:48:03 | 2 | where you had taken your -- pointed your computer? |
| 14:48:06 | 3 | A.   It was -- my own use was very -- it would not have been |
| 14:48:14 | 4 | tracked through my ISP.  I had information security measures |
| 14:48:21 | 5 | that would prevent the ability to track anything that I did on |
| 14:48:24 | 6 | the Internet. |
| 14:48:25 | 7 | Q.   Okay. |
| 14:48:26 | 8 | A.   Specifically using a leased server.  And I don't know |
| 14:48:31 | 9 | where it was, but that leased server is what I personally used |
| 14:48:36 | 10 | to download pornography -- child pornography in particular. |
| 14:48:40 | 11 | Q.   Okay. |
| 14:48:47 | 12 | MR. ORR:  May I have just a second? |
| 14:49:46 | 13 | Q.   (BY MR. ORR) All right, sir.  Now, I think you testified a |
| 14:49:49 | 14 | little while ago so far as the trip from Mr. Diehl's |
| 14:49:52 | 15 | girlfriend's house to his house? |
| 14:49:54 | 16 | A.   Yes, sir. |
| 14:49:54 | 17 | Q.   She had some little kids? |
| 14:49:56 | 18 | A.   Yes, sir. |
| 14:49:56 | 19 | Q.   Did she leave them at home? |
| 14:49:58 | 20 | A.   I honestly don't remember. |
| 14:49:59 | 21 | Q.   So -- well, two- or three-year-old kids, she wouldn't |
| 14:50:05 | 22 | likely leave them at home? |
| 14:50:06 | 23 | A.   You're absolutely right. |
| 14:50:08 | 24 | Q.   So she probably took them? |
| 14:50:09 | 25 | A.   I don't remember. |

14:50:10  1  Q.   So there's these little kids.  There's Mr. Diehl's

14:50:13  2  sister.  There's his girlfriend?

14:50:15  3  A.   Correct.  And his son A.

14:50:17  4  Q.   And his son A.

14:50:18  5  A.   Like I said, I don't remember all the details of the

14:50:21  6  night.

14:50:21  7  Q.   But what you're saying is you do remember going in the

14:50:24  8  back and he says, Hey, look at this?

14:50:25  9  A.   Absolutely.  There's certain things that are more

14:50:30 10  memorable than others is all I can answer to that.

14:50:33 11  Q.   Would you agree or disagree that, when you're taking

14:50:36 12  illegal drugs or illegally taking drugs that might by

14:50:40 13  themselves be legal under prescription, that it can in fact

14:50:43 14  make you remember stuff that didn't happen?

14:50:45 15  A.   I'm not an expert on memory, so I cannot answer that

14:50:49 16  question.

14:50:50 17  Q.   So -- well, okay.  So you at least admit you were taking

14:50:55 18  steroids?

14:50:56 19  A.   At the time roughly once a week at that point.

14:51:00 20  Q.   Okay.  And had you ever taken methamphetamine at this

14:51:03 21  point?

14:51:03 22  A.   Never.

14:51:03 23  Q.   Never.  Okay.  But -- and you don't remember if you were

14:51:06 24  drinking?

14:51:07 25  A.   I don't drink.  I don't drink much.  And if I did, it was

COURTNEY - CROSS

14:51:10  1  never more than one or two.

14:51:12  2  Q.   Okay.  And you admit that you didn't bring this up until

14:51:15  3  after you had seen Mr. Diehl had been arrested -- you found

14:51:20  4  that out?

14:51:20  5  A.   Actually, like I said, it was brought to my attention.

14:51:23  6  Q.   It's brought to your attention.  You said a minute ago,

14:51:27  7  that, well -- well, you sort of implied that you're a stand-up

14:51:31  8  kind of guy.  You wouldn't give that kind of information out

14:51:34  9  about somebody correct?

14:51:35  10  A.   Again, I didn't -- it wasn't -- to be precise about this

14:51:40  11  I -- again, I was never given the opportunity to do that.

14:51:46  12  However, if I had been given the opportunity, what I would have

14:51:49  13  done, given the opportunity, would have been to contact

14:51:53  14  Mr. Diehl and ask him to help me give up people.  I wouldn't

14:51:57  15  have honestly directly gone about this at that time.  But I was

14:52:05  16  never given than option.

14:52:06  17  Q.   But right now you're here saying this stuff about him in

14:52:10  18  order to get you a reduction of sentence?

14:52:11  19  A.   Well, again, I've never been made no promises.

14:52:14  20  Q.   Well, you're not here doing this just because you think --

14:52:18  21  A.   Well, I was --

14:52:18  22  Q.   -- just because you wanted a trip to Texas?

14:52:19  23  A.   Well, I was not given the option of whether I was going to

14:52:23  24  Texas or not.  I am, however, voluntarily giving my testimony

14:52:28  25  today.

COURTNEY – CROSS

14:52:29  1    Q.   All right.  Now, you hosted some sites of -- some Web

14:52:33  2    pages of Mr. Diehl's?

14:52:34  3    A.   A business Web site.

14:52:35  4    Q.   Business Web site.  That's right.  And you're saying that

14:52:38  5    you never hosted on your server -- you had a server to do

14:52:41  6    this.  You never hosted pornography of any kind on there?

14:52:45  7    A.   The answer is a complicated one in the fact that I did in

14:52:50  8    fact have pornography on that server.  But at the same time, I

14:52:54  9    never hosted it.  So there -- so it's esoteric, the answer.  In

14:53:01  10   other words, it requires special knowledge.  But the answer is

14:53:05  11   that I never hosted pornography of any kind on any server.

14:53:13  12          But there was never at any point any professional

14:53:15  13   sharing or any other kind of sharing between Mr. Diehl and I of

14:53:19  14   any form of pornographic files of any form.

14:53:23  15   Q.   Other than the story about he took you into the bedroom

14:53:26  16   and showed you this?

14:53:27  17   A.   Correct.  And I also saw the cameras.

14:53:29  18   Q.   So what you're saying is he trusted you enough to show you

14:53:33  19   this video in his bedroom while his sister --

14:53:35  20   A.   Not in his bedroom.

14:53:37  21   Q.   Let me -- huh?

14:53:38  22   A.   It was not in his bedroom.

14:53:38  23   Q.   His office?

14:53:39  24   A.   His office.

14:53:39  25   Q.   Well, did he have a separate office other than a bedroom?

COURTNEY – CROSS

14:53:41  1  A.   Yes.

14:53:41  2  Q.   So while all these people are around in the house, he was

14:53:44  3  willing to show you all of this but he wasn't willing to

14:53:47  4  trade --

14:53:47  5  A.   Well, it started his girlfriend was passed out -- I mean,

14:53:51  6  his sister was passed out in the back room at this point.  His

14:53:54  7  girlfriend was going in between the kitchen and TV, knocking on

14:53:57  8  the door saying, Hey, what are you guys doing in there?  What

14:54:01  9  are you guys doing in there?

14:54:02  10      And -- and we're sitting there kind of having this secret

14:54:06  11  smile.  Again, the best I can give you would be the AT&T

14:54:10  12  commercial where that guy is laughing and he's saying, Oh, I've

14:54:13  13  got the one-up on you.  So that's the answer to that.

14:54:17  14  Q.   Well, I don't watch the AT&T commercials.  I have an

14:54:21  15  iPhone, so I've got enough against them for the dropped calls.

14:54:24  16      I'm handing you what's marked as Defendant's

14:54:27  17  Exhibit 1.  Can you take a look and read that.  That's from the

14:54:32  18  discovery that y'all gave us.

14:54:37  19          MR. ORR:  I'll show it.  It's an E-mail.

14:54:43  20          MR. DEVLIN:  If you wouldn't mind letting me look at

14:54:45  21  that when you're done.

14:54:46  22  A.   I can see that --

14:54:48  23  Q.   Hang on.

14:54:52  24  A.   Yes, sir.

14:55:19  25  Q.   Okay.  Can you tell us what Defendant's Exhibit Number 1

COURTNEY – CROSS

14:55:22  1   is?

14:55:24  2   A.   It is a request that I please cancel my account totally

14:55:30  3   from Mr. Diehl to me, dated 18th February of 2009.

14:55:44  4   Q.   Okay.

14:55:45  5        MR. ORR:  I'd offer Defendant's Exhibit 1.

14:55:49  6        MR. DEVLIN:  No objection, Your Honor.

14:55:50  7        THE COURT:  Defendant's Exhibit 1 is admitted.

14:55:53  8   Q.   (BY MR. ORR) And the actual text of the E-mail that you

14:55:56  9   received from Mr. Diehl was:  "I have not been on the server

14:55:58  10  for months.  Basically, since my little scare about content."

14:56:02  11  Right?

14:56:02  12  A.   Right.

14:56:03  13  Q.   "Please cancel my account totally.  If we need to settle

14:56:08  14  some funds, let's talk.  I won't be using it, nor have I used

14:56:12  15  it anyway."  And there's all this computer stuff on there that

14:56:15  16  you might understand, which I certainly don't.

14:56:19  17        Okay.  And so he's not talking about a scare about --

14:56:22  18        THE COURT:  Let me see Exhibit 1.

14:56:25  19        MR. ORR:  Oh.  I'm sorry.

14:56:26  20        THE COURT:  You can go ahead.

14:56:27  21  Q.   (BY MR. ORR) So he's not talking about a scare he received

14:56:31  22  because of an investigation.  He's talking about a scare about

14:56:34  23  content, correct?

14:56:35  24  A.   It would appear so, sir.

14:56:38  25  Q.   And the truth is that, while looking at your server,

COURTNEY - CROSS

14:56:42  1  looking at his stuff, he found on your severer pornography?

14:56:48  2  A.   That would be true.

14:56:49  3  Q.   Okay.  And that's -- and he wanted his stuff not to be on

14:56:52  4  a server that had pornography?

14:56:55  5  A.   That's correct.

14:56:57  6  Q.   So you said that he -- you told us all this stuff, that he

14:57:08  7  tried to entice people to do this and so on and so forth,

14:57:12  8  correct?

14:57:12  9  A.   Yes, sir.

14:57:13  10  Q.   But he didn't want his site on a server where you had

14:57:16  11  pornography.

14:57:17  12  A.   If that's the way -- that's one way to interpret that.

14:57:21  13  However, the little scare was specifically about the little

14:57:26  14  scare.  At least that's my interpretation of that.  And the

14:57:29  15  little scare would be the $7,000 scare where he had where he

14:57:33  16  was investigated by the two investigators from California.

14:57:37  17  Q.   But you told us -- you told this Judge a while ago that

14:57:41  18  you didn't ever have pornography on your server, correct?

14:57:44  19  A.   I don't believe I ever said that.

14:57:47  20  Q.   Okay.

14:57:47  21  A.   I said I didn't host it.  There's a difference between

14:57:50  22  having something -- when you say host, that would mean

14:57:54  23  sharing.  That would be distributing.  That would mean some

14:57:58  24  other form.  There's a difference between that and having a

14:58:01  25  secured storage there.

14:58:03   1   Q.   This was a server that people on the Internet could

14:58:07   2   connect --

14:58:08   3   A.   Yes.

14:58:08   4   Q.   -- to Mr. Diehl's Web pages, correct?

14:58:11   5   A.   Correct.  When you talk about --

14:58:12   6   Q.   Let me finish.  That Mr. Diehl's Web pages were there and

14:58:16   7   probably other people's Web pages?

14:58:18   8   A.   I had about five different companies on the server.

14:58:21   9   Q.   Okay.  So you had all these Web pages on this server,

14:58:25   10  correct?

14:58:25   11  A.   Well, I wouldn't call them pages.  There were no --

14:58:28   12  right.  There were Web sites on the server.

14:58:30   13  Q.   Whatever.  I'm sorry.  I don't know the lingo.  And so on

14:58:34   14  this site; that is, your server that people on the Internet

14:58:37   15  regularly connected to, you happened to have some secure

14:58:40   16  storage of child pornography that you didn't have any intention

14:58:46   17  of anyone else to connect to?

14:58:48   18  A.   Correct.

14:58:48   19  Q.   That's your story?

14:58:49   20  A.   Yes.

