1       **IN THE UNITED STATES DISTRICT COURT**
        **FOR THE WESTERN DISTRICT OF TEXAS**
2                    **AUSTIN DIVISION**

3  UNITED STATES OF AMERICA,    )  AU:10-CR-00297(1)-LY
                                )
4       Plaintiff,              )
                                )
5  VS.                          )  AUSTIN, TEXAS
                                )
6  DAVID ANDREW DIEHL,          )
                                )
7       Defendant.              )  DECEMBER 21, 2010

8          ************************************************
           TRANSCRIPT OF DOCKET CALL AND PRETRIAL CONFERENCE
9               BEFORE THE HONORABLE LEE YEAKEL
           ************************************************
10
   APPEARANCES:
11
   FOR THE PLAINTIFF:        MATTHEW B. DEVLIN
12                           ASSISTANT UNITED STATES ATTORNEY
                             816 CONGRESS AVENUE, SUITE 1000
13                           AUSTIN, TEXAS 78701

14 FOR THE DEFENDANT:        STEPHEN M. ORR
                             ORR & OLAVSON
15                           804 RIO GRANDE
                             AUSTIN, TEXAS 78701
16
   COURT REPORTER:           ARLINDA RODRIGUEZ, CSR
17                           200 WEST 8TH STREET
                             AUSTIN, TEXAS 78701
18                           (512) 916-5143

19
                     **EXAMINATION INDEX**
20
   SEAN MULLEN
21      DIRECT BY MR. DEVLIN                      33
        CROSS BY MR. ORR                          54
22      REDIRECT BY MR. DEVLIN                    64

23

24 Proceedings recorded by computerized stenography, transcript

25 produced by computer.

| | | |
|---|---|---|
| 08:58:09 | 1 | (Open Court) |
| 08:59:52 | 2 | THE COURT:  We're here this morning on *United States* |
| 08:59:59 | 3 | *v. Diehl*, Cause Number 10-CR-297, set this morning for docket |
| 09:00:02 | 4 | call and pretrial motions.  This is a case that is set for jury |
| 09:00:07 | 5 | selection and trial on January the 11th, 2011.  I'll hear |
| 09:00:12 | 6 | announcements from the parties. |
| 09:00:13 | 7 | MR. DEVLIN:  Matthew Devlin for the United States. |
| 09:00:17 | 8 | MR. ORR:  Stephen Orr for Mr. Diehl, Your Honor. |
| 09:00:19 | 9 | THE COURT:  And we've got numerous motions scheduled |
| 09:00:22 | 10 | this morning.  Do any of them require evidence? |
| 09:00:24 | 11 | MR. DEVLIN:  I believe that only one of them will, |
| 09:00:27 | 12 | Judge, and we can take that in whatever order you want.  And I |
| 09:00:30 | 13 | believe -- and Mr. Orr can confirm it -- there is a motion to |
| 09:00:34 | 14 | suppress statements that were made by the defendant subsequent |
| 09:00:38 | 15 | to his arrest.  We will have -- we plan on presenting evidence |
| 09:00:42 | 16 | on that motion and then argument.  I think all the other |
| 09:00:45 | 17 | motions can be disposed of through the pleadings submitted by |
| 09:00:48 | 18 | the parties. |
| 09:00:49 | 19 | THE COURT:  All right.  Well, let me run through them |
| 09:00:53 | 20 | in the order I have them.  The motions for discovery and |
| 09:00:56 | 21 | inspection, Mr. Devlin, have you provided and, Mr. Orr, have |
| 09:01:00 | 22 | you received all of what the defense is entitled to in this |
| 09:01:04 | 23 | case? |
| 09:01:04 | 24 | MR. ORR:  Your Honor, I believe I have received not |
| 09:01:07 | 25 | only what the defense is entitled to but probably more than |

| | | |
|---|---|---|
| 09:01:09 | 1 | what the defense is entitled to under the rules. |
| 09:01:12 | 2 | MR. DEVLIN:  Yes, sir.  We've had absolutely no |
| 09:01:14 | 3 | problems at all with discovery. |
| 09:01:15 | 4 | THE COURT:  All right.  That will just be granted so |
| 09:01:19 | 5 | we have a record on it. |
| 09:01:20 | 6 | Motion for notice of intent to use evidence under |
| 09:01:23 | 7 | 12(b)4. |
| 09:01:24 | 8 | MR. DEVLIN:  That's been provided, Judge. |
| 09:01:26 | 9 | THE COURT:  All right.  Then that is of course |
| 09:01:28 | 10 | granted also. |
| 09:01:29 | 11 | Now, the motion in limine, Mr. Orr, what are you |
| 09:01:37 | 12 | after here? |
| 09:01:38 | 13 | MR. DEVLIN:  Which one are you talking about, Judge? |
| 09:01:40 | 14 | MR. ORR:  Number 24, Your Honor? |
| 09:01:42 | 15 | THE COURT:  Twenty-four, yes. |
| 09:01:44 | 16 | MR. ORR:  I think that's our -- 24.  I believe it's |
| 09:01:49 | 17 | another -- as far as extraneous offenses, Your Honor, to |
| 09:01:53 | 18 | prevent the admission of those. |
| 09:01:57 | 19 | THE COURT:  Well, as motion in limine, that will be |
| 09:02:00 | 20 | granted.  Mr. Devlin, all that does to you is, if you have any |
| 09:02:04 | 21 | other offenses, you just have to approach the bench -- |
| 09:02:07 | 22 | MR. DEVLIN:  Yes, sir. |
| 09:02:07 | 23 | THE COURT:  -- and let me know why those have become |
| 09:02:10 | 24 | relevant or needed at that point.  I'll take that up outside |
| 09:02:14 | 25 | the presence of the jury. |

```
09:02:15   1              MR. DEVLIN:  Will do.
09:02:16   2              THE COURT:  Now, we've got the motion to suppress
09:02:19   3   search and seizure of phone and computer hard drives.  Is that
09:02:24   4   one you'll take up on argument, or will you need evidence on
09:02:28   5   that?
09:02:28   6              MR. DEVLIN:  Judge, I have represented our -- I did
09:02:30   7   file a response to that, and I've represented that we do not
09:02:34   8   plan to introduce any evidence from those searches and seizures
09:02:38   9   in our case in chief.  Since even if the evidence were
09:02:43  10   suppressible, and we've -- I've made argument that it was not.
09:02:47  11   But even if it were, it could come in on rebuttal or
09:02:50  12   cross-examination of the defendant.  So it -- hopefully, that
09:02:55  13   will resolve the motion at that point.
09:02:57  14              So even if you were to determine that, in the worst
09:02:59  15   case, that they were suppressible, we could still bring them in
09:03:03  16   for those limited purposes.  So I'm representing to the Court
09:03:06  17   and I've represented to Mr. Orr we're not planning to introduce
09:03:09  18   any of that in our case in chief.
09:03:12  19              THE COURT:  Mr. Orr?
09:03:13  20              MR. ORR:  I'm sure that if that changes, Mr. Devlin
09:03:16  21   will inform us.
09:03:17  22              MR. DEVLIN:  Absolutely.
09:03:18  23              THE COURT:  Well, what I will do is grant it as a
09:03:20  24   motion in limine --
09:03:21  25              MR. ORR:  Yes, sir, Your Honor.
```

| | | |
|---|---|---|
| 09:03:22 | 1 | THE COURT:  -- at this point and we'll withhold the |
| 09:03:24 | 2 | ruling as a motion to suppress and won't take up the issue of |
| 09:03:28 | 3 | whether it's suppressible. |
| 09:03:29 | 4 | MR. DEVLIN:  Very good. |
| 09:03:30 | 5 | THE COURT:  And, Mr. Devlin, if you seek to introduce |
| 09:03:33 | 6 | it, approach the bench and we'll deal with it as a motion to |
| 09:03:36 | 7 | suppress at that time Mr. Orr wants to urge that. |
| 09:03:39 | 8 | MR. DEVLIN:  Yes, sir. |
| 09:03:40 | 9 | THE COURT:  Now, number 33, the motion to suppress |
| 09:03:43 | 10 | statements, we're going to hear evidence on; is that correct? |
| 09:03:46 | 11 | MR. DEVLIN:  Yes. |
| 09:03:46 | 12 | THE COURT:  All right.  Documents number 44 and 57, |
| 09:03:54 | 13 | which is the motion for bill of particulars and the amended |
| 09:03:59 | 14 | motion for bill of particulars, that motion has been superseded |
| 09:04:03 | 15 | by the amended motion.  So I will dismiss the motion for bill |
| 09:04:08 | 16 | of particulars number 44. |
| 09:04:11 | 17 | Now, the first amended motion for bill of |
| 09:04:14 | 18 | particulars, number 57, Mr. Orr, you argue that the indictment |
| 09:04:20 | 19 | tracked the statute with bare assertions and that the defendant |
| 09:04:23 | 20 | cannot defend himself. |
| 09:04:26 | 21 | MR. ORR:  Yes, sir. |
| 09:04:27 | 22 | THE COURT:  I didn't have a whole lot of problem |
| 09:04:29 | 23 | figuring it out when I read it. |
| 09:04:31 | 24 | MR. ORR:  That's why you're the Judge, and I'm still |
| 09:04:33 | 25 | down here in the pits as a mere lawyer. |

09:04:35  1          THE COURT:  Tell me what the problem is.  What can

09:04:38  2  you not defend?

09:04:40  3          MR. ORR:  Well, we have vague terminology so far as

09:04:45  4  alleged victims, Your Honor.  Then we have vague terminology so

09:04:50  5  far as the acts depicted.  It may say something like sexual

09:04:54  6  intercourse.  Then the problem -- the problem becomes one of

09:04:58  7  differentiating between counts.  The visual depictions are not

09:05:03  8  described -- are not depicted in enough detail that the defense

09:05:09  9  can determine where one video, for instance, begins or ends and

09:05:15  10 another begins.  The indictment is not really adequate to allow

09:05:21  11 a defense of double jeopardy or multiplicity or duplicity so

09:05:27  12 far as the indictment is concerned.

09:05:29  13         The details are, I think, it's -- are exceedingly

09:05:36  14 vague, Your Honor.  For instance, in many -- many counts filed

09:05:39  15 in various cases, a date will be alleged or a serial number of

09:05:43  16 a firearm will be given or the type of drug involved will be

09:05:47  17 given.  But here the indictment does not really give notice.

09:05:51  18 And it's more than -- it's not enough, in my opinion, to say,

09:05:55  19 Well, we've been allowed to watch the videos.  Mr. Diehl and

09:06:01  20 myself were allowed to watch what are supposedly the videos for

09:06:05  21 the various counts.

09:06:07  22         But what you have here is a problem where later on,

09:06:10  23 years from now or on appeal, we can't really tell which video

09:06:14  24 goes with which count.  It would be not too difficult to

09:06:18  25 substitute one video for another video under these counts.

| | | |
|---|---|---|
| 09:06:24 | 1 | Many of the videos would be interchangeable under the language |
| 09:06:28 | 2 | in these counts. |
| 09:06:29 | 3 | THE COURT:  Mr. Devlin? |
| 09:06:30 | 4 | MR. DEVLIN:  Judge, first of all, I did file a |
| 09:06:32 | 5 | response to Document Number 46 back in September. |
| 09:06:34 | 6 | THE COURT:  You did. |
| 09:06:35 | 7 | MR. DEVLIN:  And since I believe that the motion is |
| 09:06:37 | 8 | substantially the same, I would like to carry that over to a |
| 09:06:40 | 9 | response to the amended motion.  I think we've gone beyond what |
| 09:06:43 | 10 | we're supposed to do in the second superseding indictment. |
| 09:06:46 | 11 | We've endeavored to describe the videos.  First of all, in the |
| 09:06:52 | 12 | language of the statute, we've used -- the charges track the |
| 09:06:57 | 13 | language of 2251(a).  We've then gone on to lay out the |
| 09:07:02 | 14 | video -- the visual depictions by describing generally what |
| 09:07:06 | 15 | they depict, by describing the length -- the approximate length |
| 09:07:11 | 16 | of each visual depiction.  And as Mr. Orr alluded to, we've had |
| 09:07:16 | 17 | one session -- two sessions with the defendant and Mr. Orr and |
| 09:07:20 | 18 | a couple of other sessions with just Mr. Orr to point out |
| 09:07:24 | 19 | exactly which videos are set forth in each of the counts. |
| 09:07:30 | 20 | I don't see how any further description of those |
| 09:07:33 | 21 | videos is going to be of any use without actually almost |
| 09:07:38 | 22 | including a copy of the video in the indictment, which we don't |
| 09:07:41 | 23 | want to do, of course. |
| 09:07:42 | 24 | So we've identified -- we've identified the victims |
| 09:07:46 | 25 | by Jane Doe 1, 2, 3 and John Doe.  We have related to Mr. Orr |

09:07:51  1   and the defendant who those are -- who those people are and

09:07:54  2   their actual names.  And we've done our very best to lay out

09:07:58  3   exactly what should be -- what the charge -- what each charge

09:08:03  4   and which visual depiction those portray.  So I think that

09:08:07  5   based on my response to the bill of particulars, that we've

09:08:10  6   done more than we have to and also the fact that we've tracked

09:08:14  7   the language of the statute.  I believe that this is sufficient

09:08:16  8   to notify him and to protect him in the future from being

09:08:19  9   prosecuted for these offenses a second time.

09:08:22 10            THE COURT:  Mr. Devlin, have you provided Mr. Orr and

09:08:26 11   the defendant with a copy of every video you seek to introduce

09:08:29 12   into evidence?

09:08:30 13            MR. ORR:  We have not provided them with a copy,

09:08:32 14   Judge, because they're child pornography.  However, we have sat

09:08:35 15   down -- pursuant to a court order, we have sat down with both

09:08:37 16   him and the defendant and run through each video that's subject

09:08:41 17   to each count.

09:08:42 18            THE COURT:  You are not going to seek to introduce or

09:08:44 19   present to the jury any videos which have not been previously

09:08:48 20   displayed to the defendant and his lawyer; is that correct?

09:08:53 21            MR. ORR:  As far as child porn videos, that is

09:08:55 22   correct.  We have given him a copy of another video that we may

09:08:58 23   introduce that is not child porn.  So he already has that.

09:09:01 24   But, no, not a copy of anything else that --

09:09:03 25            THE COURT:  You're not going to seek to introduce

09:09:05  1  anything that's germane to this indictment that you have not

09:09:09  2  previously provided the defendant access to?

09:09:11  3          MR. DEVLIN:  Oh, no, sir.

09:09:12  4          THE COURT:  Mr. Orr, are you aware of anything you

09:09:15  5  think they're going to seek to introduce that you have not

09:09:18  6  previously seen or had an opportunity to review?

09:09:21  7          MR. ORR:  No, Your Honor.  But Mr. Devlin -- well, I

09:09:28  8  wouldn't say he's tricky, but who knows what he might try to do

09:09:32  9  at trial.  And I do mean that as a compliment.

09:09:38 10          THE COURT:  I can certainly police that at trial.

09:09:40 11  I'm not too concerned about that.

09:09:41 12          I find that the indictment complies with the

09:09:43 13  statute.  I find based on Mr. Devlin's assurances -- and if it

09:09:48 14  tends to be that those were untrue at the time of trial, I will

09:09:52 15  deal with it then -- that the indictment adequately and clearly

09:09:57 16  gives the defendant notice of what he's going to be called upon

09:10:01 17  to defend against.  And so the first amended motion for bill of

09:10:07 18  particulars is denied.

