# EXHIBIT E

# No. 11-51076

## In the
## United States Court of Appeals
## For the Fifth Circuit

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DAVID ANDREW DIEHL,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISRTRICT OF TEXAS

———————————

BRIEF FOR THE UNITED STATES OF AMERICA

———————————

RICHARD L. DURBIN
Attorney for the United States,
Acting Under The Authority of
28 U.S.C. § 515

MARA ASYA BLATT
Assistant United States Attorney
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7090/ FAX (210) 384-7031
ATTORNEYS FOR APPELLEE

## <u>RECOMMENDATION ON ORAL ARGUMENT</u>

The record and the parties' briefs adequately present the facts and legal arguments relevant to this appeal. *See* FED. R. APP. P. 34(a)(2)(C). The United States therefore recommends that oral argument is unnecessary and would not significantly aid the Court in its decisional process. *See id.*

# TABLE OF CONTENTS

RECOMMENDATION ON ORAL ARGUMENT ......................................................... ii

TABLE OF CONTENTS ........................................................................................ iii

TABLE OF AUTHORITIES .................................................................................... v

JURISDICTION .................................................................................................... 1

STATEMENT OF THE ISSUES ............................................................................... 2

STATEMENT OF THE CASE ................................................................................... 3

SUMMARY OF THE ARGUMENTS ........................................................................ 29

ARGUMENTS AND AUTHORITIES ....................................................................... 31

    I. Diehl's Counsel Was Not Ineffective—The § 3283 Statute Of Limitations Had Not Yet Run When Diehl Was Charged With Violating 18 U.S.C. § 2251 Therefore, As A Matter Of Law, The Indictment Was Not Time-Barred. (Germane To Appellant's Issue 1) .............................................................................................. 31

    II. The Trial Evidence Supports The Conclusion That The Government Proved The 18 U.S.C. § 2251(a) Interstate Nexus. ................................................................. 36

    III. The District Court Exercised Its Sentencing Discretion In A Procedurally Sound And Substantively Reasonable Way – Diehl's 600-Month Sentence Should be Affirmed By This Court. ........................................................................................ 42

    IV. The District Court Did Not Plainly Err When It Ordered Forfeiture Of Diehl's Electronic Equipment Because Diehl Relinquished His Property Rights To The Equipment Which Contained Contraband ......................................................... 49

# **TABLE OF CONTENTS - continued**

CONCLUSION ................................................................................................. 55

CERTIFICATE OF SERVICE ........................................................................ 55

CERTIFICATE OF COMPLIANCE .............................................................. 56

# <u>TABLE OF AUTHORITIES</u>

**<u>Federal Cases</u>**                                                                                                              **<u>Pages</u>**

*Cooper v. City of Greenwood*, 904 F.2d 302 (5th Cir. 1990) .....................................52, 53, 54

*Gall v. United States,* 552 U.S. 38 (2007) ........................................................... 43

*One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693 (1965) .......................................... 52

*Rakas v. Illinois*, 439 U.S. 128 (1978).................................................................... 52

*Rita v. United States*, 551 U.S. 338 (2007) ............................................................. 46

*Stogner v. California*, 538 U.S. 607(2003) ............................................................. 35

*United States v. Bleckler*, 510 F. App'x 495 (8th Cir. 2013)................................................ 47

*United States v. Bonilla*, 523 F.3d 647 (5th Cir. 2008) ...................................................... 46

*United States v. Campos–Maldonado*, 531 F.3d 337 (5th Cir. 2008) ................................... 48

*United States v. Carpenter*, 680 F.3d 1101 (9th Cir. 2012) ................................................... 33

*United States v. Carroll*, 105 F.3d 740 (1st Cir. 1997).................................................... 38

*United States v. Cisneros–Gutierrez*, 517 F.3d 751 (5th Cir. 2008).......................................... 43

*United States v. Coutentos*, 651 F.3d 809 (8th Cir. 2011) ..................................................... 33

*United States v. Crow*, 164 F.3d 229 (5th Cir. 1999)............................................................. 35

*United States v. Davis*, 624 F.3d 508 (2d Cir. 2010) ......................................................... 40

*United States v. Dean*, 100 F.3d 19 (5th Cir. 1996)............................................................. 52

*United States v. Dominguez–Alvarado,* 695 F.3d 324 (5th Cir. 2012) ................................... 50

*United States v. Garcia,* 567 F.3d 721 (5th Cir. 2009) .............................................31, 37, 38

## Federal Cases

*United States v. Gaudet,* 966 F.2d 959 (5th Cir. 1992)........................................ 32

*United States v. Hernandez,* 633 F.3d 370 (5th Cir. 2011) ................................. 45

*United States v. Herrick,* 512 F. App'x 534 (6th Cir. 2013) .............................. 47

*United States v. Hicks,* 389 F.3d 514 (5th Cir. 2004)......................................... 46

*United States v. Huskey,* 349 F. App'x 495 (11th Cir. 2009).............................. 47

*United States v. Isiwele,* 493 F.3d 562 (5th Cir. 2012) ..................................... 49

*United States v. Jeffers,* 342 U.S (1951) ........................................................... 52

*United States v. Jeffries,* 405 F.3d 682 (8th Cir. 2005) ..................................... 36

*United States v. Juluke,* 426 F.3d 323 (5th Cir. 2005) ....................................... 49

*United States v. Kallestad,* 236 F.3d 225 (5th Cir. 2000) .................................. 35

*United States v. Kimler,* 335 F.3d 1132 (10th Cir. 2003)................................... 39

*United States v. Leo Sure Chief,* 438 F.3d 920 (9th Cir. 2006) .......................... 36

*United States v. Marmolejo,* 89 F.3d 1185 (5th Cir. 1996).................................. 49

*United States v. McWaine,* 290 F.3d 269 (5th Cir. 2002) ................................... 47

*United States v. Mouton,* 481 F. App'x 96 (5th Cir. 2011).................................. 35

*United States v. Oehne,* 698 F.3d 119(2d Cir. 2012) ......................................... 47

*United States v. Rodriquez-Aguirre,* 264 F.3d 1195(10th Cir. 2001) ................. 52

*United States v. Runyan,* 290 F.3d 223 (5th Cir.), *cert. denied,* 537 U.S. 888 (2002).....38, 39

*United States v. Russell,* 662 F.3d 831 (7th Cir. 2011) ...................................... 40

*United States v. Schaffner,* 258 F.3d 675 (7th Cir. 2001) ..............................39, 41

## Federal Cases

*United States v. Sealed Appellant*, 526 F.3d 241 (5th Cir. 2008) .......................................... 39

*United States v. Stephens*, 717 F.3d 440 (5th Cir. 2013) ..................................................... 48

*United States v. Terrell*, 700 F.3d 755 (5th Cir. 2012 ..................................................... 40, 41

*United States v. Wallace*, 389 F.3d 483 (5th Cir. 2004) ...................................................... 38

## Federal Statutes

18 U.S.C. § 3742(a) .......................................................................................................... 1

18 U.S.C. § 3553(a) ..................................................................................................*ad passim*

18 U.S.C. § 3509(k) ..............................................................................................33, 35

18 U.S.C. § 3509(a)(8) .........................................................................................33, 34

18 U.S.C. 3509(a)(6) ............................................................................................33, 34

18 U.S.C. § 3283 ...................................................................................................*ad passim*

18 U.S.C. § 2251 ...................................................................................................*ad passim*

18 U.S.C. § 2251(a) ..............................................................................................*ad passim*

28 U.S.C. § 1291 .................................................................................................................. 1

28 U.S.C. § 2252A(a)(5)(B) ........................................................................................ 52

28 U.S.C. § 2255 .........................................................................................31, 32, 38

## Federal Rules

FED. R. APP. P. 34(a)(2)(C) ........................................................................................ ii

FED. R. CRIM. P. 32.2(b)(1) ........................................................................................ 53

## No. 11-51076

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### UNITED STATES OF AMERICA,

**Plaintiff-Appellee,**

**v.**

### DAVID ANDREW DIEHL,

**Defendant-Appellant.**

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISRTRICT OF TEXAS

————————————

### BRIEF FOR THE UNITED STATES OF AMERICA

————————————

## <u>JURISDICTION</u>

This is an appeal from a final judgment of the district court in a criminal case.

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1291 and 18 U.S.C. §

3742(a).

1

## STATEMENT OF THE ISSUES

1.     Whether Diehl's counsel was ineffective because he failed to raise a statute of limitations defense to the second superseding indictment that did not exist as a matter of law?  (Germane to Appellant's Issue 1).

2.     Whether Diehl's counsel was ineffective even though he twice objected to the jurisdictional nexus for, and the constitutionality of, 18 U.S.C. § 2251(a)? (Germane to Appellant's Issue 2).

3.     Whether this Court should affirm Diehl's 600-month sentence because the record demonstrates it is procedurally sound and substantively reasonable? (Germane to Appellant's Issues 3, 4, 5, 6, 7, and 8).

4.     Whether this Court can affirm the district court's *sua sponte* forfeiture order because Diehl's substantial rights were not violated nor does it seriously affect the integrity of the proceedings?  (Germane to Appellant's Issue 9).

## STATEMENT OF THE CASE

On October 19, 2010, a federal grand jury sitting in the Western District of Texas, Austin Division, returned a second superseding indictment charging Appellant David Andrew Diehl ("Diehl") with 10 counts of sexually exploiting a child and production of child pornography in violation of 18 U.S.C. § 2251(a).  (R.185-195). [1]

### A.    *Pretrial Proceedings.*

On December 3, 2011, Diehl filed an amended bill of particulars arguing that the indictment failed to give him proper notice of the basis for the charges against him, and an amended motion to dismiss the indictment arguing four issues.  (R.220-222, 224-229).  As grounds for dismissal, Diehl first asserted that Congress lacked the authority under the Commerce Clause to regulate wholly intrastate production of child pornography; second, that § 2251(a) was vague, uncertain and violated that 5th and 1st Amendments of the federal constitution; third, that § 2251(a) violated the Due Process clause because it permitted the subsequent transportation of child pornography to justify prosecution; and fourth, that the indictment itself was "overly vague, ambiguous and broad."  (R.224-229).

On December 21, 2011, the district court held a hearing on those, and other, motions.  (R.751).  The district court first denied Diehl's first amended motion for a

---

[1]     Citation to this Court's appellate record is designated as "R." followed by pertinent page number(s).  Citation to the Presentence Investigation Report is designated as "PSR" followed by the relevant paragraph number(s).  Citations to Government exhibits are designated as "GX" followed by the relevant exhibit number(s).

bill of particulars finding that "the indictment adequately and clearly gives defendant notice of what he's going to be called upon to defend against. (R.755).