14:58:50   21       MR. ORR:  May I have just one other moment,

14:58:53   22  Your Honor?

14:59:20   23  Q.   (BY MR. ORR) Well, Mr. Diehl was allowed to log onto your

14:59:24   24  server to administer his Web pages, correct?

14:59:25   25  A.   Yes, he was.  He had full administrative access.

14:59:27  1   Q.   And when he got on there, he could see that you had

14:59:30  2   these -- he could go to the file structure and see that you had

14:59:33  3   these other file sharing files --

14:59:35  4   A.   Yes.

14:59:36  5   Q.   -- correct?

14:59:36  6   A.   Yes, he could.

14:59:36  7   Q.   And they were of a pornographic nature, correct?

14:59:39  8   A.   Yes.

14:59:39  9   Q.   So people, if they knew the right passwords, could get on

14:59:42  10  there and upload or download?

14:59:43  11  A.   Well, people who knew the right passwords, they could also

14:59:48  12  access your garage, and the same laws apply to either.  In

14:59:51  13  other words, using that logic, that I -- if I knew the right

14:59:56  14  password, I could push your garage door and open it and go into

15:00:00  15  your garage.  To say those are similar is just completely

15:00:04  16  nonsense as far as I am concerned.

15:00:06  17  Q.   People get on the Internet, and they download files?

15:00:09  18  A.   But if there's no path or access or server sharing those

15:00:12  19  files, then it is impossible to do so.

15:00:16  20  Q.   Well, Mr. Diehl got on there and he could see them,

15:00:19  21  correct?

15:00:20  22  A.   Because he had full administrative access to the server.

15:00:23  23  Q.   And you began deleting them, did you not?

15:00:26  24  A.   Actually, I -- he did actually tell me to get it off the

15:00:33  25  server.  But I continued to use it for that purpose after

COURTNEY - CROSS

15:00:43  1   that -- after he was off the server completely.

15:00:47  2   Q.   He told you to get, what, the pornography off the server?

15:00:50  3   A.   Yes, sir.

15:00:51  4   Q.   But you -- but he got off instead and you continued to use

15:00:54  5   it for pornography?

15:00:55  6   A.   It was my server.

15:00:56  7   Q.   Was it located in your house?

15:00:58  8   A.   No.

15:00:58  9   Q.   Some other off --

15:01:00 10   A.   I have no idea where it was located.

15:01:02 11   Q.   It wasn't even a computer that you controlled?

15:01:04 12   A.   I leased it for $110 month from a -- I can't remember the

15:01:10 13   company now.

15:01:10 14   Q.   They call them server forums or ...

15:01:13 15   A.   It was a leased server.  It was a full Windows Server 2003

15:01:16 16   with the full server software suite on it.

15:01:36 17          MR. ORR:  One minute, Your Honor.

15:01:57 18   Q.   (BY MR. ORR) Okay.  And the main purposes of your dealing

15:02:02 19   with Mr. Diehl was software you would -- he would -- you would

15:02:07 20   get him to help you on doing various projects?

15:02:10 21   A.   Our main dealing was discussing software.  However, we

15:02:14 22   talked about everything from politics to motorcycles.  He

15:02:18 23   actually convinced me that the Honda ST1300 was a great bike,

15:02:22 24   and I went out and bought one, for example.

15:02:24 25   Q.   Was it a great bike?

COURTNEY – CROSS

15:02:30  1  A.    Yes.  So to answer your question, we had both a

15:02:34  2  professional and personal relationship.

15:02:37  3  Q.    Thank you.

15:02:38  4           MR. ORR:  Pass the witness, Your Honor.

15:02:40  5           THE COURT:  Mr. Devlin, redirect?

15:02:44  6           MR. DEVLIN:  Briefly, Your Honor.

15:02:46  7                    **REDIRECT EXAMINATION**

15:02:46  8  **BY MR. DEVLIN:**

15:02:46  9  Q.    Mr. Courtney, going back to the Star Baby video, at the

15:02:49  10 time was there any discussion between you and him that you had

15:02:52  11 seen this particular video yourself?

15:02:54  12 A.    Yes, there was.

15:02:55  13 Q.    And tell us about that.

15:02:58  14 A.    Well, again, when he said that he had made it, it was --

15:03:01  15 to me it was surprising because I had in fact seen that video

15:03:04  16 and downloaded that from eMule specifically.  And, again, eMule

15:03:08  17 is a huge network.  So I had seen that video independently.  So

15:03:18  18 I did in fact very much doubt his claim that he made it.  And

15:03:24  19 I -- and, again, I spent -- I watched that thing 50, 60 times

15:03:30  20 just trying to make out if that was in fact him because, again,

15:03:35  21 there is a hand, a ring, and this -- this kind of banter going

15:03:40  22 back and forth between a male voice and the female subject.

15:03:46  23 And so, again, I didn't necessarily believe but he -- that was

15:03:51  24 what he had told me.

15:03:52  25 Q.    Did he seem in any way surprised or dismayed that you had

COURTNEY – CROSS

15:03:56  1  seen that video somewhere else before?

15:03:58  2  A.   I don't recall.  I don't honestly -- I just -- because

15:04:04  3  once -- when he said he made it, it just shocked me.  So, I --

15:04:10  4  I mean, not that it was bad.  Just that this is something I had

15:04:14  5  known and I had seen.  I was, like, whoa, you know.  So at that

15:04:17  6  point I kind of just -- that's really what hit me.  So it was a

15:04:23  7  kind of a big shock.  So ...

15:04:27  8           MR. DEVLIN:  Pass the witness, Your Honor.

15:04:29  9           THE COURT:  Mr. Orr?

15:04:30  10          MR. ORR:  Just a second, Your Honor.  No further

15:04:41  11  questions, Your Honor.

15:04:41  12          THE COURT:  You may step down.  Mr. Devlin, you may

15:05:08  13  proceed.

15:05:10  14          MR. DEVLIN:  Government rests, Your Honor.

15:05:29  15          MR. ORR:  May we approach, Your Honor?

15:05:36  16          THE COURT:  You may.  You don't have to come over

15:05:38  17  here, do you?  It's a bench trial.  We don't have a jury.

15:05:39  18          MR. ORR:  I am just used to doing that, Your Honor.

15:05:39  19  This is the second bench trial I did.  The first one was, like,

15:05:42  20  1974.  Somewhere in there.  I had forgotten what they're like.

15:05:46  21          THE COURT:  Well, at least you didn't file a motion

15:05:48  22  in limine for a bench trial like some lawyers do.

15:05:52  23          MR. ORR:  Well, no.  At least I didn't do that.

15:05:57  24  Yes.  Wouldn't want Your Honor to think about certain things.

15:06:02  25          We have subpoenaed N.A.D., his son, here.  What we'd

15:06:10  1  like to do is close the Courtroom -- there's people from the

15:06:13  2  press here -- and have him testify.

15:06:22  3          THE COURT:  Mr. Devlin, what's the Government's

15:06:24  4  position, and what is the reason?

15:06:32  5          MR. DEVLIN:  That's what I need to find out.  I'm not

15:06:35  6  necessarily opposed to it.  I'm not really quite sure, since

15:06:38  7  his name is out there already, it's -- is he going to be

15:06:41  8  testifying about some protected stuff?

15:06:44  9          MR. ORR:  No.  Probably not.  But I think it would

15:06:49  10  just likely be traumatic.

15:06:55  11          THE COURT:  I'm not sure that's enough.

15:06:58  12          MR. ORR:  Well, can we approach?  Now I'd really like

15:07:01  13  to approach.

15:07:01  14          THE COURT:  Okay.

15:07:23  15      (At the bench, on the record)

15:07:23  16          MR. ORR:  Well, he was one of the John Does -- I

15:07:33  17  mean, he's the John Doe in the indictment, which we've gotten

15:07:36  18  taken out.  But, you know, it could get into some stuff that

15:07:39  19  would be -- you know, I don't know what all we are going to

15:07:41  20  do.  We may blunder into some stuff that would be protected

15:07:45  21  activity.  I mean, it's not my intention to get into that, but

15:07:49  22  the main thing is I just don't want to read about it.

15:07:51  23          MR. DEVLIN:  Well, I'm not sure that gives me a lot.

15:07:53  24          THE COURT:  It's not really --

15:07:55  25          MR. DEVLIN:  I'm not going to get into that --

COURTNEY - CROSS

15:07:58  1          THE COURT:  -- that simple, to just seal the

15:07:59  2     Courtroom just because of sensibilities.  There's got to be a

15:08:03  3     little bit deeper reason.  You know, I try cases all the time

15:08:07  4     where juveniles testify.

15:08:12  5          MR. ORR:  Yes, sir.

15:08:12  6          MR. DEVLIN:  I have no evidence on the John Doe

15:08:14  7     aspect that would count.

15:08:14  8          THE COURT:  And we don't have any -- there has not

15:08:18  9     been anything raised that there are any compromising pictures

15:08:21  10    of him or embarrassing pictures of him or any sexual wrongdoing

15:08:25  11    with him.

15:08:26  12         MR. DEVLIN:  Not on the Government's case and chief

15:08:27  13    there haven't.  There are, but I'm not intending to introduce

15:08:29  14    those, Judge.  I'm not going to get into that.

15:08:30  15         THE COURT:  Are you going to get into that?

15:08:32  16         MR. ORR:  No.

15:08:32  17         THE COURT:  Then I think --

15:08:34  18         MR. ORR:  Actually, I want to use him to combat some

15:08:37  19    of the stuff Mr. Courtney said.

15:08:39  20         MR. DEVLIN:  With that said, then I'm not going to

15:08:41  21    get into anything involving any --

15:08:45  22         THE COURT:  Well, I'm not going to seal it now.

15:08:47  23         If the landscape changes, then I want to hear from

15:08:53  24    one or the other of you that's likely to change.

15:08:56  25         MR. DEVLIN:  Okay.

COURTNEY - CROSS

149

| | | |
|---|---|---|
| 15:08:57 | 1 | THE COURT: Then I will reconsider my ruling. |
| 15:09:00 | 2 | MR. ORR: Can we have a break while I talk to him |
| 15:09:02 | 3 | about doing that? A short break? |
| 15:09:04 | 4 | THE COURT: Yeah. We'll go ahead and take our |
| 15:09:06 | 5 | afternoon recess. |
| 15:09:07 | 6 | MR. ORR: I'd like to be -- |
| 15:09:10 | 7 | THE COURT: We'll just take our afternoon recess. |
| 15:09:13 | 8 | MR. ORR: Yeah. I'd like to talk to him about it. |
| 15:09:15 | 9 | (Open Court, Defendant present) |
| 15:09:15 | 10 | THE COURT: All right. Ladies and gentlemen, at this |
| 15:09:17 | 11 | time, the Court will be in recess until 3:30. We'll take our |
| 15:09:23 | 12 | afternoon recess at this time. |
| 15:09:25 | 13 | (Recess) |
| 15:28:13 | 14 | (Open Court, Defendant present) |
| 15:28:13 | 15 | THE COURT: Mr. Orr? |
| 15:29:53 | 16 | MR. ORR: Your Honor, at the close of the |
| 15:29:56 | 17 | Government's evidence, Defendant David Diehl moves for judgment |
| 15:29:59 | 18 | of acquittal pursuant to Federal Rule of Criminal Procedure 29, |
| 15:30:04 | 19 | on the grounds that the evidence offered by the Government is |
| 15:30:07 | 20 | insufficient on the United States Constitution and the relevant |
| 15:30:11 | 21 | case law to establish federal jurisdiction in this matter, and |
| 15:30:15 | 22 | that there is no adequate interstate nexus shown -- |
| 15:30:18 | 23 | THE COURT: Slow down. Go ahead, but just slow |
| 15:30:21 | 24 | down. You're just reading very quickly. |
| 15:30:23 | 25 | MR. ORR: I'm making this up as I go. |

15:30:25  1          THE COURT:  I don't think Ms. Rodriguez is having

15:30:27  2  trouble.  But make it up more slowly as you go.

15:30:30  3          MR. ORR:  Yes, Your Honor.  I go a lot faster if I'm

15:30:33  4  making stuff up.