09:10:08 19          Now, I have a motion to dismiss, which is number 45

09:10:15 20  and a first amended motion to dismiss which is 58.  I will

09:10:21 21  dismiss the motion -- the first motion to dismiss, number 45,

09:10:25 22  because it's superseded by the amended motion.  Mr. Devlin,

09:10:30 23  you've not responded to the amended motion.  Is your position

09:10:35 24  the same as it was on the bill of particulars?  You wish to

09:10:38 25  present your original response as a response to the amended

| | | |
|---|---|---|
| 09:10:42 | 1 | motion and have it considered that way? |
| 09:10:44 | 2 | MR. DEVLIN:  Yes, Your Honor.  And my response is |
| 09:10:46 | 3 | document number 50.  That was my original response.  And, |
| 09:10:50 | 4 | actually, the timing of my response was after the second |
| 09:10:52 | 5 | superseding indictment, but it was prior to the amended |
| 09:10:55 | 6 | motion.  So I believe that this adequately addresses the |
| 09:10:57 | 7 | amended motion. |
| 09:10:58 | 8 | THE COURT:  All right.  Mr. Orr, do you care to be |
| 09:11:00 | 9 | heard on that? |
| 09:11:01 | 10 | MR. ORR:  Yes, Your Honor.  Yes, Your Honor.  The |
| 09:11:10 | 11 | cases seem to rely on this marijuana case, that marijuana |
| 09:11:15 | 12 | affects -- intrastate marijuana might affect the clause.  And |
| 09:11:25 | 13 | what I urge is that anything that comes within the purview of |
| 09:11:28 | 14 | First Amendment, anything dealing with speech or anything close |
| 09:11:31 | 15 | to speech, visual depictions would -- just in general, visual |
| 09:11:34 | 16 | depictions would be protected by the First Amendment.  They may |
| 09:11:37 | 17 | not be protected by the First Amendment, of course, if they get |
| 09:11:40 | 18 | into child pornography, if they depict children or involve |
| 09:11:44 | 19 | children being used for sexual performances or sexual activity. |
| 09:11:48 | 20 | But what -- what we have here is a statute that can |
| 09:11:54 | 21 | allow production of child pornography merely for home usage to |
| 09:12:01 | 22 | be punished under the Interstate Commerce Provision.  And I |
| 09:12:07 | 23 | believe that that in effect violates the United States |
| 09:12:10 | 24 | Constitution and the United States Constitution Fifth Amendment |
| 09:12:13 | 25 | Due Process Provision. |

| | | |
|---|---|---|
| 09:12:14 | 1 | It allows an extension of federal jurisdiction to |
| 09:12:21 | 2 | matters that it ought not be dealing with.  The states |
| 09:12:27 | 3 | themselves can deal with production of child pornography within |
| 09:12:32 | 4 | their borders, and I think that all 50 states do that. |
| 09:12:35 | 5 | I know for certain that Texas has the laws |
| 09:12:39 | 6 | prohibiting the usage of children in videos that depict sexual |
| 09:12:49 | 7 | activity by those children.  And what you get here is, |
| 09:12:52 | 8 | Your Honor, a very laudable goal as far as nobody wants to see |
| 09:12:58 | 9 | children abused and used in videos, whether on the Internet or |
| 09:13:03 | 10 | not.  But this statute in the final way, it allows punishment |
| 09:13:11 | 11 | of people for production of child pornography is to say has |
| 09:13:14 | 12 | been transported in interstate commerce. |
| 09:13:19 | 13 | And I think that that's a -- well, in any event, |
| 09:13:33 | 14 | Your Honor, if it's produced with materials and the person has |
| 09:13:36 | 15 | reason to know that it's going to be used in interstate |
| 09:13:39 | 16 | commerce and travels across state lines and that person |
| 09:13:44 | 17 | intentionally sends it across state lines, then that might be |
| 09:13:49 | 18 | within the purview of the interstate commerce clause in federal |
| 09:13:53 | 19 | jurisdiction. |
| 09:13:53 | 20 | But what we have here is part of the statute allows |
| 09:14:00 | 21 | that, if the video was made -- someone makes a video in their |
| 09:14:03 | 22 | home and then someone else transports it without the knowledge, |
| 09:14:11 | 23 | consent, or approval of the person who produced the video, then |
| 09:14:14 | 24 | the person who produced the video is liable under federal law |
| 09:14:19 | 25 | for production of child pornography because someone else |

| | | |
|---|---|---|
| 09:14:22 | 1 | transported it in interstate commerce. |
| 09:14:32 | 2 | In other words that's the last view -- if you if you |
| 09:14:34 | 3 | look at 2251(a), the final phrase is:  Or if such visual |
| 09:14:43 | 4 | depiction has actually been transported in interstate or |
| 09:14:46 | 5 | foreign commerce or mailed. |
| 09:14:48 | 6 | So what I'm saying is that that particular |
| 09:14:52 | 7 | phraseology of the statute wipes out hundreds of years of |
| 09:14:58 | 8 | Anglo-Saxon jurisprudence in just doing away with any |
| 09:15:00 | 9 | requirement of scienter. |
| 09:15:06 | 10 | THE COURT:  And explain to me again, why are the |
| 09:15:10 | 11 | facts of this -- because I want this on the record -- different |
| 09:15:13 | 12 | from what the *Kallestad* case was that the Fifth Circuit had in |
| 09:15:18 | 13 | front of them. |
| 09:15:19 | 14 | MR. ORR:  I think that the facts of this case, |
| 09:15:21 | 15 | Your Honor, are not going to show that any transportation -- |
| 09:15:24 | 16 | well, number one, the *Kallestad* was a long time ago under a |
| 09:15:28 | 17 | different statute. |
| 09:15:32 | 18 | THE COURT:  Well, I'm not sure. |
| 09:15:33 | 19 | MR. ORR:  And I think -- I'm sorry. |
| 09:15:34 | 20 | THE COURT:  Go ahead. |
| 09:15:35 | 21 | MR. ORR:  Well, I think under the facts of this case, |
| 09:15:39 | 22 | if I can step into -- |
| 09:15:41 | 23 | THE COURT:  *Kallestad* was 2000.  That's not a |
| 09:15:43 | 24 | particularly long time ago for me. |
| 09:15:45 | 25 | MR. ORR:  Well, the facts -- actually, I know a |

| | | |
|---|---|---|
| 09:15:47 | 1 | little bit about it because I represented Kallestad in state |
| 09:15:49 | 2 | court and then he got indicted in federal.  And I think all the |
| 09:15:53 | 3 | facts underlying that arose sometime in the '90s. |
| 09:15:57 | 4 | THE COURT:  All right.  Go ahead. |
| 09:15:58 | 5 | MR. ORR:  And so far as the -- in this -- I think |
| 09:16:04 | 6 | that possibly the entire statute is not unconstitutional.  But |
| 09:16:08 | 7 | that phraseology I think, and I think they may want to rely on |
| 09:16:13 | 8 | that to some extent, that it has been transported. |
| 09:16:16 | 9 | THE COURT:  Well, what's the difference between child |
| 09:16:18 | 10 | pornography and firearms when it comes to statutes such as |
| 09:16:22 | 11 | that? |
| 09:16:23 | 12 | MR. ORR:  I think that the firearm, when you receive |
| 09:16:25 | 13 | the firearm -- if I am a convicted felon and I get a firearm |
| 09:16:30 | 14 | and I buy a Smith & Wesson from Connecticut, I guess it is, or |
| 09:16:35 | 15 | wherever they have come from, then I have received it after |
| 09:16:38 | 16 | it's been transported in interstate commerce.  And I am |
| 09:16:40 | 17 | presumed to know that it was transported in interstate |
| 09:16:43 | 18 | commerce, or at least I can look at it and make some |
| 09:16:46 | 19 | determination that it was transported in interstate commerce. |
| 09:16:49 | 20 | In this particular situation, we have the exact |
| 09:16:51 | 21 | opposite, that I produced a firearm in the State of Texas and |
| 09:16:55 | 22 | don't intend for it to go anywhere.  I'm going to have a |
| 09:16:59 | 23 | machine shop in my garage, and I hide that firearm very |
| 09:17:02 | 24 | carefully so no one can steal it.  And low and behold, my home |
| 09:17:06 | 25 | is burglarized one day, and somebody transports that firearm to |

| | | |
|---|---|---|
| 09:17:10 | 1 | Oklahoma or Louisiana, wherever.  And then all of a sudden, I'm |
| 09:17:14 | 2 | a firearm criminal because somebody has transported it in |
| 09:17:19 | 3 | interstate commerce although I had nothing to do with it. |
| 09:17:27 | 4 | THE COURT:  Mr. Devlin? |
| 09:17:28 | 5 | MR. DEVLIN:  Well, Judge, again, we share your |
| 09:17:33 | 6 | concern, that there really is no difference between the firearm |
| 09:17:36 | 7 | statutes and the child pornography statutes in terms of the |
| 09:17:41 | 8 | interstate nexus.  In the firearm statute, it's very well |
| 09:17:45 | 9 | established that the defendant does not have to have anything |
| 09:17:47 | 10 | to do with the prior movement in interstate commerce of the |
| 09:17:50 | 11 | firearm. |
| 09:17:51 | 12 | Similarly, there is no requirement that the defendant |
| 09:17:54 | 13 | have anything to do with the interstate transportation or the |
| 09:17:57 | 14 | interstate of foreign transportation of any of the child |
| 09:18:02 | 15 | pornography.  That's just simply a jurisdictional hook for |
| 09:18:05 | 16 | federal jurisdiction.  As I've mentioned in my reply brief, the |
| 09:18:09 | 17 | fact that we have alleged that the visual depiction was |
| 09:18:11 | 18 | transported in interstate and foreign commerce is a sufficient |
| 09:18:15 | 19 | interstate nexus to overcome any -- any motion to dismiss under |
| 09:18:20 | 20 | the commerce clause. |
| 09:18:22 | 21 | And as you -- in the case of *United States v.* |
| 09:18:28 | 22 | *Jeronimo-Baustista*, the 10th Circuit case that I cite, the |
| 09:18:32 | 23 | Court found that purely intrastate production of child |
| 09:18:35 | 24 | pornography is reachable under the Commerce Clause.  And that |
| 09:18:39 | 25 | was where the second prong, where the materials had been moved |

09:18:43  1   in interstate commerce, was used.  But in this case we don't

09:18:47  2   have that alleged anymore in the second superseding

09:18:49  3   indictment.  We're showing that the visual depiction was

09:18:52  4   transported in interstate or foreign commerce.  That's

09:18:54  5   certainly more than sufficient interstate nexus to bring this

09:18:58  6   within the jurisdiction of the Court and to overcome a motion

09:19:02  7   to dismiss.

09:19:03  8          There is no scienter requirement for that because,

09:19:03  9   again, it's just a jurisdictional hook.  The defendant has to

09:19:06  10  have nothing to do with the transportation.  The gravamen of

09:19:09  11  the offense is not the transportation, but it's the use,

09:19:12  12  employment, corrosion, et cetera of a minor for the purpose of

09:19:15  13  producing child pornography.  That's the gravamen of the

09:19:19  14  offense.

09:19:20  15         The interstate transportation just simply brings it

09:19:23  16  within the jurisdiction of the federal court.  So the scienter

09:19:27  17  requirement is not -- there's no scienter requirement under the

09:19:29  18  circumstances.

09:19:30  19         I don't know if he addressed vagueness.  I've

09:19:33  20  addressed it in my response.  I don't think there's anything

09:19:36  21  vague about the statute.  Certainly there's nothing vague about

09:19:39  22  the indictment.  He hasn't alleged what is vague about the

09:19:44  23  statute or the indictment.  And if his concern is, well, he

09:19:48  24  doesn't know how it was transported in interstate or foreign

09:19:51  25  commerce, we're going to certainly show that it was transported

| | | |
|---|---|---|
| 09:19:54 | 1 | in interstate or foreign commerce at trial.  So there shouldn't |
| 09:19:57 | 2 | be any vagueness concerns.  So we would ask that you deny the |
| 09:20:01 | 3 | defendant's motion to dismiss. |
| 09:20:03 | 4 | THE COURT:  Mr. Orr, anything further on the motion |
| 09:20:04 | 5 | to dismiss? |
| 09:20:05 | 6 | MR. ORR:  Yes, Your Honor.  We just -- it may be the |
| 09:20:10 | 7 | gravamen of the offense that it's the production of child |
| 09:20:15 | 8 | pornography, use of children in a video depicting some sort of |
| 09:20:19 | 9 | sexual activity.  And he says, well, it's just the commerce |
| 09:20:22 | 10 | that gives the federal courts jurisdiction.  But that's a |
| 09:20:24 | 11 | pretty important item, to take a guy from state court to |
| 09:20:28 | 12 | federal court based on some vague idea that somebody has in the |
| 09:20:32 | 13 | past transported or somebody, before we get to court -- |
| 09:20:37 | 14 | sometime after the production of the video and sometime before |
| 09:20:41 | 15 | we get to court has moved the stuff in interstate commerce. |
| 09:20:45 | 16 | And I would cite the Court to Schaefer -- |
| 09:20:48 | 17 | *United States v. Schaefer* out of 10th Circuit, 501 f.3d 1197, |
| 09:20:58 | 18 | where the Court held -- merely showing that a video is on the |
| 09:21:01 | 19 | Internet is not enough to show that the images moved across the |
| 09:21:06 | 20 | state lines.  And I don't know that the government -- I think |
| 09:21:11 | 21 | the complaint in this case shows, according to the government's |
| 09:21:15 | 22 | theory, that the videos -- the beginning video -- and I think |
| 09:21:18 | 23 | the discovery shows the beginning videos -- the videos are made |
| 09:21:22 | 24 | in the year 2000.  That's the government allegation I think, |
| 09:21:25 | 25 | insofar as we have received through discovery. |

09:21:28  1         Then the allegation becomes based on the discovery

09:21:31  2  and the complaint that the items appear on the Internet in

09:21:35  3  2005.  Then along about somewhere in last year, the government

09:21:41  4  begins to identify Mr. Diehl and concludes that he must have

09:21:46  5  something to do with this.  So in other words, there's this

09:21:49  6  five-year -- two five-year gaps here.  Five years from the date

09:21:53  7  of alleged production to the time it appears on the Internet

09:21:56  8  and is discovered by the people who scan the Internet for this

09:21:59  9  sort of activity.  And then five years after that, Mr. Diehl is

09:22:02  10  identified as supposedly the person who had the -- dealt with

09:22:06  11  the production of this stuff.

09:22:07  12         So I think we have a vastly different situation from

09:22:13  13  a situation where it's a gun or drugs.  In other words, what

09:22:21  14  you have here is basically that they found the videos on the

09:22:26  15  Internet.  That's not enough to show -- number one, it's not

09:22:33  16  enough to show that it has been transported under the meaning

09:22:37  17  of the statute.  And then there's no showing that Mr. Diehl

09:22:39  18  transported it.  And the statute would then be unconstitutional

09:22:45  19  for allowing Mr. Diehl --

09:22:46  20         THE COURT:  I don't think that all of those showings

09:22:49  21  have to be made for purposes of a motion to dismiss.  The

09:22:53  22  government still has to prove their case beyond a reasonable

09:22:56  23  doubt and prove every element of the offense beyond a

09:23:00  24  reasonable doubt.  They do not have to show at the motion

09:23:05  25  dismiss stage that they've already proved every element of

| | | |
|---|---|---|
| 09:23:10 | 1 | their case beyond a reasonable doubt. |
| 09:23:13 | 2 | MR. ORR:  Yes, Your Honor. |
| 09:23:16 | 3 | THE COURT:  Well, I just think that maybe the cart is |
| 09:23:19 | 4 | ahead of the horse here on the base of what the government has |
| 09:23:23 | 5 | to prove.  I find that the indictment is not vague, ambiguous, |
| 09:23:27 | 6 | and overly broad.  And I further find that the applicable |
| 09:23:31 | 7 | statutes are not vague, uncertain, or in violation of the Fifth |
| 09:23:34 | 8 | Amendment.  So that leaves us with whether or not Congress has |
| 09:23:39 | 9 | the authority to regulate what you assert are wholly intrastate |
| 09:23:44 | 10 | production of child pornography. |
| 09:23:47 | 11 | For purposes of the motion to dismiss, I'm going to |
| 09:23:51 | 12 | deny the motion to dismiss because the government has pleaded |
| 09:23:55 | 13 | facts which it proved beyond a reasonable doubt which satisfy |
| 09:24:01 | 14 | their burden.  By pleading them as they have pleaded them, I |
| 09:24:08 | 15 | think they satisfy the requirements of invoking this Court's |
| 09:24:14 | 16 | jurisdiction.  And so I'll deny the motion to dismiss, but you |
| 09:24:22 | 17 | may argue at the close of the government's evidence that they |
| 09:24:24 | 18 | haven't gotten there based on what that evidence is and whether |
| 09:24:27 | 19 | or not they've proved it beyond a reasonable doubt. |
| 09:24:29 | 20 | MR. ORR:  Yes, Your Honor. |
| 09:24:30 | 21 | THE COURT:  Now, I've got two motions in limine left, |
| 09:24:34 | 22 | documents 59 and 60.  What are you after there? |
| 09:24:51 | 23 | MR. ORR:  Your Honor, 59 deals with the government's |
| 09:24:53 | 24 | contention that they have videos that depict Mr. Diehl's hand |
| 09:24:56 | 25 | in the videos.  Motion in Limine Number 60 deals with the |