The district court next considered Diehl's first amended motion to dismiss. (R. 755). After hearing extensive argument on the jurisdictional issue, the district court denied the motion ruling that, as pleaded, the government sustained its burden to prove its case beyond a reasonable doubt, and properly invoked the court's jurisdiction. (R.764).

### B.    The Bench Trial.

On February 7, 2011, Diehl went to trial on the second superseding indictment and stipulated facts before United States District Court Judge Lee Yeakel. (R.185-195, 319-320, 321, 322-336, 368, 371). He knowingly and voluntarily waived his right to a jury trial, and did not object to the introduction of the fact stipulation. (R.369-371).

Diehl was a computer programmer, computer software developer, and information technology professional. (R.324). He stipulated that he "recorded, created, and produced" the videos, that he was the adult male seen or heard in all of the videos referenced in the ten-count indictment, and that he  was the only adult present during their production. (R.327, 328, 331, 332).

In August 2009, the Maine State Police ("MSP") contacted WD-TX FBI Special Agent Sean Mullen about their investigation of a child pornography series called the "tent" series. (R.376). Based on their forensic analysis, the MSP concluded

4

the videos had been made at the Star Ranch, a family-oriented nudist park located near Austin, Texas within the Western District of Texas.  (R.376, 435).

With this information, WD-TX agents opened an investigation and, through interviews done at Star Ranch, were able to identify one child victim in the videos—Jane Doe #1 (JD#1).  (R.376).  JD#1, then about 20 years old, was interviewed and identified Diehl as the man who sexually abused her in the video. *Id.* [2]  She also identified other witnesses.  *Id.*

Through a separate investigation, Mullen was made aware of other videos believed to have been produced and made by Diehl.  (R.377).  From them, another victim, Jane Doe #2 ("JD#2") was identified and interviewed.  *Id.*  She confirmed that she and Diehl appeared in the videos.  *Id.*

Working with the National Center of Missing and Exploited Children ("NCMEC"), Mullen discovered another child pornographic series named "cbaby" in which JD#2 and another victim, Jane Doe #3 ("JD3#") appeared.  (R.377). [3]  The NCMEC gave Mullen information about the child victims in the series, confirmed that Diehl did appear in the videos, and provided investigative summaries.  (R.402).

Diehl stipulated the videos were created between February 1999 and at least November 2000.  (R.325).  He also stipulated he personally knew and was acquainted

---

[2]     Diehl stipulated that JD#1 was born in 1989, JD#2 in 1991, and JD#3 in 1996.  (R.324).

[3]     Mullen testified NCMEC collects "series"—one or more visual depictions of child pornography that have a common name or theme—to help identify the location, the victim, and/or the offender.  (R.377-378).

with each of the minor victims. (R.325). One, JD#2, actually lived with Diehl and his then-wife, Kerry Jenkins ("Jenkins"), in this period. (R.325, 439). The other two victims were stipulated to have been the children of friends of Diehl and Jenkins. *Id.*

Mullen identified GX1 through 10 as true and correct copies of the videos, or still images derived therefrom, created by Diehl between 1999 and 2000. (R.382-392). They supported Counts 1 through 10 of the second superseding indictment. (R.382). Diehl stipulated the videos contained "a visual depiction of one or more of the Minor Victims engaging in sexually explicit conduct, including genital-genital and/or oral genital (oral sex) sexual intercourse; masturbation; and/or the lascivious exhibition of the genitals and public area of a Minor Victims [sic] and pubic area of a Minor Victim and/or an adult male." (R.325-326).

Mullen also confirmed that GX11 contained a video given to him by Jenkins, long-since divorced from Diehl. (R.391). Filmed at the Diehl's Austin home when they were married, it shows JD#2 stripping down to her underwear and playing with another young girl playing in a non-sexual way. (R.393-394). The video was significant because it was recorded with what appeared to be a hidden camera. *Id.*

GX12B, admitted without objection, documented that Diehl and Jenkins had registered for an event held at the Star Ranch from June 18 to June 24, 2000. (R.397). Receipts for items purchased at Star Ranch demonstrated their attendance at the event. (R.397-398). GX12E was also admitted without objection and contained medical records confirming Diehl's June 13, 2000 motorcycle accident in which he

6

hurt his left hand. (R.400). The video contained in GX1 had images of a left hand with abrasions. (R.400-401). Mullen confirmed that the videos contained in GX1-1 and 1-2 were part of the "tent" series made at the Star Ranch between June 18 and June 24, 2000. *Id.* The videos contained in GX2 through 10 contained videos and still images from the "cbaby" series. (R.401). The district court and counsel agreed the court could most efficiently view the videos through GX7, 11, and 13 which compiled the material "most relevant to the decisions the Court has to make in this case." (R.414-420).

Through the NCMEC, agents from at least 5 states contacted Mullen about the "tent" and "cbaby" series. (R.403). It was undisputed that all the videos had been found on electronic media outside the state of Texas in Arizona, Maryland, Indiana, and Australia. (R.333, 403).

Mullen obtained Diehl's desktop computer containing two hard drives from Jenkins because Diehl, then living in Florida, had shipped them to Jenkins in Austin through his attorney. (R.405). Jenkins voluntarily gave the equipment to Mullen. *Id.* One of the two hard drives was encrypted ("the encrypted drive"). (R.406). Investigators have been unable to break the drive's encryption or subject it to forensic examination (R.405-406).

Mullen believed the videos had been uploaded to the internet at some point before 2005, although he admitted he had only hearsay evidence to support that conclusion. (R.408-409). He also admitted that the information he obtained from

Diehl's various Internet Service Providers ("ISP")and email providers did not reveal the download or upload of illegal material.  (R.409).  However, he also testified that there are many ways to upload or download information from or to the internet that would not normally be recorded by an ISP, including the use of email, social networking sites, peer-to-peer software, and bulletin board services such as Usenet.  (R.411-412).  He explained that an ISP would have to record that information to track such activity.  (R.412).  To the best of his knowledge, ISPs do not take that kind of affirmative action.  (R.412).

Diehl's ex-wife, Kerry Jenkins, next testified that from February 1999 to November 2000, she and Diehl lived in Austin, Texas.  (R.424); (*see also* R.324-325, 424; GX12A, 12B). .  She then moved to Ohio and Diehl later followed before they were divorced in 2002.  (R.425-426).  After the divorce, Diehl moved to several different states including Florida, California, and Texas.  (R.427).  They remained in close contact after that time because they have a teenage son.  (R.423).

Jenkins said there were always computers in their home, at first a desktop and then a laptop, and that Diehl built his desktop computer.  (R.428, 429).  Diehl always brought his computers with him when they moved.  (R.429).

Jenkins described Diehl as an avid videographer who had two camcorders and a small, three-inch long "lipstick camera" that could be "hooked to the camcorders so that he could video without actually using the camcorder."  (R.430).  She did not

know if Diehl ever used the lipstick camera, but did know that he uploaded and stored videos on his computer. (R.431).

Jenkins said Diehl was learning to use video editing software when they were still married. *Id.* Like the computers, the video cameras and equipment moved with them. (R.432). During the course of their marriage, she said Diehl wrote "retriever software" that enabled him to go onto the Internet and download files. (R.433).

Between late 2009 and early 2010, Jenkins learned that Diehl was being investigated for molesting the child of someone she knew. (R.434). By the time she learned of the instant prosecution, the investigation was already under way. (R.434-435). She helped investigators identify the Jane Does, and testified that JD#2 lived with her and Diehl for about six months in 1999. (R.437-439). She was also able to identify JD#1. (R.440-441).

The Government next called Kenneth Courtney, Diehl's former co-worker and friend, who testified he met Diehl in 2006 when they were both living near Tampa, Florida. (R.451-452). [4] He characterized Diehl as a "top of the line" software programmer and engineer. (R.459). The two men shared an obsession with child

---

[4]    At the time of trial, Courtney had already begun serving a 15-year Florida state sentence for possession of child pornography. (R.481, 490).

pornography although Courtney did not learn of Diehl's involvement until July or August 2008. (R.451, 460, 465). [5]

In summer 2008, Diehl showed Courtney "a minor portion" of his child pornography collection. (R. 465). Courtney saw the encrypted computer hard drive in which Diehl stored the videos. (R 465). Courtney said that, like his collection of child pornography, Diehl's was very well organized and "was only accessible after entering the encryption program and the long encryption key." *Id.*

Courtney saw excerpts of the "tent" series, and another series he believed was called "Star Baby," at Diehl's home on Diehl's desktop computer. (R.465-467). Diehl bragged to Courtney that he "actually made" "Star Baby," which Courtney had independently obtained through eMule. (R.468). Diehl told Courtney the name of the female child seen in the video, but warned him not to repeat it. (R.468). Diehl also showed Courtney some footage from "a nudist camp [Diehl] had gone to" that showed "kids jumping on a bed" in a non-sexually explicit way. (R.470).

Diehl told Courtney he also had series named "Tori" and "Baby J." (R. 470). Courtney described the 8 or 9-year-old girl who appears in the "Baby J" series as the "Traci Lords" of the child pornography world. *Id.*

Courtney and Diehl discussed child pornography files they downloaded from the internet through an esoteric file-sharing network, eMule. (R. 462). Diehl said he

---

[5] Diehl called his minor son, N.A.D., to testify at trial. (R.521). N.A.D. remembered Courtney coming to the house "just about 20" times, sometimes during the day, and sometimes at night. (R.524-525).

used Internet Relay Chat ("IRC") to "meet" "makers," that is, people who produced child pornography. (R.463). Courtney described IRC as "a very decentralized communication medium that enabled direct communication between each computer." (R.463). Courtney said Diehl used IRC to "entice [makers] with the possibility of having this complete series to make new material." (R.463). Courtney described a "series" as "a movie that was broken down into individual files [that had] continuity between each set." (R.464).

Diehl also showed Courtney a system of wireless cameras Diehl imbedded into cleaning supply bottles. (R.471-472). He asked Courtney to use the devices to film Courtney's daughter and the daughter of his girlfriend. *Id.* Courtney refused. (R.472).

Diehl told Courtney he had asked others to make child pornography videos, and had been involved with someone who had made a series with a girl named Vicky. (R 472-473). Diehl considered himself a "player" in the maker scene. (R 473-474). Courtney said that Diehl was a "very sophisticated IRC user" who "compelled many people…to make video material." (R.474).