15:30:34  5          That the -- and there is no evidence whatsoever that

15:30:38  6  Mr. -- of any credible nature that Mr. Diehl or any other

15:30:41  7  nature that Mr. Diehl transported in interstate commerce any --

15:30:47  8  any child pornography alleged in any of the counts of the

15:30:52  9  indictment.  And we renew our motion to dismiss that we filed

15:30:56  10  prior to trial.

15:30:57  11          THE COURT:  Mr. Devlin?

15:30:59  12          MR. DEVLIN:  Your Honor, I think taken in the light

15:31:02  13  most favorable to the Government, the evidence is more than

15:31:05  14  ample to show the interstate nexus and the other elements.

15:31:09  15          First of all, the stipulation does show the first

15:31:11  16  two -- there are three elements.  The first two elements being

15:31:14  17  that the defendant used, persuaded, enticed, et cetera, one or

15:31:18  18  more -- one or more children to engage in sexually explicit

15:31:21  19  conduct for the purpose of producing a visual depiction of such

15:31:25  20  conduct.  Secondly, that the children were minors at the time.

15:31:28  21  I don't think there's any dispute about those.

15:31:30  22          Third, in terms of the element of interstate nexus,

15:31:33  23  the element is not that the defendant transported it.  That's a

15:31:35  24  separate offense of transporting or, in some cases,

15:31:37  25  distribution.  But simply that the visual depictions actually

15:31:42  1  were transported in interstate and foreign commerce.  And

15:31:44  2  that's the element, not that he did it.

15:31:46  3          I think by standing alone, the stipulation is

15:31:48  4  sufficient to show that.  But on top of that, additional

15:31:54  5  testimony just reinforces the stipulation.

15:31:57  6          THE COURT:  Break it down for me on Jane Doe 1,

15:32:02  7  Jane Doe 2, and Jane Doe 3.  And don't argue it generally.

15:32:09  8  Point out for me what we have on each of the three and where it

15:32:15  9  appears.

15:32:19  10          MR. DEVLIN:  In terms of count 1, Judge -- that would

15:32:22  11  be Government Exhibits 1-1 and 1-2 -- the evidence is that

15:32:29  12  the -- in the stipulation paragraph -- actually, paragraph 15

15:32:41  13  states that each of the visual -- excuse me.

15:32:44  14          The video exhibits, which is essentially Government's

15:32:47  15  Exhibits -- which includes Government's Exhibits 1-1 and 1-2,

15:32:53  16  that each of those visual depictions were found in digital

15:32:57  17  video format stored in one or more computers, hard drives,

15:33:00  18  and/or other computer storage media in places outside the State

15:33:04  19  of Texas and seized in connection with child pornography

15:33:06  20  investigations that were conducted in and after the video

15:33:10  21  exhibits were produced.

15:33:11  22          And the rest of paragraph 15 also pertains to all of

15:33:14  23  the video -- what are labeled as the video exhibits in the

15:33:18  24  stipulation, that 1-1 and 1-2 in particular were found on one

15:33:24  25  or more computers in Mesa, Arizona.

15:33:29   1         That the 1-1 and 1-2 and the other video exhibits

15:33:35   2   were found in the digital video format at places outside of the

15:33:39   3   State of Texas and seized in connection with other criminal

15:33:43   4   investigations.

15:33:43   5         That the visual -- and, again, it just repeats that

15:33:45   6   the visual depictions contained in the video exhibits were

15:33:48   7   found outside of the State of Texas as recently as 2010.  And

15:33:52   8   that each of the video exhibits is currently available on the

15:33:54   9   Internet, and all of them have been available on the Internet

15:33:58  10   since at least 2007.

15:33:59  11         I think that the statements in all of paragraph 15

15:34:03  12   and the stipulation by -- by itself would certainly supply us

15:34:09  13   more than enough evidence to show the interstate nexus element

15:34:13  14   of the fact that the visual depictions actually were

15:34:17  15   transporting in interstate and foreign commerce -- and/or

15:34:22  16   foreign commerce.

15:34:23  17         I would then also in particular as to 1-1 and 1-2, I

15:34:27  18   think Mr. Courtney's testimony substantially adds to that.  He

15:34:31  19   saw the videos in 1-1 and 1-2, as he identified through still

15:34:39  20   photographs, in the State of Florida on the defendant's

15:34:43  21   computer.  And he was shown that in about 2008.  And so I think

15:34:46  22   that by that alone, again, would -- would more than adequately

15:34:51  23   support the interstate nexus element as to the videos in

15:34:55  24   count 1.

15:34:56  25         In addition, the testimony of Kerry Jenkins was that

15:35:00  1  the defendant -- she and the defendant moved quite a bit.  That

15:35:05  2  after they lived in Austin, after the time that the video

15:35:09  3  exhibits were produced -- and, again, that includes 1-1 and

15:35:13  4  1-2 -- that the defendant moved to Ohio and he subsequently

15:35:19  5  moved back to Texas, to Florida, to California.  I don't have

15:35:23  6  them in the exact order she testified to.  But that he also

15:35:26  7  took all of his computer equipment with him, and that would

15:35:31  8  include the -- the computers that he had when they were

15:35:39  9  married.

15:35:40  10        And she testified that he uploaded and stored videos

15:35:43  11 on his computer that he took.  He was an avid videographer and

15:35:50  12 that she has seen him upload and store videos on the computer.

15:35:53  13 I think it's a fair inference that the video exhibits -- and,

15:35:57  14 again, I'm using them collectively -- were stored on computers

15:36:01  15 owned and maintained by him and were so transported with him in

15:36:06  16 interstate commerce during each of his moves.

15:36:08  17        So I think that additional evidence beyond what is

15:36:11  18 already in paragraph 15 of the stipulation would more than

15:36:14  19 adequately satisfy the interstate nexus element as to count 1.

15:36:19  20        And as to Counts 2 through 10, again, paragraph 15.

15:36:25  21 I can go individually, but I think it really applies to all of

15:36:29  22 them.  I think paragraph 15 is fairly -- does encompass all of

15:36:33  23 the video exhibits that were admitted as to each of Counts 2

15:36:36  24 through 10 and that they were found in other states either in

15:36:41  25 count -- in the case of Count 2, Government Exhibit 2 was found

| | | |
|---|---|---|
| 15:36:51 | 1 | on a computer in Westminster, Maryland.  Government Exhibit 3 |
| 15:36:55 | 2 | was found on computers in Westminster, Maryland.  Government |
| 15:36:59 | 3 | Exhibit 4-1 -- and I have 5 here, but that's probably 5-1 and |
| 15:37:05 | 4 | 5-2 -- were found on computers in Westminster, Maryland. |
| 15:37:10 | 5 | Government Exhibit 6 and 8 were found on computers in |
| 15:37:15 | 6 | Mesa, Arizona.  Government's Exhibits 7, 9-1, 9-2, and 10 were |
| 15:37:19 | 7 | found in computers in Westminster, Maryland. |
| 15:37:22 | 8 | It's established earlier in the stipulation that |
| 15:37:26 | 9 | the -- all of those videos were produced in Texas, in the |
| 15:37:30 | 10 | Western District of Texas.  Government's Exhibits 1-1 and 1-2 |
| 15:37:34 | 11 | were produce at the Star Ranch.  Government Exhibit 2 was |
| 15:37:37 | 12 | produced at the Star Ranch in the Western District of Texas. |
| 15:37:40 | 13 | The rest of them were produced at the defendant's residence on |
| 15:37:44 | 14 | Hazelhurst Drive in the Western District of Texas. |
| 15:37:47 | 15 | So the fact that they have been found in other states |
| 15:37:50 | 16 | is sufficient to show that the visual depictions had actually |
| 15:37:53 | 17 | been transported in interstate and foreign commerce. |
| 15:37:56 | 18 | And, in addition, there is stipulation that each of |
| 15:37:59 | 19 | the video exhibits is available on the Internet.  And under the |
| 15:38:02 | 20 | case of the *United States v. Runyan* -- that's 290 F.3d 223, a |
| 15:38:15 | 21 | Fifth Circuit case from 2002 -- |
| 15:38:16 | 22 | THE COURT:  290 F.3d.  What's your page citation? |
| 15:38:20 | 23 | MR. DEVLIN:  223. |
| 15:38:21 | 24 | THE COURT:  And that's *Runyan*? |
| 15:38:23 | 25 | MR. DEVLIN:  R-u-n-y-a-n. |

| 15:38:25 | 1 | THE COURT: All right. Go ahead. |

15:38:26  2        MR. DEVLIN:  Transmission on the Internet was found

15:38:28  3  by the Fifth Circuit in the context of sexual exploitation

15:38:35  4  offenses to be sufficient to show interstate nexus.  And that

15:38:41  5  is at -- the point cite is page 239.  States:  "As *Runyan*

15:38:56  6  correctly notes, the Circuit has not yet decided whether an

15:38:58  7  Internet transmission in and of itself constitutes interstate

15:39:01  8  transportation sufficient to satisfy the interstate commerce

15:39:04  9  element of Section 2251," which is at least the statute under

15:39:08  10  which we're charged here.

15:39:10  11        "In the instant case we squarely face this question.

15:39:16  12  We join the First Circuit and holding that 'transmission of

15:39:19  13  photographs by means of the Internet is tantamount to moving

15:39:22  14  photographs across state lines and, thus, constitutes

15:39:24  15  transportation and interstate commerce' for the purpose of

15:39:26  16  18 U.S.C. Section 2251."

15:39:28  17        I believe that that -- that case provides sufficient

15:39:32  18  support that just having these videos exhibits on the Internet

15:39:37  19  is sufficient to show interstate and foreign commerce, since

15:39:41  20  the Internet is -- is a means of interstate and foreign

15:39:44  21  commerce.

15:39:45  22        And, as Mr. Courtney testified, too, he said he has

15:39:49  23  seen at least Government's Exhibits 1-1 and 1-2 over the

15:39:56  24  network that he used, called eMule, which he described as

15:40:00  25  involving the connection of thousands or millions of computers

COURTNEY – CROSS

| | | |
|---|---|---|
| 15:40:06 | 1 | and that it was a worldwide network. |
| 15:40:08 | 2 | So I think, again, under the circumstances, all of |
| 15:40:11 | 3 | the evidence is sufficient to show that all of the video |
| 15:40:15 | 4 | exhibits that are charged in Counts 1 through 10 have a |
| 15:40:21 | 5 | sufficient interstate nexus proven sufficient to not only get |
| 15:40:25 | 6 | by a motion for judgment of acquittal, but also to convict the |
| 15:40:29 | 7 | defendant.  And we believe that the Court should deny the |
| 15:40:33 | 8 | motion -- the Rule 29 Motion. |
| 15:40:35 | 9 | THE COURT:  Mr. Orr, your motion.  You get the last |
| 15:40:38 | 10 | word. |
| 15:40:39 | 11 | MR. ORR:  Well, we believe that finding videos |
| 15:40:42 | 12 | somewhere else on the Internet is not enough to show that they |
| 15:40:46 | 13 | were transported. |
| 15:40:47 | 14 | And, secondly, Your Honor, even if they were |
| 15:40:50 | 15 | transported by someone -- some unknown persons, the way the |
| 15:40:56 | 16 | statute reads, it says, "have been transported."  So even if |
| 15:41:00 | 17 | Mr. Diehl made these videos at a certain point in time and |
| 15:41:04 | 18 | somebody else transported it later, that would be an |
| 15:41:07 | 19 | unconstitutional application to Mr. Diehl of someone else |
| 15:41:10 | 20 | undertaking transportation of the videos.  And I think the |
| 15:41:13 | 21 | evidence is not adequate to show that he in fact transported |
| 15:41:17 | 22 | anything. |
| 15:41:18 | 23 | If the literal reading of the statute -- and I think |
| 15:41:21 | 24 | what Mr. Devlin argues for is to decrease or to do away with |
| 15:41:25 | 25 | the requirement that Mr. Diehl had done something knowingly and |

15:41:33   1   intelligently -- intentionally, I mean.

15:41:33   2           THE COURT:  What's your response to *Runyan*?

15:41:35   3           MR. ORR:  Well, I think *Runyan* is wrong, Your Honor.