| | | |
|---|---|---|
| 09:25:05 | 1 | videos.  I'd like to keep the videos from the presence of the |
| 09:25:10 | 2 | jury until Your Honor has decided that they are admissible. |
| 09:25:14 | 3 | They don't constitute any sort of using of the same videos in |
| 09:25:21 | 4 | different counts, if they're otherwise authenticated, that the |
| 09:25:26 | 5 | proper predicate for a video or any kind of visual depiction in |
| 09:25:30 | 6 | any trial of any kind has been laid by the government. |
| 09:25:35 | 7 | THE COURT:  Well, I'm not going to allow them to |
| 09:25:37 | 8 | publish the video to the jury until they've proved its |
| 09:25:41 | 9 | admissibility.  Mr. Devlin is going to have to establish the |
| 09:25:44 | 10 | basis and predicate and is going to have to move its admission |
| 09:25:47 | 11 | before it's displayed -- any video's admission before they're |
| 09:25:51 | 12 | displayed and published to the jury, at which time you get an |
| 09:25:53 | 13 | opportunity to object. |
| 09:25:54 | 14 | MR. ORR:  I would urge that in this particular case |
| 09:25:58 | 15 | with these types of videos, Your Honor, that there should be a |
| 09:26:02 | 16 | hearing outside the presence to the jury before this is offered |
| 09:26:04 | 17 | to the jury.  Because if something is offered and a predicate |
| 09:26:07 | 18 | isn't properly laid, then the jury will have an idea what's |
| 09:26:10 | 19 | really going on in the videos and Mr. Diehl will be prejudiced |
| 09:26:15 | 20 | thereby. |
| 09:26:15 | 21 | THE COURT:  Mr. Devlin? |
| 09:26:16 | 22 | MR. DEVLIN:  Well, Judge, if I don't lay the proper |
| 09:26:20 | 23 | predicate and the evidence is not admitted, we're talking this |
| 09:26:23 | 24 | is a child pornography case, not a white collar fraud case that |
| 09:26:27 | 25 | has child pornography. |

| | | |
|---|---|---|
| 09:26:28 | 1 | THE COURT:  I tend to think the cat is going to be |
| 09:26:30 | 2 | out of the bag when the indictment is going to be read to the |
| 09:26:34 | 3 | jury, Mr. Orr, about what all of this evidence involves.  But |
| 09:26:38 | 4 | go ahead, Mr. Devlin. |
| 09:26:40 | 5 | MR. DEVLIN:  I'm sorry.  I interpret, at least on the |
| 09:26:43 | 6 | motion in limine and Document 60, I just simply interpret as a |
| 09:26:48 | 7 | motion to file the rules of evidence, which we intend to do. |
| 09:26:51 | 8 | So I don't plan on showing the video to the jury and then |
| 09:26:54 | 9 | laying the predicate.  I plan on laying the predicate and then |
| 09:26:57 | 10 | moving for its admission, and if admitted, showing it to the |
| 09:27:00 | 11 | jury. |
| 09:27:00 | 12 | THE COURT:  And what is the business in Document |
| 09:27:03 | 13 | Number 59 about the hand? |
| 09:27:05 | 14 | MR. DEVLIN:  Well, Judge -- |
| 09:27:06 | 15 | THE COURT:  Do you have an expert on hand comparison? |
| 09:27:11 | 16 | MR. DEVLIN:  I don't plan to have an expert on hand |
| 09:27:13 | 17 | comparisons.  All that is, is we have pictures -- our case |
| 09:27:18 | 18 | revolves around proving that the defendant was in those videos |
| 09:27:21 | 19 | and, therefore, produced them. |
| 09:27:22 | 20 | Part of identifying the defendant is identifying |
| 09:27:26 | 21 | marks and body parts and things like that in the video that may |
| 09:27:30 | 22 | correspond to him.  And so I think the jury is fully capable of |
| 09:27:34 | 23 | doing that on its own without an expert.  We don't plan to have |
| 09:27:38 | 24 | a hand comparison expert.  So I will certainly -- if there's |
| 09:27:41 | 25 | any evidence to be introduced or alluded to, I will certainly |

09:27:45  1  admit it properly and then make appropriate arguments and

09:27:50  2  inferences based on the evidence as required -- as allowed by

09:27:54  3  the rules of evidence.

09:27:55  4          THE COURT:  Well, Mr. Orr, what do you have to say

09:27:57  5  about that?

09:27:57  6          MR. ORR:  Well, I think whether it's an expert or

09:28:01  7  not, any identification of someone by a hand or a supposed

09:28:06  8  crooked finger or bent finger is pretty weak stuff.

09:28:12  9          THE COURT:  Well, why doesn't that go to the weight,

09:28:14 10  not the admissibility?

09:28:15 11          MR. ORR:  Well, that argument could be made,

09:28:17 12  Your Honor.  I just think that even -- it's just highly

09:28:20 13  prejudicial to say that's his finger.  And I think the

09:28:22 14  prejudicial value of that sort of thing is outweighed by

09:28:26 15  some -- a lay opinion or an expert opinion to think you can

09:28:30 16  identify people by their fingers.

09:28:33 17          THE COURT:  I'm not sure that we ever get to opinion

09:28:35 18  here.  I may very well not allow whatever witness is looking at

09:28:39 19  that to state an opinion.  I'm going to deny those two motions

09:28:42 20  in limine.  I think I can handle any objections to that

09:28:46 21  evidence as it comes up.

09:28:48 22          The Government with regard to motion in limine which

09:28:53 23  is Document 60 is going to be required to establish predicate

09:28:58 24  to admit any video before any of it is published to the jury.

09:29:03 25  Any video published to the jury on the motion in limine, you

| | | |
|---|---|---|
| 09:29:10 | 1 | know, I'll make a decision on whether I'll allow a conclusion |
| 09:29:12 | 2 | to be drawn as it comes up. |
| 09:29:14 | 3 | All right.  Then I think that deals with every |
| 09:29:20 | 4 | defendant's motion except the motion to suppress statements, |
| 09:29:25 | 5 | where we'll hear some evidence and we also have the |
| 09:29:28 | 6 | United States' motion to protect the privacy of juvenile |
| 09:29:33 | 7 | victims and witnesses.  Mr. Orr, have you had an opportunity to |
| 09:29:36 | 8 | review that? |
| 09:29:36 | 9 | MR. ORR:  Yes, Your Honor. |
| 09:29:37 | 10 | THE COURT:  Do you have any objection to that motion? |
| 09:29:39 | 11 | MR. ORR:  No, Your Honor. |
| 09:29:39 | 12 | THE COURT:  All right.  Then the government's motion |
| 09:29:41 | 13 | to protect privacy -- |
| 09:29:43 | 14 | MR. ORR:  Excuse me.  We do object to that motion, |
| 09:29:46 | 15 | Your Honor.  We think the full identity of these people should |
| 09:29:49 | 16 | be allowed in front of the jury. |
| 09:29:51 | 17 | THE COURT:  Why? |
| 09:29:53 | 18 | MR. ORR:  In order -- under the confrontation clause, |
| 09:29:56 | 19 | Your Honor, we should be able to allow to fully and fairly |
| 09:29:59 | 20 | confront the witnesses. |
| 09:30:00 | 21 | THE COURT:  Well, I think you're going to be allowed |
| 09:30:03 | 22 | to fully confront the witnesses.  The thrust of the motion, |
| 09:30:09 | 23 | Mr. Devlin, is primarily that we close the courtroom and |
| 09:30:13 | 24 | recognize their situation.  And then we also protect the |
| 09:30:22 | 25 | identity by not placing it in the record.  How does that |

09:30:26  1  destroy your right to confront them?

09:30:28  2          MR. ORR:  Well, Mr. Diehl has a right to a full,

09:30:31  3  speedy, and public trial, Your Honor.  So I think closing the

09:30:34  4  courtroom would be in violation of that right under the

09:30:36  5  United States Constitution.

09:30:37  6          THE COURT:  Mr. Devlin?

09:30:38  7          MR. DEVLIN:  Your Honor, I think that's been

09:30:40  8  addressed under 3509.  It's designed to -- the right to a

09:30:45  9  public trial is not absolute, and it is subject to reasonable

09:30:50  10 narrowly tailored measures when circumstances dictate that it

09:30:54  11 should be.  And Section 3509 has been found to be one of those

09:30:59  12 circumstances.  We plan to have the victims in this case

09:31:02  13 testify.  We plan as -- we plan to identify them.

09:31:07  14         And if we have the courtroom closed, we can identify

09:31:10  15 them by their true names, because that's kind of the purpose of

09:31:14  16 closing the courtroom.  But it is also to allow them, again,

09:31:19  17 not to have their identities revealed.  Identifying them as

09:31:23  18 Jane Doe Number 1, 2, and 3 while having the public being able

09:31:27  19 to come in and see them is not going to sufficiently protect

09:31:30  20 their interest as child victims.

09:31:33  21         The twist in this case is that we've alleged that all

09:31:38  22 these offenses occurred about ten years ago, when all of these

09:31:41  23 victims were children.  And that's -- I'm talking Jane Doe

09:31:46  24 Number 1, 2 and 3, and then John Doe.  Two of the victims are

09:31:51  25 now over the age of 18 and two are still under the age of 18.

09:31:53   1   So there's no question on the two that are under the age of

09:31:55   2   18.  The question really goes to the two that are over the age

09:31:57   3   of 18.

09:31:58   4        And our argument is that it was the intent of the

09:32:01   5   statute to protect children because these offenses occurred

09:32:04   6   when these -- when Jane Doe Number 1 and 2 were children; that

09:32:09   7   those interests still apply; that they should not have -- be

09:32:13   8   subject to their identities being revealed and to an open

09:32:18   9   courtroom just because they happen to have turned of age prior

09:32:22  10   to trial.

09:32:22  11        So under the circumstance, we believe that the

09:32:26  12   courtroom should be closed for all of them because of the fact

09:32:29  13   that they were child victims at the time of the offenses.  And

09:32:33  14   the constitutionality of section 3509 has not been -- has

09:32:38  15   certainly not been -- 3509 has certainly not been found to be

09:32:44  16   unconstitutional, and we are certainly tailoring it to limit

09:32:47  17   the disclosure of the child victims' identities and any

09:32:50  18   information relating to the children which 3509 also requires

09:32:57  19   not to be disclosed.

09:32:58  20        So that will require that the courtroom be closed

09:33:00  21   when these victims testify and when any person whose identity

09:33:05  22   may reveal the victims identity may testify; namely, any parent

09:33:09  23   or other relative of the child victims which we intend --

09:33:15  24        THE COURT:  Well, let me address that, because I am

09:33:17  25   concerned that that could get a little broad.  Is it not

09:33:20  1   adequate if persons who have knowledge of the names of the

09:33:25  2   victim -- victims merely identify them as "Jane Doe" and "John

09:33:31  3   Doe" and by number?  Cannot we handle that that way without

09:33:35  4   having to close the courtroom when persons who are not the

09:33:39  5   alleged victim themselves are testifying?

09:33:42  6          MR. DEVLIN:  I would be open to that Judge.  Again,

09:33:44  7   the only concern is that people aren't -- you know, we as

09:33:47  8   attorneys are used to doing that and you as the Judge, but I

09:33:50  9   don't think the witness may be in a position to be able to do

09:33:53  10  that uniformly across the board.  And any disclosure -- any

09:33:58  11  inadvertent disclosure of the true name of a victim I think

09:34:02  12  would be harmful to that victim.

09:34:03  13         THE COURT:  Well, I agree with you, although I am

09:34:06  14  concerned about the *narratus*.  And I think that you are capable

09:34:16  15  of addressing this with the witnesses and we have a couple of

09:34:25  16  weeks before trial that they're not to use any names.  At least

09:34:29  17  I'm going to start it that way.  I'm going to grant this

09:34:34  18  motion, and the courtroom will be closed at any time that any

09:34:43  19  of the alleged victims is testifying.

09:34:47  20         I do find the mere fact that they are adults at this

09:34:50  21  time does not place them outside of the 3509, and I exercise my

09:35:01  22  discretion.  I recognize that does not mandate closing the

09:35:05  23  courtroom, but I exercise my discretion with regard to when the

09:35:11  24  victims are testifying.  I instruct both sides to not ask

09:35:15  25  questions of other witnesses that would reveal true names of

09:35:21  1  these people.

09:35:22  2         MR. ORR:  May I just urge for the record, I want to

09:35:24  3  make sure it's clear and I think it's been discussed, but at

09:35:27  4  least three of the alleged victims are in excess of 18 years

09:35:30  5  age now, Your Honor.

09:35:32  6         MR. DEVLIN:  Two.

09:35:33  7         MR. ORR:  Two

09:35:33  8         THE COURT:  Two is the information I'm given by the

09:35:36  9  government.

09:35:38  10         MR. ORR:  Well, I think that at least this statute

09:35:42  11  shouldn't apply to those people.  If you want to use -- I think

09:35:49  12  just closing the courtroom is too strong a remedy for what the

09:35:53  13  government proposes here and is in violation of the

09:35:56  14  United States Constitution Sixth Amendment right to a public

09:35:59  15  trial, Your Honor.

09:36:00  16         MR. DEVLIN:  We're simply asking the courtroom be

09:36:02  17  closed during the testimony of those victims.  And so that's --

09:36:06  18  that's the narrow -- that's a narrowing tailoring that we're

09:36:10  19  asking for at this point.

09:36:12  20         THE COURT:  I'm going to grant the motion to the

09:36:15  21  extent the courtroom will be closed during the testimony of any

09:36:18  22  alleged victim.  I again state that I instruct both lawyers to

09:36:24  23  instruct their witnesses and prepare their witnesses not to use

09:36:30  24  the true names of those victims when they're testifying about

09:36:36  25  the victims.

09:36:37  1      I think it can be handled that way.  I do not think

09:36:40  2  the defendant has been denied his right to a public trial.  In

09:36:46  3  balancing the factors here and in reviewing what the Supreme

09:36:49  4  Court has said about narrow tailoring in *Globe Newspaper*

09:36:58  5  *Company* and in reviewing section 3509, I think that such an

09:37:02  6  order as I have just rendered will protect the rights of this

09:37:06  7  defendant and will give him a public trial.

09:37:16  8      I think the defendant reads "public trial" too

09:37:19  9  broadly.  This case is on the docket.  It's known that it will

09:37:25  10  be held.  It is known that it will be going on.  It is known

09:37:31  11  that witnesses will be called and brought in.  The media and

09:37:35  12  other members of the public who have an interest in observing

09:37:39  13  this trial will be present during all but when the alleged

09:37:47  14  victims themselves testify.  And I think and I do find that the

09:37:54  15  rights of this defendant under the Constitution will be

09:37:56  16  adequately protected by that.  So that will be my ruling on the

09:38:02  17  motion.

09:38:02  18      Now, the government has also filled a Notice of Other

09:38:07  19  Crimes, Wrongs, and Acts, Document 51.  That's just a notice to

09:38:10  20  you, Mr. Orr.  You receive that and you're aware of it?

09:38:14  21      MR. ORR:  Yes, Your Honor.

09:38:14  22      THE COURT:  All right.  With the exception of the

09:38:16  23  motion to suppress, are there any motions filed by either the

09:38:20  24  government or the Defense that I have not referred to or we've

09:38:23  25  not discussed that I need to take up other than the motion to

09:38:26   1   suppress?

09:38:28   2              MR. DEVLIN:  No more that have been filed,

09:38:30   3   Your Honor.  There is one matter that I would like to address

09:38:32   4   with the Court, and I think it's more of an awareness

09:38:37   5   discussion than it is anything else.

09:38:40   6              We anticipate presenting 13 child porn videos.  I

09:38:49   7   think that's the count of -- you know, throughout the

09:38:52   8   ten counts.  Showing those in their entirety, I estimate -- I

09:38:59   9   haven't added them all up -- but it's probably going to be

09:39:01  10   about two hours worth of child porn.

09:39:04  11              The Department of Justice and I know that the

09:39:06  12   investigating agencies have pretty actively monitored the

09:39:15  13   mental well-being of its prosecutors and agents.  And my

09:39:18  14   concern is that we have jurors coming in who are going to be

09:39:22  15   not expecting this kind of thing, and they're going to be

09:39:25  16   watching a lot of child pornography.  I don't know what's --

09:39:28  17   what the reaction is going to be.