Courtney believed Diehl had been downloading child pornography through another file-sharing network, Usenet, since at least 1993. (R.475). He said Diehl managed his child pornography collection "incredibly tightly" using "very elaborate security protocols, discussion protocols." (R.475). Diehl also told Courtney not to

talk about the collection and not to transfer any files. *Id.* The two men "never once ever transferred a single file ever." *Id.*

Diehl described in detail "the process by which he would [use IRC to] get new material, which would be several files from the beginning of the series and expectations of a [sic] new material at which point he would share the rest of that series. But it was very—it was *quid pro quo.*" (R.476). Courtney added that by using eMule there was "never a [traceable] transfer" of any files between his and Diehl's computers. *Id.*

Diehl told Courtney that, at one point he destroyed his entire child pornography collection because he "was being investigated by" law enforcement. (R.477). Courtney said that retaining a child pornography collection is "an obsessive compulsive tendency," and "the ultimate virus." *Id.* As he put it: "Generally speaking, once you have something, you don't want to delete it." (R.478).

Courtney maintained a secure storage server for several websites, including one paid for by Diehl, that contained pornography. (R 503, 504-505). Diehl also had full administrative access to the server that allowed him to view the file structure and files of any other account on the server . (R. 505-506).

In February 2009, Diehl cancelled his server account. (R.503). In an email to Courtney, he wrote "I have not been on the server for months. Basically, since my little scare about content." (R.503, 506). Courtney said Diehl instructed him to

12

remove the pornography from the server but Courtney kept it for his own use. (R.507). The Government rested. (R.509).

Diehl moved for a Rule 29 judgment of acquittal arguing that the Government had failed to produce sufficient evidence to establish § 2251's jurisdictional interstate nexus. (R.512). He renewed those arguments made in his pre-trial motion to dismiss maintaining there was no credible evidence that he transported in interstate commerce any of the child pornography referenced in the second superseding indictment. (R.513).

The Government argued it was only required to prove that the visual depictions themselves had been transported in interstate and foreign commerce, not that Diehl actually physically transported the pornography across state or international lines. (R.513-514). As proof, it offered stipulated facts and trial evidence that the videos had been found on many computers, outside of Texas as recently as 2010, and that each video had been available on the Internet since at least 2007. (R.514-515, 517). The prosecutor also recapped Courtney's testimony that he viewed the "tent" series on Diehl's home computer in Florida in 2008, and Jenkins' testimony that whenever she and Diehl moved his computers went with them. (R 515, 516).

In response, Diehl argued that "finding videos somewhere else on the Internet is not enough to show that they were transported" because there was no way to prove that the videos had not been "transported" by an unknown person. (R.519). He

urged the district court that to hold otherwise would "do away with the requirement" that Diehl acted "knowingly and intentionally." (R.519-520).

The district court overruled the motion relying upon this Court's *Runyan* decision and Courtney's and Jenkins' testimony, which it found "credible." (R.520). After the defense elicited brief testimony from Diehl's 14-year-old son, both parties closed. (R.521, 527-528). The agreed fact stipulation was entered in evidence and closing arguments were heard. (R.528).

The district court summarized the Government's closing argument as standing for the proposition that "if there is child pornography and it moves in interstate commerce, whether the…defendant…admitted [it] move[d] in interstate commerce or not, that is enough, the mere fact that it did [move.]." (R.538). On closing, the defense re-urged there was no evidence of an interstate nexus and that the statute itself was unconstitutional if the Government's evidence was sufficient to convicted Diehl. (R.538-547). The district court closely questioned defense counsel during his closing argument, and explicitly stated it understood Diehl's position. *Id.*; (R.545).

On rebuttal, the Government marshaled two Supreme Court opinions to argue that the strand of § 2251 with which Diehl was charged did not have a scienter requirement. (R.549-551). The district court then recessed to consider the case. (R.554).

The next morning, the district court and the parties reconvened for the verdict. (R.557). The district court reviewed the charges against Diehl and the evidence it had

14

before it including, the agreed stipulation of facts, the testimony offered at trial, and the exhibits entered in evidence. (R.558-559). It found beyond a reasonable doubt that the videos contained in the Government's exhibits "clearly established" § 2251(a)'s "visual depiction" and "sexually explicit" elements. (R.559).

With regard to the "transportation" element, the district court observed that it focused on "whether the visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or affecting interstate or foreign commerce or mailed." (R.560). It rejected Diehl's assertion § 2251 contained a scienter element or that the Government had to prove he "intended [the] transportation [of the pornography]" based on its review of the legal authorities submitted by the parties. (R.560, 562).

Relying again on the *Runyan* decision, the district court held that the Government had proved the transportation element beyond a reasonable doubt because the transmission of photographs by internet was tantamount to moving them across state lines. (R.561). Based on these findings of fact and law, the district court found Diehl guilty of all ten counts in the second superseding indictment. (R.361, 564).

## C.    The PSR.

The PSR explicitly described the child pornographic Jane Doe videos Diehl made which supported the offense of conviction. PSR ¶¶23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33,  They included scenes of oral, digital, and penile penetration of the

children's vaginas, cunnilingus, masturbation, fellatio, and erotic play. *Id.* Diehl is the only adult in the videos and appears in all of them. *Id.*

The videos described in Count 1 are from the "tent" child pornography series identified by NCMEC. PSR ¶23. The videos described in Counts 2-10 are from the "c-baby" child pornography series identified by NCMEC. PSR ¶¶25-33. The "c-baby" and "tent" series have been available on the Internet since at least 2007 and have been found on computers and/or computer storage media in many places outside of Texas. PSR ¶35. As recently as 2010, these images were discovered in separate child pornography investigations. *Id.* Between March 24, 2011 and March 26, 2011, NCMEC reviewed their "c-baby" and "tent" series technical assistance reports. PSR ¶36. The "c-baby" series was identified 2,681 times and the "tent" series 706 times on media submitted by law enforcement agencies to NCMEC review. *Id.*

Diehl's advisory sentencing range was calculated based on a total offense level 40 and criminal history category II. PSR ¶¶133, 141. The ten counts of conviction were specifically excluded from grouping pursuant to USSG § 3D1.2(d). PSR ¶44. Diehl scored 2 criminal history points for prior menacing and domestic violence convictions. PSR ¶¶136, 139, 141.

The PSR detailed state charges pending against Diehl in Williamson County, Texas for aggravated sexual assault of a girl who was seven when three incidents of sexual abuse, including the digital penetration of the victim's vagina, took place. PSR

16

¶148.  Diehl was also named in a two-count Bastrop County, Texas indictment for aggravated sexual assault of a child who was younger than 14 years of age when he used his tongue and finger to penetrate the child's sex organ.  PSR. ¶ 149.

Diehl's counts of conviction each had a 240-month statutory mandatory maximum.  PSR ¶175; *Addendum to the Presentence Report* at 1A.  Based on the PSR calculations, Diehl's advisory guideline sentencing range was set at 324 to 405 months.  PSR ¶176.  The PSR noted that Diehl had been charged and convicted of many unscored crimes which led to an under-representation of his criminal history and an incorrect perception of his likelihood to commit other crimes.  PSR¶ 190.  For these reasons, the probation officer stated that "an upward departure may be warranted."  *Id.*

Prior to sentencing, Diehl made six objections to the PSR—five related to his offense level scoring, two related to criminal history scoring.  *See Objections To Presentence Investigatory Report.*  In a sealed sentencing memorandum, Diehl revealed his reasons for seeking a downward departure from the sentencing range recommended in the PSR.  No adjustments were made to the PSR's calculations prior to sentencing.  *Id.*

### D.    *The October 24, 2011 Sentencing Hearing.*

Sentencing began with Diehl's assurance that he had been given sufficient time to review the PSR with his attorney.  (R.825-826).  The district court recapitulated the PSR's calculations and its conclusion that Diehl's sentencing range was defined by a

17

guideline maximum of 405 months and a statutory maximum of 20 years on each count of conviction. (R.826). [6] Diehl agreed he understood those calculations and his sentencing liability as outlined by the district court. (R.826-827). The district court then heard Diehl's scoring objections to the PSR. (R.827).

None of Diehl's five objections to the PSR's offense level and criminal history scoring are relevant to the instant appeal. (R.827, 833, 836, 838). However, all were fully heard and considered by the district court. (R.825-874)(hearing on scoring objections); (R.827, 830, 835, 837, 840-841, 855, 857-858, 861, 864-865, 869-870, 872, 873, 879). [7]

To respond to Diehl's objections to the vulnerable victim and care, custody, and control enhancements, the Government called case agent Mullen. (R.842, 843, 844--853). He testified that, when he interviewed JD#3 and her family, he learned that JD#3 was three years old when Diehl made the videos. (R.843-844). At that time the two families lived a few miles apart from one another and Jenkins was a friend of JD#3's mother. *Id.*

From JD#3's mother, Mullen also learned that JD#3 was left in Diehl's care and custody on at least one other occasion when she went shopping with Jenkins. (R.844-845). Jenkins confirmed that she and JD#3's mother had indeed gone

---

[6] The 2000 Guidelines were used to determine Diehl's advisory Guideline sentencing range. (R.870).

[7] These citations mark points in the record when the district court questioned either counsel or the witness, or discussed or commented upon the proceedings and are offered to demonstrate that the district court was fully engaged in the sentencing process.

shopping leaving JD#3 with Diehl.  (R.845).  Neither woman remembered how long they were gone while shopping. (R.847).

There was no indication in the videos with JD#3 that her mother, her father, Jenkins, or any other adult were present at the time that they were made.  (R.846-847, 848).  There was also no indication that anyone was near enough to respond to any of JD#3's cries for help when the video was made. (R.847).

Mullen had no other information that JD#3 ever spent any time in Diehl's house without a parent being present other than the time when her mother went shopping with Jenkins.  (R.849).  Mullen estimated that JD#3 appeared in the videos for about 15 minutes.  (R.850).  His investigation revealed that the videos could have been made as late as November 2000 when JD#3 would have been four years old.  (R.850).  All the videos were filmed within Diehl's home.  (R.853).

Mullen concluded that Diehl videotaped JD#3 on several occasions because she appeared in some of the videos in different clothing, nail polish, and accessories.  (R.851).  The videos were also shot in different rooms in Diehl's house.  *Id.*  There was no indication that any of her clothing or accessories had been left at Diehl's house.  *Id.*  The lighting in the videos also varied from natural to darker, artificial light.  (R.852).

Upon questioning from the district court, Mullen confirmed that investigators had not been able to access the encrypted drive or any information it contained.  (R.853).  Mullen said he never asked Diehl to help investigators de-crypt the drive

because Diehl had invoked his right to counsel.  (R.853-854, 865).  Diehl's counsel said "the password [for the hard drive]…was apparently a very long and complicated" and "was written down and not memorized."  (R.874).  He said the password was seized by the Diehl's landlord when Diehl was arrested, but that Diehl was willing to assist in its decryption.  *Id.*

After extensive argument on the scoring objections, the district court granted Diehl's objections to the application of the vulnerable victim and physical restraint enhancements thus eliminating four points from his offense level scoring.  (R.875).  It denied Diehl's objections to the care, custody, and control enhancement relying upon the evidence it heard at trial and the witnesses' demeanor,  the PSR's lack of grouping, acceptance of responsibility, and criminal history scoring.  (R.876-878).