15:41:39   4   I think that, just the mere fact that something is found on the

15:41:43   5   Internet somewhere else is not adequate to convict someone of

15:41:50   6   "have been transported."

15:41:54   7           THE COURT:  I understand your argument, but it's not

15:41:58   8   up to me to tell the Fifth Circuit that they were wrong.  It's

15:42:01   9   up to the Fifth Circuit to reconsider or the Supreme Court of

15:42:04  10   the United States to tell the Fifth Circuit that they were

15:42:07  11   wrong.

15:42:07  12           MR. ORR:  Well, Your Honor, I'll get up to the

15:42:09  13   Fifth Circuit, and I will tell them that they were wrong.

15:42:12  14           THE COURT:  All right.  Having heard the argument, I

15:42:15  15   do find that this is an area of the law that in the past has

15:42:21  16   not been litigated widely.  It's becoming more and more

15:42:27  17   litigated, but I find based on *Runyan* and based on -- primarily

15:42:33  18   on *Runyan*, but also based on the testimony of Mr. Courtney, who

15:42:38  19   I find credible as to that part at least in his testimony, and

15:42:43  20   Ms. Jenkins, who I find credible, that the Government has

15:42:50  21   satisfied its burden of going beyond a motion for acquittal,

15:42:57  22   because I cannot find that there is no reasonable trier of fact

15:43:01  23   that could not contribute -- could not convict under the facts

15:43:06  24   that have been presented in the Government's case in chief.  So

15:43:09  25   the defendant's Rule 29 motion is overruled.

15:43:13  1          Mr. Orr, do you have evidence you wish to present?

15:43:17  2          MR. ORR:  Yes, Your Honor.  We'd like to call A.D.

15:43:22  3     (Witness sworn)

15:43:22  4          THE COURT:  All right.  Let me ask that -- go ahead

15:44:07  5  and be seated.  An initial question, Mr. Orr, before you

15:44:11  6  question.

15:44:12  7          Mr. D., how old are you?

15:44:14  8          THE WITNESS:  Fourteen, sir.

15:44:15  9          THE COURT:  And do you know you have just been given

15:44:18  10  an oath by the lady here, Ms. Jones?

15:44:21  11          THE WITNESS:  Yes, sir.

15:44:22  12          THE COURT:  And you know that you need to tell the

15:44:23  13  truth and you know what the truth is; is that correct?

15:44:26  14          THE WITNESS:  Yes, sir.

15:44:27  15          THE COURT:  All right.  You may proceed, Mr. Orr.

15:44:29  16          MR. ORR:  Thank you, Your Honor.

15:44:29  17                         **N.A.D.,**

15:44:29  18  having been first duly sworn, testified as follows:

15:44:29  19                    DIRECT **EXAMINATION**

15:44:29  20  **BY MR. ORR:**

15:44:29  21  Q.   Mr. D., I am Steve Orr.  I represent your father.  You

15:44:35  22  understand that, I think?

15:44:36  23  A.   Yes, sir.

15:44:36  24  Q.   All right, sir.  And I'll try to keep this as simple as I

15:44:40  25  can for you.  All right.  And you have lived with your father

15:44:47   1   for how many years?  A good long while, correct, sir?

15:44:51   2   A.   Yes, sir.

15:44:51   3   Q.   And up until recently, you have gone to live with your

15:44:54   4   mom?

15:44:54   5   A.   Yes, sir.

15:44:54   6   Q.   All right.  And when you first went to live with your

15:44:57   7   father, did you travel about and move from state to state?

15:45:00   8   A.   Yes, sir.

15:45:00   9   Q.   Okay.  And do remember what states that you -- that you

15:45:04   10   moved from and to?  Could you tell the Judge that?

15:45:07   11   A.   For the most part, yes.

15:45:09   12   Q.   Would you please tell him.

15:45:11   13   A.   Okay.  The furthest back I can remember would be Ohio.

15:45:16   14   And from there I believe we moved to Texas.  And after that we

15:45:22   15   moved to Florida, I believe.  And then we moved to Dallas and

15:45:28   16   then again to Florida.  And we moved several times within each

15:45:32   17   of these.  At least twice.

15:45:33   18   Q.   Okay.

15:45:33   19   A.   And then we moved to California and then back to Florida.

15:45:37   20   Q.   Okay.  And during the -- was all that moving a little

15:45:42   21   stressful for you?

15:45:43   22   A.   Yes, sir.

15:45:43   23   Q.   Okay.  Did your dad keep you in schools?

15:45:46   24   A.   Yes, sir.

15:45:46   25   Q.   Okay.  Did you make good grades?

| | | |
|---|---|---|
| 15:45:48 | 1 | A.    For the most part. |
| 15:45:50 | 2 | Q.    Well, nobody's perfect.  And did you -- were you -- how |
| 15:45:55 | 3 | long had you lived in Florida? |
| 15:45:57 | 4 | A.    Total? |
| 15:45:58 | 5 | Q.    Yes, sir. |
| 15:45:59 | 6 | A.    Around three years. |
| 15:46:01 | 7 | Q.    Oak.  And this last time you were there, how long did you |
| 15:46:04 | 8 | live there?  Is that what you're talking about? |
| 15:46:07 | 9 | A.    No.  The last time? |
| 15:46:08 | 10 | Q.    Uh-huh. |
| 15:46:09 | 11 | A.    It was a total of like seven months in Jacksonville, I |
| 15:46:15 | 12 | believe.  Jacksonville, Florida. |
| 15:46:18 | 13 | Q.    Okay.  And while you were in Florida, you rose to the |
| 15:46:21 | 14 | ranks of being one of the top tennis players over there? |
| 15:46:24 | 15 | A.    Top fifties. |
| 15:46:25 | 16 | Q.    Top how many? |
| 15:46:26 | 17 | A.    Fifties. |
| 15:46:27 | 18 | Q.    Okay.  And you're on the tennis team in your school now, |
| 15:46:31 | 19 | correct? |
| 15:46:31 | 20 | A.    Yes, sir. |
| 15:46:32 | 21 | Q.    And you're doing quite well in tennis? |
| 15:46:34 | 22 | A.    Yes, sir. |
| 15:46:35 | 23 | Q.    All right, sir.  Now, when you -- well, let me ask you |
| 15:46:41 | 24 | this:  Did you -- did your dad take good care of you while you |
| 15:46:45 | 25 | were moving from place to place and while you were living with |

N.A.D. – DIRECT

| | | |
|---|---|---|
| 15:46:48 | 1 | him?  I mean, you got fed and taken to school and that sort of |
| 15:46:54 | 2 | thing? |
| 15:46:54 | 3 | A.   Yes. |
| 15:46:55 | 4 | Q.   And so far as your -- did you know -- when you lived in |
| 15:47:02 | 5 | Florida, did you know a guy named Kenneth Courtney? |
| 15:47:05 | 6 | A.   Yes, sir. |
| 15:47:06 | 7 | Q.   Okay.  Did your dad -- did there ever come a time when |
| 15:47:08 | 8 | your dad warned you about Kenneth Courtney? |
| 15:47:12 | 9 | A.   No. |
| 15:47:12 | 10 | Q.   Do you recall a time when your dad said, We can't hang out |
| 15:47:16 | 11 | with Kenneth Courtney anymore? |
| 15:47:19 | 12 | A.   No, sir. |
| 15:47:19 | 13 | Q.   Okay.  Do you remember a time when you were at a meeting |
| 15:47:22 | 14 | or a group with Mr. -- with David Diehl's sister and his |
| 15:47:28 | 15 | girlfriend in Florida, and Mr. Courtney and Mr. Diehl, your |
| 15:47:32 | 16 | father, had a fight? |
| 15:47:34 | 17 | A.   I don't remember that, sir.  I'm sorry. |
| 15:47:39 | 18 | Q.   Okay.  Do you ever remember them going over to your house; |
| 15:47:42 | 19 | that is, David Diehl, Mr. Courtney, and your aunt and |
| 15:47:50 | 20 | Mr. Diehl's girlfriend? |
| 15:47:53 | 21 | A.   Coming over to our house? |
| 15:47:55 | 22 | Q.   Coming to your house. |
| 15:47:56 | 23 | A.   All at once?  I don't remember.  I don't remember when |
| 15:48:04 | 24 | they all came. |
| 15:48:04 | 25 | Q.   Okay.  How many times do you think you have seen |

| | | |
|---|---|---|
| 15:48:07 | 1 | Mr. Courtney? |
| 15:48:08 | 2 | A.   Maybe 15 total. |
| 15:48:14 | 3 | Q.   Okay. |
| 15:48:15 | 4 | A.   No.  Probably more than that.  Just about 20. |
| 15:48:18 | 5 | Q.   Do you ever remember him coming to your house? |
| 15:48:21 | 6 | A.   Once maybe. |
| 15:48:24 | 7 | Q.   Do you remember when that was and who else was there? |
| 15:48:27 | 8 | A.   No. |
| 15:48:28 | 9 | Q.   Do you remember what time of day it was? |
| 15:48:31 | 10 | A.   It was during the daytime, and then it went into night. |
| 15:48:35 | 11 | Q.   Yeah.  Daytime or nighttime?  Was it dark or daylight? |
| 15:48:38 | 12 | A.   It was light, and then it was, like, during the evening. |
| 15:48:41 | 13 | So it was a bit of both.  Like he came over in the afternoon |
| 15:48:45 | 14 | and stayed for a little while. |
| 15:48:47 | 15 | Q.   Okay.  And you don't remember who else was there, if |
| 15:48:49 | 16 | anyone? |
| 15:48:50 | 17 | A.   No. |
| 15:48:50 | 18 | Q.   Do you remember what the purpose of that visit was with |
| 15:48:53 | 19 | Mr. Courtney? |
| 15:48:54 | 20 | A.   No.  I don't remember.  I didn't even know.  I was |
| 15:48:57 | 21 | probably reading my book at the time. |
| 15:48:59 | 22 | Q.   I'm sorry?  I couldn't quite hear that. |
| 15:49:01 | 23 | A.   I didn't know.  At the time I was probably reading a book, |
| 15:49:04 | 24 | so I wasn't sure as to what they were doing. |
| 15:49:07 | 25 | Q.   Okay. |

| | | |
|---|---|---|
| 15:49:12 | 1 | MR. ORR:  May I have just a moment, Your Honor? |
| 15:49:14 | 2 | THE COURT:  Yes. |
| 15:49:37 | 3 | MR. ORR:  I pass the witness. |
| 15:49:38 | 4 | THE COURT:  Mr. Devlin? |
| 15:49:39 | 5 | MR. DEVLIN:  I have no questions, You Honor. |
| 15:49:41 | 6 | THE COURT:  You may step down. |
| 15:50:01 | 7 | Mr. Orr, anything further? |
| 15:50:05 | 8 | MR. ORR:  One -- less than one minute. |
| 15:50:08 | 9 | THE COURT:  Take the time you need. |
| 15:50:52 | 10 | MR. ORR:  No further witnesses, Your Honor.  We rest. |
| 15:50:58 | 11 | THE COURT:  Mr. Devlin, does the Government have any |
| 15:51:00 | 12 | rebuttal? |
| 15:51:01 | 13 | MR. DEVLIN:  No rebuttal, Your Honor.  We close. |
| 15:51:05 | 14 | THE COURT:  Mr. Orr, does the defendant close? |
| 15:51:07 | 15 | MR. ORR:  We close, Your Honor. |
| 15:51:11 | 16 | THE COURT:  All right.  How much time would you like |
| 15:51:14 | 17 | for closing argument summations? |
| 15:51:19 | 18 | MR. DEVLIN:  Ten minutes, Judge. |
| 15:51:20 | 19 | MR. ORR:  That's fine, sure. |
| 15:51:21 | 20 | THE COURT:  You want a little time to gather your |
| 15:51:23 | 21 | thoughts before I entertain the closing summation, or are you |
| 15:51:27 | 22 | ready to go straight into it? |
| 15:51:30 | 23 | MR. DEVLIN:  Just a few -- five minutes would be |
| 15:51:33 | 24 | sufficient for me, Judge. |
| 15:51:35 | 25 | THE COURT:  Well, we'll be in recess until |