09:39:30  18              Clearly we can address it in voir dire and ahead of

09:39:33  19   time.  But I just don't -- these are all disturbing videos, and

09:39:37  20   there's at least one that's particularly shocking even to

09:39:39  21   someone like me who sees these all the time.  I just don't know

09:39:42  22   what the reaction of the jurors is going to be afterwards, and

09:39:45  23   I don't know what impact that might have on a juror dropping

09:39:49  24   out.  I don't know if the Court wants to consider having

09:39:53  25   additional alternate jurors in light of the possible -- I call

| | | |
|---|---|---|
| 09:39:55 | 1 | it shock value, but I think that's what it's going to have. |
| 09:39:58 | 2 | I know that murder cases and homicide cases are tried |
| 09:40:00 | 3 | all the time with gruesome photographs, but this is going to be |
| 09:40:04 | 4 | at that level because of the nature of the child porn.  So I |
| 09:40:07 | 5 | simply raise that as a concern.  I don't know how to address |
| 09:40:11 | 6 | that best.  I don't know what will happen if a juror sees these |
| 09:40:16 | 7 | and they are, you know, overcome by -- by being disturbed by |
| 09:40:19 | 8 | the nature of these videos and what to do there. |
| 09:40:22 | 9 | I just want to put that out to the Court to perhaps |
| 09:40:24 | 10 | consider at least alternate jurors.  And I don't know about |
| 09:40:28 | 11 | counseling opportunities if any juror needs them afterwards, |
| 09:40:32 | 12 | because this is going to shock the sensibilities of ordinary |
| 09:40:35 | 13 | people.  And it's going to be unfortunately -- unfortunately, |
| 09:40:40 | 14 | because of the nature of the case, I have to show these to not |
| 09:40:43 | 15 | only show sexually explicit conduct to show the identity of the |
| 09:40:49 | 16 | defendant in that.  And so there's no avoiding that. |
| 09:40:52 | 17 | I'm going to try to cut it down as best I can, |
| 09:40:54 | 18 | Judge.  I'm certainly going to -- part of my strategy as well |
| 09:40:58 | 19 | is to take still photographs of those and show them to the |
| 09:41:01 | 20 | witnesses.  I do not plan on showing any of the videos to any |
| 09:41:04 | 21 | of the victims or the witnesses.  I'm going to do that through |
| 09:41:07 | 22 | still photographs and probably have the videos introduced |
| 09:41:09 | 23 | through the agents to try to minimize that.  But I don't know |
| 09:41:12 | 24 | how much I can minimize the impact on the jury.  So I just |
| 09:41:15 | 25 | simply throw that out for the Court's consideration. |

| | | |
|---|---|---|
| 09:41:17 | 1 | THE COURT:  Mr. Orr, comments?  Any ideas? |
| 09:41:21 | 2 | MR. ORR:  Well, you know, I just did one of these in |
| 09:41:31 | 3 | state court involving some child alleged -- it was child |
| 09:41:35 | 4 | pornography.  And the jury I don't think enjoyed it, but I |
| 09:41:38 | 5 | don't know that they needed any counseling.  I think that, you |
| 09:41:41 | 6 | know, it's not -- it's not pretty stuff.  But in that case, the |
| 09:41:47 | 7 | State used some video that allegedly was produced by the |
| 09:41:53 | 8 | defendant and they used some other stuff that was not produced |
| 09:41:56 | 9 | by him, and I don't think any the jury enjoyed it.  It's not |
| 09:42:05 | 10 | pleasant.  But I think that in this particular situation, I |
| 09:42:10 | 11 | don't know whether we need alternate jurors or not.  That's the |
| 09:42:14 | 12 | decision for the Court. |
| 09:42:15 | 13 | THE COURT:  As both of you know, I always take two |
| 09:42:17 | 14 | alternate jurors in a criminal case anyway.  The question would |
| 09:42:20 | 15 | be whether I would take three or four in this case, but there |
| 09:42:24 | 16 | definitely would be two alternate jurors in this case.  We'll |
| 09:42:28 | 17 | have the regular 12 and two alternates because that's what -- I |
| 09:42:31 | 18 | always take two alternates.  And I've had another case where |
| 09:42:36 | 19 | I've taken four alternates.  I did it in that case because it |
| 09:42:39 | 20 | was going to be an extremely lengthy case, and I felt certain |
| 09:42:43 | 21 | we would lose jurors as we go along.  At the end of the day, |
| 09:42:47 | 22 | none of the alternates got to deliberate.  We didn't lose a |
| 09:42:50 | 23 | single juror during the course of that trial. |
| 09:42:52 | 24 | MR. ORR:  Yes. |
| 09:42:53 | 25 | THE COURT:  So I'll just consider that.  Let me ask |

| | | |
|---|---|---|
| 09:42:57 | 1 | both of you how long do you think this case will take to try? |
| 09:42:59 | 2 | MR. DEVLIN:  I don't think it will -- I think we |
| 09:43:01 | 3 | should be wrapped up no later than Friday if we start on |
| 09:43:05 | 4 | Tuesday. |
| 09:43:07 | 5 | THE COURT:  Mr. Orr? |
| 09:43:08 | 6 | MR. ORR:  I agree with that. |
| 09:43:16 | 7 | THE COURT:  As you know, I generally give both sides |
| 09:43:20 | 8 | some time to voir dire, not a lot of time to voir dire.  It's a |
| 09:43:27 | 9 | little bit different case.  What do you think will be -- |
| 09:43:30 | 10 | knowing that this is not state court, I'm not going to give you |
| 09:43:35 | 11 | free discretion.  What are your ideas on what would be a |
| 09:43:39 | 12 | reasonable amount of time for you to ask some questions? |
| 09:43:41 | 13 | MR. ORR:  I don't know.  Twenty minutes, maybe. |
| 09:43:44 | 14 | MR. DEVLIN:  Twenty minutes would be fine, Judge. |
| 09:43:46 | 15 | MR. ORR:  Well, I had unlimited time in the one I |
| 09:43:48 | 16 | tried in state court.  It did me no good whatsoever.  So ... |
| 09:43:52 | 17 | THE COURT:  I'll give you each 20 minutes voir dire. |
| 09:43:55 | 18 | That will give you some time to bore in on things. |
| 09:43:57 | 19 | Now, we're set for the 11th, as you know.  And while |
| 09:44:00 | 20 | we're on the question of voir dire, I do most of the voir |
| 09:44:04 | 21 | dire.  I'm going to give you an opportunity to voir dire.  I |
| 09:44:09 | 22 | would like any particular questions you want incorporated in my |
| 09:44:14 | 23 | voir dire filed no later than Wednesday, the 5th. |
| 09:44:19 | 24 | MR. ORR:  Yes, sir. |
| 09:44:20 | 25 | THE COURT:  By the same -- and any charge materials |

| | | |
|---|---|---|
| 09:44:33 | 1 | you want, I want by Wednesday, the 5th also so we can begin |
| 09:44:38 | 2 | working on the Court's charge before trial.  Because as I |
| 09:44:45 | 3 | always do, once both sides rest and close, I like to get this |
| 09:44:50 | 4 | case to the jury as quickly as I can get it to the jury. |
| 09:44:54 | 5 | MR. DEVLIN:  Yes, sir.  The government has already |
| 09:44:57 | 6 | submitted its proposed charges. |
| 09:45:00 | 7 | MR. ORR:  We'll be preparing some, Your Honor.  We'll |
| 09:45:03 | 8 | get them filed on time. |
| 09:45:04 | 9 | THE COURT:  Now, I don't think the charge will be |
| 09:45:06 | 10 | particularly difficult in this case.  How much time, providing |
| 09:45:09 | 11 | this case survives the motion to suppress -- and I'm going to |
| 09:45:12 | 12 | hear testimony on it -- how much time do you believe you need |
| 09:45:14 | 13 | for opening statements in this case? |
| 09:45:21 | 14 | MR. DEVLIN:  No more than 30 minutes, Judge, I think. |
| 09:45:24 | 15 | MR. ORR:  I think that would be plenty, Your Honor. |
| 09:45:26 | 16 | THE COURT:  All right.  I'll give you 30 minutes to |
| 09:45:28 | 17 | the side.  Be reminded that on opening statements, the |
| 09:45:36 | 18 | government doesn't get to open and hold part of its time back. |
| 09:45:41 | 19 | Mr. Devlin, you'll make your opening statement.  Mr. Orr, you |
| 09:45:44 | 20 | can make yours immediately following or you can wait, of |
| 09:45:47 | 21 | course, until the defense's time.  But you'll have 30 minutes |
| 09:45:50 | 22 | to the side for opening statements. |
| 09:45:53 | 23 | All right.  Anything -- and I'll ask you this again |
| 09:45:57 | 24 | before we adjourn today, but anything either one of you wants |
| 09:46:00 | 25 | to bring up at this point that we haven't covered before we get |

MULLEN – DIRECT

| | | |
|---|---|---|
| 09:46:04 | 1 | into hearing evidence the government has with regard to the |
| 09:46:09 | 2 | motion to suppress? |
| 09:46:10 | 3 | MR. DEVLIN:  Nothing else from the government at this |
| 09:46:12 | 4 | point, Your Honor. |
| 09:46:13 | 5 | MR. ORR:  No, Your Honor. |
| 09:46:14 | 6 | THE COURT:  All right.  Mr. Devlin, then I will call |
| 09:46:17 | 7 | the motion to suppress statements, which -- the defendant's |
| 09:46:21 | 8 | motion to suppress statements which is Document Number 33.  I |
| 09:46:24 | 9 | understand you have some evidence in that regard? |
| 09:46:26 | 10 | MR. DEVLIN:  Yes, Your Honor.  We would call |
| 09:46:27 | 11 | Special Agent Sean Mullen. |
| 09:46:54 | 12 | (Witness sworn) |
| 09:46:54 | 13 | **SEAN MULLEN,** |
| 09:46:54 | 14 | having been first duly sworn, testified as follows: |
| 09:46:54 | 15 | **DIRECT EXAMINATION** |
| 09:46:54 | 16 | **BY MR. DEVLIN:** |
| 09:46:54 | 17 | Q.   You are Special Agent Sean Mullen, M-u-l-l-e-n, of the |
| 09:46:55 | 18 | Federal Bureau of Investigation? |
| 09:46:57 | 19 | A.   That's correct. |
| 09:46:58 | 20 | Q.   And you're based here in Austin? |
| 09:46:59 | 21 | A.   Yes, sir. |
| 09:46:59 | 22 | Q.   And how long have you been with the FBI? |
| 09:47:02 | 23 | A.   Just over seven years. |
| 09:47:03 | 24 | Q.   And you are the lead agent, if you will, on this case; is |
| 09:47:06 | 25 | that correct? |

MULLEN - DIRECT                                                    34

```
09:47:06   1   A.   That is correct.

09:47:07   2   Q.   Were you involved with the arrest of the defendant in this

09:47:11   3   case, David Andrew Diehl, on April 6th, 2010?

09:47:15   4   A.   Yes, I was.

09:47:16   5   Q.   Where did that arrest occur?

09:47:18   6   A.   Ponte Vedra, Florida.

09:47:22   7   Q.   And that is -- the defendant was residing in Florida at

09:47:24   8   that time?

09:47:25   9   A.   Yes, he was.

09:47:26  10   Q.   All right.  Can you describe the circumstances of the

09:47:27  11   arrest, please.

09:47:28  12   A.   Yes.  The arrest occurred just off of Route A1A in

09:47:33  13   Ponte Vedra.  Agents approached Mr. Diehl.  He was with another

09:47:38  14   individual at the time.

09:47:38  15   Q.   What time of day was this?

09:47:39  16   A.   Approximately 6:30, 6:45 at night.  He was advised that he

09:47:43  17   was under arrest and what the charges were.  He was placed in

09:47:48  18   the handcuffs, advised not to make any statements, was brought

09:47:52  19   to a vehicle where he was shown an FD-395 Advice of Rights form

09:47:56  20   and verbally provided his rights again.  And then he read the

09:48:00  21   form, advised he understood those rights, and then advised he

09:48:04  22   was willing to speak with the agents at the time and signed a

09:48:07  23   form to waive his rights.

09:48:09  24   Q.   Okay.

09:48:15  25            MR. ORR:  No objection.
```

09:48:15  1                    MR. DEVLIN:  May I approach the witness?

09:48:19  2                    THE COURT:  Yes.  You want to offer that?

09:48:20  3                    MR. DEVLIN:  I'm going to show the witness this.

09:48:22  4  Yes, I'm going to offer --

09:48:23  5  Q.   (BY MR. DEVLIN) I'm going to show you what is marked as

09:48:25  6  Government's Exhibit Number 1.  Is that a copy of the original

09:48:27  7  of the FD-395 Advice of Rights form?

09:48:30  8  A.   Yes, it is.

09:48:31  9  Q.   And is that a fair and accurate copy of the document?

09:48:34 10  A.   Yes, it is.

09:48:34 11  Q.   And does that indicate -- was that prepared at or near the

09:48:38 12  time that it was -- that the rights were given to Mr. Diehl?

09:48:41 13  A.   Yes, it was.

09:48:42 14  Q.   And it contains information on the location, the date, and

09:48:45 15  the time.  And the time in it is indicated at 6:45 p.m.?

09:48:50 16  A.   That's correct.

09:48:50 17  Q.   Okay.  And that contains Mr. Diehl's signature, and also

09:48:54 18  one of them is your signature?

09:48:56 19  A.   That is correct.

09:48:57 20                    MR. DEVLIN:  All right.  I move to admit Government

09:48:58 21  Exhibit 1 for purposes of this hearing.

09:49:00 22                    MR. ORR:  I have no objection.

09:49:01 23                    THE COURT:  Government's Exhibit Number 1 is admitted

09:49:03 24  for purposes of this hearing.

09:49:09 25  Q.   (BY MR. DEVLIN) The other signature on there, the top one,

09:49:11   1   is the other special agent – the other FBI agent with you?

09:49:13   2   A.   Yes, it is.

09:49:14   3   Q.   And his name was Jonathan McDonald?

09:49:17   4   A.   Yes, it was.

09:49:18   5   Q.   Okay.  And, now, prior to that, I take it that you went

09:49:23   6   through that Advice of Rights form as it is laid out as it's

09:49:26   7   written; is that correct?

09:49:27   8   A.   That is correct.

09:49:28   9   Q.   And Mr. Diehl was -- his attention was directed to that

09:49:31   10  form as well?

09:49:31   11  A.   That is correct.

09:49:32   12  Q.   All right.  Did Mr. Diehl indicate that he understood his

09:49:35   13  rights?

09:49:35   14  A.   Yes, he did.

09:49:37   15  Q.   And was he asked to sign that document indicating he

09:49:40   16  understood his rights?

09:49:41   17  A.   Yes, he was.

09:49:42   18  Q.   Did he indicate he wished to waive his rights and speak

09:49:46   19  with you at that time?

09:49:47   20  A.   Yes, he did.

09:49:48   21  Q.   Prior to that document being filled out with Mr. Diehl --

09:49:50   22  and I take it that -- that David Andrew Diehl is in the

09:49:54   23  courtroom today?

09:49:54   24  A.   Yes, he is.

09:49:55   25  Q.   Can you please point him out and describe an article of

09:49:58  1  clothing he's wearing?

09:49:59  2  A.   He's wearing a green shirt.

09:50:01  3  Q.   Okay.  Green V-neck shirt?

09:50:03  4  A.   Yes, sir.

09:50:05  5        MR. DEVLIN:  May the record reflect the witness has

09:50:06  6  identified the defendant?

09:50:07  7        THE COURT:  The record will so reflect.

09:50:09  8  Q.   (BY MR. DEVLIN) Prior to that -- I just want to make

09:50:12  9  clear -- was Mr. Diehl advised of his rights verbally without a

09:50:16  10  written document prior to that time?

09:50:17  11  A.   Yes, he was.

09:50:18  12  Q.   At what point was he verbally advised prior to filling out

09:50:23  13  that document?

09:50:23  14  A.   Immediately after he was placed into custody and prior to

09:50:26  15  moving him to the vehicle.

09:50:27  16  Q.   All right.  Prior to him -- so that was the first

09:50:29  17  occasion, and then the written advisement, this form, was the

09:50:34  18  second advice of his rights?

09:50:36  19  A.   Yes, it was.

09:50:36  20  Q.   Okay.  Who advised him of his rights the first time

09:50:39  21  verbally?

09:50:40  22  A.   Myself and Special Agent McDonald.

09:50:42  23  Q.   And how did you do that?  How did you advise him of his

09:50:45  24  rights?  Did you do it from memory?  Did you do it using this

09:50:49  25  form?

MULLEN – DIRECT

09:50:49  1  A.   I did it from memory at the time, and I advised him we'd

09:50:52  2  go over it more thoroughly once we sat down in the vehicle.