With these rulings, Diehl's advisory Guideline sentencing range was reduced to 210 to 262 months based on an offense level of 36, criminal history category II. (R.880).  Both parties agreed the district court's calculations were correct to that point. *Id.*

The district court next heard Diehl's non-scoring objections, including the details of an April 6, 2010 Google search Diehl conducted for information about sex tourism and child prostitution in Nicaragua in advance of his April 8, 2010 trip to Managua, Nicaragua.  (R.880); PSR ¶18.  Diehl extensively objected to the PSR's characterization of the sexual acts committed in the videos, and sought their removal claiming that the information would "certainly subject Mr. Diehl in prison to reprisal."

(R.881-882). [8]  Removal of the PSR's description of the videos as having been filmed with a hidden camera was also sought.  (R.882); PSR ¶165.

Diehl further objected to the inclusion of certain assets to support of the PSR's conclusion that Diehl would be able to pay a fine.  *Id.*  He also objected to the PSR's conclusion that possible grounds for an upward departure existed, and argued that his criminal history actually overrepresented his criminal conduct because most of those offenses were committed 20 years ago.  (R.883).

In a series of objections which appeared to address the upward departure issue, Diehl's counsel also argued that, while "reprehensible," the acts depicted in the videos were seen "in a majority" of child pornography cases "[w]here there is production of videos, all these sorts of things are in the common case. They're simply not extraordinary in this case."  (R 883).  Counsel further claimed there was nothing in the videos that evidenced "torture, gratuitous infliction of injury or prolonging of the pain or humiliation," or "full-on penetration" that caused any of the children to experience "any pain."  (R.883-884). [9]  Finally, counsel argued the PSR misrepresented the extent to which the videos were distributed, positing that they were "available to a very small number of people who knew how to find them."  (R.884).

---

[8]     Ultimately, the district court ruled that the PSR would be sealed and distributed only to those "person who have a need to know."  (R. 891).

[9]     It is clear from the record that the district court saw the videos in question.  (R.901).

21

For its part, the Government noted that after his arrest, Diehl's sister told interviewers her brother was a pedophile and that he had previously travelled abroad where he said he was able to "buy a couple of girls for the price of a pair of gym shoes." (R.885). It therefore argued that the allegations concerning Nicaragua were relevant . *Id.* The Government also detailed evidence, some of which was contained in the PSR, concerning Diehl's penchant for using a hidden camera to record sexual activity. (R.887).

Ultimately, the district court overruled all of Diehl's non-scoring objections, noting that "like all thorough [PSR] reports this Court receives, there are certain items that are entitled to more weight that other items and certain items have more effect on the Court's making of a decision as to an appropriate sentence than others." (R.890-892). The district court then turned its attention to the § 3553(a) factors and heard argument from both sides on that issue. (R.893-908).

Diehl argued the charged offenses occurred more than ten years ago when he was living in an unhealthy lifestyle, drinking heavily, and using drugs . (R.893-894). As against this behavior, Diehl asked the district court to consider that he had been gainfully employed as a successful software engineer since that time supporting and raising his son. (R.894-895). Presumably in mitigation, Diehl noted that he had been sexually abused and drugged as a child and young teenager. (R.895). Diehl also asked the district court to discount Courtney's testimony that he had been involved with child pornography since the videos were made as untruthful, and instead maintained

that he had eschewed such activity since the videos were made.  (R.896-897).  Finally, Diehl asserted that the sentencing ranges proscribed for his crimes in the guidelines were not based on any empirical data.  (R.898).  For these reasons, he asked the district court to depart downward from the advisory sentencing range to impose a 120-month term of imprisonment.  (R. 898-899).

On allocution, Diehl characterized his crimes as "a terrible lapse in judgment," brought on by his then nudist camp lifestyle.  (R.899-900).  While expressing a willingness to serve his sentence, he also told the district court he wanted "to get out to be able to help my child succeed."  (R.900).

The Government argued the "day of reckoning" had come for Diehl and that district court should order a term of imprisonment tantamount to a life sentence. (R.901).  It reminded the district court that Diehl's the hard drive remained encrypted and recalled Courtney's testimony that Diehl's collection of child pornography was on that drive and very well-organized.  (R.902-903).  The Government also reviewed Courtney's testimony that Diehl continued to be involved in the production of child pornography after the Jane Does videos were made . (R.904).  It recalled the nature of the videos themselves, the fact that Diehl produced them and committed the sexual assaults and rapes they memorialized, and the fact that Diehl had never apologized to his victims.  (R.905, 907).  It asked the district court to sentence Diehl to a minimum term of 60 years (720 months).  (R.906, 907).

23

Over Diehl's objection, members of the public were then allowed to address the district court. (R.908-909, 910-917, 918). This included written and oral evidence from a potential fourth victim, S.B., and her family members who testified that Diehl had sexually assaulted her when she was 7 years old. (R.909-916). The mother of one of the Jane Does also testified: "Who knew that a family man with a two-year old son and a wife could just be so evil.". (R.916-917).

Diehl addressed the district court personally, arguing that Courtney's testimony was untruthful and that he ended the relationship when he discovered Courtney had child pornography. (R.919-920). While offering an apology to Jane Doe's mother for the "20 minutes of video that were made with your daughter," Diehl said:

> I'm sorry I affected your life. Mine's been destroyed. My son's been taken from me. The rest of my life will be affected—but aside from that, I sincerely am sorry. I have violated your trust. Mine was violated as a child. I was raped. But I got over it.

(R. 920-921). To the parents of the alleged fourth victim, he added:

> The last time I saw [your daughter] S., and before you left Austin, [S.]was a perfectly happy little girl. Never expressed any concern about me or fear from me when I took my son, her, and your son to the fair here in Bastrop. And I dropped her off, and then we moved away.
>
> I don't know what happened in your lives. But I never, ever, threatened S. in any way shape or form…I stopped by your house [in 2007]. I came there, and everything was fine. You welcomed me. It was a happy 20 minutes or whatever that we talked. And then I went on my way to Kerry where A. was. But if I had threatened your family in any way, I wouldn't be stopping by seven years later to say hello.

24

> And I never threatened her, and I don't know what the problems are or
> how this has come about where she, and you know, got addicted to
> drugs or whatever. But it's not me, and you're going to have to keep
> searching. She's not a part of these charges. She was never abused by
> me. And absolutely I have never threatened anybody, any kid. It's not
> part of my personality. I didn't do it. And I'm really sorry that you have
> used this platform to try to solve your family's problems, but I didn't do
> it.

(R. 921-922). [10] The district court then recessed for a few hours so it could "study

what has been presented to me here today and give some thought to it." (R.922).

The district court began its sentencing colloquy, initially observing that the case

had been "well lawyered on both sides," and that both parties should have been

"pleased with the quality of the representation" they received. (R.923-924). With

regard to Diehl's previous counsel, the district court also said he "did whatever he

could do to raise every issue with this Court that could have any arguable relevance to

this case both at the guilt or innocence phase and at the sentencing phase." (R.924).

---

[10] At a pre-sentencing status hearing held on October 17, 2011, the issue of whether S.B. and her family could testify at sentencing was discussed after Diehl filed a Motion to Exclude Impact Statement and Testimony. (R.56-80). The Government said it would not call S.B. or her family as witnesses but that it was possible they would speak solely "when the Court opened the floor up for anybody to speak at sentencing." (R.57). Although the district court withheld its ruling on the motion at that time, it did note: "I just want to look at [the issue] a little bit and determine what I want to do. This is different than the normal case I get for a lot of reasons…I have been through the presentence investigation report pretty thoroughly. I have been through everything that I have received pretty thoroughly. Just because somebody makes a statement doesn't mean that I necessarily consider that. I don't always consider everything that's said in the courtroom in determining what I think the appropriate sentence under Title 18, Section 3553 is to be. But that's what I want to think through before I determine what I'm going to do here." (R.72). S.B. testimony was heard at sentencing, but prior to the imposition of sentence the district court ruled: "In order that there be no mistake about it, I do not consider any of what I heard in that regard [sic] with regard to this potential fourth victim in determining what I think an appropriate sentence in this case would be." (R. 891, 928, 929).

Twenty pages of the sentencing transcript memorialize the actual imposition of sentence by the district court. (R. 923-943). [11] At the outset, the district court explained the procedural context for the hearing:

> I had originally set this case for sentencing on June the 15th of 2011 following the trial that had been conducted on February 8, 2011. That gap of four months was longer than what I usually set for sentencing hearings because I felt like there would be a lot of information that I needed to review and wanted to give defendant's counsel ample time to present anything they desired to this Court.
>
> We came on at that time for sentencing hearing, and Mr. Diehl indicated that he had fired previous counsel and did not want counsel to represent him, so I again delayed sentencing in order that an attempt could be made to locate counsel. And on July the 20th, 2011, we conducted another hearing, at which time Mr. Morris was allowed to appear as counsel for the defendant and his previous counsel was discharged. And it was a result of that hearing that we set sentencing, then, for today.

(R. 924).

Throughout the sentencing hearing, the district court consistently made reference to the evidence it heard at trial and received at sentencing, the sentencing memoranda and arguments of counsel, Diehl's allocution, the PSR and Diehl's objections thereto, the purpose and policy behind the Guidelines, the advisory nature of the Guidelines, the sentencing ranges imposed by statute, and the purpose and application of 18 U.S.C. § 3553(a). (R.924-925, 926-932, 934, 935-937).

The district court summarized Diehl's and the Government's positions concerning the imposition of a sentence outside the advisory guideline range. (R.927,

---

[11]    The complete sentencing transcript is 119 pages long. (R.825-944).

929-930, 931, 935)(discussing Diehl's request for a 120-month sentence and the Government's for a 720-month term).  It found that the correctly calculated advisory sentencing guideline range was 210 to 262 months.  (R.925, 926, 930, 931). Nevertheless, the district court chose to impose a non-guideline § 3553(a) sentence bounded by the 20-year statutory maximum.  (R.930-931).  In so doing, it said:

> So, in my opinion, I have considered everything with regard to an appropriate guideline sentence and every argument by the defendant and the government in that regard and the sentence that I will impose today is the sentence that I would impose had we not ever had a discussion of the guidelines and if we did not have the guidelines at all.  But I have fully and thoroughly considered all ramifications of the guidelines.

(R.931).