| | | |
|---|---|---|
| 15:51:37 | 1 | 4:00 o'clock.  Does that give you enough time? |
| 15:51:39 | 2 | MR. DEVLIN:  That's perfect, Judge. |
| 15:51:40 | 3 | MR. ORR:  Oh, yeah.  That's great.  Sure. |
| 15:51:41 | 4 | THE COURT:  And I'll hear closing summations at |
| 15:51:44 | 5 | 4 o'clock. |
| 15:51:44 | 6 | MR. ORR:  As always, Your Honor, you made a perfect |
| 15:51:48 | 7 | ruling. |
| 15:51:48 | 8 | THE COURT:  I know.  It's uncanny, isn't it? |
| 15:51:50 | 9 | MR. ORR:  That may not be what I tell the |
| 15:51:53 | 10 | Fifth Circuit. |
| 15:51:53 | 11 | THE COURT:  I think you'll say something else to them |
| 15:51:55 | 12 | the next time you have an opportunity.  I don't know when that |
| 15:51:58 | 13 | will be.  Court's in recess. |
| 15:52:01 | 14 | MR. DEVLIN:  Judge, before me -- I'm sorry.  Before |
| 15:52:04 | 15 | you leave, may -- we would like to excuse Mr. Courtney so he |
| 15:52:07 | 16 | can return to where he's being -- |
| 15:52:09 | 17 | MR. ORR:  Fine with us, Your Honor. |
| 15:52:10 | 18 | MR. DEVLIN:  Thank you, Your Honor |
| 15:52:10 | 19 | THE COURT:  And you had previously asked about |
| 15:52:13 | 20 | Agent Mullen, I believe, and the defendant wanted him retained |
| 15:52:17 | 21 | also in case the defendant wanted to call him. |
| 15:52:19 | 22 | MR. ORR:  Yeah.  We don't have any problems with |
| 15:52:21 | 23 | that.  We decided not put him back. |
| 15:52:23 | 24 | THE COURT:  Since both sides have rested and closed |
| 15:52:25 | 25 | without objection from either party, either side can release |

| | | |
|---|---|---|
| 15:52:28 | 1 | any witnesses that they may have here.  Mr. Orr, you're in |
| 15:52:31 | 2 | agreement with that? |
| 15:52:32 | 3 | MR. ORR:  Yes, Your Honor. |
| 15:52:32 | 4 | THE COURT:  Mr. Devlin? |
| 15:52:33 | 5 | MR. DEVLIN:  Yes, Your Honor.  Thank you. |
| 15:52:35 | 6 | THE COURT:  All right. |
| 15:52:37 | 7 | (Recess) |
| 15:52:37 | 8 | (Open Court, Defendant present) |
| 16:01:52 | 9 | THE COURT:  One brief matter.  The Government and the |
| 16:02:04 | 10 | defendant previously filed under seal on July 31, 2011 the |
| 16:02:09 | 11 | agreed stipulation of facts and evidence, and I allowed it to |
| 16:02:13 | 12 | be filed under seal at that time.  I have now admitted that |
| 16:02:18 | 13 | stipulation of facts and evidence into the record as of this |
| 16:02:24 | 14 | morning in Open Court.  I did not seal it.  I just want to make |
| 16:02:30 | 15 | sure the parties understand that that constitutes evidence at |
| 16:02:35 | 16 | this point and is in the record and is not sealed because we |
| 16:02:40 | 17 | have had a request for a copy of it that I intend to honor, |
| 16:02:46 | 18 | unless either one of you gives me some very good reasons why it |
| 16:02:52 | 19 | is not public testimony at this point. |
| 16:02:55 | 20 | MR. DEVLIN:  No, sir.  We admitted it today with the |
| 16:02:57 | 21 | understanding that it would be unsealed as evidence. |
| 16:02:59 | 22 | THE COURT:  Mr. Orr? |
| 16:03:01 | 23 | MR. ORR:  Well, we would like to have it continue to |
| 16:03:04 | 24 | be sealed, Your Honor. |
| 16:03:05 | 25 | THE COURT:  Well, I'm not going to continue it |

16:03:08  1    sealed.  Ms. Jones, the clerk's office, can provide copies of

16:03:10  2    the agreed stipulation of facts in evidence because I do not

16:03:16  3    find that it contains anything that will compromise any

16:03:21  4    victims.  It is well-drafted, it is circumspect, and it is

16:03:27  5    public record.

16:03:28  6          So at this time, Mr. Devlin, I'll hear from the

16:03:31  7    Government for ten minutes.  You may reserve part of your time

16:03:35  8    if you desire for rebuttal, but you may proceed with summation.

16:03:40  9                    **GOVERNMENT'S CLOSING ARGUMENT**

16:03:40  10         MR. DEVLIN:  Thank you, Your Honor.  And I will

16:03:41  11   reserve just a very short period of time for rebuttal.

16:03:46  12         Thank you, Your Honor.  May it please the Court,

16:03:47  13   Counsel, Your Honor.  In this case I am going to focus

16:03:51  14   primarily on the interstate nexus elements, since that is

16:03:54  15   really the only one in dispute here.

16:03:56  16         The first two elements of the offense -- offenses, I

16:04:00  17   should say -- and, again, I'm going to argue them together only

16:04:02  18   because they are all production of child pornography in

16:04:04  19   counts 1 through 10.  Essentially there are three elements to

16:04:07  20   each of those offenses.

16:04:08  21         First, that an actual minor; that is, a real person

16:04:10  22   who is less than 18 years old, was depicted.  The stipulation

16:04:13  23   clearly establishes that at the time that these video exhibits

16:04:17  24   were produced, all of the minors identified as victims; namely,

16:04:22  25   Jane Doe Number 1, Jane Doe Number 2, and Jane Doe Number 3

16:04:26  1  were all under the age of 18.

16:04:28  2          Secondly, and the -- I think this is a good reminder

16:04:31  3  of what this offense is.  It's really not the actual

16:04:34  4  production, but simply the use, persuasion, inducement,

16:04:38  5  enticement, or coercion of a minor to take part in sexually

16:04:41  6  explicit conduct for the purpose of producing a visual

16:04:44  7  depiction of the conduct.  That's clearly been established as

16:04:48  8  well by the stipulation.

16:04:49  9          It's been established that the defendant is the adult

16:04:52  10  male who is seen and/or heard in all of the videos; that it is

16:04:57  11  his arm and his body parts that are seen in those videos; that

16:05:01  12  he was the only male in -- depicted in the videos; that he was

16:05:06  13  running the videos; and that he is the one who did use,

16:05:09  14  persuade, induce, and entice the minors to take part in the

16:05:14  15  deplorable sexually explicit conduct that is depicted in those

16:05:17  16  videos.

16:05:18  17          So I think the first and second elements are more

16:05:21  18  than established beyond a reasonable doubt by the agreed

16:05:24  19  stipulation.

16:05:25  20          My focus will be on the third element, which is that

16:05:27  21  the visual depiction was mailed or actually transported in

16:05:32  22  interstate or foreign commerce.  There's not a *mens rea* aspect

16:05:36  23  to that because that is a federal jurisdictional element.  It

16:05:38  24  still needs to be proven beyond a reasonable doubt.  But as the

16:05:40  25  Court is well aware, the Court can take into account both

16:05:44 1   direct and circumstantial evidence.

16:05:46 2          And in this case the Government is admittedly relying

16:05:48 3   a lot on circumstantial evidence.  We did not have a seizure of

16:05:52 4   child pornography from the defendant, which is a very unusual

16:05:55 5   circumstance in these types of cases, so we have had to

16:05:58 6   establish the -- that element by other means.

16:06:01 7          But, first, the stipulation itself, as I argued a few

16:06:06 8   minutes ago, is more than sufficient to show -- I'm going to,

16:06:10 9   again, refer to them as the video exhibits as they are

16:06:13 10  expressed in the stipulations, because they are -- it's really

16:06:17 11  all or nothing to a great extent.

16:06:19 12         All of those visual depictions were found outside of

16:06:22 13  Texas in the course of other investigations.  That's

16:06:25 14  established by the stipulation.  It was also agreed in the

16:06:28 15  stipulation that all of those videos are on the Internet and

16:06:31 16  have been for some time.  I think Mr. Courtney's testimony

16:06:35 17  reinforces that fact.  He said that he found at least the video

16:06:39 18  charge in Count 1 on the Internet prior to seeing it at the

16:06:43 19  defendant's house in Florida in 2008.

16:06:46 20         In addition, there is a lot of other evidence, Judge,

16:06:49 21  that is probably more subtle that does show that the

16:06:51 22  defendant -- excuse me, that the these videos were -- were

16:06:55 23  transported in interstate and foreign commerce.

16:06:58 24         First of all, as Kerry Jenkins testified and even as

16:07:02 25  young A.D. testified, they moved the -- the defendant moved

16:07:07   1   extensively over a period of time, starting at least as early

16:07:10   2   as 1999 and continuing until almost the time that he was

16:07:14   3   arrested, moved extensively around the country.  He lived in

16:07:18   4   Texas, lived in Florida, lived in California, lived in Georgia,

16:07:22   5   lived in Ohio.  And each of those times he transported all of

16:07:25   6   his computer and video equipment.

16:07:27   7           Secondly, the defendant designed the computer system

16:07:30   8   himself, as testified to by Kerry Jenkins.

16:07:33   9           Third, she said that he uploaded and stored videos on

16:07:36  10   his computer.  So he took the time, even ten years ago or so,

16:07:40  11   to upload videos that were produced onto computer.  He also

16:07:48  12   used video editing software.  And as you saw in one of the

16:07:51  13   video exhibits -- I believe it might have been 5-1 -- there was

16:07:55  14   some editing and some -- there's a lot of music on some of

16:08:00  15   those videos.  Whether he actually did that or not, we cannot

16:08:03  16   directly establish.  However, the circumstantial evidence

16:08:08  17   certainly shows that he is probably responsible for that.

16:08:10  18           And one of the other things is that he was pretty

16:08:13  19   much an avid videographer.  Probably went beyond what most

16:08:17  20   people did.  He not only videotaped a lot of innocuous

16:08:20  21   activities involving Jane Doe Number 2, which is depicted in

16:08:24  22   Government Exhibit 11, but he also had an extensive array, it

16:08:29  23   seems, of spy cameras.  Kerry Jenkins testified about the

16:08:32  24   lipstick camera and what she called the button camera that she

16:08:36  25   saw that the defendant had.  Now, reportedly he was going to

16:08:39  1  use that to film himself motorcycling, but clearly that could

16:08:45  2  have -- could have been used for other purposes.

16:08:47  3       Kenneth Courtney also testified to the defendant's

16:08:49  4  use of hidden cameras.  He saw one in an Ajax container and

16:08:53  5  another one in a spray bottle -- very small, very

16:08:56  6  inconspicuous.

16:08:58  7       So the defendant has -- is quite an expert

16:09:01  8  videographer and is obviously one who wants to do a lot of

16:09:06  9  videotaping and presumably would want to use that for both

16:09:09  10 legitimate and illegitimate purposes.  I think the

16:09:13  11 circumstantial evidence shows that.

16:09:16  12       Regarding Mr. Courtney, he's longtime friends with

16:09:19  13 the defendant.  He's not a jailhouse snitch.  He's not coming

16:09:22  14 here because he had a recent encounter with the defendant.  He

16:09:25  15 was friends with him for a long time.  Knew him both socially

16:09:28  16 and professionally.  He's serving a sentence for child

16:09:30  17 pornography himself.  In this case, birds of a feather flock

16:09:34  18 together.

16:09:34  19       At some point they learned of their mutual interest

16:09:37  20 in child pornography.  I wish I could -- Mr. Courtney could

16:09:39  21 have explained that better, because I can't frankly imagine how

16:09:42  22 such a conversation would even come up.  But apparently it did

16:09:45  23 at some point.

16:09:46  24       Mr. Courtney saw the tent video, which is really

16:09:49  25 Government's Exhibits 1-1 and 1-2, frankly, together off of the

16:09:54  1  defendant's computer in Florida.  That's the only video that we

16:09:57  2  have pretty direct testimony about in terms of being

16:10:00  3  transported interstate, because now we have that video being

16:10:02  4  produced in Texas and now those videos are in the State of

16:10:06  5  Florida as late as 2008.  I think there's a good inference that

16:10:11  6  the child pornography collection that the defendant had was

16:10:15  7  also transported with him.