09:50:55  3  Q.   Can you specifically remember what you advised him of when

09:50:58  4  you did do a verbal advise of rights?

09:51:00  5  A.   I remember advising him he had a right to an attorney and

09:51:02  6  he had a right to remain silent and anything he said would be

09:51:04  7  used against him in court.

09:51:05  8  Q.   Okay.  Was any questioning of him done at that point?

09:51:08  9  A.   No, sir.

09:51:09  10  Q.   All right.  When was the first question -- when was the

09:51:13  11  first time you or another law enforcement agent asked him a

09:51:17  12  question?

09:51:17  13  A.   After he had signed the FD-395 waiving his rights.

09:51:21  14  Q.   Okay.  Can you describe to us the conversation that ensued

09:51:28  15  after you filled out Government Exhibit Number 1?

09:51:31  16  A.   Yes.  We asked Mr. Diehl identifying questioning to verify

09:51:37  17  his identity and then asked him various questions about where

09:51:41  18  he's lived and who he was married to previously.  And we

09:51:47  19  discussed motorcycles.  And then also we presented him with

09:51:51  20  photographs.  Mr. Diehl insisted that we get to the point.

09:51:55  21  Q.   Okay.

09:52:14  22          MR. DEVLIN:  May I approach the witness, Your Honor?

09:52:17  23          THE COURT:  You may.

09:52:17  24  Q.   (BY MR. DEVLIN) I'm now handing you what's been marked as

09:52:20  25  Government's Exhibit Number 2.  It's a five-page document.  Do

09:52:23   1   you recognize that document?

09:52:27   2   A.   Yes, I do.

09:52:28   3   Q.   And that is a copy of the original of those five pages; is

09:52:32   4   that correct?

09:52:32   5   A.   That is correct.

09:52:33   6   Q.   And what is that document?

09:52:34   7   A.   That document contains a photograph of a bill -- a novelty

09:52:38   8   bill and then three pages of a hand and then a final page of

09:52:45   9   two visual depictions of a minor female.

09:52:47  10   Q.   And what's the relevance of this document?

09:52:49  11   A.   All of these items were found to be in one of the videos

09:52:53  12   alleged in the indictment.

09:52:54  13   Q.   Were these documents -- were these presented to Mr. Diehl

09:52:56  14   at the time of his interview on April 6th?

09:52:59  15   A.   Yes, they were.

09:53:00  16   Q.   Okay.  There are handwritten notations in the document as

09:53:05  17   well.  Whose handwriting is that?

09:53:07  18   A.   That is mine.

09:53:07  19   Q.   All right.  And that handwriting is -- that is there to

09:53:11  20   indicate what?

09:53:11  21   A.   It indicates what Mr. Diehl responded to when shown the

09:53:15  22   pictures and asked about them.

09:53:16  23   Q.   Okay.  Is that document in the same or substantially the

09:53:19  24   same condition as it was when it was presented to Mr. Diehl and

09:53:22  25   you wrote your notes on it?

MULLEN – DIRECT

09:53:24  1   A.   Yes, it is.

09:53:24  2   Q.   And those notes were intended to be shorthand versions of

09:53:27  3   his responses?

09:53:28  4   A.   Correct.

09:53:29  5        MR. DEVLIN:  For purposes of this hearing, I move to

09:53:32  6   admit Government's Exhibit Number 2?

09:53:34  7        MR. ORR:  No objections for purposes of this hearing.

09:53:35  8        THE COURT:  Government's Exhibit Number 2 is admitted

09:53:38  9   for purposes of this hearing.

09:53:39  10  Q.   (BY MR. DEVLIN) All right.  The first page has to do

09:53:41  11  with -- what appears to be a million dollar novelty bill with

09:53:46  12  the word Star Ranch and other words on it.  What was asked and

09:53:50  13  what was his response to that?

09:53:52  14  A.   Mr. Diehl was asked if he had ever seen that novelty bill,

09:53:56  15  and he responded he had never seen it before.

09:53:59  16  Q.   And so "never seen bill" is basically a summary of his

09:54:02  17  response, correct?

09:54:03  18  A.   Right.

09:54:03  19  Q.   The second page depicts what?

09:54:09  20  A.   It depicts what appears to be the right hand of an

09:54:13  21  individual in a somewhat fist formation.

09:54:14  22  Q.   I take it that that right hand was extracted from a still

09:54:17  23  image of one of the child pornography videos that we will be

09:54:20  24  introducing at trial?

09:54:21  25  A.   Yes, it was.

| | | |
|---|---|---|
| 09:54:22 | 1 | Q.   Was he shown that? |
| 09:54:23 | 2 | A.   Yes, he was. |
| 09:54:24 | 3 | Q.   And what was he asked in relation to that? |
| 09:54:26 | 4 | A.   He was asked what that was.  He identified it as a hand, |
| 09:54:29 | 5 | and then he was asked whose hand it was.  And he said it was |
| 09:54:33 | 6 | not his hand. |
| 09:54:34 | 7 | Q.   It was not his hand? |
| 09:54:35 | 8 | A.   Yeah. |
| 09:54:35 | 9 | Q.   And then you indicate in your notes:  "Hand not Diehl's |
| 09:54:39 | 10 | hand"? |
| 09:54:39 | 11 | A.   Correct. |
| 09:54:40 | 12 | Q.   The third page depicts what? |
| 09:54:42 | 13 | A.   Appears to be a left hand in a little bit of a grasping |
| 09:54:47 | 14 | motion, maybe, with a wedding band on it. |
| 09:54:49 | 15 | Q.   And that photograph was also extracted from a still image |
| 09:54:53 | 16 | of one of the child pornography videos? |
| 09:54:55 | 17 | A.   Yes, it was. |
| 09:54:56 | 18 | Q.   And both of these were actually taken out of the child |
| 09:54:59 | 19 | pornography videos alleged in count one; is that correct? |
| 09:55:03 | 20 | A.   That is correct. |
| 09:55:03 | 21 | Q.   Involving Jane Doe Number 1? |
| 09:55:05 | 22 | A.   That is correct. |
| 09:55:06 | 23 | Q.   What was asked and what was his response when shown that |
| 09:55:09 | 24 | picture? |
| 09:55:09 | 25 | A.   Mr. Diehl was asked what that picture was.  He identified |

09:55:12  1  it as a hand and then asked whose hand it was.  He identified

09:55:15  2  that it could be his hand.

09:55:16  3  Q.   Okay.  And that is noted on there as "Could be Diehl's

09:55:19  4  hand."  That's shorthand for his response?

09:55:21  5  A.   Correct.

09:55:21  6  Q.   All right.  And what's the fourth picture?

09:55:24  7  A.   This is also what appears to be a left hand, this time the

09:55:27  8  palm of it, also taken from -- the still image taken from the

09:55:33  9  videos alleged in count one.

09:55:34  10 Q.   Okay.  And what was he asked, and what was his response?

09:55:38  11 A.   He was asked if what that picture depicted.  He responded

09:55:41  12 it was a hand.  He also responded that -- when asked whose hand

09:55:44  13 it was, that he didn't know and that it doesn't look like his

09:55:47  14 hand -- it doesn't look like my hand to me.

09:55:51  15 Q.   Okay.  And the fifth page depicts what?

09:55:54  16 A.   Has two pictures, both of the face of a minor female

09:55:59  17 identified as Jane Doe Number 1 in the alleged videos -- the

09:56:02  18 videos in count one.

09:56:03  19 Q.   All right.  And what was he asked and what was his

09:56:06  20 response in relation to those?

09:56:08  21 A.   He was asked if he could identify who that was.  And he

09:56:12  22 identified Jane Doe Number 1 by her first name.

09:56:15  23 Q.   Okay.  And that is indicated on there?

09:56:17  24 A.   Yes, it is.

09:56:19  25           MR. DEVLIN:  Okay.  Judge, for purposes of this

MULLEN - DIRECT                                                    43

| | | |
|---|---|---|
| 09:56:20 | 1 | hearing, because the real name of Jane Doe Number 1 is being |
| 09:56:25 | 2 | used in this document, I would move that it be sealed.  The |
| 09:56:28 | 3 | defense has been provided a copy of the document, the original |
| 09:56:32 | 4 | copy.  And so based on Section 3509, I would ask that this |
| 09:56:37 | 5 | document be sealed. |
| 09:56:37 | 6 | THE COURT:  All right.  Let me review the document. |
| 09:56:39 | 7 | The motion to seal will be granted, and the motion will be |
| 09:56:43 | 8 | sealed immediately following this hearing.  Mr. Kissler, don't |
| 09:56:48 | 9 | seal it yet because it may come up again during the hearing. |
| 09:56:53 | 10 | Q.   (BY MR. DEVLIN) Is there any other conversation that |
| 09:56:55 | 11 | ensued after he was advised of and waived his rights? |
| 09:56:59 | 12 | A.   Not after that last picture shown to him. |
| 09:57:01 | 13 | Q.   What happened after that? |
| 09:57:03 | 14 | A.   Mr. Diehl invoked his right to have counsel present, and |
| 09:57:06 | 15 | the interview was immediately terminated at that time. |
| 09:57:09 | 16 | Q.   All right.  No further questioning ensued? |
| 09:57:12 | 17 | A.   No, sir. |
| 09:57:13 | 18 | Q.   All right.  What happened after that? |
| 09:57:14 | 19 | A.   We began to prepare Mr. Diehl to transport to the |
| 09:57:20 | 20 | Jacksonville Sheriff's Office.  During that time, he was |
| 09:57:23 | 21 | standing alone with Special Agent McDonald for a period of |
| 09:57:28 | 22 | time.  And then after that, he was placed in Special Agent |
| 09:57:30 | 23 | McDonald's vehicle, and Special Agent McDonald, myself, and |
| 09:57:34 | 24 | Mr. Diehl drove to the Jacksonville Sheriff's Office. |
| 09:57:36 | 25 | Q.   Okay.  After he invoked his right to a lawyer -- and it |

MULLEN - DIRECT                                                   44

| | | |
|---|---|---|
| 09:57:39 | 1 | was pretty clear to you that he had asked for a lawyer; is that |
| 09:57:42 | 2 | right? |
| 09:57:42 | 3 | A.   That is correct. |
| 09:57:43 | 4 | Q.   So you had ceased all interrogation, any questioning, |
| 09:57:46 | 5 | anything else? |
| 09:57:47 | 6 | A.   That is correct. |
| 09:57:48 | 7 | Q.   Did Mr. Diehl make any statements after that point to you |
| 09:57:51 | 8 | or to Agent McDonald or any other agent that you're aware of? |
| 09:57:55 | 9 | A.   Yes, he did. |
| 09:57:56 | 10 | Q.   All right.  What did he say, and then I guess what were |
| 09:58:00 | 11 | the circumstances of his saying that? |
| 09:58:03 | 12 | A.   During the vehicle transport, while he was being |
| 09:58:06 | 13 | transported to Jacksonville Sheriff's Office, he made various |
| 09:58:11 | 14 | statements regarding the embarrassment this might cause to his |
| 09:58:13 | 15 | son.  He asked some questions as to the evidence and whether |
| 09:58:17 | 16 | due diligence was done. |
| 09:58:19 | 17 | And I advised Mr. Diehl several times that he had |
| 09:58:21 | 18 | already invoked his right -- his constitutional rights and we |
| 09:58:25 | 19 | were not going to speak to him any more about that.  The only |
| 09:58:27 | 20 | answers that I would provide to him would be questions he might |
| 09:58:30 | 21 | have at processing as far as where he was going to be taken and |
| 09:58:33 | 22 | when he would see the magistrate judge for his initial |
| 09:58:36 | 23 | appearance. |
| 09:58:36 | 24 | Q.   Okay.  Did he make any other statements to Agent McDonald |
| 09:58:41 | 25 | along the lines of "I did not make any videos of child |

09:58:44  1  pornography"?  "Nudism isn't the same thing as child

09:58:47  2  pornography"?  And asking, "Are you for Texas, because in Texas

09:58:51  3  they'll put you in jail for anything?"  Did he make those

09:58:54  4  statements as well?

09:58:55  5  A.   According to Special Agent McDonald's FD-302 report, yes,

09:58:59  6  he did.

09:58:59  7           MR. ORR:  Objection.  Hearsay, Your Honor.

09:59:00  8           MR. DEVLIN:  Well, for purposes of this hearing,

09:59:03  9  Judge, the motion to suppress, hearsay is admissible.

09:59:05  10          THE COURT:  It's overruled, but bear in mind that

09:59:08  11  nothing that's used in this hearing will be used in the trial.

09:59:10  12  If you want to elicit testimony similar to this, you need to

09:59:13  13  ask it anew at the trial, and Mr. Orr will be allowed to object

09:59:16  14  at that time.

09:59:17  15          MR. DEVLIN:  Yes, sir.  Absolutely.

09:59:19  16  Q.   (BY MR. DEVLIN) But those statements were also made by

09:59:21  17  Mr. Diehl; is that correct?

09:59:22  18  A.   Yes, it was.

09:59:23  19  Q.   Were any of the statements that you've now mentioned that

09:59:25  20  were made by Mr. Diehl after he invoked his right to an

09:59:29  21  attorney made in any -- made in any way in response to any

09:59:32  22  question you or another law enforcement agent asked him?

09:59:35  23  A.   No, sir.

09:59:36  24  Q.   Did he -- did he make them in response to anything that

09:59:43  25  you might have been saying to somebody else or you might have

MULLEN – DIRECT

09:59:46   1  been talking to yourself or any other type of conversation that

09:59:51   2  might have been going on that didn't involve him?

09:59:55   3  A.   No, sir.

09:59:55   4  Q.   All right.  So is it fair to say these statements were

09:59:58   5  spontaneous on his part?

09:59:59   6  A.   Yes.

10:00:00   7  Q.   Okay.  Did you -- were you providing him with any

10:00:03   8  explanation of the procedures that he would then be going

10:00:07   9  through at that point?  Anything like that?

10:00:10  10  A.   Not until he asked directly.

10:00:12  11  Q.   Okay.  So none of this was in response -- you weren't

10:00:14  12  explaining procedures to him, and then he popped out with this

10:00:18  13  information?

10:00:18  14  A.   Not that I recall.

10:00:22  15  Q.   And even after he had started back and made some of these

10:00:25  16  statements, did you resume questioning at that point?

10:00:27  17  A.   No, I did not.

10:00:28  18  Q.   All right.  So no questions were asked at any time at that

10:00:31  19  point; is that correct?

10:00:32  20  A.   That is correct.

10:00:33  21  Q.   All right.  Were there any other statements -- and a

10:00:37  22  summary of these statements have been reduced to 302 summaries

10:00:41  23  by you and by Special Agent McDonald and provided to Mr. Orr;

10:00:46  24  is that correct?

10:00:47  25  A.   That is correct.

MULLEN – DIRECT                                          47

10:00:49  1  Q.   Okay.  Any other statements made that day by Mr. Diehl of

10:00:53  2  any relevance?

10:00:54  3  A.   No, sir.

10:01:00  4          MR. DEVLIN:  Okay.  A moment, Your Honor?

10:01:01  5          THE COURT:  Yes.

10:01:18  6  Q.   (BY MR. DEVLIN) I want to now move to October 25th of

10:01:21  7  2010, on that date, pursuant to a court order, there was what

10:01:27  8  I'll term a video review session that was attended by the

10:01:35  9  defendant, Mr. Diehl, by Mr. Orr, his attorney, by me, by

10:01:38  10 yourself, and by two other FBI agents, Special Agent

10:01:45  11 Jake Bailey and Special Agent Scott Jensen; is that correct?

10:01:48  12 A.   That's correct.

10:01:49  13 Q.   And that session occurred in this courthouse on the third

10:01:51  14 floor in the -- I guess it was in Judge Yeakel's jury room; is

10:01:55  15 that correct?

10:01:56  16 A.   That is correct.

10:01:56  17 Q.   All right.  Can you describe what occurred during that

10:02:01  18 video review session?

10:02:03  19 A.   During that session, Mr. Orr had asked us to explain what

10:02:08  20 videos we had and then also to -- on the court order, show them

10:02:12  21 to Mr. Diehl.  We also brought some other physical evidence to

10:02:15  22 present at that time.

10:02:16  23 Q.   I guess the best way to describe, the session was that it

10:02:19  24 was to follow up on a court order that Mr. Diehl be allowed to

10:02:23  25 review the child porn videos that we had in our possession

10:02:27  1  since we were not -- since by statute, we're not allowed to

10:02:31  2  give Mr. Orr or Mr. Diehl a copy of those, correct?