The district court went on to analyze each of the § 3553(a) factors, including the history and characteristics of the defendant, the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence to criminal conduct, to avoid unwanted sentencing disparities, and "to assess a sentence that is sufficient but not greater than necessary to satisfy each of those factors [its] considered."  (R.932, 934, 936 ).  The record reflects it relied heavily upon the seriousness of Diehl's crimes, characterizing them as "horrible" and "the most serious of crimes."  (R.927, 932, 933).

Recalling the trial evidence, the district court found the offenses:

> did not start in a vacuum.  And this is why I said earlier it was my belief from the evidence at the trial and it was my belief today that at least at some point Mr. Diehl uploaded on at least one occasions those two series—["cbaby' and "Tent']—that depict the Jane Does 1, 2, and 2, who

27

are the victims…in the indictment…that he uploaded them enough times to where they got into circulation where they now have developed a life of their own and are continuing to be circulated.  And I do find that there is no way to pull those videos back.

(R.933-934).

With full knowledge of the breadth of its sentencing authority, it added:

I render a sentence that will follow not in the way of vengeance or an example, as the defense is concerned about.  Nor do I render it based on the challenge of the government that the Court should have the courage to give a sentence—a strong sentence.

I render the following sentence because I find that it is appropriate under Title 18 of the United States Code, Section 3553 based on all of the evidence before me and for that reason alone. I find that the following is a reasonable sentence to impose in this case.

(R.936-937).

Diehl was sentenced consecutively to 200 months on each of Counts Once, Three and Six, and concurrently to 200 months on Counts Two, Four, Five, Seven, Eight, Nine and Ten "for a total of 600 months."  (R.937).  While in prison, Diehl was also ordered to participate in the Bureau of Prison's sex offender management program.  (R.937).  Judge Yeakel also imposed a 5-year term of supervised release, a $1,000 fine, and a $1,000 special assessment.  (R.692-693, 699-707).

Lastly, the district court *sua sponte* ordered a forfeiture as follows:

It is further ordered that you shall forfeit all right, title, and interest in the following items: One custom-built black computer contained [sic] a Seagate Barracuda 7200 250 GB hard drive, serial number 6RY5KCF8; one custom-built black computer containing a Maxtor DiamondMax 21, 500 GB hard drive, serial number 9QG2Y6DO; and any media storage devices or other computer accessories that have been seized.

(R.941). This appeal, filed by Diehl *pro se*, ensued. (R.713-715).

## SUMMARY OF THE ARGUMENTS

1.      18 U.S.C. § 3283 is the statute of limitations for 18 U.S.C. § 2251 offenses. At the time of Diehl's criminal conduct, it required that such charges had to be filed before the child who was subjected to sexual or physical abuse "reache[d] the age of 25 years." It was undisputed that none of the minor Jane Does Diehl raped and abused in his pornographic videos were over the age of 25 at the time of indictment. The charges against Diehl were therefore timely brought pursuant to it as a matter of law. For these reasons, Diehl's counsel failure to object to the indictment as time-barred was not ineffective representation because there was no statute of limitations defense to be raised. This Court should thus affirm Diehl's convictions. (Germane to Appellant's Issue One).

2.      Prior to trial, Diehl's counsel sought dismissal of the indictment arguing that § 2251 was unconstitutional and that Congress lacked the authority to regulate the wholly intrastate production of child pornography. At trial, Diehl's counsel moved for a Rule 29 acquittal reasserting that the Government had failed to produce sufficient evidence to establish § 2251's interstate nexus element, and propounded the same argument on closing. The district court properly denied these motions both as a matter of law and fact. Having made these arguments several times in the course of

this case, Diehl's counsel was actually effective in the defense of his client; Diehl's convictions should thus be affirmed.  (Germane to Appellant's Issue 2).

3.      The district court sentenced Diehl to a 600-month, non-guideline sentence. The record in this case provides overwhelming support for the conclusion that Diehl's sentence was procedurally sound and substantively reasonable.  Because Diehl cannot sustain his burden to demonstrate the district court abused its discretion or was clearly erroneous in its findings of fact, his sentence should be affirmed. (Germane to Appellant's Issues 3, 4, 5, 6, 7, and 8).

4.      At sentencing, the district court *sua sponte* ordered the forfeiture of some seized electronic equipment, including the encrypted hard drive.  Diehl did not object.  The record demonstrates the encrypted hard drive contained contraband and that Diehl relinquished his possessory rights to the equipment.  For these reasons, the district court did not commit reversible plain error because the forfeiture of property to which Diehl relinquished possessory rights did not violate his substantial rights or seriously affect the integrity of the proceedings. (Germane to Appellant's Issue 9).

**ARGUMENT AND AUTHORITIES**

I.   **Diehl's Counsel Was Not Ineffective—The § 3283 Statute Of Limitations Had Not Yet Run When Diehl Was Charged With Violating 18 U.S.C. § 2251 Therefore, As A Matter Of Law, The Indictment Was Not Time-Barred. (Germane To Appellant's Issue 1).**

   A.   *The Appropriate Standard Of Review.*

Diehl claims his counsel was ineffective for not arguing that the crimes with which he was charged were time-barred. *See Appellant's Brief* at 9-39. [12] To succeed on a claim of ineffective assistance of counsel, a defendant:

> must demonstrate that his attorney's performance fell below an objective standard of reasonableness. This court has described that standard as "requiring that counsel research relevant facts and law." …Second, [a defendant] must also prove that he was prejudiced by his attorney's substandard performance. [T]o prove prejudice, [a defendant] must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different.

*United States v. Garcia*, 567 F.3d 721, 729 (5th Cir. 2009)(internal quotations removed).

As demonstrated below, Diehl's counsel was not ineffective by failing to challenge the indictment as time-barred because, as a matter of law, the prosecution was timely instituted pursuant to 18 U.S.C. § 3283. Indeed, the district court observed at sentencing that the case had been "well-lawyered on both sides," and that Diehl's trial counsel had done "whatever [they] could do to raise every issue with this Court

---

[12]   In the event that undersigned counsel has misinterpreted Diehl's briefing of this issue as raising a §2255 challenge instead of a direct appeal, the Government adopts all the arguments made herein as if this issue were on direct appeal. It further asserts that under any standard of review, Diehl's present challenge fails.

that could have any arguable relevance to this case both at the guilt or innocence phase and at the sentencing phase." (R.923-924).

This case thus presents this court with the "rare occasion[] where the record is sufficiently developed" for the court "to consider claims of inadequate representation on direct appeal." *Id.* Whether on direct appeal plain error or § 2255 review, Diehl's statute of limitations arguments fail. *See United States v. Gaudet*, 966 F.2d 959, 962 (5th Cir. 1992)(applying plain error review to statute of limitations issue).

> **B.    *Diehl's Claim That The Statute Of Limitations Expired Before Indictment Fails—None Of The Children He Sexually Abused Had Reached 25 Years Of Age Before It Was Filed.***

Diehl was charged with offenses that occurred in or about June, 2000. (R.185-95). At the time of the offense, the statute of limitations that applied to § 2251 offense read as follows:

> No statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse of a child under the age of 18 years shall preclude such prosecution before the child reaches the age of 25 years.

18 U.S.C. § 3283 (West 2000).

It is undisputed that JD #1 was between 10 and 12 years of age, that JD #2 was between 7 and 9 years of age, and that JD #3 was between 2 and 4 years of age when Diehl sexually abused them and created the "tent" and "cbaby" video series. (R.325)(agreed stipulation of facts). Diehl was indicted on October 19, 2010. (R.185). In this case, a period of no more than 10 ½ years would have elapsed from the time

the offenses against the Jane Does were committed to the date of indictment. The eldest victim of Diehl's crimes, JD#1, would therefore have been no older than 22½ years old, that is, under the statutory limitations age of 25, when this prosecution was instituted. Diehl was thus timely indicted and his statute of limitations argument therefore fails.

Nevertheless, Diehl argues, incorrectly, that § 2251 causes of action are not controlled by the § 3283 statute of limitations. *See Appellant's Brief* at 10, 17-40. Section 3283's predecessor statute, 18 U.S.C. § 3509(k), has always been considered the statute of limitations for § 2251. Indeed, the language of the 2000 iteration of § 3283 and the language of § 3509(k) is exactly the same. *Compare* 19 U.S.C. § 3509(k) *with* 18 U.S.C. § 3283 (West. 2000); *see United States v. Coutentos*, 651 F.3d 809, 816-817 (8th Cir. 2011)(holding that § 3283 "is the governing limitations period for the § 2251(a) production charge).

> Since 1990. "sexual abuse" for either § 3509(k) or § 3283 has been defined as:
>
> the employment, use, persuasion, inducement, enticement, or coercion of a child to engage in, or assist another person to engage in, *sexually explicit conduct* or the *rape, molestation*, prostitution *or other form of sexual exploitation of children*, or incest with children.

18 U.S.C. § 3509(a)(8) (emphasis added). Section 3509(a)(6) additionally provided, and still provides, that "the term 'sexual exploitation' means <u>child pornography</u> or child prostitution." 18 U.S.C. § 3509(a)(6)(emphasis added); *Coutentos*, 651 F.3d at 816-817; *United States v. Carpenter*, 680 F.3d 1101, 1103-1104 (9th Cir. 2012)(joining

sister circuits in using § 3509(a)'s definition of "sexual abuse" as "the appropriate definition to use in applying section 3283's extended statute of limitations.").

In this case, there is no dispute that Diehl engaged in sexually-exploitative conduct with very young children. Indeed, he stipulated that he "recorded, created, and produced" the videos, all of which graphically depict him engaged in sexually explicit conduct, rape, molestation, and other forms of sexual exploitative activity with the three Jane Does. (R.327, 332). He also admitted he was the only adult seen and heard in the videos and was in the room at the time of their creation. (R.327, 328, 331, 332). There is no question then the nature and timing of the criminal conduct for which Diehl was indicted both fall within the ambit of § 3283.

Diehl asserts several other corollary challenges to the use of § 3283 as the appropriate statute of limitations. First, that "[o]ther courts have determined the statute of limitations for exploitation offenses is five years," but none of the cases he cites actually stand for that proposition. *See Appellant's Brief* at 10-12. Second, he argues that § 3509 was enacted solely for the purpose of preventing sexual child abuse on Indian reservations, but this assertion finds no basis in the statutory text even as it existed in 1999. *See* 18 U.S.C. §§ 3509(a)(6) & (8)(West 1999); *Appellant's Brief* at 26-28. Third, he maintains that § 3509(k) had "no relevance to § 3283...other than to expand the amount of time the federal government had to collect restitution for Native Americans." *See Appellant's Brief* at 28-37. However, as demonstrated above, the Government only relies upon § 3283 as the appropriate stature of limitations.