16:10:16  8          And on that point, Judge, Mr. Courtney testified that

16:10:18  9  the defendant had an extensive child pornography collection.

16:10:22  10  He traded with others.  In fact, his trading system was such

16:10:25  11  that he would use -- he would put out very small snippets of

16:10:30  12  videos that he had and then, apparently, in trying to get

16:10:34  13  others to make more child pornography for him, whatever that

16:10:37  14  meant, either make it themselves or get some more to send to

16:10:40  15  him, he would then send the longer series of the videos.

16:10:44  16          I think it's pretty clear that child pornography --

16:10:48  17  this child pornography collection that Mr. Courtney himself had

16:10:51  18  and the defendant had were valuable commodities.  This is

16:10:54  19  contraband.  It's kind of like drugs.  Mr. Diehl was using it

16:10:59  20  as a thing of value because he was sending it out to folks who

16:11:02  21  wanted to have it traded, who wanted to have some more, and who

16:11:05  22  wanted to have the entire series and not just a little

16:11:10  23  snippet.

16:11:11  24          So I think the circumstantial evidence is such that

16:11:12  25  it is beyond what is in the stipulation, that he would maintain

16:11:14  1  all of the video exhibits that he had produced on his computer

16:11:18  2  since those would be especially valuable.  Those were personal

16:11:21  3  experiences that he had -- and I hate to call them experiences,

16:11:25  4  but that is the best term I could come up with at the moment --

16:11:28  5  and not just somebody else's experiences that he would then be

16:11:31  6  able to trade.  These were his own.  These would be especially

16:11:35  7  valuable.  This was his own doing.  This is something that he

16:11:38  8  produced, that he made, that he knows the source of, and that

16:11:41  9  he would want to have -- that he would want to experience

16:11:45  10  himself repeatedly and that he would want to send out to

16:11:48  11  others.

16:11:48  12      And as it was testified to by Agent Mullen, the tent

16:11:54  13  series videos, which is the videos in count 1 and the c-baby

16:11:58  14  series videos, which would have been videos in counts 2

16:12:00  15  through 10 were known and popular child pornography series.

16:12:05  16  In fact, Agent Mullen is still getting calls about them turning

16:12:08  17  up in other places.

16:12:10  18      So obviously the defendant knew that these were

16:12:14  19  valuable.  So he wanted to maintain that.  There would be no

16:12:17  20  reason that he would destroy those.  No reason that he would

16:12:19  21  not transport those with him when he went into other places.

16:12:23  22      In addition, the defendant used the Internet relay

16:12:25  23  chat channels that Mr. Courtney testified was a method used by

16:12:29  24  a very, very small percentage of people and a small percentage

16:12:33  25  of users.

16:12:34  1          Again, Mr. Diehl's knowledge of -- he's a

16:12:37  2  knowledgeable computer expert.  He has a homemade computer.  It

16:12:42  3  was something he was very sensitive to that this -- his child

16:12:45  4  pornography collection was something to be protected, something

16:12:48  5  to be safeguarded, something to be kept from law enforcement,

16:12:52  6  frankly.  The defendant made sure that he had the child

16:12:55  7  pornography well encrypted, that it was safeguarded, and that

16:12:59  8  he took special care with it.

16:13:02  9          On top of that, Mr. Courtney testified that he found

16:13:06 10  at least the count 1 videos and possibly more on the eMule

16:13:09 11  network that he described -- that he described as a very

16:13:14 12  extensive worldwide network.  As the stipulation states, not

16:13:17 13  only were all the video exhibits before you found outside of

16:13:20 14  the State of Texas in the course of other investigations.  They

16:13:24 15  were also stipulated to be on the Internet.

16:13:26 16          And, finally, the defendant did -- apparently did

16:13:29 17  destroy some videos, at least according to him, as far as

16:13:33 18  Mr. Courtney testified, but only when he was being investigated

16:13:36 19  in another sexual molestation investigation.

16:13:40 20          Mr. Courtney was not able to describe how much of

16:13:44 21  that he had destroyed, but Mr. Courtney was able to describe

16:13:47 22  that there was no other occasion that he was aware of where the

16:13:49 23  defendant would destroy or did destroy any of this child

16:13:52 24  pornography collection.  And, again, as I mentioned earlier,

16:13:55 25  this is valuable property to the defendant.  There would be no

16:13:58  1   reason why he would ever destroy any of this unless it came to

16:14:01  2   a very serious circumstance, such as being investigated and

16:14:05  3   potentially being caught.

16:14:06  4          And, finally, one of the more subtle aspects of

16:14:09  5   Mr. Courtney's testimony was that, when the defendant was

16:14:13  6   showing the tent series video to Mr. Courtney, there was --

16:14:17  7   Mr. Courtney apparently had mentioned that he had seen it

16:14:19  8   before -- couldn't believe that the defendant had produced it.

16:14:22  9   There was nothing mentioned by the defendant that he was

16:14:24  10  surprised that Mr. Courtney had seen it, that he was shocked or

16:14:27  11  dismayed or that there was anything indicating that the

16:14:31  12  defendant did not know that it was already out there on the

16:14:33  13  Internet.  Very subtle.  Very circumstantial.  But I think it

16:14:38  14  is an important bit of evidence that, taken in combination with

16:14:43  15  all the other evidence, taken in combination especially with

16:14:46  16  the facts that have been stipulated to in the stipulation, I

16:14:49  17  think that that just simply adds to the great weight of the

16:14:53  18  evidence showing interstate nexus.

16:14:55  19         So based on the evidence in this case, based on the

16:14:57  20  stipulation, based on the testimony before you, we urge that

16:15:00  21  you find the defendant guilty of Counts 1 through 10 of the

16:15:03  22  second superseding indictment.

16:15:06  23         THE COURT:  Mr. Orr -- well, let me ask you a

16:15:08  24  question before Mr. Orr because he might want to address this.

16:15:14  25  Mr. Orr said in his argument on the Rule 29 motion that --

16:15:20  1  words to the effect that it would be unfair to convict this

16:15:25  2  defendant if there was no evidence that the defendant knew that

16:15:29  3  the visual depictions were going to be mailed or transported in

16:15:34  4  interstate or foreign commerce.  I believe I heard that your

16:15:37  5  argument was that knowledge and *mens rea* is not an element of

16:15:41  6  the offense; is that correct?

16:15:43  7          MR. DEVLIN:  As this is charged, yes, Your Honor.

16:15:45  8  It's not an element of this particular offense.  If we charge

16:15:48  9  him with transportation or distribution, I would concede that

16:15:52  10  it is.

16:15:52  11          THE COURT:  It's the Government's argument, then, if

16:15:57  12  there is child pornography and it moves in interstate commerce,

16:16:05  13  whether the defendant or a defendant as charged in this

16:16:09  14  indictment admitted to move in interstate commerce or not, that

16:16:13  15  is enough, the mere fact that it did?  Is that the

16:16:15  16  Government's --

16:16:15  17          MR. DEVLIN:  That is correct, Your Honor.  That it

16:16:17  18  did obviously, subsequent to the production, which I think it

16:16:20  19  can't move before the production.  So yes.

16:16:22  20          THE COURT:  All right.

16:16:23  21          MR. DEVLIN:  Just like a firearm, Your Honor.

16:16:24  22          THE COURT:  All right.  Thank you.  Mr. Orr?

16:16:29  23              **DEFENDANT'S CLOSING ARGUMENT**

16:16:29  24          MR. ORR:  I think the way this particular stretch

16:16:34  25  would read, 2251, there is a requirement.  It's not merely a

| 16:16:38 | 1 | jurisdictional requirement.  But it is a requirement that there |

16:16:38  1  jurisdictional requirement.  But it is a requirement that there

16:16:41  2  be knowledge.  It's not something you can graft on to it as you

16:16:46  3  can a firearm statute, but there has to be knowledge that the

16:16:49  4  person intended that it moved in interstate commerce.  That's

16:16:51  5  one of the first prongs in there.  And then the final line of

16:16:56  6  that is or if it has been moved, it has been transported.

16:17:01  7       And so one of the things I'm saying is that that

16:17:04  8  statute, if it does away with the scienter requirement, is

16:17:09  9  unconstitutional.  And, second, that the cases that deal with

16:17:17  10  the possibility that -- of convicting someone because they made

16:17:20  11  a home video that may be of pornographic nature involving

16:17:25  12  children and that later on it is moved in interstate commerce

16:17:28  13  without their permission or consent or knowledge, but they are

16:17:31  14  then guilty of a federal crime, is not the law -- should not be

16:17:35  15  the law under our constitution.

16:17:37  16       And as applied to the facts in this particular case,

16:17:41  17  the Government has heaped one circumstance after another into

16:17:46  18  the Courtroom here and tries to heap them on top of each other

16:17:49  19  to get to the point to say that, Well, it got moved in

16:17:54  20  interstate commerce; therefore, Mr. Diehl must have done it.

16:17:57  21       Now, if they think it's of no concern that Mr. Diehl

16:18:01  22  moved this stuff in interstate commerce, they certainly have

16:18:06  23  spent a fair amount of time trying to prove that he had

16:18:09  24  something to do with moving it.  So I think that they have

16:18:12  25  implicitly admitted that they need to show that Mr. Diehl in

16:18:16  1   fact knowingly transported any child pornography in interstate

16:18:21  2   commerce, which they have failed to do.

16:18:23  3          THE COURT:  Well, let me ask you this:  In looking at

16:18:25  4   Section 2251 ...

16:18:26  5          MR. ORR:  Yes, sir.  Let me get it up here.

16:18:43  6          THE COURT:  Let me know when you have it.

16:18:45  7          MR. ORR:  I've got it right here.

16:18:47  8          THE COURT:  All right.  Follow with me.

16:18:50  9          MR. ORR:  Yes, sir.

16:18:50  10         THE COURT:  I'm looking at only the interstate part.

16:18:53  11         MR. ORR:  Yes, sir.

16:18:54  12         THE COURT:  It appears to me three ways that it can

16:18:56  13  be proved by the Government.

16:18:58  14         MR. ORR:  Yes, sir.

16:18:58  15         THE COURT:  One, if such person knows or has reason

16:19:01  16  to know that such visual depiction will be transported or

16:19:04  17  transmitted using any means or facility of interstate or

16:19:08  18  foreign commerce or affecting interstate or foreign commerce --

16:19:13  19         MR. ORR:  Yes, sir.

16:19:15  20         THE COURT:  -- or mailed.

16:19:18  21         Then, two, if that visual depiction was produced or

16:19:23  22  transmitted using materials that had been mailed, shipped, or

16:19:26  23  transported in or affecting interstate or foreign commerce by

16:19:30  24  any means, including computer, or if such visual depiction has

16:19:37  25  been -- has actually been transported or transmitted using any

16:19:41 1  means or facility of interstate or foreign commerce in or

16:19:45 2  affecting interstate or foreign commerce or mailed.

16:19:48 3        The third way of proving the jurisdictional base

16:19:52 4  appears to not have a scienter requirement in it.

16:19:58 5        MR. ORR:  That's my point.  Yes, sir.

16:20:00 6        THE COURT:  So your point is, it doesn't have the

16:20:01 7  requirement and that causes it to be constitutionally infirm?

16:20:06 8        MR. ORR:  I've got two points here, I guess.

16:20:08 9        THE COURT:  All right.

16:20:08 10       MR. ORR:  If that's the reading of the statute, that

16:20:10 11 section of that statute, then that's unconstitutional.  It does

16:20:16 12 not comply with our Anglo-Saxon jurisprudence.

16:20:19 13       But an alternative reading of the statute is that,

16:20:23 14 because the drafters of the statute talk about, if such person

16:20:24 15 knows or has reason to know that such visual depiction will be

16:20:28 16 transported, they have imposed a scienter requirement on the

16:20:31 17 interstate transportation.  And then it seems to me

16:20:35 18 illogical -- if I can argue the other side of the coin here, it

16:20:39 19 seems illogical to me that they would then all of a sudden do

16:20:45 20 away with the scienter requirement on the third way that we

16:20:48 21 could have interstate commerce.