10:02:33  3  A.   That is correct.

10:02:34  4  Q.   And so this was intended to go through all the child porn

10:02:37  5  videos that have been charged in the ten-count second

10:02:41  6  superseding indictment; is that correct?

10:02:42  7  A.   That's correct.

10:02:43  8  Q.   And other evidence as well.  There were some other

10:02:46  9  photographs, another video that did not depict child porn but

10:02:49  10 that we believe was associated with him; is that correct?

10:02:53  11 A.   Yes.  That's correct.

10:02:54  12 Q.   Okay.  Now, there was no other people present other than

10:02:58  13 the ones I just mentioned, correct?

10:02:59  14 A.   That is correct.

10:03:00  15 Q.   All right.  Was -- and prior to that session, is it true

10:03:04  16 that I advised -- in Mr. Orr's presence, I advised Mr. Diehl

10:03:09  17 that basically this was a video review session.  It was

10:03:13  18 designed simply to allow him to watch videos.  Because of the

10:03:17  19 nature of the evidence, that's child pornography and

10:03:20  20 contraband, that they had -- that we or at least one of us,

10:03:23  21 being myself or one of the three agents, had to be in the room

10:03:26  22 at all times, correct?

10:03:28  23 A.   That is correct.

10:03:29  24 Q.   He was further advised that anything -- that this was not

10:03:33  25 going to be a questioning session.  That anything he said,

10:03:35   1   though, would be noted down or could be noted down and used

10:03:39   2   against him; is that correct?

10:03:41   3   A.   That is correct.

10:03:41   4   Q.   And that if he wanted to have any conversations with his

10:03:44   5   lawyer, that he should save those conversations for another

10:03:49   6   time where he is meeting with Mr. Orr privately; is that right?

10:03:52   7   A.   That is correct.

10:03:53   8   Q.   And that none of his conversations were going to -- with

10:03:56   9   Mr. Orr were going to be protected if they were loud enough to

10:04:01  10   be heard by you or by myself; is that right?

10:04:02  11   A.   That is correct.

10:04:03  12   Q.   And the reason for that is twofold:  One is you are

10:04:05  13   showing him contraband evidence; and then, secondly, he was

10:04:08  14   being essentially borrowed from the marshals as a person in

10:04:12  15   custody and you could not allow him to remain in that room

10:04:16  16   unsupervised without an agent close by; is that right?

10:04:20  17   A.   That is correct.

10:04:21  18   Q.   Okay.  And he was provide with an opportunity before this

10:04:26  19   meeting and presumably after this meeting to meet with Mr. Orr

10:04:29  20   pursuant to whatever the marshal's guidelines were for having

10:04:32  21   an attorney-client meeting; is that right?

10:04:35  22   A.   That's my understanding, yes.

10:04:36  23   Q.   Okay.  Did Mr. Diehl indicate that he understood this?

10:04:39  24   A.   Yes, he did.

10:04:40  25   Q.   All right.  What happened?

MULLEN - DIRECT

10:04:43  1    A.    Mr. Diehl -- Mr. Diehl was shown the videos, and there

10:04:48  2    were points during the video he made statements and then was

10:04:51  3    also questioning Mr. Devlin and myself regarding the contents

10:04:58  4    of the videos and the legality of the videos.

10:05:00  5    Q.    Okay.  So he was asking several questions; is that

10:05:04  6    correct?

10:05:04  7    A.    That'S correct.

10:05:05  8    Q.    And during that session, at least -- well, throughout that

10:05:07  9    session when Mr. Diehl asked a question, Mr. Orr, his attorney,

10:05:12  10   told him, Don't say anything, or words to that effect.  Is that

10:05:15  11   true?

10:05:15  12   A.    That is correct.

10:05:16  13   Q.    But Mr. Diehl said that he insisted on saying something

10:05:20  14   and continued to ask a question; is that right?

10:05:23  15   A.    That is correct.

10:05:24  16   Q.    And at various points during this session, which the

10:05:27  17   session ended up lasting about two hours; is that right?

10:05:30  18   A.    Approximately, yes.

10:05:31  19   Q.    Throughout that entire two hours, Mr. Diehl was asking all

10:05:33  20   kinds of questions and making all kinds of statements; is that

10:05:37  21   correct?

10:05:37  22   A.    That is correct.

10:05:38  23   Q.    Were any of those in response to any questioning made by

10:05:42  24   either myself or by any of the FBI agents present?

10:05:45  25   A.    No, they were not.

MULLEN – DIRECT

10:05:46  1   Q.   And at various points when Mr. Diehl would ask a question,

10:05:50  2   it would often be directed to me as the prosecutor, correct?

10:05:52  3   A.   That is correct.

10:05:53  4   Q.   And on almost every occasion, I would ask Mr. Orr if it

10:06:00  5   was okay to answer.  And Mr. Orr pretty much said it was okay

10:06:02  6   to answer, and then a statement would be made.  Is that

10:06:05  7   correct?

10:06:05  8   A.   That's correct.

10:06:06  9   Q.   No questions would be asked of Mr. Diehl, though; is that

10:06:09  10  right?

10:06:09  11  A.   That is right.

10:06:10  12  Q.   Okay.  I think there was one time that there was one

10:06:12  13  question asked by one of the agents, and I said:  Mr. Diehl,

10:06:16  14  don't answer that.  And then I asked the agent not to ask any

10:06:19  15  questions; is that correct?

10:06:20  16  A.   That is correct.

10:06:21  17  Q.   But other than that, it was all Mr. Diehl doing the

10:06:24  18  talking and addressing questions to me and Mr. Orr allowing me

10:06:28  19  to answer the questions?

10:06:28  20  A.   That is correct.

10:06:29  21  Q.   Okay.  And that -- a summary of that session, if you will,

10:06:36  22  while not designed to be an interview, turned out to be a time

10:06:39  23  when Mr. Diehl made numerous statements that were noted down

10:06:43  24  and recorded by Special Agent Bailey; is that right?

10:06:48  25  A.   Yes.

MULLEN – DIRECT

| | | |
|---|---|---|
| 10:06:48 | 1 | Q.   Primarily? |
| 10:06:49 | 2 | A.   Special Agent Bailey and Special Agent Jensen took notes. |
| 10:06:52 | 3 | Q.   Okay.  But you were present through that entire session |
| 10:06:56 | 4 | for the full two hours? |
| 10:06:57 | 5 | A.   Yes, I was. |
| 10:06:58 | 6 | Q.   And there was no breaks, at least, to have Mr. Diehl leave |
| 10:07:00 | 7 | and come back; is that right? |
| 10:07:01 | 8 | A.   That is correct. |
| 10:07:02 | 9 | Q.   And that has been summarized in a 302 that I've just |
| 10:07:05 | 10 | provided today to Mr. Orr; is that correct? |
| 10:07:07 | 11 | A.   Yes, it is. |
| 10:07:08 | 12 | Q.   Throughout that session, Mr. Diehl made numerous |
| 10:07:14 | 13 | statements indicating that he –– I'm just going to summarize |
| 10:07:17 | 14 | this –– that he knew the people in the video, that he was |
| 10:07:21 | 15 | asking –– is that correct? |
| 10:07:23 | 16 | A.   Yes, it is. |
| 10:07:24 | 17 | Q.   He was asking how someone could be identified if you |
| 10:07:30 | 18 | couldn't see their face. |
| 10:07:31 | 19 | A.   That is correct. |
| 10:07:32 | 20 | Q.   He was trying to talk about an injury or the deformity to |
| 10:07:38 | 21 | a hand in one or more of the videos and asking when that |
| 10:07:42 | 22 | occurred and how you can prove when that occurred or words to |
| 10:07:46 | 23 | that effect; is that right? |
| 10:07:48 | 24 | A.   That is right. |
| 10:07:48 | 25 | Q.   Okay.  Basically he was asking how we were going to prove |

10:07:59    1   our case, and I told him.

10:08:01    2   A.    That is correct.

10:08:02    3   Q.    Okay.  And -- let's see.  There was lastly a video that

10:08:12    4   has been provided to the defense that did not constitute child

10:08:15    5   porn that I will refer to as a home video that was provided to

10:08:18    6   you by the defendant's ex-wife, Kerry Jenkins; is that right?

10:08:22    7   A.    That is correct.

10:08:23    8   Q.    And during that video it shows various things, but it

10:08:28    9   shows Jane Doe Number 2 just around his house being

10:08:35   10   videotaped.  At one point he was wondering who had filmed the

10:08:38   11   video; is that correct?

10:08:39   12   A.    That is correct.

10:08:40   13   Q.    And within seconds, there was a voice heard that was --

10:08:46   14   has been identified as Mr. Diehl.  And in response to hearing

10:08:49   15   that, he spontaneously said, "Oh, I am," meaning I'm filming

10:08:54   16   it, basically.  Is that correct?

10:08:55   17   A.    That is correct.

10:08:56   18   Q.    All right.  And that's documented in your 302 summarizing

10:09:00   19   that; is that right?

10:09:01   20   A.    Yes, it is.

10:09:02   21   Q.    Okay.  So none of those -- none of the statements that he

10:09:04   22   made during the October 25th session were made in response to

10:09:08   23   any question or interrogation by law enforcement is that right?

10:09:12   24   A.    That is correct.

10:09:13   25   Q.    In fact, he wasn't even advised of his rights there

| | | |
|---|---|---|
| 10:09:16 | 1 | because there was no intent or plan to ask him any questions. |
| 10:09:18 | 2 | He was simply there to watch videos; is that correct? |
| 10:09:21 | 3 | A.    That is correct. |
| 10:09:22 | 4 | Q.    Okay.  And he had had one session prior to that probably a |
| 10:09:26 | 5 | month or two prior to that in the grand jury room on the third |
| 10:09:30 | 6 | floor of this courtroom where he was also shown a series of |
| 10:09:33 | 7 | videos but did not engage in any of the questioning and making |
| 10:09:36 | 8 | the statements that he did on October 25th; is that correct? |
| 10:09:39 | 9 | A.    That's correct. |
| 10:09:44 | 10 | MR. DEVLIN:  All right.  I'll pass the witness. |
| 10:09:45 | 11 | THE COURT:  Mr. Orr, cross-examination? |
| 10:09:50 | 12 | MR. ORR:  Yes, Your Honor. |
| 10:09:51 | 13 | **CROSS-EXAMINATION** |
| 10:09:51 | 14 | **BY MR. ORR:** |
| 10:09:51 | 15 | Q.    Agent Mullen, were either of these conversations that you |
| 10:09:53 | 16 | testified about, I think April 26th and October 25th of this |
| 10:09:57 | 17 | year, recorded? |
| 10:09:58 | 18 | A.    No, they were not. |
| 10:09:59 | 19 | Q.    Okay.  So neither in the car nor on your original approach |
| 10:10:04 | 20 | to Mr. Diehl in Florida was there any tape recording made of |
| 10:10:12 | 21 | any kind? |
| 10:10:12 | 22 | A.    That's correct. |
| 10:10:12 | 23 | Q.    No memory card recording or anything along those lines? |
| 10:10:16 | 24 | A.    Audio? |
| 10:10:16 | 25 | Q.    Audio.  Any kind of audio or -- |

| | | |
|---|---|---|
| 10:10:18 | 1 | A.    No, there was not. |
| 10:10:19 | 2 | Q.    -- any video recordings you made? |
| 10:10:20 | 3 | A.    Video recordings?  No. |
| 10:10:22 | 4 | Q.    And no such recordings were made on October the 25th of |
| 10:10:26 | 5 | this year? |
| 10:10:26 | 6 | A.    That's correct. |
| 10:10:27 | 7 | Q.    All right.  So far as the April 25th incident, Mr. Diehl, |
| 10:10:35 | 8 | according to your testimony, was warned of his rights under the |
| 10:10:38 | 9 | United States Constitution, correct? |
| 10:10:39 | 10 | A.    That's correct.  Are you referring to April 6th, 2010? |
| 10:10:43 | 11 | Q.    Oh, April 6th.  I'm sorry. |
| 10:10:44 | 12 | A.    Yes.  On April 6th. |
| 10:10:44 | 13 | Q.    April 6th, right? |
| 10:10:47 | 14 | A.    That's correct. |
| 10:10:47 | 15 | Q.    And so far as those rights, those were first read to him |
| 10:10:55 | 16 | and then he was given a card; is that correct, sir? |
| 10:10:58 | 17 | A.    No.  He was provided a sheet of paper, the FD-395, Advice |
| 10:11:00 | 18 | of Rights. |
| 10:11:01 | 19 | Q.    A sheet of paper.  Okay.  Anyway, in writing? |
| 10:11:04 | 20 | A.    Uh-huh. |
| 10:11:05 | 21 | Q.    Correct? |
| 10:11:05 | 22 | A.    That's correct. |
| 10:11:06 | 23 | Q.    And you had mentioned that -- that he asked for an |
| 10:11:09 | 24 | attorney? |
| 10:11:09 | 25 | A.    That's correct. |

```
10:11:10   1   Q.    Okay.  And was the point at which he asked for an
10:11:14   2   attorney, how many seconds after the written warning was signed
10:11:20   3   by him was that request made?
10:11:24   4   A.    How many seconds after?
10:11:25   5   Q.    Yeah.  Do you know?
10:11:26   6   A.    It was approximately 13 minutes after he waived his rights
10:11:30   7   that he asked for his attorney.
10:11:32   8   Q.    Okay.  You didn't -- did he even -- did he first ask about
10:11:35   9   lawyer or say, Should I get a lawyer?  Did he say -- when was
10:11:39  10   the first time the lawyer word got mentioned?
10:11:41  11   A.    When I read his Advice of Rights to him.
10:11:44  12   Q.    And after that when was it mentioned next?
10:11:47  13   A.    When he asked for his attorney.
10:11:48  14   Q.    When he asked for an attorney, not -- and that's the 13
10:11:53  15   minutes later time?
10:11:57  16   A.    That's correct.
10:11:58  17   Q.    Okay.  So far as the questions you asked Mr. Diehl, you
10:12:04  18   had these questions -- I presume you had some exhibits with you
10:12:07  19   and questions prepared, did you not, sir?
10:12:09  20   A.    Yes, I did?
10:12:10  21   Q.    And you -- you intended to ask him some questions when you
10:12:14  22   first approached him, did you not, sir?
10:12:16  23   A.    Yes, I did.
10:12:17  24   Q.    Okay.  And you as an FBI agent have approached many people
10:12:21  25   and asked many people questions, have you not, sir?
```

| | | |
|---|---|---|
| 10:12:24 | 1 | A.    That's correct. |
| 10:12:24 | 2 | Q.    And you understand that when you first show up on |
| 10:12:27 | 3 | somebody's doorstep or on the -- grab them -- however you |
| 10:12:30 | 4 | grabbed them, they're frequently startled, are they not, sir? |
| 10:12:36 | 5 | A.    Some are, yes. |
| 10:12:37 | 6 | Q.    It's a bit of a shock when the FBI shows up and it's not |
| 10:12:40 | 7 | just a friendly visit.  You're there to arrest somebody? |
| 10:12:44 | 8 | A.    Yes. |
| 10:12:44 | 9 | Q.    Okay.  People react in different ways, do they not, sir? |
| 10:12:47 | 10 | A.    Some do, yes.  They all act a little different. |
| 10:12:50 | 11 | Q.    Okay.  And so far as how Mr. Diehl acted, did he seem to |
| 10:12:54 | 12 | be shocked and surprised? |
| 10:12:55 | 13 | A.    Yes, he did. |
| 10:12:56 | 14 | Q.    Okay.  And did he inquire of the sort of the usual |
| 10:13:01 | 15 | question I guess people frequently ask:  What's this all about? |
| 10:13:04 | 16 | A.    Yes, he did. |
| 10:13:05 | 17 | Q.    And what did you tell him? |
| 10:13:06 | 18 | A.    I advised him that he's being arrested on a complaint out |
| 10:13:09 | 19 | of the Western District of Texas for the production of child |
| 10:13:12 | 20 | pornography. |
| 10:13:13 | 21 | Q.    Okay.  Did he ask you some more questions? |
| 10:13:15 | 22 | A.    He asked what this was all about, and I advised him we'll |
| 10:13:18 | 23 | get to that point. |
| 10:13:19 | 24 | Q.    Okay.  And is that when you started showing him these |
| 10:13:23 | 25 | items that have be admitted into evidence for this hearing? |