34

Finally, Diehl's argument that § 3283 after its 2003 amendment is unconstitutional fails, and his reliance upon the *Stogner* decision is misplaced. *See Appellant's Brief* at 37-39. [13] *Stogner* only controls when an attempt is made to revive a prosecution—already time-barred under a then-applicable but presently expired statute of limitations—through an entirely new statute of limitations. *See Stogner v. California*, 538 U.S. 607, 610(2003). The facts of *Stogner* clarify its result.

Stogner was charged in 1998 with having committed sex-related child abuse between 1955 and 1973. *See Stogner*, 539 U.S. at 2449. At the time of those acts, a 3-year state statute of limitations was in effect. *Id.* By the time Stogner was charged pursuant to the new statute of limitations enacted after the 3-year statute *expired*, the charges against him had been time-barred for 22 years. *Id.* In this circumstance, the Supreme Court held that "a law enacted after expiration of a previously applicable limitations period violates the *Ex Post Facto* Clause when it is applied to revive a previously time-barred prosecution." *Stogner*, 539 U.S. at 632-633.

Following *Stogner*, arguments such as Diehl's have been rejected. For example, the Ninth Circuit has held that the 1994 version of § 3283, which allows for prosecution until the child reaches age 25, can still be applied constitutionally to

---

[13]     Section 2251, as the district court acknowledged, was enacted through the constitutional exercise of Congress' Commerce Clause power. *See United States v. Mouton*, 481 F. App'x 96, 97 (5th Cir. 2011) applying *United States v. Kallestad*, 236 F.3d 225, 231–33 (5th Cir. 2000)(holding § 2252 constitutionally sound because "Congress can reach defendant's [local possession of] pornography because it legitimately seeks to eliminate the interstate market for child pornography. And it is rational to conclude that reaching local possession is a necessary incident to that objective."); *United States v. Crow*, 164 F.3d 229, 236 (5th Cir. 1999)(holding that claim that § 2251 is unconstitutional because it lacks a scienter requirement is meritless).

offenses committed between 1994 and 2003 even if the prosecution is instituted after the 2003 amendment to § 3283 which authorizes prosecution during the entire life of the child. *See United States v. Leo Sure Chief*, 438 F.3d 920, 923, 924-925 (9th Cir. 2006)(rejecting defendant's argument that previous five-year statute of limitations applied to his federal sex offense prosecution); *United States v. Jeffries*, 405 F.3d 682, 683-685 (8th Cir. 2005)(applying extended §3283 limitations period to conduct that occurred pre-amendment because prosecution of the conduct was not time-barred by the time of amendment). Moreover, Diehl admits he "isn't claiming there is a revival issue"—all *ex post facto* concerns are thus removed. *Appellant's Brief* at 37.

For these reasons, Diehl's constitutional argument thus fails. *See Appellant's Brief* at 39. As a matter of law, § 3283's limitations deadline was applicable in this case because none of Diehl's victims had reached the age of 25 when he was indicted and he committed his crimes after the 1994 amendment to § 3283. Had this issue been raised at trial, the district court could have concluded as a matter of law that § 3283 was properly applied in this case. Any challenge Diehl's counsel could have made to the indictment as time-barred would have failed, and his performance is therefore not ineffective. This Court should therefore affirm Diehl's convictions.

## II. The Trial Evidence Supports The Conclusion That The Government Proved The 18 U.S.C. § 2251(a) Interstate Nexus.

Diehl claims his counsel was ineffective for allegedly failing to argue there was insufficient evidence that Diehl "transported" child pornography in interstate

commerce. *See Appellant's Brief* at 40-47. However, the record reveals that defense counsel did raise the issue before the district court once, through a pre-trial in a motion to dismiss the indictment, and again, after the close of evidence at trial with Rule 29 motion for acquittal. (R.512-513)(defendant moving for Rule 29 relief because, *inter alia*, "there is no interstate nexus shown."); (R.757-764)(pre-trial hearing on motion to dismiss indictment for insufficiency related to interstate commerce nexus). The district court in fact noted that Diehl's counsel had raised "every issue" of "any arguable relevance" at trial. (R.924).

To succeed on a claim of ineffective assistance of counsel, a defendant "must demonstrate that his attorney's performance fell below an objective standard of reasonableness. [and] prove that he was prejudiced by his attorney's substandard performance. [T]o prove prejudice, [a defendant] must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." *Garcia*, 567 F.3d at 729 (internal quotations removed). The instant record amply demonstrates that Diehl's counsel effectively raised the interstate transportation issue orally and in writing, and argued appropriate authorities to the district court and government counsel.

This case thus presents that "rare occasion[] where the record is sufficiently developed" for this Court "to consider claims of inadequate representation on direct

appeal." *Id.* [14]    Whether on direct appeal or § 2255 review, Diehl's sufficiency

arguments fail. [15]

### B.    The District Court Correctly Denied Diehl's Rule 29 Motion—The § 2251(a) Interstate Nexus Was Established With Sufficient Evidence.

When Diehl filmed the Jane Does in 1999 and 2000, § 2251(a) read as follows:

### § 2251. Sexual exploitation of children

**(a)** Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, …any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished as provided under subsection (d),…if such visual depiction has actually been transported in interstate or foreign commerce or mailed.

18 U.S.C. § 2251(a)(West 2000).   In 2002, while this version of § 2251(a) was still in

effect, this Court considered "whether an Internet transmission, in and of itself,

constitutes interstate transportation sufficient to satisfy the interstate commerce

element of § 2251." *United States v. Runyan*, 290 F.3d 223, 239 (5th Cir.), *cert. denied,*

537 U.S. 888 (2002).   The *Runyan* court answered that question in the affirmative

holding that "transmission of photographs by means of the Internet is tantamount to

moving photographs across state lines and thus constitutes transportation in interstate

commerce for the purposes of 18 U.S.C. § 2251." *Id.* quoting *United States v. Carroll,*

---

[14]    Diehl concedes "the record is complete for this [§ 2255] analysis." *Appellant's Brief* at 42.

[15]    In the event that undersigned counsel has misinterpreted Diehl's briefing of this issue as raising a §2255 challenge instead of a direct appeal, the Government adopts all the arguments made herein as if this issue were on direct appeal.  It further asserts that under any standard of review, Diehl's present challenge fails. *See United States v. Wallace*, 389 F.3d 483, 485 (5th Cir. 2004)(findings of fact following bench trial are reviewed for clear error, conclusions of law *de novo*).

105 F.3d 740, 742 (1st Cir. 1997); *see also United States v. Kimler*, 335 F.3d 1132, 1139 (10th Cir. 2003)(actual interstate trafficking in the proscribed images over the internet is "actual interstate activity…in interstate commerce."); *United States v. Schaffner*, 258 F.3d 675, 680 (7th Cir. 2001)("The plain language of § 2251(a) regulates the movement of visual depictions of child pornography in interstate commerce."). Both defense and Government counsel cited and discussed the *Runyan* decision with the district court. (R.560-564).

The *Runyan* Court considered this question in the context of the "first prong of the jurisdictional portion of the statute—"the element requiring that an offender must 'know[] or ha[ve] reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed'." *Id.* However, Diehl was charged under the third prong of the statute—"if such visual depiction has actually been transported in interstate or foreign commerce or mailed"—which does not require that the offender "must know or have reason to know." 18 U.S.C. § 2251(a)(West 2000). The district court heard the arguments of counsel on this issue prior to rendering its verdict, and rejected Diehl's argument that § 2251(a)'s third prong contained a scienter requirement. (R.561, 562). That the district court's ruling was correct, is further reinforced by this Court's observation that the interstate nexus is "jurisdictional only in the shorthand sense that without that nexus there can be no federal crime under the statute" *United States v. Sealed Appellant*, 526 F.3d 241, 243 (5th

Cir. 2008).   It is not, however, "jurisdictional in the sense that it affects a court's…constitutional or statutory power to adjudicate a case." *Id.*

The record also reveals that an ample, circumstantial factual predicate supported the district court's conclusion that the interstate commerce nexus had been proven.  First, the "c-baby" and "tent" child pornography series derived from the Jane Doe videos, were found on computers located in other states *and* other countries including Arizona, Australia, Indiana, Maryland, and New Jersey. (R.561).  As Diehl stipulated, the videos were found on electronic media and computers in several other states outside of Texas "since at least 2007" and as "recently as 2010."  (R.333).

This Court, and several other courts of appeals, have affirmed § 2251(a) convictions finding a sufficient link to interstate or foreign commerce, when the charged images are discovered on computers in other states or countries.  *See United States v. Terrell*, 700 F.3d 755, 759-760 (5th Cir. 2012); *United States v. Russell*, 662 F.3d 831, 842 (7th Cir. 2011)(interstate/foreign commerce nexus proven when sexually explicit images of defendant's daughter were found on computer in Canada); *see also United States v. Davis*, 624 F.3d 508, 513 (2d Cir. 2010)(holding § 2251(a) "neither explicitly requires knowledge of future interstate transmission to exist at the time the visual depiction is produced nor explicitly contemplates that the knowledge might be acquired thereafter.").

Courtney testified that when he and Diehl both lived in Florida, Diehl showed him some Jane Doe video images contained on an encrypted hard drive, several years

after those videos had been made in Texas. Diehl's ex-wife Jenkins also testified that she and Diehl lived in several other states after leaving Texas and that they brought his computers with them each time they moved. This evidence also supports the conclusion that Diehl actually transported those images on his computer from Texas to another state(s). *See Schaffner*, 258 F.3d at 678 (actual movement of the prohibited item across state lines, not commercial purpose, satisfies interstate commerce nexus).

Courtney also testified that Diehl considered himself a major "maker" of child pornography and used the IRC system to communicate directly with the computers of other makers. The two men also discussed their use of an esoteric file-sharing network named eMule to download child pornography from the internet. Finally, Courtney testified that Diehl told him he used IRC to "entice [makers] with the possibility of having this complete series to make new material." From this credible evidence, the district court reasonably and correctly concluded that Diehl used the Internet to download *and* upload images from the "c-baby" and the "tent" series which he admittedly produced and apparently distributed electronically.

This Court holds that "the government need not prove that the defendant who is charged [under § 2251(a)] with production of child pornography also be the same person who transported it in interstate commerce." *Terrell*, 700 F.3d at 761. The district court was thus legally correct when it found:

> The facts are clear beyond a reasonable doubt that the production of the child pornography occurred within the state of Texas and that it appeared in other states and, therefore, the Court finds that it is enough

41

> to show that it had been transported or transmitted using any means or
> facility of interstate or foreign commerce.