16:20:50 22       I think what they intended there was to say, well,

16:20:53 23 if -- if the Government can prove that it was moved in

16:20:58 24 interstate commerce by the defendant, that he actually moved

16:21:01 25 it, then that shows that he intended to do it.  But they

| | | |
|---|---|---|
| 16:21:04 | 1 | haven't done that in this particular case. |
| 16:21:06 | 2 | I guess my third argument is that the evidence fails |
| 16:21:09 | 3 | to convict Mr. Diehl of either knowing it's going to be moved |
| 16:21:14 | 4 | in interstate commerce or intentionally moving in interstate |
| 16:21:17 | 5 | commerce.  And then if the Government is intending to rely on |
| 16:21:21 | 6 | the argument, well, it got moved in interstate commerce, but |
| 16:21:25 | 7 | that's unconstitutional. |
| 16:21:30 | 8 | Is that -- and so what they have here is, they |
| 16:21:34 | 9 | have -- they have gone to the trouble of bringing in |
| 16:21:38 | 10 | Mr. Diehl's ex-wife to prove that stuff got moved.  He went |
| 16:21:42 | 11 | around.  They went to Ohio.  The computers got moved.  They |
| 16:21:48 | 12 | talked about video cameras and such as that.  They talk -- they |
| 16:21:54 | 13 | talk about a lot of stuff that creates a suspicion.  They have |
| 16:21:59 | 14 | never, to me, based on the evidence that we have, heard today |
| 16:22:01 | 15 | in this courtroom and proved beyond a reasonable doubt that |
| 16:22:03 | 16 | Mr. Diehl moved anything in interstate commerce, that he had |
| 16:22:10 | 17 | any intention that it be moved in interstate commerce.  Their |
| 16:22:14 | 18 | big argument is that it was found -- |
| 16:22:18 | 19 | THE COURT:  In interstate commerce. |
| 16:22:19 | 20 | MR. ORR:  -- it's found on computers across state |
| 16:22:22 | 21 | lines.  That's their argument.  And we would urge that it |
| 16:22:26 | 22 | being -- |
| 16:22:26 | 23 | THE COURT:  How would it have gotten there? |
| 16:22:30 | 24 | MR. ORR:  Well, I don't know.  But in some cases the |
| 16:22:33 | 25 | Government may be able to prove -- they can prove through FTP |

16:22:37  1  logs and through subpoena of records from the various Internet

16:22:42  2  service where they can prove through the computers that they

16:22:45  3  have apparently have seized, that they found these videos in

16:22:48  4  these computers in whatever -- whatever part of the country or

16:22:52  5  the world.  They can prove where it came from.  They could go

16:22:54  6  to the trouble to show some history by going through the -- who

16:23:00  7  knows how it got there?

16:23:01  8       And I think they have to do more than to say, well,

16:23:04  9  it's found over there in some other state.  Now, the Government

16:23:07  10  brings in Mr. Courtney to say that in Florida, Mr. Diehl showed

16:23:11  11  him one of these videos.  And, of course, he doesn't even

16:23:15  12  really mention that.  This whole story about the fight and

16:23:19  13  going over to Mr. Diehl's house, it's not even in the -- he

16:23:21  14  admits he didn't tell them about that in November when he's

16:23:25  15  talking about it.  He didn't even bring this up until his

16:23:29  16  lawyer apparently tells this to Mr. Mullen.

16:23:31  17       I don't know if whether Mr. Mullen called him or how

16:23:35  18  it came about exactly, but when he's talking to these agents

16:23:38  19  about produce -- when they first show up as Cyber Crimes people

16:23:41  20  in Florida, they show up in his house and start talking about

16:23:44  21  producers.  He doesn't mention Mr. Diehl because he wants to

16:23:47  22  tell the Court, Well, I am not that kind of guy.  Well, we know

16:23:51  23  he is that kind of guy because here is in Court testifying

16:23:54  24  about his supposed great friend David Diehl.  So we know he is

16:23:59  25  that kind of guy, that he would come and testify.

| | | |
|---|---|---|
| 16:24:01 | 1 | So his testimony about this incident in Florida is |
| 16:24:03 | 2 | totally un-credible.  Number one, he may not be a jailhouse |
| 16:24:07 | 3 | snitch, as Mr. Devlin referred to him, but to use the common |
| 16:24:13 | 4 | parlance of the street, he sure is a snitch.  And so he's doing |
| 16:24:18 | 5 | it for the common reason that people snitch, to get himself a |
| 16:24:21 | 6 | better deal.  He got himself 15 years.  He would not like to do |
| 16:24:29 | 7 | 15 years, and who could blame him for that?  Nobody wants to do |
| 16:24:32 | 8 | any amount of time. |
| 16:24:34 | 9 | So what he has done is, I don't know if it is because |
| 16:24:37 | 10 | of the drug usage or because he has had time to sit around in |
| 16:24:39 | 11 | the Florida prison system and dream up some way to add value. |
| 16:24:45 | 12 | He wouldn't admit that he would have to add value to the |
| 16:24:48 | 13 | Government's case to get his time fixed.  Well, I'm just here |
| 16:24:50 | 14 | to tell the truth. |
| 16:24:51 | 15 | Well, clearly if he came over here and said nothing |
| 16:24:54 | 16 | that helped the Government's case, Mr. Devlin's phone call, if |
| 16:24:57 | 17 | any, to the Florida prosecutor would be without much enthusiasm |
| 16:25:03 | 18 | in seeking the time reduction for Mr. Courtney. |
| 16:25:06 | 19 | So I think what you've got here is certainly some |
| 16:25:11 | 20 | suspicion that the Government has created, perhaps with |
| 16:25:14 | 21 | Mr. Courtney, but they have not -- taking Mr. Courtney's |
| 16:25:18 | 22 | testimony and all of the other testimony that they put on, they |
| 16:25:21 | 23 | have not proven the elements of the offense beyond a reasonable |
| 16:25:24 | 24 | doubt. |
| 16:25:25 | 25 | And I think that they haven't shown their |

16:25:28  1    jurisdictional requirement insofar as just because some of

16:25:31  2    these videos are found on -- on other computers and other

16:25:35  3    states.

16:25:37  4            THE COURT:  Well, let me ask you this:  If there is

16:25:42  5    no -- if you were wrong on the constitutionality of the third

16:25:46  6    clause of the interstate nexus portion of Section 2251, has not

16:25:55  7    the Government proved that element by showing that it has shown

16:26:01  8    up in other states?  If it reads, "If such visual depiction has

16:26:09  9    actually been transported or transmitted using any means or

16:26:13 10    facility of interstate or foreign commerce or in any way

16:26:17 11    affecting interstate or foreign commerce or mailed," and they

16:26:20 12    seized the videos in other states -- and that testimony is at

16:26:25 13    least one of them in another country -- and that clause is

16:26:32 14    constitutional, has not the Government satisfied its burden?

16:26:36 15            MR. ORR:  If it's constitutional?

16:26:39 16            THE COURT:  Yes.

16:26:40 17            MR. ORR:  Well, I will never admit that, Your Honor.

16:26:42 18            THE COURT:  Well, you don't have to admit it's

16:26:44 19    constitutional.  I understand your argument.  But if we take it

16:26:48 20    at face value, has not the Government satisfied its burden of

16:26:53 21    showing that this material, as charged in the indictment, moved

16:26:57 22    in interstate commerce if the Government has proved that it

16:27:01 23    originated in Texas and was seized in another state or another

16:27:05 24    country?

16:27:06 25            MR. ORR:  I don't even want to concede that moving in

16:27:11  1  interstate commerce is shown by the fact that it may be found

16:27:14  2  in another state.  I think there are cases that indicate --

16:27:17  3  Your Honor, I think it's just not enough.  They've got to show

16:27:22  4  some method or means that it got across.  It's not like a gun

16:27:25  5  that we found --

16:27:26  6          THE COURT:  Why is it not like a gun?

16:27:27  7          MR. ORR:  Well, because a gun is a physical item.

16:27:30  8  It's got to travel somehow or other, in somebody's pocket from

16:27:34  9  Connecticut, from the Colt Arms factory to Texas.

16:27:38  10          THE COURT:  World's changed.

16:27:41  11          MR. ORR:  Well --

16:27:42  12          THE COURT:  Things travel through the air.

16:27:44  13          MR. ORR:  Yes, sir.  Little electrons.  They're just

16:27:49  14  little electrons.  You can't transport a gun in the form of

16:27:53  15  electrons.

16:27:54  16          THE COURT:  But you can transport images of the gun

16:27:57  17  by electrons.  And in this case the charge is not that the

16:28:01  18  minors were transported, but images of the minors were

16:28:04  19  transported.  Can that not be done by electrons?

16:28:12  20          MR. ORR:  Well, I suppose it can be, yes.  I think

16:28:14  21  that's what I just said.  Electrons move the world these days.

16:28:20  22          THE COURT:  I understand your argument.  But you will

16:28:22  23  admit that the Government has proved that these items were in

16:28:26  24  fact found outside of the State of Texas?

16:28:29  25          MR. ORR:  Yes, sir.

| | | |
|---|---|---|
| 16:28:31 | 1 | THE COURT:  All right.  Mr. Devlin, you may rebut. |
| 16:28:39 | 2 | And what I would like for you to address is the |
| 16:28:47 | 3 | constitutionality of the third clause. |
| 16:28:49 | 4 | MR. ORR:  May I just clarify one thing, Your Honor? |
| 16:28:52 | 5 | THE COURT:  You may. |
| 16:28:52 | 6 | MR. ORR:  The language of statute is transporting. |
| 16:28:55 | 7 | It is not found.  It's transporting.  And just because |
| 16:28:58 | 8 | something -- the Government -- |
| 16:28:59 | 9 | THE COURT:  I know.  I didn't say that I find that it |
| 16:29:04 | 10 | was transporting.  I was asking you how it would have gotten |
| 16:29:07 | 11 | there if it wasn't transported, and you weren't conceding |
| 16:29:10 | 12 | that.  All you said was that, yes, you will admit that it was |
| 16:29:14 | 13 | located in another state. |
| 16:29:16 | 14 | MR. ORR:  Yes, sir.  And I think it's up to the |
| 16:29:18 | 15 | Government to show how it was transported. |
| 16:29:22 | 16 | THE COURT:  So your argument is it's not enough to |
| 16:29:25 | 17 | show it got to the other state? |
| 16:29:30 | 18 | MR. ORR:  Yeah. |
| 16:29:31 | 19 | THE COURT:  All right. |
| 16:29:32 | 20 | MR. ORR:  Yes, sir. |
| 16:29:32 | 21 | THE COURT:  All right.  Now, Mr. Devlin? |
| 16:29:35 | 22 | MR. DEVLIN:  You want me to address what, Judge? |
| 16:29:38 | 23 | THE COURT:  Well, what I'm interested in is the |
| 16:29:40 | 24 | argument Mr. Orr made that either all three of the methods of |
| 16:29:45 | 25 | proving interstate nexus require scienter or, in the event they |

16:29:49   1   don't, why the third one is constitutional without such a

16:29:53   2   requirement.  I believe that's where issue is joined at this

16:30:02   3   point.  Or at least it is in my mind, and I'm the one who has

16:30:04   4   to make a decision.

16:30:05   5                 **GOVERNMENT'S REBUTTAL ARGUMENT**

16:30:05   6         MR. DEVLIN:  Yes, Your Honor.  And I guess I'm

16:30:06   7   relying heavily -- and I should go back to my materials when we

16:30:09   8   had the motions hearing, when we talked about constitutionality

16:30:13   9   with the commerce clause.  I kind of thought that was decided

16:30:15  10   at that point.  So I'm not fully prepared to address that at

16:30:18  11   this time, other than to rely on my response to that motion to

16:30:21  12   dismiss, which -- in which I think Mr. Orr advanced the same

16:30:26  13   arguments, although maybe perhaps more broadly, that under the

16:30:29  14   Commerce Clause, Sub 2251 is not constitutional.

16:30:33  15         What I'm -- I was -- what I'm prepared to address is

16:30:37  16   the scienter requirement in which there is not a whole lot of

16:30:41  17   case law.