| | | |
|---|---|---|
| 10:13:26 | 1 | A.   No.   Before showing those items, I showed him his Advice |
| 10:13:30 | 2 | of Rights and he read him his Advice of Rights and he signed |
| 10:13:33 | 3 | this. |
| 10:13:34 | 4 | Q.   And then after that he asked, What's this all about?  And |
| 10:13:36 | 5 | then you gave him his rights, and then you -- in response to |
| 10:13:41 | 6 | his question about, What's this all about? did you begin |
| 10:13:44 | 7 | showing him these exhibits? |
| 10:13:45 | 8 | A.   Not until we had moved into the vehicle -- |
| 10:13:48 | 9 | Q.   Okay. |
| 10:13:48 | 10 | A.   -- and I advised him of his rights. |
| 10:13:50 | 11 | Q.   Was it daylight? |
| 10:13:52 | 12 | A.   Yes, it was. |
| 10:13:53 | 13 | Q.   Okay.  And so where did you seat him in the vehicle?  Seat |
| 10:13:55 | 14 | him. |
| 10:13:55 | 15 | A.   Seat him? |
| 10:13:56 | 16 | Q.   Seat him. |
| 10:13:57 | 17 | A.   In the back seat behind in the back passenger seat. |
| 10:14:01 | 18 | Q.   Okay.  And was he handcuffed? |
| 10:14:03 | 19 | A.   He was handcuffed. |
| 10:14:04 | 20 | Q.   Were his handcuffs behind him? |
| 10:14:06 | 21 | A.   Initially they were.  But we moved them to the front when |
| 10:14:08 | 22 | we sat him down. |
| 10:14:09 | 23 | Q.   And why did you do that? |
| 10:14:10 | 24 | A.   For comfort. |
| 10:14:11 | 25 | Q.   And so you have testified you showed him these various |

| | | |
|---|---|---|
| 10:14:14 | 1 | exhibits, correct, sir? |
| 10:14:15 | 2 | A.    That's correct. |
| 10:14:16 | 3 | Q.    And were they handed to him so that he could hold them in |
| 10:14:21 | 4 | his hands? |
| 10:14:22 | 5 | A.    I believe I showed them to him -- |
| 10:14:23 | 6 | Q.    Okay. |
| 10:14:24 | 7 | A.    -- from where I was sitting. |
| 10:14:25 | 8 | Q.    Were you sitting in the front seat or the back seat? |
| 10:14:27 | 9 | A.    I was sitting in the back seat next to him. |
| 10:14:30 | 10 | Q.    And so the notes that have been scribbled on these -- |
| 10:14:35 | 11 | well, I don't mean to insult you.  But the notes that have been |
| 10:14:39 | 12 | placed on these exhibits, when they were put on there? |
| 10:14:41 | 13 | A.    At the moment he told me the answer. |
| 10:14:43 | 14 | Q.    Okay.  Did you have something there to write on, like a -- |
| 10:14:46 | 15 | A.    Yes. |
| 10:14:46 | 16 | Q.    -- clipboard? |
| 10:14:47 | 17 | A.    Yes.  I had a notepad. |
| 10:14:49 | 18 | Q.    All right.  So far as what he told you -- if I understand |
| 10:14:55 | 19 | it, so far as the photographs of the hand, he indicated that |
| 10:14:58 | 20 | that, if I could hear your testimony, was not his hand -- |
| 10:15:02 | 21 | didn't look like his hand? |
| 10:15:04 | 22 | A.    That's correct. |
| 10:15:04 | 23 | Q.    Did he admit that any of the photographs could be of his |
| 10:15:07 | 24 | hand? |
| 10:15:08 | 25 | A.    No.  He said it could be, but he never said it was, no. |

| 10:15:11 | 1 | Q.   Okay.  And, basically, did he not admit -- he did deny |
| 10:15:17 | 2 | that that was his hand? |
| 10:15:19 | 3 | A.   Yes. |
| 10:15:19 | 4 | Q.   Okay.  Insofar as the photographs of the girl in the |
| 10:15:25 | 5 | photographs there, what exactly did he tell you about that? |
| 10:15:29 | 6 | A.   He provided me her first name. |
| 10:15:32 | 7 | Q.   Okay. |
| 10:15:32 | 8 | A.   And that he knew her -- he knew her by her first name. |
| 10:15:36 | 9 | Q.   Okay.  And did you know that he knew this young lady? |
| 10:15:39 | 10 | A.   I thought he might know her, yes. |
| 10:15:41 | 11 | Q.   Okay.  Did he tell you how he might know her? |
| 10:15:44 | 12 | A.   No.  We didn't get to that, because that's when he shortly |
| 10:15:47 | 13 | thereafter asked for an attorney. |
| 10:15:49 | 14 | Q.   Okay.  And do you remember the question that prompted him |
| 10:15:51 | 15 | to ask for an attorney? |
| 10:15:53 | 16 | A.   I asked him what her last name was. |
| 10:15:56 | 17 | Q.   And then what were his exact words, if you recall? |
| 10:15:59 | 18 | A.   If I recall, he started saying that he knew what this was |
| 10:16:03 | 19 | all about and that he wanted his attorney. |
| 10:16:06 | 20 | Q.   But you don't recall that those are in fact his exact |
| 10:16:09 | 21 | words, or do you? |
| 10:16:09 | 22 | A.   The words were about:  Wait a minute.  I know what this is |
| 10:16:14 | 23 | all about.  Yes, those were his exact words at the time. |
| 10:16:17 | 24 | Q.   Well, you had told him that he was being arrested on |
| 10:16:20 | 25 | charges -- federal charges of child pornography from Texas, |

| | | |
|---|---|---|
| 10:16:24 | 1 | correct? |
| 10:16:24 | 2 | A.    That's correct. |
| 10:16:24 | 3 | Q.    And he made some comment about Texas? |
| 10:16:27 | 4 | A.    Not in my presence initially, no. |
| 10:16:29 | 5 | Q.    But in, what, Agent McDonald's presence? |
| 10:16:32 | 6 | A.    Yes.  According to his report. |
| 10:16:34 | 7 | Q.    And what was his comment? |
| 10:16:35 | 8 | A.    I don't have his FD-302 in front of me, so I don't know |
| 10:16:42 | 9 | exactly what it was. |
| 10:16:43 | 10 | Q.    Is there any other comments that he made that you haven't |
| 10:16:46 | 11 | testified about so far this morning in the April 6th hearing or |
| 10:16:50 | 12 | meeting? |
| 10:16:50 | 13 | A.    Not that I'm aware of.  It would be documented in the |
| 10:16:54 | 14 | FD-302s. |
| 10:16:57 | 15 | Q.    Okay.  So far as the October 25th meeting, there was no |
| 10:17:02 | 16 | warning of rights, correct? |
| 10:17:04 | 17 | A.    That is correct. |
| 10:17:05 | 18 | Q.    Okay.  And there was no -- no questioning by the FBI, |
| 10:17:09 | 19 | according to what you're saying here, correct, sir? |
| 10:17:12 | 20 | A.    Except for the one Special Agent Bailey asked that |
| 10:17:14 | 21 | Mr. Devlin -- |
| 10:17:14 | 22 | Q.    Do you remember what that question was? |
| 10:17:16 | 23 | A.    I do not recall what that was. |
| 10:17:18 | 24 | Q.    Now, you mentioned in your reports, your 302 that I've |
| 10:17:25 | 25 | just been handed this morning, that a video was shown to |

| | | |
|---|---|---|
| 10:17:33 | 1 | Mr. Diehl and that so far as -- of a John Doe and that |
| 10:17:41 | 2 | Mr. Diehl identified him as a boy, correct? |
| 10:17:44 | 3 | A.   That's correct. |
| 10:17:45 | 4 | Q.   Even though at the point that he identified it as a boy, |
| 10:17:48 | 5 | that not enough of the video had been shown that you could tell |
| 10:17:52 | 6 | it was boy, correct? |
| 10:17:53 | 7 | A.   Yes.  In my opinion, not enough had been shown. |
| 10:17:56 | 8 | Q.   So you do understand that discovery had been given to |
| 10:17:59 | 9 | Mr. Diehl's attorney weeks, if not months, in advance of this |
| 10:18:03 | 10 | October 25th meeting? |
| 10:18:04 | 11 | A.   That's correct, yes. |
| 10:18:05 | 12 | Q.   Okay.  And you know that the attorney was told; that is, |
| 10:18:09 | 13 | me, was told that this video at the house in the bathtub |
| 10:18:12 | 14 | depicted a girl and a boy? |
| 10:18:14 | 15 | A.   I don't know that for sure.  I wasn't privy to those |
| 10:18:18 | 16 | conversations. |
| 10:18:20 | 17 | Q.   Okay.  All right.  You don't know that for sure, but that |
| 10:18:24 | 18 | would be something that might have been told by Mr. Devlin to |
| 10:18:27 | 19 | me? |
| 10:18:28 | 20 | A.   I couldn't speak on what Mr. Devlin had spoke to you |
| 10:18:31 | 21 | about.  I don't know. |
| 10:18:32 | 22 | Q.   And one of the purposes of getting discovery is so the |
| 10:18:36 | 23 | defense attorney can explain things to his counsel -- or to his |
| 10:18:40 | 24 | client, correct? |
| 10:18:41 | 25 | A.   Yes. |

10:18:41   1   Q.   You want to be able to tell the citizen accused what the
10:18:45   2   government has against him, correct?
10:18:47   3   A.   Correct.
10:18:47   4   Q.   So there are two interpretations for this so far as the
10:18:56   5   child in the bathtub being a boy by Mr. Diehl:  One
10:18:59   6   interpretation is that he knew it was a boy because he was
10:19:03   7   present when the video was made or because his lawyer told
10:19:05   8   him.  Correct?
10:19:07   9   A.   I don't make interpretations of it.  I was just stating
10:19:12  10   what he said.
10:19:13  11   Q.   All right.  And speaking of the boy in the tub, have any
10:19:18  12   forensic interviews been had with that young man?
10:19:22  13   A.   I believe there was one.
10:19:24  14   Q.   Okay.  Were there any forensic interviews of any other
10:19:28  15   witnesses in this case?
10:19:29  16   A.   Yes, there was.
10:19:30  17   Q.   And what were those?  Do you remember?
10:19:32  18   A.   They were done by the child advocacy centers in the
10:19:36  19   respective cities in which the alleged victims reside in.
10:19:41  20            MR. ORR:  Okay.  May I have just a moment,
10:19:45  21   Your Honor?
10:19:54  22            I pass the witness, Your Honor.
10:19:55  23            THE COURT:  Mr. Devlin, any redirect?
10:19:58  24            MR. DEVLIN:  Yes, Your Honor.
10:20:01  25                      ********************

|||
|---|---|
| 10:20:01 | 1 |
| 10:20:01 | 2 |
| 10:20:01 | 3 |
| 10:20:05 | 4 |
| 10:20:12 | 5 |

**REDIRECT EXAMINATION**

**BY MR. DEVLIN:**

Q.   Agent Mullen, what was your understanding in April –– on April 6th of Mr. Diehl's employment or educational background?

A.   He was employed as a computer programmer at the time.

Q.   Okay.  Was there anything about his demeanor that indicated to you that he did not understand his rights when you read them to him?

A.   No.

Q.   Did he understand English well?

A.   Yes, he did.

Q.   Did he ask any questions after you had read him his rights about the rights?

A.   No.

Q.   Okay.  Was there any question in your mind that he understood his rights?

A.   No.  In my mind he understood them.

Q.   Okay.  And the form that you read, the FD-395, that's the standard rights advisement form for the Federal Bureau of Investigation; is that correct?

A.   That is correct.

          MR. DEVLIN:  Pass the witness, Your Honor.

          THE COURT:  Mr. Orr?

          MR. ORR:  No further questions, Your Honor.

          THE COURT:  You may step down.

| | | |
|---|---|---|
| 10:21:01 | 1 | Mr. Devlin, any further evidence? |
| 10:21:03 | 2 | MR. DEVLIN:  No further evidence on this motion, |
| 10:21:05 | 3 | Your Honor. |
| 10:21:06 | 4 | THE COURT:  Mr. Orr do you have any evidence to |
| 10:21:08 | 5 | present? |
| 10:21:08 | 6 | MR. ORR:  No, Your Honor. |
| 10:21:09 | 7 | THE COURT:  All right.  Then I'll hear your argument. |
| 10:21:15 | 8 | MR. DEVLIN:  Your Honor, I think it's a simple |
| 10:21:16 | 9 | resolution of this case.  All of the statements made by the |
| 10:21:19 | 10 | defendant after he was arrested were made in response to proper |
| 10:21:25 | 11 | Miranda warnings.  The defendant understood them.  The Miranda |
| 10:21:28 | 12 | warnings were proper under the law. |
| 10:21:30 | 13 | He spoke for about 13 minutes and gave various |
| 10:21:33 | 14 | statements.  We've only done a very brief overview of those, |
| 10:21:36 | 15 | but he gave more statements.  After about 13 minutes, he |
| 10:21:41 | 16 | invoked his right to counsel.  It was clear to the agents that |
| 10:21:43 | 17 | he did that.  The interrogation stopped at that point. |
| 10:21:46 | 18 | After that he made some statements spontaneously, not |
| 10:21:52 | 19 | in response to any interrogation or other activity by the |
| 10:21:55 | 20 | agents that would have been intended to elicit a response. |
| 10:21:59 | 21 | And, again, while those responses may not have -- may not seem |
| 10:22:04 | 22 | incriminating, nevertheless we're presenting them to the Court |
| 10:22:09 | 23 | as statements that were made by him voluntarily after he had |
| 10:22:13 | 24 | invoked his counsel and after the agents had scrupulously |
| 10:22:16 | 25 | honored his invocation of counsel. |

10:22:19  1          On the 25th of October, there was no Miranda warning

10:22:22  2  at that point because there was no interrogation.  All the

10:22:25  3  statements made by Mr. Diehl were made after he was well

10:22:30  4  advised that he shouldn't be making any statements.  His

10:22:33  5  counsel told him not to say anything, and he insisted on doing

10:22:37  6  that.  The agents were there to simply listen and record what

10:22:40  7  he said.  All the questioning was done by Mr. Diehl, and

10:22:44  8  responses made by me or any of the agents were done after --

10:22:48  9  pretty much after asking Mr. Orr if there was any problem.

10:22:52  10 There was no objection lodged by Mr. Orr or Mr. Diehl to any

10:22:55  11 responses that were made, and none of them were intended to

10:22:59  12 elicit any further response.

10:23:01  13         I believe all the statements are admissible for

10:23:04  14 compliance with Miranda, the ones from April 6th.  And

10:23:07  15 October 25th the statements were completely voluntary and, in

10:23:11  16 fact, insisted upon by Mr. Diehl even after he was advised time

10:23:15  17 and time again to keep his mouth shut.

10:23:17  18         So we would ask that all statements be deemed

10:23:21  19 admissible.  Whether we admit them or not of course is going to

10:23:24  20 be up to us.  But there's been no constitutional violation.

10:23:28  21 The defendant, as indicated, was a computer programmer.  He's

10:23:31  22 an intelligent man, understood his rights, didn't have any

10:23:34  23 problems according to Agent Mullen.  And so we have a valid

10:23:38  24 Miranda waiver.  The statements are admissible, and we ask that

10:23:43  25 the motion be denied.

```
10:23:44   1          THE COURT:  Mr. Orr?

10:23:44   2          MR. ORR:  The government has not carried its burden,

10:23:47   3   Your Honor, to show that the waiver of rights was knowingly and

10:23:50   4   voluntarily made on April 6th.  And the other April 25th [sic]

10:23:54   5   hearing, Your Honor, it should not -- those -- any comments by

10:23:58   6   Mr. Diehl should be prohibited.  They are just comments made in

10:24:01   7   the course of getting discovery.  He has a right to see the

10:24:04   8   videos and seek information, and those kind of comments should

10:24:08   9   not be allowed.  It would impinge upon the defendant's right to

10:24:11  10   seek discovery and his right to due process under the law.

10:24:14  11          THE COURT:  I find after listening to the evidence

10:24:17  12   and hearing argument that the government has satisfied its

10:24:21  13   burden and carried its burden showing that the statements that

10:24:25  14   were made at or around the time of the arrest were given at

10:24:29  15   least during the first about 13 minutes after the defendant had

10:24:33  16   been properly given his Miranda warnings and that any

10:24:37  17   statements thereafter were voluntary.

10:24:40  18          And with regard to October the 25th, I further find

10:24:44  19   based on the evidence in front of me that all statements were

10:24:47  20   voluntary.  Therefore, the motion to suppress is denied.

10:24:53  21          MR. ORR:  Your Honor, one more thing I'd like to get

10:24:55  22   on the record.  The government has -- apparently does not have

10:24:59  23   yet these forensic interviews, and I have actually requested

10:25:03  24   them, I think, over the time I've been on the case a few times

10:25:05  25   by E-mail.  And Mr. Devlin informed me I'll be allowed to see
```

10:25:13  1  those, and I would like to see those well in advance of trial.