(R.562).  Restated, there was sufficient evidence that the Government proved beyond

a reasonable doubt that the § 2251(a) interstate commerce nexus, and federal

jurisdiction, existed. [16]  Moreover, Diehl's counsel fully raised the jurisdictional issue

with the district court.  For all these reasons, Diehl cannot sustain his burden to prove

his counsel was ineffective or, in any way, demonstrate prejudice.  His convictions

should thus be affirmed.

## III.  The District Court Exercised Its Sentencing Discretion In A Procedurally Sound And Substantively Reasonable Way—Diehl's 600-Month Sentence Should Be Affirmed By This Court.

Diehl argues the district court failed to impose a procedurally sound and

substantively reasonable sentence. *Appellant's Brief* at 47-64.  The record supports the

opposite conclusion. It reflects the district court took great care in initially calculating

the advisory guideline sentencing range.  In fact, the district court's attention to that

calculation resulted in its rejection of the PSR's sentencing calculations and its grant

of several of Diehl's offense level objections.  Similarly, it justified its ultimate

sentencing decision to impose a non-guidelines sentence with an extensive § 3553(a)

factor analysis.  As discussed below, none of Diehl's present complaints therefore

constitute error, plain or otherwise.

---

[16]    As the district court noted at sentencing: "I am satisfied that this defendant uploaded images of the films that he took, because I have no other explanation of how they would have gotten in circulation had this defendant not uploaded them  And that comes from the evidence that I heard at the trial in this case.").  (R.927).

### A.     *The Appropriate Standard of Review.*

Following the imposition of sentence, Diehl's counsel objected to the sentence as "substantively unreasonable and also procedurally unreasonable." (R.943).  Giving liberal interpretation to Diehl's *pro se* appeal, the Government presumes any error he now raises with regard to his sentence was preserved.

This Court reviews a criminal sentence by engaging in a bifurcated analysis.  *See Gall v. United States,* 552 U.S. 38, 51 (2007); *United States v. Cisneros–Gutierrez,* 517 F.3d 751, 764 (5th Cir. 2008).  To ensure the sentencing court committed no significant procedural error, it first considers factors such as whether the district court "fail[ed] to calculate (or improperly calculating) the Guidelines range, treat[ed] the Guidelines as mandatory, fail[ed] to consider the [18 U.S.C.] § 3553(a) factors, select[ed] a sentence based on clearly erroneous facts, or fail[ed] to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall,* 552 U.S. at 51.  If the sentencing decision is procedurally sound, this Court then considers the "substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Id.*

### B.     *The District Court's Sentence Was Procedurally And Substantively Sound.*

Diehl was sentenced consecutively to 200 months on each of Counts Once, Three and Six, and concurrently to 200 months on Counts Two, Four, Five, Seven,

43

Eight, Nine and Ten "for a total of 600 months." (R.937). Although the district court ultimately imposed this sentence as an upward variance based on its § 3553(a) analysis, it characterized "the proper guideline sentence" as based on an advisory guideline sentencing range of 210 to 262 months. (R.925).

Diehl raises the following challenges to his sentence:

1)     That the district court did not consider the correctly-calculated, advisory guideline sentencing range because during the imposition of sentence, it referred to the fact that it did not consider the guideline range would result in an appropriate sentence. *See Appellant's Brief* at 47-50.

2)     That the district court failed to consider the defense's arguments when determining Diehl's sentence. *See Appellant's Brief* at 50-53.

3)     That the district court failed to adequately explain its reasons for its sentencing decision in its Statement of Reasons. *See Appellant's Brief* at 53-55.

4)     That the district court failed to take into account alleged evidence of Diehl's "self-rehabilitation." *See Appellant's Brief* at 55-58.

5)     That the district court did not consider that a statutory fine as an appropriate sentence in lieu of a term of imprisonment. *See Appellant's Brief* at 58-59. [17]

---

[17]     By statute, Diehl faced a maximum fine of $250,000 and, under the guidelines one ranging from $25,000 to $250,000. PSR ¶¶183, 184. The PSR stated that "considering the defendant's assets and his liabilities…[he] appears to be able to pay a reasonable fine within the guidelines." PSR ¶174. At sentencing, Diehl objected to the inclusion of assets that supported the imposition of a

6)     That the district court did not conform the sentence to the § 3553 factors.  *See Appellant's Brief* at 55-58.

7)     That the district court did not adequately consider all sentencing options available to it.  *See Appellant's Brief* at 58-59.

8)     That the district court imposed a substantively unreasonable sentence. *See Appellant's Brief* at 59-64.

A sentence is procedurally unreasonable if it is based on clearly erroneous facts. *United States v. Hernandez,* 633 F.3d 370, 375 (5th Cir. 2011).  Contrary to Diehl's assertion, the record reveals the district court spent a significant amount of time during sentencing reviewing the evidence and listening to the arguments of counsel. *See Appellant's Brief* at 50-53; (R.874-877).  For offense level scoring, these included Diehl's objections to the application of the vulnerable victim, physical restraint trusting relationship, and care, custody and control enhancements that were applied to this offense level scoring.  (R.874-876).  The district court also reviewed Diehl's objections to the government's refusal to move for the third point for acceptance of responsibility and to the non-application of grouping pursuant to U.S.S.G. § 3D1.1. (R.876-877).  Some of these objections were granted and resulted in a significant

---

fine. (R.882). The district court properly advised Diehl of the statutory fine range, and ultimately adopted a range of $20,000 to $200,000 as "appropriate." (R.826-827, 880). Ultimately, it ordered Diehl to "pay…a fine…of $1,000" without interest. (R.941). Under such circumstances, Diehl cannot sustain his burden to demonstrate any abuse of discretion in the district court's fine decision. *See United States v. Ivey,* 32 F.3d 567 at *2 (5th Cir. 1994)(fine decision is subject to abuse of discretion standard and "it is enough that a district court explicitly adopts the factual findings of a PSR which concludes that a defendant is capable of paying a fine.").

reduction to Diehl's advisory guideline sentencing range to 210 to 262 months (offense level 36, criminal history category II) from the 324 to 405 month range recommended in the PSR.  (R.879-880); PSR ¶176.

For these reasons, Diehl's reliance upon *Bonilla* is entirely misplaced.  *See Appellant's Brief* at 49-50.  The decision actually supports the conclusion that the district court did not err in any way when it imposed Diehl's non-Guidelines sentence.  *See United States v. Bonilla*, 523 F.3d 647, 657-658 (5th Cir. 2008).  In fact, the district court in this case fully justified and explained its calculations and, to the letter, followed the Supreme Court's admonition in *Rita* that the record must be clear that "the judge listened to and considered the arguments and evidence" and stated his "reasons" for his decision.  *Rita v. United States*, 551 U.S. 338, 359 (2007).

The record also sustains the conclusion that the sentence imposed by the district court was substantively reasonable.  Diehl appears to that his sentence violated *Apprendi*.  *See Appellant's Brief* at 59.  However, the district court imposed 200-month sentences on each count, that is to say, the terms of imprisonment were below the properly-calculated advisory guideline sentencing range and within the 240-month applicable statutory maximum.  *Apprendi* "poses no obstacle to guideline calculations that do not result in a sentence exceeding the statutory maximum on any single count, [and].  [t]his is true even when the total punishment exceeds the statutory maximum on any particular count."  *United States v. Hicks*, 389 F.3d 514, 532 (5th Cir. 2004).  Stated another way, the district court's consecutive sentencing on Counts 1, 2, and 3

46

still resulted in a legal sentence. *See United States v. McWaine*, 290 F.3d 269, 276 (5th Cir. 2002)(adopting 2d Circuit view of *Apprendi* in relation to consecutive sentencing).

In addition to the all the material reviewed and calculations made, by the district court, it explicitly referenced the case law submitted by both the defense and the government that presented "examples of other [§ 2251] cases of [sentences of]…50 years, 70 years, and 45 years." (R.927).  The district court noted "that all of those cases involved one victim only, and here there were three victims." *Id.*  In fact, Diehl's 600-month sentence is in line with other § 3553(a) sentences found to substantively reasonable for producers of child pornography.  *See United States v. Oehne*, 698 F.3d 119, 125-126 (2d Cir. 2012)(affirming as substantively reasonable § 3553(a), 540-month sentence for 2-count production and distribution of child pornography indictment); *United States v. Herrick*, 512 F. App'x 534 at **3-4 (6th Cir. 2013)(affirming as substantively reasonable § 3353(a) 1,140-month sentence for 6-count indictment involving production and possession of child pornography by former Boy Scout leader); *United States v. Bleckler*, 510 F. App'x 495 at *1 (8th Cir. 2013)(affirming as substantively reasonable § 3553(a) 660-month sentence for producer of child pornography involving 3 children); *United States v. Huskey*, 349 F. App'x 495, 497 (11th Cir. 2009)(affirming as substantively reasonable § 3553(a) 840-month sentence for manufacturing, distributing, and receiving child pornography).

The entire sentencing transcript in this case is 119 pages long; the district court's actual imposition of sentence encompasses 20 pages.  Each pages reflects the

significant and serious consideration the district court gave to the evidence it heard at trial and received at sentencing, the sentencing memoranda and arguments of counsel, Diehl's allocution, the PSR and Diehl's objections thereto, the purpose and policy behind the Guidelines, the advisory nature of the Guidelines, the sentencing ranges imposed by statute, and the purpose and application of 18 U.S.C. § 3553(a). (R.924-925, 926-932, 934, 935-937).  In short, the district court:

> considered everything with regard to an appropriate guideline sentence and every argument by the defendant and the government in that regard and the sentence that I will impose today is the sentence that I would impose had we not ever had a discussion of the guidelines and if we did not have the guidelines at all.  But I have fully and thoroughly considered all ramifications of the guidelines.

(R.931).  Having presided over a bench trial, the district court was in a peculiarly "superior position to find facts and assess their import;" its "determination of the appropriate sentence is [therefore] entitled to deference." *See United States v. Campos–Maldonado,* 531 F.3d 337, 339 (5th Cir. 2008).

On this record, Diehl cannot meet his burden to demonstrate any abuse of discretion by the district court or to rebut the presumption of reasonableness given to his sentence.  *See United States v. Stephens*, 717 F.3d 440, 447 (5th Cir. 2013).  His sentencing challenges are thus without merit, and his sentence should be affirmed by this Court.