16:30:42  18         THE COURT:  What did you just say about the commerce

16:30:44  19   clause?

16:30:45  20         MR. DEVLIN:  Mr. Orr had filed a motion to dismiss

16:30:47  21   the indictment based on the Commerce Clause, and you had ruled.

16:30:51  22         THE COURT:  But I ruled on that with less than a

16:30:53  23   fully developed record.  That's what we always have when we

16:30:59  24   make a preliminary ruling.  I ruled that you had enough to get

16:31:02  25   this case to trial.  It was not necessarily in the inquiry,

| | | |
|---|---|---|
| 16:31:07 | 1 | because there's always a different slant to it after I have had |
| 16:31:11 | 2 | an opportunity to hear all of the evidence other than what was |
| 16:31:14 | 3 | just presented for purposes of a preliminary motion.  The |
| 16:31:19 | 4 | burden, we're now at reasonable doubt stage, which is different |
| 16:31:23 | 5 | than earlier. |
| 16:31:24 | 6 | MR. DEVLIN:  Right.  Well, I am relying heavily on |
| 16:31:27 | 7 | facts, obviously, to establish reasonable doubt.  And I think |
| 16:31:29 | 8 | we're trying to determine what the legal standard is, whether |
| 16:31:32 | 9 | we have to show that it was transported or that he transported. |
| 16:31:36 | 10 | And I -- or at least knew that he transported.  And in that |
| 16:31:41 | 11 | regard, Judge, there really is a dearth of case law regarding |
| 16:31:44 | 12 | the particular element that we're dealing with. |
| 16:31:47 | 13 | In one -- in Supreme Court Case 1994, *United States* |
| 16:31:52 | 14 | *v. X-Citement Video* at 513 U.S. 64 -- it's, again, a 1994 |
| 16:32:00 | 15 | case -- the Supreme Court in the context of 2251 held that |
| 16:32:03 | 16 | there is not a scienter requirement as to the age of victims. |
| 16:32:07 | 17 | That the defendant did not have to know the age of the |
| 16:32:10 | 18 | victims. |
| 16:32:11 | 19 | In addition, Judge, in *United States v. Feola*, which |
| 16:32:14 | 20 | is another Supreme Court case -- that's from 1975.  It was not |
| 16:32:18 | 21 | in the child pornography context.  It's at 420 US 671.  I |
| 16:32:24 | 22 | believe it was in the context of the federal -- the assault |
| 16:32:27 | 23 | statute of federal employees.  I believe the issue was whether |
| 16:32:30 | 24 | or not the defendant in that case had to know the person was a |
| 16:32:34 | 25 | federal employee, and the Supreme Court basically said no |

16:32:37  1  because of the existence of the fact that confers federal

16:32:40  2  jurisdiction need not be one in the mind of the actor at the

16:32:43  3  time he perpetrates the act made criminal by the federal

16:32:45  4  statute.

16:32:46  5        So, based on that case -- I don't have one of the

16:32:49  6  firearms cases in front of me, but the firearms cases

16:32:55  7  addressing the interstate commerce element in the firearms

16:32:58  8  cases would certainly be appropriate here and apply to this

16:33:01  9  particular element because, again, there is a provision in 2251

16:33:07  10 in the context -- and 2252 in the context of transporting or

16:33:13  11 distributing, that the defendant did transport or distribute

16:33:15  12 those things and that he would have to have done that in

16:33:20  13 interstate or foreign commerce.

16:33:21  14        Whereas, in this particular case, the element of

16:33:24  15 interstate nexus is just simply conferring federal jurisdiction

16:33:30  16 over the defendant's actions in using and enticing and

16:33:32  17 persuading minors to engage in sexually explicit conduct for

16:33:36  18 purpose of producing a visual depiction.

16:33:39  19        So the fact that the visual depiction is produced and

16:33:44  20 moves in interstate commerce by any means, whether it's by the

16:33:47  21 defendant or otherwise, is simply the element that establishes

16:33:51  22 federal jurisdiction.  And it does not need to be shown that

16:33:54  23 the defendant himself did it because, if that were the case,

16:33:57  24 then we could probably charge him with transporting and

16:34:00  25 distributing on top of producing since those are separate acts.

| | | |
|---|---|---|
| 16:34:04 | 1 | So, again -- again, the gravamen of the offense is |
| 16:34:08 | 2 | the enticement, use, persuasion of a minor to engage in |
| 16:34:10 | 3 | sexually explicit conduct for the purpose of producing a visual |
| 16:34:13 | 4 | depiction.  That's why there are other elements regarding the |
| 16:34:17 | 5 | interstate nexus that would apply, that the materials used to |
| 16:34:20 | 6 | produce traveled in interstate and foreign commerce.  There is |
| 16:34:25 | 7 | no requirement that the defendant have transported those |
| 16:34:27 | 8 | materials.  And then the element that the defendant -- excuse |
| 16:34:31 | 9 | me -- the element that the visual depictions actually moved in |
| 16:34:35 | 10 | interstate and foreign commerce do not need to be accomplished |
| 16:34:40 | 11 | by the defendant because Congress would have been quite clear |
| 16:34:43 | 12 | in saying that he would have had to have transported them in |
| 16:34:46 | 13 | order to make that requirement on the Government. |
| 16:34:48 | 14 | So I believe that the scienter requirement that's |
| 16:34:53 | 15 | discussed in the *X-Citement Video* case regarding age is |
| 16:34:57 | 16 | particularly appropriate.  And also in the *Feola* case, that |
| 16:35:02 | 17 | describes the existence of the fact that federal jurisdiction |
| 16:35:06 | 18 | does not need to be known to the defendant at the time that he |
| 16:35:11 | 19 | perpetrates the criminal act. |
| 16:35:12 | 20 | So, again, with operating under a dearth of case law |
| 16:35:16 | 21 | and, if the Court wishes, I would be happy to submit a |
| 16:35:20 | 22 | post-trial brief that would expound upon that further, if the |
| 16:35:22 | 23 | Court feels that would be helpful. |
| 16:35:25 | 24 | MR. ORR:  We'd be happy to do that, too.  And it |
| 16:35:28 | 25 | might be fun, especially for young Mr. Crawford here. |

| | | |
|---|---|---|
| 16:35:36 | 1 | THE COURT:  Well, I don't know what cases you're |
| 16:35:40 | 2 | going to come up with that I haven't heard from you on because |
| 16:35:45 | 3 | I am reasonably convinced that there are not a lot of cases out |
| 16:35:52 | 4 | there based on what I did to prepare for the pretrial hearing |
| 16:35:58 | 5 | in this case and this.  So my question is:  Other than getting |
| 16:36:04 | 6 | from both of you what would amount to additional written |
| 16:36:07 | 7 | argument, am I likely to get anything that would shed any |
| 16:36:13 | 8 | authoritative or precedential light on this issue other than |
| 16:36:17 | 9 | what I have already heard, because I am not convinced that |
| 16:36:22 | 10 | there are cases that neither one of you have shown to me here |
| 16:36:26 | 11 | before that are out there. |
| 16:36:28 | 12 | MR. DEVLIN:  There is no cases that I've found, |
| 16:36:30 | 13 | Judge, that are directly on point on this particular element of |
| 16:36:34 | 14 | 2251(a). |
| 16:36:35 | 15 | MR. ORR:  I think that's fair. |
| 16:36:37 | 16 | MR. DEVLIN:  So it would be by analogy, Judge. |
| 16:36:40 | 17 | MR. ORR:  May I say something additionally? |
| 16:36:43 | 18 | Something brief? |
| 16:36:44 | 19 | THE COURT:  Yes. |
| 16:36:44 | 20 | MR. ORR:  The *Runyan* case actually deals with a |
| 16:36:46 | 21 | situation where Runyan was telling the people, the young |
| 16:36:50 | 22 | women -- he says, I'm going to put this on the Internet.  He |
| 16:36:53 | 23 | told them. |
| 16:36:53 | 24 | THE COURT:  I'm familiar with the factual difference |
| 16:36:55 | 25 | in *Runyan*, but I think the Circuit -- the Circuit in *Runyan* |

16:37:02  1  compared *Runyan* to *Carroll* out of what I think is the First

16:37:08  2  Circuit and found the fact situations very similar and agreed

16:37:14  3  with *Carroll*.  But I think the clause that was being discussed

16:37:22  4  and where issue was joined in *Runyan* was the first clause of

16:37:26  5  the interstate nexus in 2251(a), that the person knows or has

16:37:31  6  reason to know that the visual depiction will be transported or

16:37:36  7  transmitted, et cetera, et cetera.  Because there the evidence

16:37:43  8  was that the defendant made a statement to the victim that I

16:37:48  9  intend to transmit this, if I am recalling it.

16:37:52 10           MR. ORR:  That's correct, Your Honor.  I've got it

16:37:54 11  right here.

16:37:55 12           THE COURT:  But I don't think this third clause was

16:37:57 13  discussed.

16:37:59 14           MR. DEVLIN:  I don't believe it was because it didn't

16:38:01 15  get to that point.  And right --

16:38:03 16           THE COURT:  So I get it in the first instance because

16:38:06 17  I don't think there is another -- I don't think there's a case

16:38:09 18  on the third clause of the interstate nexus portion of 2251.

16:38:14 19           MR. DEVLIN:  Not squarely, no, Judge.

16:38:17 20           THE COURT:  Then I am not sure that just additional

16:38:21 21  analogies other than what you have presented are going to shed

16:38:29 22  any more light on what I am going to do with the third clause

16:38:31 23  of 2251(a).

16:38:34 24           MR. ORR:  We have a law review article -- Law

16:38:35 25  Review 21 article that deals with "The Jurisdictional Limits of

16:38:38  1   Federal Criminal Child Pornography Law," if Your Honor would

16:38:41  2   like that.

16:38:42  3             THE COURT:  Well, I would consider that.

16:38:43  4             MR. ORR:  Would you like us to pass it up?  I'll get

16:38:46  5   you a copy, too.  I'll get it for you.  Just remind me.

16:39:01  6             THE COURT:  All right.  Here is what I am going to

16:39:04  7   do:  I need to deliberate on this since I am the trier of fact,

16:39:12  8   and I want to review what I have in front of me.  And so I am

16:39:19  9   going to recess until 10 o'clock in the morning.  And if you

16:39:24 10   all will be back at 10 o'clock in the morning, I will announce

16:39:30 11   my verdict at that time.  I am not going to delay on this, but

16:39:34 12   I do need some time to look over what I have and give some

16:39:38 13   thoughts to -- give some thought to what has been presented to

16:39:43 14   me, particularly with regard to interstate nexus.

16:39:47 15             So at this time we're going to be in recess until

16:39:53 16   10:00 in the morning.  I do not intend to entertain additional

16:39:59 17   argument in the morning.  I will look at what I have, and I

16:40:03 18   will render a verdict at that time.  Is there anything else

16:40:07 19   that anyone wants to present to the Court this evening?

16:40:11 20             MR. DEVLIN:  No, Your Honor.

16:40:11 21             MR. ORR:  No, Your Honor.

16:40:12 22             THE COURT:  All right.  Then at this time we're in

16:40:14 23   recess until 10 o'clock in the morning.

16:40:18 24        (End of transcript)

         25

1  **UNITED STATES DISTRICT COURT        )**

2  **WESTERN DISTRICT OF TEXAS           )**

3      I, Arlinda Rodriguez, Official Court Reporter, United

4  States District Court, Western District of Texas, do certify

5  that the foregoing is a correct transcript from the record of

6  proceedings in the above-entitled matter.

7      I certify that the transcript fees and format comply with

8  those prescribed by the Court and Judicial Conference of the

9  United States

10      WITNESS MY OFFICIAL HAND this the 7th day of March 2011.

11

12                          /S/ Arlinda Rodriguez
                            Arlinda Rodriguez, Texas CSR 7753
13                          Expiration Date:  12/31/2012
                            Official Court Reporter
14                          United States District Court
                            Austin Division
15                          200 West 8th Street, 2nd Floor
                            Austin, Texas 78701
16                          (512) 916-5143

17

18

19

20

21

22

23

24

25