10:25:16  2  I prefer to have copies of them.

10:25:18  3       THE COURT:  Well, Mr. Devlin, let me hear from you,

10:25:20  4  and let's work this out now.

10:25:22  5       MR. DEVLIN:  There is absolutely no question --

10:25:22  6       THE COURT:  Because once I release y'all for the

10:25:24  7  holidays, we will come back on January the 11th and select a

10:25:28  8  jury.  So we won't be back again probably before that.

10:25:32  9       MR. DEVLIN:  Yes, sir.  No.  This -- I have given

10:25:36  10 Mr. Orr all kinds of discovery.  But I have represented to him

10:25:40  11 carefully, because of the amount of evidence in this case and

10:25:43  12 other things, that I honestly can't represent to him that I

10:25:46  13 have given him every single thing out there.  And I have

10:25:50  14 regularly and frequently encouraged him to contact

10:25:52  15 Agent Mullen, the case agent, if there is any discovery that he

10:25:57  16 wishes to take a look at that might be in Agent Mullen's

10:26:01  17 possession.  Agent Mullen has it all.

10:26:03  18      I know that he's probably trying to keep track of

10:26:05  19 what he's given me and what he hasn't.  But it's all been out

10:26:08  20 there and available for Mr. Orr to inspect.  So this is not a

10:26:10  21 discovery problem, Judge.  We've had no problems at all.  I

10:26:13  22 never said he can't look at anything.  He can look at

10:26:16  23 everything he wants to at any time he wants to.  So that's

10:26:20  24 fine.

10:26:20  25      THE COURT:  Mr. Orr.

| | | |
|---|---|---|
| 10:26:20 | 1 | MR. ORR:  Well, then I misunderstood, because I've |
| 10:26:22 | 2 | made several requests for them.  It's a failure to communicate, |
| 10:26:28 | 3 | I suppose. |
| 10:26:29 | 4 | THE COURT:  Agent Mullen is here.  Mr. Devlin is |
| 10:26:31 | 5 | here.  You're here.  So before y'all leave the courthouse |
| 10:26:35 | 6 | today, you have a conversation to where both sides understand |
| 10:26:39 | 7 | what's out there and what you have been provided.  This is your |
| 10:26:43 | 8 | chance to ask for anything else you might want to ask about. |
| 10:26:47 | 9 | And if you're not satisfied with the result of that |
| 10:26:51 | 10 | conversation, get something on file right away. |
| 10:26:54 | 11 | MR. ORR:  Yes, sir. |
| 10:26:54 | 12 | THE COURT:  I don't want there to be any pending |
| 10:26:57 | 13 | nagging doubts about your not being provided with discovery |
| 10:27:00 | 14 | when we get back here to start selecting a jury. |
| 10:27:03 | 15 | MR. ORR:  No, Your Honor.  I intend to work over the |
| 10:27:05 | 16 | holidays on this.  And does that really mean I can't nag |
| 10:27:10 | 17 | Your Honor and/or Mr. Devlin about this case? |
| 10:27:12 | 18 | THE COURT:  Well, I request and you-all do what you |
| 10:27:14 | 19 | will do.  I understand.  I understand.  I was not directing |
| 10:27:20 | 20 | "nagging" to me.  I was referring to "nagging doubts" about |
| 10:27:23 | 21 | whether you have been provided -- |
| 10:27:24 | 22 | MR. ORR:  Well, I'm a little sensitive about that |
| 10:27:26 | 23 | word, Your Honor. |
| 10:27:27 | 24 | THE COURT:  Let me ask you-all something.  I failed |
| 10:27:29 | 25 | to mention it sooner.  Since I don't anticipate, because we've |

| | | |
|---|---|---|
| 10:27:33 | 1 | been over everything today, including the amount of time you |
| 10:27:36 | 2 | need for opening statements and what have you, that we'll need |
| 10:27:40 | 3 | to get together in advance of the voir dire on the 11th.  I |
| 10:27:46 | 4 | didn't ask you-all about whether any side has -- either side |
| 10:27:50 | 5 | has objection to note taking by jurors in this case. |
| 10:27:54 | 6 | MR. DEVLIN:  I don't have any objection, Your Honor. |
| 10:27:55 | 7 | MR. ORR:  I don't -- I don't have any objection, |
| 10:27:57 | 8 | Your Honor. |
| 10:27:57 | 9 | THE COURT:  All right.  Well, it's generally easier |
| 10:27:59 | 10 | for the jurors.  And if this case is going to last four days, I |
| 10:28:02 | 11 | think probably it would be better for them.  So the jurors will |
| 10:28:07 | 12 | be allowed to take notes.  I will give them the admonishment |
| 10:28:11 | 13 | about note taking and not placing undue reliance on notes by |
| 10:28:14 | 14 | other jurors and what have you, as I always do. |
| 10:28:17 | 15 | All right.  I will make a decision and will let you |
| 10:28:23 | 16 | know the morning of trial whether we will take additional |
| 10:28:27 | 17 | alternates.  Otherwise, you can count on the fact there will be |
| 10:28:31 | 18 | two alternates.  I'll just make a decision after I've thought |
| 10:28:35 | 19 | about this about whether we'll take any more alternates. |
| 10:28:38 | 20 | Anything else we need to take up before trial? |
| 10:28:44 | 21 | MR. ORR:  No, Your Honor. |
| 10:28:45 | 22 | MR. DEVLIN:  Not from the government, Your Honor. |
| 10:28:46 | 23 | THE COURT:  All right.  Then very good.  I appreciate |
| 10:28:48 | 24 | the fact that y'all are working together in getting this case |
| 10:28:53 | 25 | organized for trial.  You are the number one case on |

10:28:56  1  January 11th, so you will go to trial.  So you can plan on

10:29:03  2  starting your jury selection promptly at 9 o'clock.

10:29:07  3       To remind you of the way we handle things here, I

10:29:12  4  will ask my questions, you will each be given your 20 minutes,

10:29:16  5  and then what will happen is I'll call you to the bench and ask

10:29:22  6  you if there are any jurors you would like held back because

10:29:26  7  you might want an additional question or you think you might

10:29:30  8  have a challenge for cause of a particular juror.  Then we will

10:29:35  9  release every other juror from the panel for their recess and

10:29:42  10  then bring any that we've retained up to the bench one at a

10:29:46  11  time and then let them go.  I will then rule on the challenges

10:29:50  12  for cause after all of the prospective jurors are out of the

10:29:53  13  room, and we will look at the list and determine where your

10:29:58  14  strike range falls.

10:29:59  15       Now, one of the things I do that you both know, but

10:30:04  16  I'll remind you of it, I will be keeping track during the

10:30:09  17  voir dire process of responses from jurors that indicate to me

10:30:12  18  that we may have a juror that does not have a legal reason to

10:30:16  19  be exempted from jury service but just doesn't want to be on

10:30:20  20  the jury.

10:30:25  21       My experience in private practice was that if

10:30:27  22  somebody really didn't want to be on the jury, they did not

10:30:31  23  make a good juror and they always blamed their service on one

10:30:34  24  side or the other and you never knew who they were going to

10:30:37  25  blame it on.  So I encourage you to keep little notes of that,

| | | |
|---|---|---|
| 10:30:40 | 1 | too, because, again, while the panel is out of the room, I will |
| 10:30:45 | 2 | go over those jurors that I have highlighted with you and we'll |
| 10:30:49 | 3 | hear from you on any you have.  And if you both agree -- it |
| 10:30:55 | 4 | takes both sides to agree.  We're not going to argue or |
| 10:30:57 | 5 | anything of that nature.  I will just mention the name of the |
| 10:31:01 | 6 | juror.  If you both agree you don't want that juror, then that |
| 10:31:04 | 7 | juror will not be in your strike range.  But you both have to |
| 10:31:07 | 8 | agree.  If either side says, no, we want to retain that juror |
| 10:31:11 | 9 | then you have to make a decision on what to do with your |
| 10:31:16 | 10 | peremptory challenges. |
| 10:31:16 | 11 | But if we have jurors who really just don't want to |
| 10:31:20 | 12 | serve, they might be bad jurors and you agree to that, I will |
| 10:31:24 | 13 | go ahead and mark them off.  They will not know they've been |
| 10:31:29 | 14 | excluded.  They will still come back in and sit, and we will |
| 10:31:31 | 15 | announce the jurors after you strike your list.  But bear that |
| 10:31:35 | 16 | in mind.  It takes both of you to agree, and it won't be |
| 10:31:40 | 17 | debated.  If one side or the other says, no, retain the juror, |
| 10:31:43 | 18 | we will. |
| 10:31:44 | 19 | We will take the noon break after we seat the jury |
| 10:31:49 | 20 | regardless of how early or late that comes because, generally, |
| 10:31:53 | 21 | the jurors have been here for a long time and it's a new |
| 10:31:56 | 22 | experience to them.  They're going to be tired after we do the |
| 10:32:00 | 23 | selection.  So if jury selection goes fast, we may take an |
| 10:32:04 | 24 | early lunch.  If jury selection goes slowly, we will take a |
| 10:32:08 | 25 | late lunch.  But in order that you may plan as soon, as we have |

| | | |
|---|---|---|
| 10:32:12 | 1 | the jurors impaneled and sworn and I've given them their |
| 10:32:17 | 2 | preliminary instructions, we will recess for lunch. |
| 10:32:20 | 3 | When we return, I will give whatever other |
| 10:32:24 | 4 | instructions that I mean to give, the indictment will be read, |
| 10:32:29 | 5 | the defendant will enter a plea, and then you may begin with |
| 10:32:34 | 6 | your opening statements and go right into the -- to the |
| 10:32:39 | 7 | evidence. |
| 10:32:41 | 8 | Then our work will basically be, tempting though it |
| 10:32:47 | 9 | is to come early and stay late, I'm always reminded by what |
| 10:32:53 | 10 | Judge Nowlin said looking at the way Judge Bunton ran his |
| 10:32:57 | 11 | courtroom, that it looked like a good idea until he realized he |
| 10:33:00 | 12 | had to be there, too, and then it wasn't as much fun as it |
| 10:33:05 | 13 | sounded to get here at 7 o'clock in the morning and go 'til |
| 10:33:08 | 14 | 8 o'clock at night. |
| 10:33:10 | 15 | Really why I don't do that is out of consideration |
| 10:33:13 | 16 | for the jurors and the fact that staff doesn't get paid |
| 10:33:16 | 17 | overtime for that.  Y'all are getting paid, and I'm appointed |
| 10:33:19 | 18 | forever.  So I don't care, but I don't like to cause the staff |
| 10:33:22 | 19 | to be away from their families any more than they have to. |
| 10:33:26 | 20 | So generally our working hours:  We will start at |
| 10:33:29 | 21 | 9:00 in the morning.  We will take a mid-morning recess |
| 10:33:33 | 22 | somewhere around 10:30 where there's a convenient stopping |
| 10:33:37 | 23 | point in the evidence.  We will take a noon recess somewhere |
| 10:33:40 | 24 | around noon when there's a convenient stopping point in the |
| 10:33:43 | 25 | evidence. |

| | | |
|---|---|---|
| 10:33:47 | 1 | We will either be back at 1:30 or 2:00.  I will make |
| 10:33:51 | 2 | that announcement on a day-to-day basis during the trial.  And |
| 10:33:53 | 3 | that will depend on if I don't have other matters that I have |
| 10:33:56 | 4 | to deal with over the noon hour, we'll come back from the noon |
| 10:34:00 | 5 | recess at 1:30.  If I do, we'll come back at 2:00, because, |
| 10:34:04 | 6 | amazingly, my other cases keep going on while I'm out here in |
| 10:34:08 | 7 | the courtroom trying a case.  But that -- that will be |
| 10:34:12 | 8 | announced each day. |
| 10:34:15 | 9 | Then in the afternoon, we'll take a break sometime |
| 10:34:18 | 10 | mid-afternoon, 3:30 or so, wherever there's a convenient |
| 10:34:23 | 11 | stopping point in the evidence.  And we will recess as close to |
| 10:34:28 | 12 | 5:00 as there is a convenient stopping point in the evidence. |
| 10:34:30 | 13 | Again, part of the reason for starting at 9:00 and |
| 10:34:34 | 14 | recessing at 5:00 is we draw jurors from 24 counties.  They can |
| 10:34:42 | 15 | go as far west as Gillespie County, which is Fredericksburg, as |
| 10:34:47 | 16 | far east as Burleson County, which is Caldwell.  And some of |
| 10:34:52 | 17 | those jurors have long distances to drive in the growing |
| 10:34:57 | 18 | traffic.  And I have had, although most of your jurors as you |
| 10:35:01 | 19 | know will come from Travis and Williamson counties, because |
| 10:35:05 | 20 | they're the biggest counties in the district, I have had jury |
| 10:35:08 | 21 | trials where we've had the bookends, where I've had one from |
| 10:35:13 | 22 | Fredericksburg and one from Caldwell. |
| 10:35:15 | 23 | The government will allow them, if they're outside a |
| 10:35:17 | 24 | certain mileage radius to opt for a hotel room and stay.  That |
| 10:35:22 | 25 | generally doesn't work very well because the jurors we get from |

```
10:35:25   1   those counties are generally farmers and ranchers, and they
10:35:29   2   have to take care of their livestock.  And so that really -- it
10:35:33   3   sounds good, but it really doesn't do them that big of a
10:35:36   4   favor.  And most of the jurors I've found make the drive in.
10:35:39   5   So that gives you an idea of what to expect.
10:35:42   6            Again, any further question?  Mr. Devlin, anything on
10:35:45   7   your mind?
10:35:45   8            MR. DEVLIN:  No, Your Honor.
10:35:46   9            THE COURT:  Mr. Orr, anything on your mind?
10:35:48  10            MR. ORR:  No, Your Honor.  I'm just very happy that
10:35:50  11   you follow Judge Nowlin's model as opposed to Judge Bunton's
10:35:55  12   model.
10:35:56  13            THE COURT:  Well, I remember -- you and I are old
10:35:58  14   enough to have tried cases in front of Judge Bunton, and we've
10:35:59  15   been on the receiving --
10:35:59  16            MR. ORR:  I've tried some cases in front of
10:36:01  17   Judge Button and I actually harken back to days of
10:36:04  18   Judge Roberts who frequently didn't start 'til 9:30.
10:36:06  19            THE COURT:  There was a contrast there between
10:36:08  20   Judge Bunton and Judge Roberts.  And when he started at
10:36:11  21   9 o'clock, that meant you started and you had to be here at
10:36:16  22   9 o'clock, but he might come at 10:00.  And woe be the lawyer
10:36:20  23   who ever mentioned to Judge Roberts that me might allow you to
10:36:24  24   stay away until 10:00, too.  That did not go over very well.
10:36:28  25            MR. ORR:  I never had the nerve to say anything to
```

10:36:30 1   Judge Roberts.

10:36:31 2           THE COURT:  Well, you had the nerve to say a thing to

10:36:34 3   Judge Roberts.  It was Judge Patsy that you didn't have the

10:36:38 4   nerve to say anything to.  We all did with her.

10:36:40 5           Well, very good.  We're in recess until 9 o'clock

10:36:44 6   Tuesday morning, the 11th.  Everyone have a Merry Christmas and

10:36:47 7   I will see you back here in January.  Court's in recess.

10:36:51 8           (End of transcript)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   **UNITED STATES DISTRICT COURT      )**

2   **WESTERN DISTRICT OF TEXAS          )**

3        I, Arlinda Rodriguez, Official Court Reporter, United

4   States District Court, Western District of Texas, do certify

5   that the foregoing is a correct transcript from the record of

6   proceedings in the above-entitled matter.

7        I certify that the transcript fees and format comply with

8   those prescribed by the Court and Judicial Conference of the

9   United States

10       WITNESS MY OFFICIAL HAND this the 9th day of January 2012.

11

12                              /S/ Arlinda Rodriguez
                                Arlinda Rodriguez, Texas CSR 7753
13                              Expiration Date:  12/31/2012
                                Official Court Reporter
14                              United States District Court
                                Austin Division
15                              200 West 8th Street, 2nd Floor
                                Austin, Texas 78701
16                              (512) 916-5143

17

18

19

20

21

22

23

24

25