**IV.    The District Court Did Not Plainly Err When It Ordered Forfeiture Of Diehl's Electronic Equipment Because Diehl Relinquished His Property Rights To The Equipment Which Contained Contraband.**

### A. The Appropriate Standard of Review.

Generally, the district court's findings of fact regarding forfeiture are reviewed "under the clearly erroneous standard, and the question of whether those facts constitute legally proper forfeiture *de novo.*" *United States v. Juluke,* 426 F.3d 323, 326 (5th Cir. 2005) quoting *United States v. Marmolejo,* 89 F.3d 1185, 1197 (5th Cir. 1996). The Government "must establish the requisite nexus between the property and the offense by a preponderance of the evidence." *Id.* citing FED. R. CRIM. P. 32.2(b)(1). However, because Diehl did not object to the forfeiture in the district court, his present complaint is subject to plain error review. *See United States v. Isiwele*, 493 F.3d 562, 563 (5th Cir. 2012).

### B.    The District Court Decision To Forfeit Computer Equipment To Which Diehl Relinquished His Possessory Rights And Which Contained Contraband Was Not Plainly Erroneous.

For the first time on appeal, Diehl requests the return of the computer equipment forfeited by the district court. *See Appellant's Brief* at 66.  The Government does not dispute that the forfeiture of Diehl's computers and mobile phone was defective in the sense that the indictment did not contain a forfeiture count. [18]

However, although the district court's error may have been plain and obvious, the

---

[18]    In his brief, Diehl asks this Court to set aside the forfeiture part of the judgment and that "the property be restored to the Appellant." *See Appellant's Brief* at 66.

error worked no manifest injustice and requires no correction because Diehl effectively relinquished any possessory rights he had to the property that, in any event, contained contraband. *See United States v. Dominguez–Alvarado,* 695 F.3d 324, 327–28 (5th Cir. 2012). This Court should thus deny Diehl's request that the judgment be vacated and the property returned. *See Appellant's Brief* at 66.

The following evidence relevant to the forfeiture order was before the district court. Diehl was a "computer programmer, computer software developer, and information technology professional." (R.324). Sometime his arrest, a single computer containing two hard drives, one of which was encrypted, was sent from Florida at Diehl's request through his attorney to his ex-wife Kerry Jenkins in Texas. (R.405). Jenkins voluntary turned the equipment over to WD-TX investigators. Jenkins. (R.405-406).

Jenkins knew that Diehl uploaded and stored videos on his computer. (R. 31). While still married, Jenkins testified Diehl wrote "retriever software" that enabled him to go onto the Internet and download files. (R.433).

Courtney, Diehl's former friend and co-worker, and Diehl met in 2006 when both lived near Tampa, Florida. (R.451-452). He characterized Diehl as a "top of the line" software programmer and engineer and a "very sophisticated IRC user" who shared Courtney's obsession with child pornography. (R.459-460; 473-475).

Courtney and Diehl both downloaded and shared child pornography from the internet through an esoteric file-sharing network, eMule. (R.462, 473-475). Diehl told

50

Courtney he used IRC to contact people who produced child pornography and to compel them to make new material in exchange for the complete "c-baby" and "tent" series. (R.463). Courtney also believed Diehl was a "player" in the maker world, and used a file sharing network named "Usenet" to download child pornography from the Internet. (R.473-475).

In summer 2008, Diehl showed Courtney some of his child pornography collection contained on an encrypted computer hard drive. (R.465). Courtney said Diehl's collection was very well organized and "was only accessible after entering the encryption program and the long encryption key." *Id.* He said Diehl's managed his child pornography collection "incredibly tightly" using "very elaborate security protocols, discussion protocols." (R.475). Diehl also told Courtney not to talk about the collection and not to transfer any files. *Id.*

Courtney maintained a secure server with several websites, including one for which Diehl paid. (R. 504-505). Diehl had full administrative access to the server which contained pornography. (R. 505, 506). This allowed Diehl to view the file structure of any other account and its files on the server. (R. 506). In February 2009, Diehl cancelled his account on the server and emailed Courtney that "I have not been on the server for months. Basically, since my little scare about content." (R. 503, 506).

At sentencing, case agent Mullen confirmed he never asked Diehl for the encryption key because Diehl had invoked his right to counsel, and that the encryption on the hard drive had not been broken. (R.853-854). Diehl's counsel told

the district court that the password for the hard drive very long and complicated written password that had not been memorized and was seized by the landlord when Diehl was arrested. (R.874).

One legitimate reason for the government's continued retention of property seized from a defendant after the conclusion of a criminal prosecution is that the property constitutes contraband or that the defendant did not possess the property lawfully. *See United States v. Dean*, 100 F.3d 19, 20 (5th Cir. 1996); *United States v. Rodriquez-Aguirre*, 264 F.3d 1195, 1212 (10th Cir. 2001). This Court defines contraband as "two types: contraband *per se* and derivative contraband." *Cooper v. City of Greenwood*, 904 F.2d 302, 304 (5th Cir. 1990); *see Rodriguez-Aguirre*, 264 F.3d at 1213 n.13 (same).

Contraband *per se* is objects which are "intrinsically illegal in character…the possession of which, without more, constitutes a crime." *Cooper*, 904 F.2d at 305 quoting *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 699-700 (1965). Indeed, "[c]ourts will not entertain a claim contesting the confiscation of contraband *per se* because one cannot have a property right in that which is not subject to legal possession." *Id.*; *see United States v. Jeffers*, 342 U.S. 48 (1951), overruled on other grounds by *Rakas v. Illinois*, 439 U.S. 128 (1978). Child pornography is a classic example of contraband *per se*. *See* 18 U.S.C. § 2252A(a)(5)(B).

At best, Diehl can only contend a dispute exists as to whether a preponderance of the evidence demonstrates that the encrypted hard drive contains child

pornography. The following facts support this conclusion: 1) Diehl conceded he created and produced child pornographic videos, Courtney saw child pornography on Diehl's computer and the encrypted drive on which it was maintained with very tight security protocols, 2) Diehl destroyed his collection when threatened with investigation and, since at least that time, scrupulously employed security protocols and encryption on his computer, 3) Diehl built the computer himself and the machine contained *two* hard drives, one of which was *not* encrypted, 4) Jenkins said Diehl always moved with his computers and 5), Diehl sent his computer to Jenkins after his arrest.

Similarly, the encrypted drive is so inextricably entwined with the equipment in which it is housed, that the equipment itself must be considered contraband *per se*. Indeed, without the rest of his computer, the encrypted hard drive could not function, and Diehl could never have uploaded or downloaded pornographic material onto or off of the Internet. Courtney's testimony that Diehl said he had other series on his hard drive that he did not create, and the undisputed fact that the "tent" and "cbaby" series were found on hard drives and the internet around the world, was compelling proof that Diehl the computer in its entirety was used to effectuate his crime.

Section 2252(a) also clearly authorizes the forfeiture of Diehl's computer equipment because it was used in the commission of his crimes; the only question is whether the lack of notice in this case rose to the level of plain error. *See Cooper*, 904 F.2d at 305. For one final reason, the Government asserts it did not—Diehl

53

relinquished his possessory rights to the electronic equipment when he had his computer and the two hard drives mailed from Florida to Jenkins in Texas. In other words, Diehl is no longer "the rightful owner" of the property and cannot now seek its return. *See Cooper*, 904 F.2d at 304. Under such circumstances, Diehl cannot demonstrate that the district court's forfeiture affected his substantial rights because he has no right to the property.

For all the same reasons, allowing Diehl to recover the fruits of his self-admitted criminal labors and the instrumentalities with which he broadcast that illegality to the world would work, not prevent, a manifest injustice. Thus, while conceding that the district court's error in forfeiting Diehl's property was plain and obvious, the Government asserts that the decision to do so did not seriously affect the fairness, integrity, or public reputation of judicial proceedings. It thus asks this Court to affirm the district court's forfeiture order.

## CONCLUSION

For the foregoing reasons, the convictions and sentence of Appellant David Andrew Diehl, and the district court's forfeiture order, should be affirmed.

Respectfully submitted,

RICHARD L. DURBIN
Attorney for the United States,
Acting Under The Authority of
28 U.S.C. § 515

By:     /s/ Mara Asya Blatt
MARA ASYA BLATT
Assistant United States Attorney
Texas Bar No. 02473050

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2014, I filed this document with the Fifth Circuit of Appeals using the CM/ECF filing system, which will cause a copy of this document to be delivered to Appellant *pro se*.

/s/ Mara Asya Blatt
MARA ASYA BLATT
Assistant United States Attorney
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7090/ FAX (210) 384-7031

## **CERTIFICATE OF COMPLIANCE**

Pursuant to FED. R. APP. P. 32(a)(7) and 5TH CIR. R. 32.2, the undersigned certifies

this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7):

1.    EXCLUSIVE OF THE PORTIONS OF THE BRIEF EXCEPTED BY FED.
      R. APP. P. 32(a)(7)(B)(iii), THE BRIEF CONTAINS:

      A.    **13,716 words**,

OR

      B.    _____ lines of text in monospaced typeface.

2. THE BRIEF HAS BEEN PREPARED:

      A.    in proportionally spaced typeface using: **Microsoft Word 2010 in
            Garamond 14 pt.**

OR

      B.    in monospaced (nonproportionally spaced) typeface using: Typeface
            name    and    number    of    characters    per    inch:
            _____.

3.    THE    UNDERSIGNED    UNDERSTANDS    A    MATERIAL
MISREPRESENTATION    COMPLETING    THIS    CERTIFICATE,    OR
CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN FED. R. APP. P.
32(a)(7) MAY RESULT IN THE COURT'S STRIKING THE BRIEF AND
IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.

      _/s/ Mara Asya Blatt_____
      MARA ASYA BLATT
      Assistant United States Attorney

56

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

March 25, 2014

Ms. Mara Asya Blatt
U.S. Attorney's Office
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216-5512

        No. 11-51076    USA v. David Diehl
                        USDC No. 1:10-CR-297-1

Dear Ms. Blatt,

We filed your brief.  However, it must be corrected within 14 days.

You need to correct or add:

Title on the brief does not agree with the title of the case in compliance with FED R. APP. P. 32(a)(2)(C).  (See attachment)

Record References:  Every assertion in briefs regarding matter in the record must be supported by a reference to the page number of the original record, whether in paper or electronic form, where the matter is found, using the record citation form as directed by the Clerk of Court.  (See 5TH CIR. R. 28.2.2)

Once you have prepared your sufficient brief, you must email it to: renee_mcdonough@ca5.uscourts.gov for review.  If the brief is in compliance, you will receive a notice of docket activity advising you that the sufficient brief has been filed.

                        Sincerely,

                        LYLE W. CAYCE, Clerk

                        By: _____
                        Renee S. McDonough, Deputy Clerk
                        504-310-7673

cc:
    Mr. David Andrew Diehl
    Mr. Joseph H. Gay Jr.

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

DAVID ANDREW DIEHL, also known as David A. Diehl,

Defendant - Appellant